## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| OUTMEMPHIS; JANE DOE 1; JANE DOE 2; JANE DOE 3; and JANE DOE 4, | |
| Plaintiffs, | Civil Action No. 2:23-CV-2670 |
| v. | |
| BILL LEE, in his official capacity as Governor of Tennessee; JONATHAN SKRMETTI, in his official capacity as the Attorney General and Reporter of Tennessee; DAVID RAUSCH, in his official capacity as Director of the Tennessee Bureau of Investigation; and FRANK STRADA, in his official capacity as Commissioner of the Tennessee Department of Correction, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Defendants. | |

Alexis Agathocleous* (NY Bar 4227062)
Alexis Alvarez* (NY Bar 5854278)
Jon W. Davidson* ** (CA Bar 89301)
Rachel Meeropol* (NY Bar 4100954)
American Civil Liberties Union
125 Broad St., New York, NY 10004
Phone: (929) 585-0061
RMeeropol@aclu.org

Stella Yarbrough (BPR No. 033637)
Jeff Preptit (BPR No. 038451)
Lucas Cameron-Vaughn (BPR No. 036284)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
NASHVILLE, TN 37212
Phone: (615) 320-7142
JPreptit@aclu-tn.org

Lynly S. Egyes* (NY Bar 4838025)
Milo Inglehart* (NY Bar 5817937)
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: (510) 587-9696 Ext. 353
Milo@transgenderlawcenter.org

Dale Melchert* (NY Bar 5366554)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696 Ext. 354
Dale@transgenderlawcenter.org

*Pro Hac Vice application forthcoming
**Admitted only in California

## Table of Contents

PRELIMINARY STATEMENT ................................................................ 1

JURISDICTION AND VENUE .............................................................. 4

PARTIES ................................................................................................. 4

   I.     Plaintiffs ....................................................................................... 4

   II.    Defendants ................................................................................... 6

FACTUAL ALLEGATIONS ................................................................. 7

   I.     The Contemporary Science of HIV ......................................... 8

      A.   How HIV Operates ..............................................................8

      B.   Antiretroviral Treatment of HIV and How it Eliminates the Risk of HIV Transmission .............................................................................11

      C.   How the Use of Mitigation Eliminates the Risk of HIV Transmission: Condoms, Pre-Exposure Prophylaxis (PrEP), and Post-Exposure Prophylaxis (PEP) ..........13

      D.   The Risk of HIV Transmission Without Any Use of Mitigation ..........................15

   II.    History of HIV/AIDS and Tennessee's Aggravated Prostitution Law .................. 18

   III.   Relevant Statutes ...................................................................... 22

      A.   Prostitution ..........................................................................22

      B.   Aggravated Prostitution ......................................................23

      C.   Patronizing Prostitution ......................................................24

      D.   The Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act ("TN-SORA") ...........................................25

   IV.   Tennessee is An Outlier in Requiring Sex Offender Registration for this Type of Offense ...................................................................................... 40

   V.    Tennessee's Enforcement of Aggravated Prostitution Undermines Public Health Without Protecting Public Safety .......................................... 44

      A.   HIV Criminalization Laws Such as Aggravated Prostitution Undermine Public Health ..............................................................................44

      B.   Requiring People Convicted of Aggravated Prostitution to Register as Sex Offenders Does Not Improve Public Safety ........................................50

      C.   How Aggravated Prostitution is Enforced in Tennessee ...................................53

   VI.   Impact of Aggravated Prostitution and TN-SORA on Plaintiffs..........................57

      A.   OUTMemphis .....................................................................60

      B.   Jane Doe 1 ...........................................................................64

**C.**   **Jane Doe 2** ..................................................................................68

**D.**   **Jane Doe 3** ..................................................................................70

**E.**   **Jane Doe 4** ..................................................................................73

**VII.**   **Infectious Diseases that Are Comparable to HIV** ................................. 76

**A.**   **Prevalence of HIV in Tennessee** ........................................................77

**B.**   **Hepatitis B** ...................................................................................77

**C.**   **Genital Herpes** ..............................................................................80

**D.**   **Human Papillomavirus (HPV)** ...........................................................83

**CLAIMS FOR RELIEF** ................................................................................. 85

**COUNT I: Aggravated Prostitution ADA Claim** .............................................85

**COUNT II: Aggravated Prostitution Equal Protection Claim** ............................87

**COUNT III: Aggravated Prostitution Substantive Due Process Claim** .................88

**COUNT IV: Registry ADA Claim** .............................................................89

**COUNT V: Registry Equal Protection Claim** ...............................................90

**COUNT VI: Registry Substantive Due Process Claim** ....................................92

**COUNT VII: Registry Eighth Amendment Claim** ..........................................93

**COUNT VIII: Registry Ex Post Facto Claim** ...............................................94

**PRAYER FOR RELIEF** ...............................................................................95

**APPENDIX A** .......................................................................................... 98

## PRELIMINARY STATEMENT

1.      In Tennessee, an individual who is convicted under the generic Prostitution statute—which prohibits engaging in, or offering to engage in, sexual activity for compensation—faces a small fine and minimal jail time. While this is by no means inconsequential, Tennessee has also chosen to criminalize what it calls "Aggravated Prostitution." Aggravated Prostitution is identical to Prostitution, with one key additional element: knowledge that one is living with HIV.

2.      Unlike Prostitution, which is a misdemeanor, Aggravated Prostitution is a *felony* that requires *lifetime* registration as a "violent sex offender" pursuant to the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act of 2004 ("TN-SORA"). This drastic difference in treatment turns solely on HIV status and is so unmoored from medical facts as to punish sexual encounters that pose *no* risk of HIV transmission.

3.      While Aggravated Prostitution and its related registration requirements completely fail to protect public health, the laws immeasurably harm those they target. Jane Does 1–4[1] are transgender and cisgender women living with HIV, who were convicted of Aggravated Prostitution and must register as "sexual offenders" or "violent sexual offenders" for the rest of their lives under TN-SORA. They are joined as Plaintiffs in this matter by OUTMemphis, a non-profit organization that provides the LGBTQ+ community, including people convicted of Aggravated Prostitution or at risk of being charged with Aggravated Prostitution, with support

---

[1] Individual Plaintiffs intend to file a Motion to Proceed Under Pseudonyms as soon as is practicable, pending undersigned counsel's opportunity to meet and confer with Defendants' counsel as required by Local Rule 7.2(a)(1)(B).

1

with housing, employment, healthcare, and other needs. Together, Plaintiffs sue to end Tennessee's irrational, discriminatory, and cruel and unusual treatment of people living with HIV.

4.     HIV has long been recognized as a disability under the Americans with Disabilities Act of 1990 ("ADA").[2] The ADA prohibits discrimination by state government entities by reason of a person's disability. Defendants are *explicitly* violating this guarantee by subjecting people living with HIV who are convicted of engaging in sex work to dramatically increased criminal liability and lifetime registration as "violent" sex offenders—solely by virtue of their disability. This discrimination is imposed without any case-by-case, individualized assessment of any threat to public health. The Aggravated Prostitution law does not specifically target sexual behavior that can transmit HIV. Nor does it account for the fact that either partner to a sexual interaction can mitigate or entirely eliminate the risk of transmission of HIV. Given the *actual* science of HIV, Jane Does 1–4 and others convicted of Aggravated Prostitution need not and did not pose a threat to anyone's health or safety.

5.     As Congress recognized in passing the ADA, "society tend[s] to isolate and segregate individuals with disabilities."[3] For this reason, the very purpose of the ADA is to address ongoing discrimination against individuals with disabilities in critical areas like employment and housing.[4] Subjecting people to lifetime sex offender registration because of their HIV status directly frustrates these goals. Under TN-SORA, Plaintiffs are effectively barred from many employment opportunities, housing options, and public spaces as well as family and

---

[2] *Bragdon v. Abbott*, 524 U.S. 624 (1998).
[3] Americans With Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101(a)(2).
[4] *Id.* § (a)(3).

community life: they are, for example, forbidden from working, living, or even spending short amounts of time within 1,000 feet of a school, playground, park, or other area where children gather. For Jane Does 1–4, who live in large cities like Memphis, finding work and housing outside these vast and ever-changing registry "Exclusion Zones" is nearly impossible.

6.     The restrictions are particularly disruptive of family relationships, even though such relationships are critical to successful community reintegration and are known to reduce recidivism. Jane Does 1–4 cannot be alone with their nieces, nephews, or grandchildren, and are forbidden, for example, from watching their grandchildren perform in a school play or sporting event. This is so even though their convictions have nothing to do with the abuse of children.

7.     Along with being unlawful, Tennessee's criminalization of disability status is counterproductive as a means of addressing HIV. The scientific consensus is that HIV-criminalization laws do not reduce the prevalence of HIV. Rather, by criminalizing knowledge of one's HIV status, Tennessee disincentivizes at-risk individuals from seeking testing and erodes the trust in medical professionals that is needed to successfully access treatment and limit transmission.

8.     There are many other chronic and manageable infectious conditions prevalent in Tennessee, but none are subject to such draconian and counterproductive punishment. That individuals living with HIV are treated so differently can only be understood as a remnant of the profoundly prejudiced early response to the AIDS epidemic, and the continuing marginalization of the Black cisgender and transgender women who have borne the brunt of the Aggravated Prostitution and related registry requirements. Indeed, in 2022, a Black woman in Tennessee was 290 times more likely to be on the sex offender registry for an HIV-related conviction than a white man.

9.     While many states across the country have reformed their discriminatory and scientifically unsound HIV-specific criminal laws in recent years, Tennessee has continuously *increased* the penalties for Aggravated Prostitution through amendments to its registry scheme retroactively applied to Plaintiffs. Today, Tennessee's Aggravated Prostitution statute is the only law in the nation that treats people living with HIV who engage in *any* sex work, even risk-free encounters, as "violent sex offenders" subjected to lifetime registration.

10.     Counterproductive and harmful, Aggravated Prostitution and its related requirements under TN-SORA violate the ADA, equal protection, substantive due process, the Eighth Amendment, and the prohibition against ex post facto laws, and must be struck down.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for violations of rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution; article I, section 10 of the United States Constitution; and the ADA.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States, and under 28 U.S.C. § 1343(a), which gives district courts jurisdiction over actions to secure civil rights extended by the United States Government.

13.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

### I.     Plaintiffs

14.     Plaintiff OUTMemphis is a 501(c)(3) nonprofit organization based in Memphis, Tennessee that is dedicated to serving lesbian, gay, bisexual, transgender, and queer (LGBTQ+)

4

people in the Mid-South. OUTMemphis's mission is to empower, connect, educate, and advocate for the LGBTQ+ community of the Mid-South.

15.     OUTMemphis serves individuals with Aggravated Prostitution convictions, or at risk of an Aggravated Prostitution conviction, as well as individuals impacted by the Tennessee Sex Offender Registry ("the Registry") due to such convictions. OUTMemphis diverts resources from other urgent work to counsel people living with HIV about the impact of these laws and to assist those on the Registry because of such convictions in finding housing and employment consistent with registry requirements.

16.     OUTMemphis's mission is frustrated, and its work is made more difficult, by the registry Exclusion Zones and the stigma and harassment experienced by its constituents who are living with HIV, which is due in part to Defendants' maintenance and enforcement of laws criminalizing their HIV status.

17.     Plaintiffs Jane Does 1–4 are all individuals who have been convicted of Aggravated Prostitution, Tenn. Code Ann. (T.C.A.) § 39-13-516, on at least one occasion. Each Plaintiff has been deeply impacted by Tennessee's requirement that they register for life as a "sex offender" or "violent sex offender" solely because of one or more Aggravated Prostitution convictions. The online availability of Jane Doe 1's HIV status and personal information has led to her being harassed by a neighbor and extorted. Jane Doe 2 has been struggling for years to get out of a bad living situation but cannot find a home that complies with the Registry Exclusion Zones. Jane Doe 3 has eight grandchildren she adores, but she cannot watch them graduate or take them to a park. Jane Doe 4 is currently incarcerated for a registry violation and has found complying with the registry requirements so onerous that she decided not to seek parole, despite being eligible.

5

## II.     Defendants

18.     Defendant Bill Lee is the Governor of the State of Tennessee. The Governor's office is located at 600 Dr. Martin Luther King Jr. Blvd., Nashville, TN 37219. The Tennessee Constitution vests supreme executive power of the state in the governor. Tenn. Const. art. III § 1. It further provides that the governor shall take care that applicable federal and state laws are faithfully executed. Tenn. Const. art. III § 10. As executive, Governor Lee is responsible for the enforcement of laws in the state, including Aggravated Prostitution, T.C.A. § 39-13-516, and TN-SORA, T.C.A. § 40-39-201 (2023) *et seq.*, and for the administration of all state departments, including the Tennessee Bureau of Investigation and the Tennessee Department of Correction. Defendant Lee is sued in his official capacity.

19.     Defendant Jonathan Skrmetti is the Attorney General and Reporter of the State of Tennessee. The Attorney General/Reporter is headquartered at 500 Dr. Martin Luther King Jr. Blvd., Nashville, TN 37219, and has additional offices throughout Tennessee. Under T.C.A. § 8-6-109(b)(9) (2023), Defendant Skrmetti has the duty to "defend the constitutionality and validity of all legislation of statewide applicability." Defendant Skrmetti is sued in his official capacity.

20.     Defendant David Rausch is Director of the Tennessee Bureau of Investigation ("TBI"). The TBI is the primary agency of the State of Tennessee tasked with the enforcement of TN-SORA. The TBI is headquartered at 901 R.S. Gass Blvd., Nashville, TN 37216, and has additional field offices across Tennessee. The TBI is responsible for maintaining and publishing a centralized record system of those convicted of sexual offenses including Aggravated Prostitution, T.C.A. § 40-39-204(a); designing, printing, and distributing forms relating to registration under TN-SORA, T.C.A. § 40-39-205(a); keeping offenders informed of the registration, verification, tracking requirement, and sanctions under TN-SORA, T.C.A. § 40-39-

6

205(f); notifying law enforcement when an offender is not in compliance with TN-SORA,

T.C.A. § 40-39-206(b); determining whether offenses committed in a jurisdiction outside

Tennessee require a person to register, *see* T.C.A. § 40-39-202(1) (2023); determining whether a

registrant is a "sexual offender" or "violent sexual offender" and therefore the length of their

registry requirement, *see* T.C.A. §§ 40-39-202 (19), (20), (30); and processing offender requests

to be removed from the Registry, *see* T.C.A. § 40-39-207(a)(1) (2023). Defendant Rausch

oversees and directs the functions and operations of the TBI, including the duties delegated to the

TBI under T.C.A. § 40-39-201, *et seq*. Defendant Rausch is sued in his official capacity.

21.     Defendant Frank Strada is the Commissioner of the Tennessee Department of

Correction ("TDOC"). The TDOC is the primary state agency responsible for the enforcement of

sentences for those convicted of felonies and sexual offenses, including those convicted of

Aggravated Prostitution. The TDOC is headquartered at 320 6th Avenue North, Nashville, TN

37243. Under T.C.A. § 40-39-302(a), the TDOC is granted the authority to "establish a serious

offender and violent sexual offender monitoring program and to promulgate guidelines

governing it." T.C.A. § 40-39-302(b)(1) also requires that the TDOC "develop [and] implement[]

guidelines for the continuous satellite-based monitoring of serious offenders and violent sexual

offenders." Defendant Strada oversees and directs the functions and operations of the TDOC,

including the duties delegated to the TDOC under T.C.A. § 40-39-302. Defendant Strada is sued

in his official capacity.

## FACTUAL ALLEGATIONS

22.     Since its enactment, the Aggravated Prostitution statute has singled out people

living with HIV who engage in sex work or solicitation of sex work for particularly harsh

punishment in a manner that cannot be justified in light of irrefutable facts about HIV.

7

23.     Indeed, the intent and purpose underlying the Aggravated Prostitution statute; its maintenance, administration, and ongoing enforcement; and its sentencing and sex offender registry consequences are based on outdated misconceptions and harmful falsehoods about HIV that find no support in current scientific knowledge. Transmission of HIV can now be effectively prevented by either party to a sexual encounter, and even unprotected encounters pose very little risk of transmission. Huge advances in treatment of HIV and the profound effect of such treatment on preventing viral transmission and on the health and life expectancy of people living with HIV render it comparable to other infectious diseases prevalent in Tennessee. Yet only people living with HIV are criminalized and forced to register as "violent" sex offenders.

I.     **The Contemporary Science of HIV**

   A.  **How HIV Operates**

24.     HIV is a virus that attacks the body's immune system.[5]

25.     The initial stage of HIV infection, during which the virus breeches the skin or mucous membranes and gains a foothold in the body over a period of days to weeks, is known as the acute stage of infection.[6]

26.     This acute stage can frequently pass without being diagnosed as HIV, as its symptoms—which may include fever, fatigue, body aches, headaches, swollen lymph glands, and sore throat—are commonplace and not unique to HIV.

27.     Acute HIV infection can last anywhere from a few days to several weeks.[7]

---

[5] *See About HIV*, Centers for Disease Control and Prevention, https://www.cdc.gov/hiv/basics/whatishiv.html (last reviewed June 30, 2022).
[6] *Id.*
[7] *Id.*

28.     After the acute stage of infection, a person enters a period of clinical latency.[8] During this period of clinical latency, which can last for a decade or longer, an individual living with HIV most often does not display any symptoms or experience any negative health outcomes.[9] A series of mild symptoms and signs can steadily progress after 1 to 5 years of asymptomatic clinical latency. These symptoms and signs include fatigue, low-grade fever, weight loss, anxiety, decreased appetite, loose stools, mental fogginess, dandruff, itchy bumps, fungal infections, yeast infections, dry mouth, and canker sores. Most of these conditions are readily treatable and at least temporarily curable with medications.

29.     If HIV goes untreated, it will almost always lead to the final stage of this infection or AIDS (Acquired Immuno-Deficiency Syndrome). Without HIV treatment, people who develop AIDS typically survive about one to three years.[10]

30.     HIV infection is a disability under the ADA because it impairs the immune, hemic, and lymphatic systems of the human body and substantially limits the major life activity of, among other things, fighting life-threatening infections by impeding the normal operation of and functioning of the body's immune system.[11]

31.     There has been a radical transformation in the treatment of HIV since Tennessee adopted the Aggravated Prostitution statute in 1991. Once invariably fatal within eight to ten years, HIV is now a chronic, treatable condition, similar to diabetes, hypertension, chronic Hepatitis B infection, or herpes simplex infection. Those diagnosed in a timely manner and

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] U.S. Dep't of Just. – Civ. Rts. Div.: Disability Rts., *Questions and Answers: The Americans with Disabilities Act and Persons with HIV/AIDS*, Archive ADA, https://archive.ada.gov/hiv/ada_qa_hiv.htm (last updated Feb. 25, 2020).

9

promptly provided with appropriate care and treatment with antiretroviral medications experience few, if any, noticeable effects on their physical health and enjoy a life expectancy approaching that of those who do not have HIV.[12]

32.    Except in rare cases—5 or 6 to date—HIV cannot currently be cured. However, treatment with antiretroviral medication prevents transmission of HIV infection as well as preventing progression to AIDS, the life-threatening stage of the disease.[13]

33.    When untreated, HIV can be transmitted in three ways: a) percutaneous contact (through the skin, as with a needle stick injury) with blood carrying HIV; b) sexual intercourse; and c) perinatal transmission from mother to fetus during pregnancy or from mother to child during delivery or breastfeeding.[14]

34.    As explained in Section I.B., below, a daily pill is all it takes to achieve viral suppression of HIV, which renders people living with HIV medically incapable of transmitting HIV. And individuals who are not virally suppressed can still effectively prevent HIV transmission through forms of mitigation described in Section I.C., *infra*, or through engaging in sex acts that pose no risk of transmission, *see* Section I.D., *infra*.

---

[12] *See* Julia L. Marcus et al., *Comparison of Overall and Comorbidity-Free Life Expectancy Between Insured Adults With and Without HIV Infection, 2000-2016*, 3 JAMA Network Open, at 8 (June 15, 2020), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2767138.
[13] *See infra* Section I.C.
[14] *See* Ass'n of Prosecuting Att'ys et al., *Routes, Risks, and Realities of Infections Disease Transmission, Prevention, & Care: Information & Resources for NYC Prosecutors & Law Enforcement Professionals (2022)*, The Center for HIV Law and Policy, at 1, https://www.hivlawandpolicy.org/sites/default/files/Routes%2C%20Risks%2C%20and%20Reali ties%20of%20Infectious%20Disease%20Transmission%2C%20Prevention%2C%20%26%20Ca re%20Information%20%26%20Resources%20for%20NYC%20Prosecutors%20%26%20Law% 20Enforcement%20Professionals%2C%20CHLP%20et%20al%20%282022%29%29.pdf (last visited Oct. 3, 2023) [hereinafter *Routes, Risks, and Realities*].

35.     However, public understanding of HIV's transmissibility remains quite flawed. For example, it is a common misperception that a single act of unprotected sex with a person living with HIV will result in HIV transmission. In fact, the overall per act probability of HIV transmission through sexual activity is very low, even when that sexual activity involves a partner with HIV who is not receiving treatment, and even where no mitigation (described below) is used.

**B. Antiretroviral Treatment of HIV and How it Eliminates the Risk of HIV Transmission**

36.     Major medical advances in the treatment of people living with HIV have dramatically altered the landscape of HIV transmission in recent years.

37.     At almost any point during infection with HIV, including after developing AIDS, initiation and continuous treatment with antiretroviral therapy ("ART") will halt and reverse the decline in immune cell number and function, restore the person to good health, and prevent the development or progression of AIDS.[15]

38.     With consistent adherence to ART, the amount of HIV in a person's blood, known as their viral load, drops dramatically and their critical immune system cells increase to healthy levels. Within weeks to months, the person's HIV will become "virally suppressed," defined as less than 200 copies of the virus per milliliter of blood, and shortly after that, many will have an "undetectable" viral load, meaning that a laboratory test cannot detect any HIV in the sample being tested.[16]

---

[15] *See HIV Treatment Overview*, HIV, https://www.hiv.gov/hiv-basics/staying-in-hiv-care/hiv-treatment/hiv-treatment-overview/ (last updated June 7, 2022).
[16] *Id.*

39.     People living with HIV who are virally suppressed or have an undetectable viral load are incapable of transmitting HIV through sexual contact.[17]

40.     As of 2021, 66% of persons living with HIV in the United States and receiving medical care were virally suppressed.[18] This means that they pose no risk of transmitting HIV to their sexual partners.

41.     In most cases, adherence to an effective ART regimen simply requires taking one or two pills each day.[19]

42.     The time and effort required for such HIV treatment is similar to that expended by individuals who are prescribed daily medication for elevated cholesterol or who take a multivitamin.

43.     A person who discontinues ART, or whose access to ART is interrupted, will not immediately suffer negative health outcomes. It often takes several weeks for an individual's viral load to reach a level that would be considered "unsuppressed."[20] If the lapse in treatment continues, the individual's viral load will continue to increase to a level similar to where it was

---

[17] *Evidence of HIV Treatment and Viral Suppression in Preventing the Sexual Transmission of HIV*, Centers for Disease Control and Prevention, https://www.cdc.gov/hiv/risk/art/evidence-of-hiv-treatment.html (last reviewed June 2, 2022); *see also National Gay Men's HIV/AIDS Awareness Day*, Centers for Disease Control and Prevention, https://www.cdc.gov/nchhstp/dear_colleague/2017/dcl-092717-National-Gay-Mens-HIV-AIDS-Awareness-Day.html (last reviewed October 11, 2017) ("[a]cross three different studies, including thousands of couples and many thousands of acts of sex without a condom or pre-exposure prophylaxis (PrEP), no HIV transmissions to an HIV-negative partner were observed when the HIV-positive person was virally suppressed.").
[18] *See Viral Suppression and Barriers to Care*, Centers for Disease Control and Prevention, https://www.cdc.gov/hiv/statistics/overview/in-us/viral-suppression.html (last reviewed June 23, 2023).
[19] *See* David Malebranche M.D., MPH et al., *HIV Medications: What You Need to Know*, TheBody, https://www.thebody.com/health/hiv-medications (last updated Sept. 30, 2023).
[20] *See* Jonathan Z. Li et al., *Time to Viral Rebound After Interruption of Modern Antiretroviral Therapies*, 74 Clinical Infectious Diseases 865, 866–69 (2022).

prior to the initiation of ART. Few, if any, clinical symptoms will appear for several months to years, as the person enters a period of clinical latency, which can be reversed by restarting ART. The time to any appearance (or reappearance) of symptoms depends on the person's current level of immunodeficiency; the lower the person's CD4+ T cell count, the shorter the time to the appearance (or reappearance) of clinical symptoms.[21]

### C. How the Use of Mitigation Eliminates the Risk of HIV Transmission: Condoms, Pre-Exposure Prophylaxis (PrEP), and Post-Exposure Prophylaxis (PEP)

44.      Sexual partners can also effectively eliminate the risk of HIV transmission by using condoms. And individuals who are not living with HIV can additionally protect themselves from contracting HIV through Pre-Exposure Prophylaxis and Post-Exposure Prophylaxis— medical breakthroughs that are described below.

45.      Using a latex condom is highly effective in preventing HIV transmission.[22] Laboratory studies have demonstrated that latex condoms provide an essentially impermeable barrier to particles the size of HIV.[23] The ability of latex condoms to prevent transmission of HIV has also been established in "real-life" studies of sexually active couples.[24]

---

[21] *Id.*; *see also* Antonella Castagna et al., *Analytical treatment interruption in chronic HIV-1 infection: time and magnitude of viral rebound in adults with 10 years of undetectable viral load and low HIV-DNA (APACHE study)*, 74 J. Antimicrobial Chemotherapy 2039, 2041–45 (2019); Felipe García et al., *The virological and immunological consequences of structured treatment interruptions in chronic HIV-1 infection*, 15 AIDS F29, F32–39 (2001); Daniel J. Skiest et al., *Interruption of antiretroviral treatment in HIV-infected patients with preserved immune function is associated with a low rate of clinical progression: a prospective study by AIDS Clinical Trials Group 5170*, 195 J. Infectious Diseases 1426, 1428–35 (2007).

[22] *Condoms*, Centers for Disease Control and Prevention, https://www.cdc.gov/hiv/risk/condoms.html (last reviewed Feb. 15, 2022).

[23] Department of Health and Human Services, *Condoms and STDs: Fact Sheet for Public Health Personnel*, Centers for Disease Control and Prevention, at 3, https://www.cdc.gov/condomeffectiveness/docs/Condoms_and_STDS.pdf (last visited Oct. 3, 2023).

[24] *Id.* at 2.

13

46.     Individuals who are HIV-negative can also effectively block acquisition of HIV by taking antiretroviral medications regularly. This treatment is known as "pre-exposure prophylaxis" or "PrEP."[25]

47.     In 2012, Truvada, a daily tablet containing two commonly prescribed HIV medications, became the first medication approved by the U.S. Food and Drug Administration (FDA) for PrEP. It is one of three medications currently FDA-approved for use as PrEP for the purpose of preventing HIV acquisition. The other two medications are Descovy (another daily, two-medication tablet) and Apretude (a single medication injected once every two months).[26]

48.     PrEP may also be used "on demand" by taking two pills between two to 24 hours before sex, one pill 24 hours after the sexual encounter, and one pill 24 hours after the second dose. This "2-1-1" schedule prevents HIV transmission.[27]

49.     PrEP is also now available in injectable form and is administered as an intramuscular injection every two months to prevent HIV acquisition.[28]

---

[25] *See Pre-Exposure Prophylaxis (PrEP)*, HIVinfo, https://hivinfo.nih.gov/understanding-hiv/fact-sheets/pre-exposure-prophylaxis-prep (last reviewed Aug. 10, 2021).
[26] *Id.*
[27] *On-Demand PrEP*, Centers for Disease Control and Prevention, https://www.cdc.gov/hiv/basics/prep/on-demand-prep.html (last reviewed June 1, 2022) (these findings are currently only definitive with respect to cisgender men who have sex with cisgender men because clinical trials of "on-demand" PrEP have thus far only focused on this community).
[28] *What Is Injectable HIV PrEP?*, Centers for Disease Control and Prevention (Aug. 2022), https://www.cdc.gov/stophivtogether/library/topics/prevention/brochures/cdc-lsht-prevention-brochure-clinicians-quick-guide-what-is-injectable-hiv-prep.pdf.

50.     As the understanding of the value of PrEP has increased in the medical community, more and more doctors are prescribing PrEP to persons who are at higher risk for HIV acquisition.[29]

51.     Individuals who are HIV-negative can also prevent acquisition of HIV by use of post-exposure prophylaxis (PEP). PEP is a course of antiretroviral medication taken within 72 hours of a potential HIV exposure that can prevent transmission of the virus.[30]

**D.  The Risk of HIV Transmission Without Any Use of Mitigation**

52.     Even without any of the mitigation techniques described above (condoms, PrEP, or PEP), many sexual acts carry a zero to very low risk of HIV transmission, and even the "riskiest" encounters will not result in transmission of HIV more than 98% of the time.

**i.   Oral sex**

53.     The risk of HIV transmission through oral sex is extremely low to zero, whether or not mitigation is used.[31]

54.     Fellatio is the only type of oral sex that carries a more than theoretical risk of HIV transmission, and only for the partner performing fellatio on someone who is HIV-positive when there is ejaculation.[32] As a result, the risk of HIV transmission when performing fellatio on a

---

[29] *See* Rona M. Vail, *PrEP to Prevent HIV and Promote Sexual Health*, New York State Dep't of Health AIDS Inst., https://www.hivguidelines.org/wp-content/uploads/2022/10/NYSDOH-AI-PrEP-to-Prevent-HIV-and-Promote-Sexual-Health_9-27-2023_HG.pdf (last updated May 20, 2022).

[30] *See Post-Exposure Prophylaxis*, HIV, https://www.hiv.gov/hiv-basics/hiv-prevention/using-hiv-medication-to-reduce-risk/post-exposure-prophylaxis/ (last updated Apr. 17, 2023); *see also About PEP*, Centers for Disease Control and Prevention, https://www.cdc.gov/hiv/basics/pep/about-pep.html (last reviewed July 12, 2022).

[31] *Routes, Risks, and Realities*, *supra* note 14, at 2.

[32] *See id.*

person with HIV who is not on ART, without a condom or use of PrEP, has been estimated as being between 0.00 and 0.04%, or between 0 and 1 transmissions in 2,500 exposures.[33]

55.     There are no documented cases of HIV transmission from any other forms of oral sex.[34]

56.     Factors that contribute to the theoretical risk of transmission from oral sex include sores, bleeding gums, oral contact with menstrual blood, and the presence of other sexually transmitted diseases (STDs).[35]

### ii.     Vaginal intercourse

57.     HIV can also be transmitted through vaginal intercourse.

58.     The risk of HIV transmission to a receptive partner who is not on PrEP through condomless vaginal intercourse with ejaculation with a partner with HIV who is not on ART is approximately 0.08%, or 1 transmission in 1,250 exposures.[36]

59.     The risk of HIV transmission to an insertive partner who is not on PrEP through unprotected vaginal intercourse with a receptive partner with HIV who is not on ART is approximately 0.04%, or 1 transmission in 2,500 exposures.[37]

### iii.     Anal Intercourse

60.     Among sexual activities that can transmit HIV, condomless receptive anal intercourse with ejaculation presents the highest risk, but still poses a less than 1.5% chance of

---

[33] *Id.*

[34] *Id.*

[35] Nat'l Ctr. for HIV, Viral Hepatitis, STD, and TB Prevention – Div. of HIV/AIDS Prevention, *Oral Sex and HIV Risk*, Centers for Disease Control and Prevention (May 2016), https://www.cdc.gov/hiv/pdf/risk/cdc-hiv-oral-sex-fact-sheet.pdf.

[36] *Id.*

[37] *Id.*

transmission.[38] A 2010 meta-analytic study exploring the risk of HIV transmission to a receptive partner who is not on PrEP through condomless anal intercourse with an insertive partner living with HIV who is not on ART estimated the risk to be 1.4%. This translates to an average of one transmission for every 71 exposures.[39]

61.   The risk of HIV transmission to an insertive partner who is not on PrEP through condomless anal intercourse with a receptive partner with HIV who is not on ART is approximately 0.11% (or one transmission in 909 exposures) for circumcised men and 0.62% (or one transmission in 161 exposures) for uncircumcised men.[40]

62.   The following table[41] summarizes the maximum estimated risk of HIV transmission from a single exposure to HIV:

---

[38] *See Ways HIV Can Be Transmitted*, Centers for Disease Control and Prevention, https://www.cdc.gov/hiv/basics/hiv-transmission/ways-people-get-hiv.html (last reviewed Mar. 4, 2022); James Wilton, *Putting a Number on It: The Risk from an Exposure to HIV*, Stanford Health Care, https://stanfordhealthcare.org/medical-conditions/sexual-and-reproductive-health/hiv-aids/causes/risk-of-exposure.html (last visited Oct. 3, 2023).
[39] Wilton, *supra* note 38.
[40] *Id.*
[41] This table was created by Plaintiffs using data cited above.

17



63.    As explained *infra* in Sections II & III, Tennessee's HIV criminalization scheme takes none of this science into account. Instead, it criminalizes sexual acts that present a zero to 1.4% chance of transmitting HIV, by individuals who may be medically incapable of transmitting HIV, with individuals with easy access to methods that can effectively foreclose any possibility of acquiring HIV.

**II.    History of HIV/AIDS and Tennessee's Aggravated Prostitution Law**

64.    HIV first came to public consciousness in the early 1980s.

65.    Tennessee's Aggravated Prostitution law is a product of the early responses to the HIV/AIDS epidemic, which were marked by fear, panic, and drastically exaggerated and distorted misconceptions about HIV.

66.    Initially described as "gay cancer" and "gay-related immune deficiency," HIV was closely associated with men who have sex with men and other marginalized groups,

including sex workers and Black immigrants. In the early 1980s, the news media referred to HIV as "the 4H disease," blaming the epidemic on "Haitians, Homosexuals, Hemophiliacs, and Heroin users."[42]

67.     In 1987, an LA Times poll found that 42% of Americans believed that civil liberties should be suspended to fight HIV.[43]

68.     At the time, individuals living with HIV experienced particularly acute rates of housing, employment, insurance, health care, and other public accommodations discrimination, along with stigma and harassment.

69.     During these early years of the HIV/AIDS epidemic, public understanding of transmission was deeply flawed. For example, in 1985, a CBS poll reported that half of those interviewed incorrectly thought that AIDS could be contracted by sharing a glass, a third incorrectly thought it transmissible through kissing, and 28% incorrectly believed it could be passed through toilet seats.[44]

70.     During the early years of the HIV/AIDS epidemic, public health officials predicted that sex workers living with HIV would be significant drivers of the epidemic. This fear was not and has not been backed by any scientific evidence.[45]

---

[42] Linda G. Marc et al., *HIV among Haitian-born persons in the United States, 1985–2007*, 24 AIDS 2089, 2090 (2010).
[43] Robert Steinbrook, *The Times Poll: 42% Would Limit Civil Rights in AIDS Battle*, L.A. Times (Jul. 31, 1987), https://www.latimes.com/archives/la-xpm-1987-07-31-mn-217-story.html.
[44] Trevor Hoppe, PUNISHING DISEASE: HIV AND THE CRIMINALIZATION OF SICKNESS 141–42 (2017).
[45] *Id.* at 110.

71.     Despite the lack of evidence that sex work contributed significantly to HIV transmission, the possibility of transmission through sex work was a particular focus of law enforcement in the early years of the epidemic.

72.     For example, Denver police lobbied for a felony HIV-sex work law in Colorado, claiming that sex workers living with HIV were dying of AIDS and passing the infection to their clients, despite having no evidence of a single case of transmission. Police spokespersons told the Denver Post that 75% of male sex workers and 50% of female sex workers were living with HIV. Those statistics were made up. Scientific studies at the time found that less than 7% of female sex workers in American urban areas were living with HIV, and the director of Colorado's HIV control program reported that only 1% of sex workers tested by order of the police were living with HIV.[46]

73.     The first state HIV criminalization laws were passed in 1986. By 2011, 67 such laws had been enacted in 33 states. 85% of these laws were enacted by 2000. Many of these laws criminalized behavior that posed little or no risk of HIV transmission and failed to account for HIV prevention measures that reduce or eliminate transmission risk, like condom use, ART, or PrEP.[47]

74.     In 1990, the Ryan White Act required states to certify that their criminal laws "were adequate to prosecute individuals infected with HIV who intentionally or knowingly infect

---

[46] *Id.* at 114–15.
[47] J. Stan Lehman et al., *Prevalence and public health implications of state laws that criminalize potential HIV exposure in the United States*, 18 AIDS and Behav. 997, 997 (2014).

or expose others to HIV" to receive federal AIDS relief grants for treatment and care.[48] This requirement was rescinded in 2000.

75.     Tennessee's Aggravated Prostitution law was enacted in 1991, during this period of panic and prejudice, when HIV and AIDS were far less understood than they are today, before the widespread availability of ART that prevents HIV from developing into AIDS and thus dramatically reduced deaths, as well as preventing transmission, and before PrEP was available to allow HIV-negative people to prevent acquisition of HIV.

76.     The Aggravated Prostitution bill was introduced in both the Tennessee House and Senate in April of 1991, with sponsors stating that the purpose of the bill was to target people who were aware they had HIV and knowingly continued to engage in sex work.

77.     When the bill was heard before the House Committee on Calendar and Rules, and on the House floor, elected officials justified its need based on vague references to a "problem down in Memphis," and "the growing problem of HIV."[49] No testimony was presented regarding the likelihood or prevalence of transmission of HIV through sex work or the potential public health implications of the proposed law.

78.     The Aggravated Prostitution statute passed in both the Senate and House and was codified on April 29, 1991, as a Class C felony. In 1995, when Tennessee adopted a sex offender registry, it became a registerable offense. In 2010, it was re-classified as a "violent sexual offense" requiring lifetime registration.

---

[48] Ryan White Comprehensive AIDS Resources Emergency Act of 1990, (Ryan White CARE Act) 42 U.S.C. § 300ff–47 (1990) (repealed 2000).
[49] 97 CONG. REC. H–66. (Tenn. Apr. 22, 1991) (statement of Rep. Tim Joyce, Member, Gen. Assembly).

III.     **Relevant Statutes**

79.     Four statutes are particularly relevant to the claims brought in this matter: Prostitution, Aggravated Prostitution, Patronizing Prostitution, and the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act.

A.   **Prostitution**

80.     Prostitution is a crime in Tennessee. T.C.A. § 39-13-513 (2023) (the "Prostitution statute").

81.     Tennessee law defines prostitution as "engaging in, or offering to engage in, sexual activity as a business or being an inmate in a house of prostitution or loitering in a public place for the purpose of being hired to engage in sexual activity." T.C.A. § 39-13-512(6) (2023).

82.     For purposes of the Prostitution statute, Tennessee law defines "sexual activity" to mean "any sexual relations including homosexual sexual relations." *Id.* § 39-13-512(7).

83.     The Prostitution statute includes no further elements.

84.     Prostitution is a Class B misdemeanor and carries a sentence of no more than six months incarceration or a fine not to exceed $500, or both. T.C.A. § 39-13-513; T.C.A. § 40-35-111(e)(2).

85.     Prostitution committed within 100 feet of a church or within one and one-half miles of a school is a Class A misdemeanor. T.C.A. § 39-13-513(b)(2).

86.     Class A misdemeanors carry a sentence of no more than 11 months and 29 days of incarceration or a fine not to exceed $2,500, or both. T.C.A. § 40-35-111(e)(1). A person convicted of Prostitution within one and one-half miles of a school must be sentenced to at least seven days of incarceration and be fined at least $1,000. T.C.A. § 39-13-513(b)(3).

22

87.     Prostitution is not a "sexual offense" under Tennessee law and, as is true in every other state in the country, no number of Prostitution convictions requires registration as a sex offender.

**B. Aggravated Prostitution**

88.     As explained *supra*, Tennessee's criminal code also includes a statute that criminalizes "Aggravated Prostitution." T.C.A. § 39-13-516.

89.     A person commits Aggravated Prostitution when, "knowing that such person is infected with HIV, the person engages in sexual activity as a business or is an inmate in a house of prostitution or loiters in a public place for the purpose of being hired to engage in sexual activity." *Id.*

90.     The elements of the Aggravated Prostitution statute are entirely encompassed by the Prostitution statute, with one additional element: knowledge that one is HIV-positive.

91.     A person with HIV who is unaware of that fact cannot be convicted under the Aggravated Prostitution statute.

92.     The Aggravated Prostitution statute does not require proof of actual transmission of HIV or intent to transmit HIV. *Id.* § 39-13-516(c).

93.     The Aggravated Prostitution statute does not provide for any inquiry into the underlying facts and circumstances in an individual case. For instance, the statute does not allow for consideration of the alleged sexual activity at issue; the degree of the risk of HIV transmission involved (if any); whether preventative measures such as a condom, PrEP, or PEP were used; the client's HIV status; whether the accused individual has a suppressed viral load; nor whether their HIV status has been disclosed.

94.     A person with HIV can be convicted of Aggravated Prostitution for offering or agreeing to engage in sexual activity in exchange for compensation without actually engaging in that activity, or for engaging in, offering, or agreeing to sexual activity that carries no risk of HIV transmission.

95.     HIV is the only medical condition that can result in a conviction under the Aggravated Prostitution statute.

96.     Aggravated Prostitution is a Class C felony and carries a determinate sentence of three to fifteen years of incarceration, along with a potential fine, to be assessed by the jury, of up to $10,000. *Id.* § 39-13-516; T.C.A. § 40-35-111(a), (b)(3).

97.     Thus, an Aggravated Prostitution conviction can result in a sentence that is between six and 30 times the duration of the *maximum* sentence available for a Prostitution conviction.

98.     As described in detail *infra*, Tennessee has classified Aggravated Prostitution as a registerable sex offense; indeed, since 2010, it has been considered a "violent sexual offense" that requires lifetime registration as a sex offender.

**C. Patronizing Prostitution**

99.     Patronizing prostitution is also a crime in Tennessee. T.C.A. § 39-13-514 (the "Patronizing Prostitution statute").

100.    The Patronizing Prostitution statute prohibits "soliciting or hiring another person with the intent that the other person engage in prostitution, or entering or remaining in a house of prostitution for the purpose of engaging in sexual activity." T.C.A. § 39-13-512(3).

24

101.    Patronizing Prostitution is a Class A misdemeanor.[50] A person convicted of

Patronizing Prostitution within one and one-half miles of a school must be sentenced to at least

seven days of incarceration and a fine of not less than $1,000. T.C.A. § 39-13-514(b)(2).

102.    Patronizing Prostitution is not a "sexual offense" under Tennessee law and, unless

a minor is involved, no number of Patronizing Prostitution convictions requires registration as a

sex offender. T.C.A. § 40-39-202(a)(xix).

103.    Tennessee has no law criminalizing Patronizing Prostitution while knowing one is

living with HIV.

### D.  The Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act ("TN-SORA")

104.    Prior to 1995, individuals in Tennessee convicted of sexual offenses faced formal

consequences that were mostly identical to those borne by individuals convicted of similarly

serious non-sexual offenses.

105.    In 1994, however, the Tennessee General Assembly adopted legislation, the

Sexual Offender Registration and Monitoring Act of 1994, requiring the TBI to "establish,

maintain, and update a centralized record system of sexual offender registration and verification

information."[51]

106.    Tennessee's Sexual Offender Registry went into effect on January 1, 1995, T.C.A.

§ 40-39-101 (1995) *et seq.*, and has been amended on numerous occasions since then.

107.    As the U.S. District Court for the Middle District of Tennessee has recently

explained, "Tennessee's sexual offender registration system progressed from a relatively simple

---

[50] *See supra* ¶ 86 (describing Class A misdemeanor).
[51] 1994 Tenn. Pub. Acts, ch. 976 § 7(a), 978–79 ("TN-SORA").

system, dedicated to information gathering and tracking, into a far-reaching structure for regulating the conduct and lifestyles of registered sexual offenders after their punishments were complete and, in many cases, for the rest of their lives."[52]

### i.    Purpose of TN-SORA

108.    The Legislature describes TN-SORA as necessary to address the "extreme threat to the public safety" posed by "[r]epeat sexual offenders, sexual offenders who use physical violence and sexual offenders who prey on children" who "pose a high risk of engaging in further offenses after release from incarceration." T.C.A § 40-39-201(b)(1).

109.    According to the Legislature, providing information to the public about "concerning persons convicted of sexual offenses" allows the public to "adequately protect themselves and their children" and "further[s] the governmental interests of public safety and public scrutiny of the criminal and mental health systems that deal with these offenders." *Id.* § 40-39-201(b)(2).

### ii.    Offenses Requiring Registration under TN-SORA

110.    Tennessee divides offenses requiring registration as a sex offender into two categories: "sexual offenses" and "violent sexual offenses."

111.    "Sexual offenses" include: Sexual Battery; Statutory Rape; Sexual Exploitation of a Minor; False Imprisonment where the victim is a minor; Kidnapping where the victim is a minor; Indecent Exposure; Solicitation of a Minor; Spousal Sexual Battery; Aggravated Statutory Rape; Soliciting Sexual Exploitation of a Minor; Promotion of Prostitution; Patronizing Prostitution where the victim is a minor; Observation without Consent; Unlawful Photographing;

---

[52] *Does #1-9 v. Lee*, No. 3:21-CV-00590, 2023 WL 2335639, at *3 (M.D. Tenn. Mar. 2, 2023).

Sexual Contact with Inmates; Sexual Abuse of a Corpse; and **Aggravated Prostitution when the conviction occurred before July 1, 2010**. T.C.A. § 40-39-202(20).

112.    Registrants convicted of these sexual offenses may file a request for termination of registration requirements ten years after discharge from incarceration without supervision, provided they have successfully completed a term of judicial diversion or have not been convicted of any additional "sexual offense" or "violent sexual offense" during the ten-year period and have substantially complied with the registry requirements. T.C.A. § 40-39-207(a).

113.    "Violent sexual offenses" include: Aggravated Rape; Rape; Aggravated Sexual Battery; Rape of a Child; Attempt to Commit Rape; Aggravated Sexual Exploitation of a Minor; Especially Aggravated Sexual Exploitation of a Minor; Aggravated Kidnapping where the victim is a minor; Especially Aggravated Kidnapping where the victim is a minor; Sexual Battery by an Authority Figure; Solicitation of a Minor; Spousal Rape; Aggravated Spousal Rape; Statutory Rape by an Authority Figure; Incest; Aggravated Rape of a Child; Trafficking for a Commercial Sex Act; Promotion of Prostitution after a previous conviction of the same offense; Continuous Sexual Abuse of a Child; and **Aggravated Prostitution when the conviction occurred after July 1, 2010**. T.C.A. 40-39-202(31).[53]

114.    Registrants convicted of these "violent sexual offenses," including Aggravated Prostitution committed after July 1, 2010, must comply with TN-SORA's registration, verification, and tracking requirements for the rest of their lives. T.C.A. § 40-39-207(g)(2).

---

[53] Until July 1, 2023, a person convicted of Criminal Exposure to HIV under § 39-13-109(a)(1) was also required to register as a sex offender; however, the Tennessee legislature recently eliminated that requirement and provided that individuals convicted of Criminal Exposure to HIV "may file a request for termination of registration requirements with TBI headquarters in Nashville." 2023 Tenn. Pub. Acts, ch. 459.

115.    As explained above, Aggravated Prostitution was initially classified as a sexual offense requiring ten years of registration, after which individuals could petition for removal from the registry. Sexual Offender Registration and Monitoring Act, T.C.A § 40-39-102 (1995). However, in 2010, the legislature passed SB 2724 to make Aggravated Prostitution a "violent sexual offense."[54] In the House Judiciary Committee, Representative Maggart stated[55] that this change was necessary to maintain compliance with the federal Sex Offender Registration and Notification Act ("SORNA").[56]

116.    However, Representative Maggart was mistaken for two reasons. First, while the federal government has sought to incentivize states to adopt sex offender registration laws with certain features ("SORNA-congruent registries"), the federal government cannot compel states to do so. Indeed, a large majority of states have chosen to reject SORNA-congruence and have instead developed their own forms of registries. Second, while Tennessee has chosen to adopt a SORNA-congruent registry, the U.S. Department of Justice Office of Justice Programs, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking ("SMART") reviewed the State of Tennessee's implementation of SORNA in September 2011, and explicitly stated that Aggravated Prostitution did not require registration in order for Tennessee's registry to be SORNA-congruent.[57] Thus, Tennessee did not need to classify Aggravated Prostitution as a "violent sexual offense" in order to have a SORNA-congruent registry.[58]

---

[54] 2010 Tenn. Pub. Acts, ch. 1138 § (5)(x), 967.
[55] *Hearing on H.B. 2788 Before the H. Comm. on the Judiciary*, 106th Cong. (Tenn. 2010) (statement of Rep. Debra Maggart, Member, Gen. Assembly).
[56] Sex Offender Registration and Notification Act, 34 U.S.C. § 20901 (2006).
[57] *SORNA Substantial Implementation Review State of Tennessee*, SMART: Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (Sept. 2011), at 15, https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/tennessee.pdf.
[58] *Id.*

117.    Tennessee never corrected this mistake, and Aggravated Prostitution registrants convicted after 2010 are still required to register as "violent sexual offenders" for the rest of their lives.

118.    Tennessee's requirement that individuals convicted of Aggravated Prostitution register as sexual offenders is not based on any individualized assessment of actual HIV transmission, risk of transmission of HIV, intent to transmit HIV, or the likelihood of re-offending. Instead, it is based solely on the conviction itself and the person's HIV status.

119.    Aggravated Prostitution is the only offense requiring sex offender registration in Tennessee that turns on a criminal defendant's health or disability status.

### iii.    Obligations and Restrictions Imposed by TN-SORA

120.    TN-SORA imposes extensive and onerous requirements and obligations upon individuals who are required to register as sex offenders, affecting almost every aspect of a registrant's life, including housing, employment, family relationships, access to identification documents, and ability to move freely in one's community.

### a.    Registration and Reporting Requirements

121.    A person required to register as a sex offender by TN-SORA must complete and sign a TBI registration form under penalty of perjury within 48 hours prior to release from a state, federal, or private penal facility. T.C.A. § 40-39-203(b)(1) (2023).

122.    TBI registration forms require disclosure, under penalty of perjury, of name, aliases, pseudonyms, ethnic or tribal names; date and place of birth; social security number; a photocopy of a valid driver license or government-issued identification card; address and telephone number of the registrant's probation or parole officer; date of "sexual offenses" or "violent sexual offenses" for which the registrant has been convicted, along with the date of the

29

act and the county and state of each adjudication; name, address, and phone number of current

employers and length of employment; current physical address and length of residence at that

address; mailing address; any vehicle, mobile home, trailer, or manufactured home used or

owned by the registrant, including descriptions, vehicle information numbers, and license tag

numbers; any vessel, live-aboard vessel, or houseboat used by the registrant, including the name

of the vessel, description, and all identifying numbers; name and address of each institution of

higher education in this state where the registrant is employed or practices a vocation or is a

student; race and gender; name, address, and phone number of registrant's closest living relative;

whether "victims of the offender's convictions are minors or adults, the number of victims, and

the correct age of the victim or victims and of the offender at the time of the offense or offenses,

if the ages are known"; verification by the TBI or the registrant that the TBI has received the

registrant's DNA sample; a complete listing of the registrant's email address information,

including usernames, any social media accounts the registrant uses or intends to use, instant

message, other internet communication platforms or devices, and the registrant's username,

screen name, or other method by which the offender accesses these accounts or websites;

whether any minors reside in the primary or secondary residence of the registrant; any other

registration, verification, and tracking information, including fingerprints and a current

photograph of the registrant and their vehicles and vessels; copies of all of the registrant's

passports and immigration documents; and professional licensing information that authorizes the

registrant to engage in an occupation or carry out a trade or business. *Id.* § 40-39-203(i).

123.    TN-SORA provides that much of this information, including the registrant's

photograph, address, and employer, "shall be considered public information" and must be made

available to the public through a web page. T.C.A. § 40-39-206(d).

30

124.     Within 48 hours of release from a state, federal, or private penal institution, registrants must report in person to their registering agency. T.C.A. § 40-39-203(b)(2).

125.     Registrants must also "register" with or "report in person" to their registering agency within 48 hours of establishing or changing a primary or secondary residence, "establishing physical presence at a particular location," becoming employed, practicing a vocation, becoming a student, and being released from incarceration on probation or any alternative to incarceration. *Id.* § 40-39-203(a)(1).

126.     Registrants who intend to move out of Tennessee must register or report their new address within 48 hours after moving or "becoming reasonably certain of the intention to move to another state." *Id.* § 40-39-203(a)(3).

127.     Registrants must report changes to "any other information given to the registering agency by the offender" within 48 hours of such a change. *Id.* § 40-39-203(a)(4).

128.     Registrants must report any "material change in employment or vocational status" within 48 hours of such a change. *Id.* § 40-39-203(a)(6).

129.     Registrants must report any changes in email address and any instant message, chat, or other internet communication name that they use or intend to use within three days of such a change. *Id.* § 40-39-203(a)(7).

130.     There are no "good cause" exceptions to the reporting requirements or to the 48-hour notification requirements. Regardless of illness, injury, transportation problems, or other emergencies, registrants must report changes, sometimes in person, within 48 hours or face criminal charges.

131.     Unhoused registrants must report to their registering agency on a monthly basis. *Id.* § 40-39-203(f).

31

132.    Registrants convicted of a "violent sexual offense" must report in person during the months of March, June, September, and December of each calendar year to their designated law enforcement agency, on a date established by that agency, to update the registrant's fingerprints, palm prints, and photograph, as determined necessary by the agency, and to verify the continued accuracy of the information in the TBI registration form. T.C.A. § 40-39-204(b)(1).

133.    Registrants must report to a designated law enforcement agency at least 21 days before traveling out of the country; registrants who travel out of the country frequently for work or other legitimate purpose, with the written approval of the designated law enforcement agency, and registrants who travel out of the country for emergency situations, must report to the designated law enforcement agency at least 24 hours before such travel. *Id.* § 40-39-204(h).

134.    Registrants who move to another state must adhere to the complex requirements for reregistering in their new state of residence, subject to that state's laws.

135.    Registrants are also subject to myriad reporting requirements if they, for example, move to another county within Tennessee, obtain employment out of state, matriculate in an out-of-state school, or leave Tennessee for more than seven days.[59]

### b.  Fees

136.    Registrants who are financially able must pay administrative costs to the appropriate registering agency, including $100 towards the costs for the administration of TN-SORA and the investigation of sexual offenses, as well $50 in fees, each year they are on the

---

[59] Tenn. Bureau of Investigation, *Offender Relocations*, Tenn. State Gov't, https://www.tn.gov/content/dam/tn/tbi/documents/18_Offender_Relocations.pdf (last revised Nov. 30, 2015).

registry.[60] T.C.A. §§ 40-39-201(7), 40-39-204(b)(1). Registrants who are not able to pay must request a waiver and show proof of income.

### c. Community Notification and Inclusion on Internet Registry

137.     The TBI places extensive information about registrants on Tennessee's Sex Offender Registry, available to and searchable by anyone with internet access.[61]

138.      A simple search for a registrant's name combined with "Tennessee" on a search engine such as Google will identify that person as a registered sex offender.

139.     As seen in the sample image below created by Plaintiffs based on the actual information available online, the Sex Offender Registry classifies the registrant as "violent" and includes the registrant's name, date of birth, convictions, primary and secondary addresses, race, gender, date of last verification of information, photograph, driver license number, parole or probation officer, the name and address of any institution of higher education at which the registrant is employed or attends as a student, height, weight, color of eyes and hair, tattoos, scars and marks, the registrant's criminal history, the registrant's employment address, and the license plate number and a description of all the registrant's vehicles. T.C.A. § 40-39-206(d).

---

[60] *See also infra* ¶ 143 (describing community notification fees).
[61] *See Tennessee Sex Offender Registry*, Tenn. Bureau of Investigation, https://sor.tbi.tn.gov/home (last visited Sept. 13, 2023).



Sex Offender Registry

Tennessee Sex Offender Registry

ALERTS   PRINT   TIPS/BAD INFO   MAP

SAMPLE, JOANNA
OFFENDER ID: 12345678

## CLASSIFICATION/STATUS

CLASSIFICATION
VIOLENT

STATUS
ACTIVE

## OFFENSES

| DATE OF OFFENSE | DESCRIPTION | TCA CODE |
| --- | --- | --- |
| 01/01/2023 | AGGRAVATED PROSTITUTION, IF CONVICTION AFTER 7/1/2010 | 39-13-516(A) |

## ADDRESSES

PRIMARY: 901 R.S. Gass Blvd, Nashville, TN 37216
EMPLOYER: 600 Dr. M.L.K. Jr Blvd, Nashville, TN 37243

## VEHICLES

2015 GREEN ISUZU RODEO (MID-SIZE 4 DOOR)
TAG: ABCDEF, TN

## CRIMINAL HISTORY

| DATE | CHARGE | DISPOSITION |
| --- | --- | --- |
| 2020-01-01 | VIOLATION OF SEX OFFENDER REGISTRY | GUILTY PLEA – AS CHARGED |

## DEMOGRAPHICS

| | |
| --- | --- |
| HAIR<br>BLACK | EYES<br>BROWN |
| GENDER<br>FEMALE | RACE<br>BLACK |
| HEIGHT<br>511 | WEIGHT<br>150 |
| DOB<br>01/01/1970 | DRIVER'S LICENSE<br>123456789,TN |
| SCARS/MARKS<br>SCAR, LEFT ARM. TATTOO, RIGHT SHOULDER | |

## OTHER

LAST REGISTRATION
DATE: 04/09/2023(4
months ago)
LAST DATE
INFORMATION UPDATED
05/16/2023(3 months ago)
REGISTERING AGENCY:
MEMPHIS PD
PAROLE OFFICER
LAST, FIRST

34

140.     In addition, the TBI provides all registrant information to the U.S. Attorney
General for inclusion in the National Sex Offender Registry; other "appropriate law enforcement
agencies;" each school and public housing agency in each area in which the registrant resides, is
an employee, establishes a physical presence, or is a student; any agency responsible for
conducting employment-related background checks; social service entities in the child welfare
system; volunteer organizations in which contact with "minors or other vulnerable individuals
might occur"; and "[a]ny organization, company or individual who requests such notifications
pursuant to procedures established by TBI." T.C.A. § 40-39-214(a) (2023).

141.     The legislative body of any county, metropolitan form of government, or
municipality may establish a community notification system to notify residences, schools, and
child-care facilities about where a registrant resides or intends to reside. T.C.A. § 40-39-
217(a)(1) (2023).

142.     Such community notification systems may include using community notification
flyers delivered to all residents within a specified area, posting a copy of the notice at the
sheriff's office or police station closest to the registrant's residence, publicizing the notice in a
local newspaper, notifying homeowners associations within the immediate area of the
registrant's residence, or "any other method reasonably expected to provide notification." *Id.* §
40-39-217(b).

143.     Registrants can be charged an annual fee of $50, on top of other required fees, for
the purpose of defraying the costs of notification. *Id.* § 40-39-217(a)(2).

**d.  Restrictions on a Registrant's Residency and Movements**

144.     Registrants may not knowingly establish a primary or secondary residence or any
other living accommodation within 1,000 feet from the property line of any public, private, or

parochial school; licensed day care center; childcare facility; public park; playground, recreation center; or public athletic field. T.C.A. § 40-39-211(a)(1).

145.    Registrants may not knowingly reside "within 1,000 feet of the property line on which their former victims or the victims' immediate family members reside" or come within 100 feet of any of their "former victims." *Id.* § 40-39-211(b).

146.    For the individual Plaintiffs and other registrants convicted of Aggravated Prostitution, these former "victims" are presumably the individuals who engaged in Patronizing Prostitution.

147.    Three or more registrants may not establish a primary or secondary residence together or inhabit the same residence at the same time. Nor may any person, corporation, or other entity who owns that residence knowingly permit three or more registrants to do so. *Id.* § 40-39-211(h)(1)(A), 2(A).

148.    Registrants may not "be or remain upon" the grounds of a school, licensed day care center, other childcare facility, public park, playground, recreation center, or public athletic field when they have reason to believe children under 18 years of age are present. *Id.* § 40-39-211(d)(1)(A).

149.    Registrants may not stand, sit idly, or remain within 1,000 feet of the property line of any building owned or operated by any school, licensed day care center, other child care facility, public park, playground, recreation center, or public athletic field, nor any conveyance owned, leased, or contracted by any of these entities when children under 18 years of age are present, while not having a reason or relationship involving custody of or responsibility for a child or any other specific or legitimate reason for being there. *Id.* § 40-39-211(d)(1)(B), (C).

36

150.    Public library boards have the authority to "reasonably restrict" registrants' access to public libraries. T.C.A. § 40-39-216(a). A public library board may impose a total ban after considering the likelihood of children being present in the library, the age of the victim in the registrant's criminal case, and the chilling effect of the use of the library by the patrons if the registrant is not restricted. *Id*. § 40-39-216(b), (c).

151.    A registrant who enters a public library in contravention of any restrictions imposed may be prosecuted for criminal trespass. *Id*. § 40-30-216(e).

### e. Restrictions Related to Children

152.    Registrants may not "be alone with a minor or minors in a private area," defined generally as "any real or personal property, regardless of ownership, where the conduct of the offender is not readily observable by anyone but the minor or minors alone with the offender." T.C.A. § 40-39-211(k)(1)(B), (2). Exceptions exist for the offender's own child if certain criteria are met. *Id.* § 40-39-211(c), (k)(2). There are no exceptions for grandchildren, nieces and nephews, other extended family members, or one's children's friends.

153.    All restrictions related to children apply to all registrants, irrespective of whether their underlying criminal cases only involved adults.

### f. Employment Restrictions

154.    Registrants may not knowingly accept employment within 1,000 feet of the property line of any school, licensed day care center, childcare facility, public park, playground, recreation center, or public athletic field. *Id.* § 40-39-211(a)(1).

### g. Name Change Restrictions

155.    Tennessee prohibits persons convicted of any offense requiring sex offender registration from legally changing their name, except in the case of lawful marriage, marital dissolution, or adoption. T.C.A. § 29-8-101(b)(1)(B) (2023).

### h. Identification Requirement

156.    Registrants must obtain a valid driver's license or government-issued photo identification card. T.C.A. § 40-39-213(a) (2013).

157.    A registrant's Tennessee-issued driver's license or government-issued ID identifies that individual as a sexual offender or violent sexual offender, as applicable, using a code ("88") that is known to law enforcement agents and can be looked up by the public online. T.C.A. § 55-50-353 (2023).

158.    The registrant is required to carry this driver's license or equivalent government-issued photo identification card whenever outside the home. T.C.A. § 40-39-213.

159.    A violation of this requirement is a Class E felony punishable by fine of no less than $250.[62] *Id.* § 40-39-213(b).

### iv. Violations of TN-SORA Requirements

160.    Knowingly violating any part of TN-SORA is a criminal offense. T.C.A. § 40-39-208(a).

161.    Violations of TN-SORA include, but are not limited to, failing to register or report in a timely fashion, falsifying a TBI registration form, failing to timely disclose required information to a designated law enforcement agency, failing to sign a TBI registration form,

---

[62] *See also infra* Section III.D.iv.

failing to pay annual costs if financially able, and conviction of a new "sexual offense" or "violent sexual offense." *Id*.

162.    A violation of any provision of TN-SORA constitutes a Class E felony. *Id.* § 40-39-208(b).

163.    A first violation of any provision of TN-SORA is punishable by a fine of at least $350 and imprisonment for at least 90 days, *id.* § 40-39-208(c), and up to six years, *id.* § 40-35-112.

164.    A second violation is punishable by a fine of at least $600 and imprisonment for at least 180 days, *id.* § 40-39-208(d), and up to six years, *id.* § 40-35-112.

165.    A third or subsequent violation is punishable by a fine of at least $1,100 and imprisonment of at least one year, *id*. § 40-39-208(e), and up to six years, *id*. § 40-35-112.

### v.    Removal from the Registry

166.    The only way for individuals with an Aggravated Prostitution conviction after July 1, 2010, or multiple Aggravated Prostitution convictions to potentially be removed from the registry is to successfully petition their sentencing court for removal from the registry based on their status as a victim of a human trafficking offense, a sexual offense, or domestic abuse, in accordance with the procedures outlined in T.C.A. § 40-39-218. T.C.A. § 40-39-218 went into effect on July 1, 2015.

167.    This is an adversarial process, and Plaintiffs are aware of only one such successful petition, which took six years and required representation by counsel.

168.    Individuals with only one Aggravated Prostitution conviction before July 1, 2010, and no other sexual offenses may petition for removal from the registry after ten years. TBI does

not inform individuals when they are eligible for removal and will accept registration and

payment for years after these individuals become eligible for removal.

### IV. Tennessee is An Outlier in Requiring Sex Offender Registration for this Type of Offense

169.    While numerous states have statutes that criminalize a person's HIV status,

Tennessee is the only state in the country that imposes sex offender registration requirements for

engaging in sex work while living with HIV.[63]

170.    Through its Aggravated Prostitution statute, Tennessee is also the only state in the

country that requires sex offender registration for engaging in sexual activity while living with

HIV without any finding of intent to transmit HIV or consideration of actual risk of transmission.

171.    Several other states criminalize exposing an individual to bodily fluids that could

transmit HIV, but only three other states—Washington, South Dakota, and Ohio—ever require

---

[63] Florida, Georgia, Kentucky, Missouri, Ohio, Oklahoma, Pennsylvania, South Carolina, and Utah are the only other states with sex-work specific HIV-related criminal statutes, none of which require sex offender registration. *See* Fla. Stat. Ann. § 796.08(5) (West 2023) (criminal transmission of HIV during prostitution is a third-degree felony); Ga. Code Ann. § 16-5-60(c)(2) (West 2023) (reckless conduct during solicitation by a person living with HIV is a felony); Ky. Rev. Stat. Ann. § 529.090(3) (West 2023) (prostitution by a person living with HIV is a Class D felony); Mo. Rev. Stat. § 567.020(2) (West 2023) (prostitution by a person living with HIV is a class B felony); Ohio Rev. Code Ann. § 2907.24(B) (West 2023) (solicitation after positive HIV test is a third-degree felony); Ohio Rev. Code Ann. § 2907.241(D)(2) (West 2023) (loitering to engage in solicitation after positive HIV test is a fifth-degree felony); Okla. Stat. Ann. tit. 21, § 1031(B) (West 2023) (prostitution with knowledge of HIV infection is a felony); 18 Pa. Stat. and Cons. Stat. § 5902(a.1)(4) (West 2023) (prostitution with knowledge of HIV infection is a third-degree felony); S.C. Code Ann. § 44-29-145(2) (2023) (prostitution with knowledge of HIV infection is a felony); Utah Code Ann. § 76-10-1309 (West 2023) (prostitution, patronizing prostitution, or sexual solicitation with knowledge of HIV infection is a third-degree felony).

lifetime sex offender registration for this crime, and only in much narrower circumstances than Tennessee's Aggravated Prostitution statute.[64]

172.    In 2010, the President's National HIV/AIDS Strategy urged states to "reconsider whether existing [HIV-specific criminal] laws continue to further the public interest and public health."[65] The United States Department of Justice's HIV Criminal Law Best Practices Guide further explains that "[a]n important component of curtailing the [HIV] epidemic is to 'ensure that laws and policies support our current understanding of best practices for preventing and treating HIV,' including re-considering whether the vast majority of HIV-specific criminal laws 'run counter to scientific evidence about routes of HIV transmission and may undermine the public health goals of promoting HIV screening and treatment.'"[66]

---

[64] See Wash. Rev. Code Ann. §§ 9A.36.011(1); 9.94A.507(1)(a)(ii) (West 2023) (requiring lifetime registration for assault in the first degree only when the defendant transmits HIV to a child or vulnerable adult with the intent to inflict great bodily harm and with sexual motivation); S.D. Codified Laws §§ 22-24B-1(20); 22-24B-2; 22-24B-2.1; 22-24B-19.2; 22-18-33 (2023) (requiring lifetime registration for criminal exposure to HIV but allowing affirmative defense if the exposed person knew of the defendant's HIV status and gave advance consent); Ohio Rev. Code Ann. §§ 2903.11(B); 2950.01(G)(1)(c) (West 2023) (requiring lifetime registration for felonious assault only if the defendant did not disclose their HIV status or if the exposed person was a child or vulnerable adult, and only if there was sexual motivation).
[65] White House Office of Nat'l AIDS Pol'y, *National HIV/AIDS Strategy for the United States,* The White House President Barack Obama (July 2010), at 37, https://obamawhitehouse.archives.gov/sites/default/files/uploads/NHAS.pdf.
[66] U.S. Dep't of Just. – Civ. Rts. Div, *Best Practices Guide to Reform HIV-Specific Criminal Laws to Align with Scientifically-Supported Factors*, U.S. Dep't of Just. (Jul. 15, 2014), at 2, https://www.justice.gov/sites/default/files/crt/legacy/2014/10/02/bpguide.pdf (quoting *National HIV/AIDS Strategy for the United States*, at 36–37).

173.    Since 2014, at least twelve states have modernized or repealed their HIV criminal laws.[67] Illinois repealed all its HIV-specific criminal laws in 2021.[68] New Jersey and Virginia similarly repealed their felony HIV-specific laws in 2021.[69]

174.    Some states have moved laws aiming to prevent HIV transmission from the criminal code to disease control regulations, whereas others have narrowed their criminal statutes to require intent to transmit or actual HIV transmission, or to provide affirmative defenses for individuals that take measures to prevent transmission, including condom use, viral suppression or being noninfectious, and partner PrEP use.[70]

175.    Iowa eliminated its previous requirement for sex offender registration for those convicted of criminal transmission of HIV in 2014 and simultaneously provided that the sex offender registration records of those previously so convicted be expunged and that their names be removed from the registry.[71]

176.    In 2020, Indiana limited its requirement that an individual living with HIV disclose their HIV status to sexual partners (which is a crime if not disclosed, pursuant to Ind. Code § 35-45-21-3), to only situations involving "high risk activity . . . that has been

---

[67] These states are California, Colorado, Georgia, Illinois, Iowa, Michigan, Missouri, Nevada, New Jersey, North Carolina, Virginia, and Washington.
[68] 2021 Ill. Laws, Pub. Act 102–168, § 30, 5368 (repealing 720 Ill. Comp. Stat. Ann. 5/12-5.01 (West 2019)).
[69] 2021 N.J. Laws, ch. 409, § 2 (repealing N.J. Rev. Stat. Ann. § 2C:34-5(b) (West 2021)); 2021 Va. Acts Spec. Sess. 1., ch. 465 (amending Va. Code Ann. § 18.2-67.4:1 (2019)) (permitting prosecution of any person diagnosed with a sexually transmitted infection only if they engage in sexual behavior that poses a substantial risk of transmission to another person with intent to transmit the infection and infects that person).
[70] *HIV and STD Criminalization Laws*, Centers for Disease Control and Prevention, https://www.cdc.gov/hiv/policies/law/states/exposure.html (last updated Mar. 3, 2023).
[71] 2014 Iowa Acts, ch.1119 §§ 7, 10, 353–54 (repealing former Iowa Code § 692A.102(1)(c)(23) (2013)).

42

epidemiologically demonstrated, as determined by the federal Centers for Disease Control and Prevention, to bear a significant risk of transmitting" the virus.[72]

177.    Washington extensively reformed its criminal laws relating to HIV in 2020, reducing the penalty for HIV exposure from a felony to a misdemeanor, requiring that specific intent to transmit and transmission be proven, affording affirmative defenses including disclosure of status and use of a condom or other practical means to prevent transmission, and removing the state's previous requirement for sex offender registration, except in very limited circumstances.[73]

178.    With respect to reforms to state laws imposing greater penalties on individuals convicted of sex work while knowing they are HIV-positive, Colorado repealed its law criminalizing prostitution with knowledge of having an AIDS diagnosis in 2016.[74] In 2017, California eliminated its felony penalty enhancement for engaging in commercial sexual activity while living with HIV.[75] In 2018, California vacated all prior convictions for violation of that law. In 2021, Nevada repealed its law that had made it a felony to engage in prostitution after testing positive for HIV.[76] In 2022, Georgia revised its law making it a felony to engage in prostitution while living with HIV by requiring proof of intent to transmit HIV, lack of disclosure of HIV status, and conduct that "has a significant risk of transmission based on current scientifically supported levels of transmission."[77]

---

[72] 2020 Ind. Acts, Pub. L. 112–2020 § 22, 847 (amending Ind. Code Ann. Code § 16-41-7-1 (West 2019)).
[73] 2020 Wash. Sess. Laws, ch. 76 § 5, 718.
[74] 2016 Colo. Sess. Laws, ch. 230 § 3, 914 (repealing Colo. Rev. Stat. Ann. § 18-7-201.7 (West 2015)).
[75] 2017 Cal. Stat., ch. 537, § 8, 4049 (repealing Cal. Penal Code § 647f (West 2016)).
[76] 2021 Nev. Stat., ch. 491 § 24 (2021), 3181 (repealing Nev. Rev. Stat. Ann. § 201.205 (West 2020)).
[77] 2022 Ga. Laws Act 845, § 2, 663–64 (amending Ga. Code Ann. § 16-5-60(c)(2) (West 2021)).

V.     **Tennessee's Enforcement of Aggravated Prostitution Undermines Public Health Without Protecting Public Safety**

   A.  **HIV Criminalization Laws Such as Aggravated Prostitution Undermine Public Health**

179.    The reforms described above are partially based on the proven fact that HIV criminalization does not reduce HIV transmission.

180.    Knowing one's HIV status is the best way to prevent transmission. However, for an individual who engages in sex work in Tennessee, even sex work without any substantial risk of HIV transmission, knowing one's HIV status makes one vulnerable to criminal prosecution. This legal vulnerability discourages testing, impeding effective HIV care and prevention.[78]

181.    According to U.S. government statistics, about 13% of people living with HIV do not know they are HIV-positive.[79]

182.    Persons who are unaware they are living with HIV have a significantly higher rate of transmission than people who are aware and are estimated to account for 38% of all new HIV transmissions.[80]

---

[78] Perry N. Halkitis & Marybec Griffin-Tomas, *HIV criminalization and the public's health: Policy considerations in the era of Treatment as Prevention (TasP) and Pre-Exposure Prophylaxis (PrEP)*, Am. Psychol. Ass'n (Mar. 2017), http://web.archive.org/web/20230320214406/https://www.apa.org/pi/aids/resources/exchange/2017/03/policy-considerations.

[79] *U.S. Statistics*, HIV, https://www.hiv.gov/hiv-basics/overview/data-and-trends/statistics/ (last updated Oct. 3, 2023).

[80] Zihao Li et al., *Vital Signs: HIV Transmission Along the Continuum of Care − United States, 2016*, 68 Morbidity and Mortality Wkly. Rep. 267, 269 (2019).

183.    This statistic becomes even more significant when focusing on HIV transmission through sex; according to one study, between 54 and 70% of all new sexually transmitted cases of HIV were attributable to sexual contact with someone who did not know their status.[81]

184.    Put differently, the individuals who pose the highest risk of transmitting HIV through sex are not criminalized while individuals who have learned of their HIV status, perhaps to ensure they do not put others at risk, are punished regardless of whether they expose anyone to any risk of HIV transmission.

185.    Along with being ineffective, HIV criminalization laws are also counterproductive. In addition to voluntary testing, the dominant and successful public health approach to HIV prevention is pre- and post-testing counseling and education about mitigation practices. Partner notification by health officials for individuals who test positive is an important part of this approach. These best practices depend on patient trust that public health officials will maintain their confidences.[82]

186.    Criminalization erodes this trust because it sometimes requires health practitioners to testify that an accused has knowledge of their HIV status. A national 2021 survey indicated that over a third of people living with HIV believe that public health professionals "care more about enforcing laws that criminalize HIV transmission than they do about my

---

[81] Hoppe, *supra* note 44, at 198; *See also* James S. Koopman et al., *The Role of Early HIV Infection in the Spread of HIV Through Populations*, 14 J. Acquired Immune Deficiency Syndromes and Hum. Retrovirology 249, 255 (1997).
[82] Leslie E. Wolf and Richard Vezina, *Crime and Punishment: Is There a Role for Criminal Law in HIV Prevention Policy?*, 25 Whitter L. Rev. 821, 833 (2004).

health." This belief was significantly more prevalent among people living in states with HIV-specific criminal laws.[83]

187.     Moreover, multiple studies have shown that laws like Tennessee's do not result in the desired effect on safer sex practices, like abstinence, decrease in sex partners, condom use, or HIV status disclosure.[84]

188.     Most survey respondents living with HIV indicated that HIV criminalization laws make it *more difficult* to disclose their status to sexual partners.[85]

189.     A 2002 national study of HIV exposure laws found no difference in the prevalence of HIV in states that have HIV-criminalizing laws versus states that do not.[86]

190.     A 2007 empirical study compared the behavior of 490 people at elevated risk for HIV, half of whom lived in a state with an HIV-specific criminal law and half in a state with no such law. Most people in both states believed it was wrong to expose others to HIV, with no difference in this moral assessment between those who lived in a state with an HIV criminal law and those who did not. Moreover, people who believed the law of their state required safer sex or disclosure reported being just as risky in their sexual behavior as those who did not.[87]

---

[83] *The National HIV Criminalization Survey, 2021*, Sero Project, at 25, https://www.seroproject.com/wp-content/uploads/2023/03/Sero-Project-National-HIV-Criminalization-Survey-Report-2021.pdf (last visited Oct. 3, 2023).
[84] Halkitis & Griffin-Tomas, *supra* note 78.
[85] *The National HIV Criminalization Survey, 2021*, *supra* note 83, at 26.
[86] Zita Lazzarini et al., *Evaluating the impact of criminal laws on HIV risk behavior*, 30 J. L., Med. & Ethics 239, 251 (2002).
[87] Scott Burris et al., *Do Criminal Laws Influence HIV Risk Behavior? An Empirical Trial*, 39 Ariz. State L.J. 467, 500–01 (2007).

191.    Similarly, a 2009 study among a broad sample of men who have sex with men found no difference in the rate of unprotected sex depending upon living in a state with an HIV-specific law or not.[88]

192.    A 2010 empirical study of individuals living with HIV in New Jersey, which at that time had an HIV law mandating disclosure prior to "sexual penetration," found that those who were aware of the law were no more likely than those who were unaware (or believed New Jersey had no such law) to be in compliance.[89] Awareness of the law also had no impact on individuals' belief that people living with HIV should bear more than half of the responsibility for preventing HIV transmission.

193.    Indeed, an exhaustive review of 25 empirical studies conducted between 1990 and 2014 found little evidence of protective benefits from HIV-specific criminal laws.[90] This body of evidence led the American Medical Association (AMA) to adopt an updated HIV policy in 2019 advocating for the repeal of legislation criminalizing non-disclosure of HIV status.

194.    Research indicates that laws like Tennessee's increase HIV-related stigma, which undermines voluntary testing and HIV disclosure. In states with HIV-specific criminal laws, the number of at-risk individuals who report they have been tested for HIV in the past 12 months

[88] K.J. Horvath et al., *Should it be illegal for HIV-positive persons to have unprotected sex without disclosure?: An examination of attitudes among US men who have sex with men and the impact of state law* 4–5 (Aug. 20, 2012) (unpublished manuscript) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3423319/pdf/nihms365169.pdf).
[89] Carol L. Galletly et al., *New Jersey's HIV Exposure Law and the HIV-Related Attitudes, Beliefs, and Sexual and Seropositive Status Disclosure Behaviors of Persons Living With HIV*, 102 Am. J. Pub. Health 2135, 2138–39 (2012).
[90] Dini Harsono et al., *Criminalization of HIV Exposure: A Review of Empirical Studies in the United States* 13–16 (Jan. 1, 2018) (unpublished manuscript) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5218970/pdf/nihms-815311.pdf).

negatively correlates with the number of media reports on the criminalization of HIV-exposing behavior.[91]

195.    The Joint United Nations Programme on HIV/AIDS ("UNAIDS") has explained that HIV-criminalizing laws "are counterproductive because they undermine, rather than support, efforts to prevent new HIV infections. They also breach human rights, including the rights to equality and non-discrimination."[92]

196.    The CDC has similarly explained that "most HIV criminalization laws do not reflect current scientific and medical evidence," and has recommended reform of those laws, explaining that "these laws have not increased disclosure and may discourage HIV testing, increase stigma against people with HIV, and exacerbate disparities."[93]

197.    Tennessee's registry requirements are also counterproductive to preventing transmission of HIV. The Exclusion Zones make finding compliant housing extremely difficult, leading to significant rates of homelessness. And people living with HIV who are unhoused have lower rates of viral suppression.[94]

198.    One study of people living with HIV in middle Tennessee found that unhoused patients were half as likely to achieve viral suppression as compared to those with stable housing

---

[91] Sun Goo Lee, *Criminal Law and HIV Testing: Empirical Analysis of How At-Risk Individuals Respond to the Law*, 14 Yale J. Health Pol'y, L., and Ethics 194, 236–37 (2014).
[92] *HIV Criminalization*, UNAIDS (2021), https://www.unaids.org/sites/default/files/media_asset/01-hiv-human-rights-factsheet-criminalization_en.pdf.
[93] *HIV Criminalization and Ending the HIV Epidemic in the U.S.*, Centers for Disease Control and Prevention, https://www.cdc.gov/hiv/policies/law/criminalization-ehe.html (last updated Jan. 19, 2023).
[94] *See* Kinna Thakarar et al., *Homelessness, HIV, and Incomplete Viral Suppression* 6–7 (Feb. 1, 2017) (unpublished manuscript) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4982659/pdf/nihms804730.pdf).

and concluded that homelessness plays an important role in viral suppression.[95] Forcing people

living with HIV into homelessness through housing restrictions therefore makes it less likely that

they will receive consistent care.

199.    The legal vulnerability of people living with HIV is compounded by the high rate

of sexual violence and assault experienced by people who engage in street-level sex work. A

2004 study found that sex workers are almost 18 times more likely to be murdered than women

of similar age and race.[96] Female sex workers are many times more likely to be killed by

homicide than individuals in the occupations with the next highest workplace homicide rates.[97]

200.    Cities across the U.S. have also documented high levels of violence experienced

by sex workers.[98] For example, in the San Francisco Bay Area, 68% of surveyed sex workers

reported being raped and 82% reported being assaulted.[99] Of that 82%, 83% had been threatened

with a weapon.[100]

---

[95] Vladimir Berthaud et al., *The effect of homelessness on viral suppression in an underserved metropolitan area of middle Tennessee: potential implications for ending the HIV epidemic*, 22 BMC Infectious Diseases 1, 5–6 (2022).

[96] John J. Potterat, et. al., *Mortality in a Long-term Open Cohort of Prostitute Women*, 159 Am. J. Epidemiology 778, 782 (2004).

[97] *Id.* at 783.

[98] Hilary L. Surratt et al., *HIV risk among female sex workers in Miami: The impact of violent victimization and untreated mental illness*, 24 AIDS Care 553 (2012); Katherine H. A. Footer et al., *Police-Related Correlates of Client-Perpetrated Violence Among Female Sex Workers in Baltimore City, Maryland*, 109 Am. J. Pub. Health 289 (2019); Nabila El-Bassel, et. al., *Correlates of Partner Violence Among Female Street-Based Sex Workers: Substance Abuse, History of Childhood Abuse, and HIV Risks*, 15 AIDS Patient Care and STDs 41 (2001); Samir Goswami, *Unlocking Options for Women: A Survey Of Women at Cook County Jail*, 2 U. Md. L.J. Race, Relig., Gender & Class 89 (2002); Juhu Thukral & Melissa Ditmore, *Revolving Door: An Analysis of Street-Based Prostitution in New York City*, Urban Justice Center – Sex Workers Project (2003), https://sexworkersproject.org/downloads/RevolvingDoor.pdf.

[99] Melissa Farley & Howard Barkan, *Prostitution, violence, and posttraumatic stress disorder*, 27 Women & Health 37, 41 (1998).

[100] *Id.* at 41.

201.    Crimes against street-based sex workers often go unpunished and face stigma from law enforcement.[101] In many cases, law enforcement officers themselves are the perpetrators of such violence.[102]

202.    Transgender sex workers also experience these harms. A survey of 573 transgender sex workers in the San Francisco Bay Area found that 53.3% had been raped or sexually assaulted by a customer and 38.2% physically assaulted by a customer.[103] 55.9% of Black transgender sex workers reported being raped by a customer.[104]

203.    Tennessee's registry requirements also render people more vulnerable to human trafficking. Traffickers can use the photographs and other information made available online about individuals with Aggravated Prostitution convictions to induce them into sex work, knowing their employment opportunities are limited. Traffickers may also threaten reporting them to the police for subsequent sex work, knowing their HIV status renders them susceptible to another Aggravated Prostitution charge.

B.    **Requiring People Convicted of Aggravated Prostitution to Register as Sex Offenders Does Not Improve Public Safety**

204.    Tennessee's sex offender registration requirements also fail to provide any benefit to public safety.

---

[101] Footer et al., *supra* note 98*, at 298; Thukral & Ditmore, *supra* note 98, at 6–9.
[102] Thukral & Ditmore, *supra* note 98, at 6–9.
[103] Tooru Nemoto et al., *Social Support, Exposure to Violence and Transphobia, and Correlates of Depression Among Male-to-Female Transgender Women With a History of Sex Work*, 101 Am. J. Pub. Health 1980, 1983 (2011).
[104] *Id.*

205. The idea that TN-SORA will promote public safety assumes that sex offender registration will reduce recidivism by convicted offenders and thereby reduce the risk to the public. This assumption is false.

206. In fact, the research shows that public registries are likely to *increase*, rather than decrease, recidivism, and are therefore counterproductive to their avowed purpose of public protection.[105]

207. Large-scale empirical research on the impact of sex offender registries has found that public sex offender registries have likely increased, and almost certainly not reduced, the frequency of sex offenses.[106]

208. These results reflect the fact that sex offender registration and the attendant consequences exacerbate risk factors for recidivism and prevent healthy reintegration into the community.

209. Residency restrictions reduce housing options for registrants, leading to housing instability. Housing instability is consistently correlated with higher criminal recidivism and may help account for the increases in recidivism triggered by registration.

210. Similarly, requirements that interfere with employment, social support, and engagement in pro-social activities undermine the avowed public safety goals of sex offender registration laws. Social policies that ostracize and disrupt the stability of sex offenders are counterproductive to increasing public safety.

---

[105] Amanda Agan & J.J. Prescott, *Offenders and SORN Laws*, *in* SEX OFFENDER REGISTRATION AND COMMUNITY NOTIFICATION LAWS: AN EMPIRICAL EVALUATION, 102 (Wayne Logan & J.J. Prescott eds., 2021).
[106] *Id.* at 112.

211.    There is no empirical evidence to support the notion that more frequent registration check-ins lower recidivism, nor is there evidence that reporting additional information (e.g., email addresses, employment information) reduces recidivism.

212.    Studies of other states' sex offender registries show that expansive registries where most registrants must register for life cost states millions of dollars each year in staffing, surveillance, equipment, and maintenance.[107]

213.    The inclusion of Aggravated Prostitution as a registerable offense also does not serve the interest of allowing the public to "adequately protect themselves and their children." T.C.A. § 40-39-201(b)(2). Aggravated Prostitution includes no element of violence, coercion or lack of consent; those who Patronize Prostitution voluntarily elect to do so. Such individuals can protect themselves and their families by making a different choice, or by availing themselves of any number of mitigation techniques that reduce or eliminate the risk of HIV transmission in sexual encounters.

214.    Similarly, the inclusion of Aggravated Prostitution as a registerable offense does not address the "extreme threat to the public safety" posed by "sexual offenders who use physical violence and sexual offenders who prey on children." *Id.* at § 40-39-201(b)(1). The Aggravated Prostitution statute includes no element of physical violence or victims who are minors.

---

[107] *See e.g.*, Kristen Zgoba et al., *Megan's Law: Assessing the Practical and Monetary Efficacy* (December 2008) (unpublished) (available at
https://www.ojp.gov/pdffiles1/nij/grants/225370.pdf); Just. Pol'y Inst., *What will it cost states to comply with the Sex Offender Registration and Notification Act?*, Nat'l Juv. Just. Network, https://www.njjn.org/uploads/digital-library/resource_840.pdf (last visited Oct. 3, 2023).

215.    In sum, inclusion of the Aggravated Prostitution law in TN-SORA is not rationally related to any public safety goal it purports to serve.

### C.  How Aggravated Prostitution is Enforced in Tennessee

216.    Details about Tennessee arrests for Aggravated Prostitution demonstrate a lack of positive impact on public safety and recidivism.

217.    A detailed analysis of all Aggravated Prostitution convictions in Shelby County between 1993 and 2009, published as part of report on HIV criminalization in Tennessee between 1991 and 2022 by the UCLA School of Law Williams Institute ("the Report"),[108] found that most arrests involved activity posing no realistic threat to public health or safety.[109]

218.    As of the date of publication, there were 83 people on the Tennessee sex offender registry for Aggravated Prostitution.[110] 58 of these individuals were convicted in Shelby County.[111]

219.    Ninety-one percent (53) of the 58 Shelby County convictions were initiated by the Memphis Police Department's Organized Crime Unit, a vice squad which conducts undercover sting operations on street-level sex workers by having an undercover officer solicit people they perceive to be sex workers.[112]

---

[108] Nathan Cisneros et al., *Enforcement of HIV Criminalization in Tennessee*, Williams Inst. (June 2022), at 1–2, https://williamsinstitute.law.ucla.edu/wp-content/uploads/HIV-Criminalization-TN-Jun-2022.pdf.
[109] *Id.* at 11. The Registry does not report gender identity, and thus it was not possible to quantify the number of transgender women, leading to women being undercounted in the Report.
[110] *Id.* at 11.
[111] *Id.*
[112] *Id.* at 26.

220.    Four percent (2) of the 58 convictions involved plainclothes police officers who reported being propositioned by the arrestee.[113]

221.    Only 5% (3) of the 58 arrests involved actual clients or complaints to regular patrol officers.[114]

222.    In Nashville, 56% of Aggravated Prostitution arrests resulted from interactions with undercover officers or police.[115]

223.    In Shelby County, 47% of Aggravated Prostitution arrests by undercover law enforcement officers involved negotiations for the purported client to receive fellatio; there has never been a documented case of HIV transmission through receiving fellatio.[116] Forty-three percent negotiated for vaginal sex, which, even when there is no condom, has an extremely low risk of HIV transmission to the purported client.[117]

224.    Only between 5 and 9% of the arrests involved negotiations for the client to perform insertive anal sex, which, even when no condom is used, has a very low risk of transmission to the client.[118]

---

[113] *Id.*

[114] *Id.*

[115] Carol L. Galletly & Zita Lazzarini, *Charges for Criminal Exposure to HIV and Aggravated Prostitution Filed in the Nashville, Tennessee Prosecutorial Region 2000-2010* 8 (Oct. 1, 2014) (unpublished manuscript) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4060526/pdf/nihms-438037.pdf).

[116] Cisneros et al., *supra* note 108, at 31 (finding that the risk of HIV transmission per exposure is 0 to 0.04%, or 1 in 2300); *see also Supra* ¶ 55.

[117] *Id.* (finding that the risk of HIV transmission per exposure is 0.04%; where the female has an undetectable viral load, the risk falls to 0%).

[118] *Id.* (finding that the risk of HIV transmission per exposure is 0.11%, or 1 in 909; where the receptive partner has an undetectable viral load, the risk falls to 0%).

225.    Lastly, though unclear, at most between 0 and 4% of the arrests involved

negotiations that might have resulted in the customer receiving insertive anal sex,[119] which still

has a maximum HIV transmission risk of 1.38%, or 1 transmission in 72 exposures, when no

other mitigation steps are taken.[120]

226.    Similarly, in Nashville 13 of 17 cases for which information was available

involved solicitation for oral sex, 3 cases involved solicitation for vaginal intercourse, and 1 case

involved solicitation for condom-protected anal sex.[121]

227.    Seventy-four percent of all Shelby County arrests resulting in Aggravated

Prostitution convictions were of Black cisgender women. Statewide, 57% of arrests resulting in

Aggravated Prostitution convictions were of Black cisgender women.[122]

228.    Seven percent of all Shelby County arrests resulting in Aggravated Prostitution

convictions involved white women, compared to 20% statewide.[123]

229.    Among all Aggravated Prostitution registrants statewide, over 77% were Black,

even though only 56% of people living with HIV in Tennessee are Black.

230.    Transgender Black women are also targeted and disproportionately impacted by

Aggravated Prostitution policing and prosecutions.[124]

---

[119] Receptive anal sex is when the person receives anal sex from an HIV-positive partner.
[120] Cisneros et al., *supra* note 108, at 32 (finding that the risk of HIV transmission falls to 0% where the insertive partner has an undetectable viral load).
[121] Galletly & Lazzarini, *supra* note 115, at 8.
[122] Cisneros et al., *supra* note 108, at 28. It is important to note that these statistics only account for cisgender women and not transgender women, who likely are misgendered in official records.
[123] *Id.*
[124] Robin Lennon-Dearing et al., *"We all deserve justice": Perspectives on being arrested for aggravated prostitution*, 20 J. HIV/AIDS & Soc. Serv. 183, 185 (2021).

231.     In the Report, the prices discussed for the negotiated sex acts ranged from free (in exchange for a place to stay for the night) to $120, with the average price being $25 and the median price being $20.[125] A 2019 qualitative study of 14 individuals arrested for Aggravated Prostitution found that many defendants, and transgender women in particular, were engaging in sex work to earn money to survive "due to transphobia and discrimination that prevented them from obtaining employment."[126] Indeed, at least 30% of people charged with Aggravated Prostitution in Nashville from 2000 to 2010 were listed as unhoused.[127]

232.     Taken together, these factors suggest that Tennessee's enforcement of Aggravated Prostitution primarily targets those who engage in "survival sex." "Survival sex" describes the practice of people who are unhoused or financially struggling intermittently trading sex for food, a place to sleep, materials or financial goods to meet other basic needs, or for drugs.

233.     The Report further found that, of the 23 cases where the information was available in the file, the defendants were sentenced to an average of 2.9 years, a median of 3 years, and a range of 1 to 8 years in prison for each Aggravated Prostitution conviction.[128]

234.     Incarcerating people convicted of Aggravated Prostitution costs the state millions of dollars.[129] While it costs an average of $18,250 per year to incarcerate any person,[130] it can

---

[125] Cisneros et al., *supra* note 108, at 31.
[126] Lennon-Dearing et al., *supra* note 124, at 190.
[127] Galletly & Lazzarini, *supra* note 115, at 8.
[128] Cisneros et al., *supra* note 108, at 32.
[129] *Id.* at 40.
[130] *Id.*

cost an additional $3,500 per month to incarcerate a person with HIV in county jails,[131] bringing the yearly cost of incarcerating one person with HIV to $60,250.

235.    No one on the registry for Aggravated Prostitution had any other non-Aggravated Prostitution conviction mandating registration.[132] Put differently, Aggravated Prostitution registrants are not committing any other type of sex offense and are on the registry solely due to their HIV status leading to an Aggravated Prostitution conviction.

236.    Given that many people convicted of Aggravated Prostitution are engaging in sex work due to financial need and that sex work convictions and registry restrictions make it more difficult to obtain housing and employment (factors known to lead people to returning to sex work), Aggravated Prostitution convictions and their consequences increase the likelihood of people living with HIV engaging in sex work in Tennessee.

**VI.    Impact of Aggravated Prostitution and TN-SORA on Plaintiffs**

237.    Sex Offender Registration impacts nearly every aspect of the lives of the individual Plaintiffs and other registrants.

238.    Exclusion Zones, where individuals required to register as sex offenders cannot live, work, or even be more than fleetingly present, cover vast areas, especially in urban areas like Shelby County.

239.    Tennessee does not provide registrants with a map showing where Exclusion Zones are located.

---

[131] 113th CONG. (Tenn. Apr. 19, 2023) (statement of Rep. Bud Husley, Member, Gen. Assembly) (https://tnga.granicus.com/player/clip/28379?view_id=703&redirect=true&h=451e421bc22411a01be25f3a126e06fc).
[132] Cisneros et al., *supra* note 108, at 17.

240.    It is practically impossible for ordinary people to identify the areas that are inside and outside these Exclusion Zones. The task is difficult even for experts with sophisticated mapping technology. Distances are difficult to estimate or measure and property boundaries are difficult to locate. Moreover, Exclusion Zones often have irregular shapes, because they are measured from property boundaries and because the zones overlap.

241.    An unofficial mapping tool available online[133] demonstrates how difficult it is for registrants to avoid Exclusion Zones in cities like Memphis and Nashville, where most Tennessee registrants with Aggravated Prostitution convictions reside. A screenshot of Downtown Memphis from this tool appears below. The orange highlighting indicates areas within the 1,000-foot Exclusion Zones. The tool likely underestimates Exclusion Zones, since, for example, it has not marked Shelby Farms Park, a 4,500-acre public park, as part of the Exclusion Zone. Additional maps, including a map of Downtown Nashville are included in Appendix A.

---

[133] Tenn. Bureau of Investigation, *Public_Safety/Corrections_TBI_Exclusion_Zones_Buffer (MapServer)*, ArcGIS,
https://www.arcgis.com/home/webmap/viewer.html?url=https%3A%2F%2Ftnmap.tn.gov%2Farcgis%2Frest%2Fservices%2FPUBLIC_SAFETY%2FCORRECTIONS_TBI_EXCLUSION_ZONES_BUFFER%2FMapServer&source=sd (last visited Sept. 20, 2023).

**Downtown Memphis**



242.    While the mapping tool demonstrates the vast reach of the Exclusion Zones, registrants cannot rely upon it to ensure compliance as it is not an official government tool. The only way a registrant can confirm whether a job or home is legally available to them is to call the TBI and ask.

243.    Further, the vague restrictions make it difficult for registrants to know when they are complying with the Exclusion Zones. For example, in one recent case, the Court of Criminal Appeals of Tennessee had to clarify that the restriction on being near a playground applies to

both public playgrounds and privately-owned playgrounds, such as a McDonald's play area.[134] Further, the court held that purchasing and sitting down to eat a meal at a McDonald's did not constitute a "specific or legitimate reason for being there," resulting in one registered offender's arrest and revocation of his probation.[135]

244.     The Exclusion Zones can change at a moment's notice. Because registrants are prohibited from "stand[ing], sit[ting] idly, or remain[ing]" within an Exclusion Zone when children under 18 years of age are present unless they are responsible for the child or have a "specific or legitimate reason for being there," they could be found in violation of the law the moment a child enters the Exclusion Zone.[136]

245.     While knowledge is required to establish a violation, mere presence in an Exclusion Zone is arguably sufficient to establish probable cause, subjecting a registrant to constant fear of arrest.

246.     Aggravated Prostitution has nothing to do with sexual abuse of children, yet registrants with children, grandchildren, nieces, and nephews cannot freely pick them up from school, attend sporting events, go to a school play or graduation, take part in a carpool, or host their child's friends for a playdate.

### A. OUTMemphis

247.     As part of its mission to support LGBTQ+ people in the Mid-South, OUTMemphis runs direct service programs to meet the needs of the LGBTQ+ community. People impacted by HIV are one of the primary participant groups for OUTMemphis's services.

---

[134] *State v. Collier*, No. W2019-01985-CCA-R3-CD, 2021 WL 142172, at *6 (Tenn. Crim. App. Jan. 14, 2021) (*appeal denied*, May 14, 2021).
[135] *Id.* at *8.
[136] *Id.* at *3.

248.     Among its services, OUTMemphis provides HIV testing, education, navigation-to-care, and access to financial assistance, community meals, and support groups for people living with HIV. In 2022, OUTMemphis performed 172 individual HIV tests, helped people secure 60 unique prescriptions for pre-exposure prophylaxis ("PrEP") and post-exposure prophylaxis ("PEP") medications that prevent the transmission of HIV, and gave seven HIV testing certification workshops. $218,477 of OUTMemphis's fiscal year 2023 budget—more than 10% of the annual budget—is devoted specifically to HIV services. This does not include the amount spent on services for people living with HIV through non-HIV-specific programs.

249.     OUTMemphis diverts some of the resources it could otherwise use for HIV testing, outreach, and support services for individuals living with HIV to counseling people who have been convicted of Tennessee's Aggravated Prostitution law or who are at risk of being prosecuted under that law. This includes young adults in OUTMemphis's Metamorphosis Project and adults served by OUTMemphis's Sexual Health, Trans Services, Mental Health, and OUTLast programs.

250.     Criminalization of HIV status contributes to an environment in Tennessee in which some of the people OUTMemphis serves are hesitant to be tested for HIV, making OUTMemphis's work of encouraging testing more difficult, frustrating its mission.

251.     Individuals served by OUTMemphis who must comply with Tennessee's registry requirements face significant obstacles to finding employment, increasing their need for financial assistance and other OUTMemphis services.

252.     OUTMemphis's Sexual Health Program provides services to people living with HIV. The program predominantly serves Black and Latino men who have sex with men and Black and Latina transgender women. The Sexual Health Program provides free, confidential

61

health services including HIV testing, linkages to care, HIV education, social support programs, PrEP/PEP prescriptions, and service navigation.

253.    Staff in OUTMemphis's Sexual Health Program expend time and resources they could otherwise spend on other issues teaching LGBTQ+ people about Tennessee's HIV-criminalizing laws, including Tennessee's Aggravated Prostitution statute, through community education workshops and literature distribution.

254.    OUTMemphis clients have reported that the threat of criminalization, including through the Aggravated Prostitution law, has led them to fear the police and avoid participating in community events. This makes OUTMemphis's work serving such individuals more difficult, frustrating its mission.

255.    OUTMemphis also provides services to people living with HIV through mental health programming, which includes providing LGBTQ+ people with counseling and support groups. OUTMemphis's support group for people living with HIV only meets virtually, as some participants are too afraid of people discovering their status through support group attendance to come in person.

256.    OUTMemphis has also conducted late night outreach programs for sex workers, where OUTMemphis staff perform HIV testing. People who OUTMemphis engage with through this program have been convicted of Aggravated Prostitution and/or are at risk of being convicted of Aggravated Prostitution, and some may have returned to sex work because of the difficulty in finding other sources of income.

257.    OUTMemphis's Trans Services Program provides direct services and social connection to transgender people. The Trans Services program has regularly served participants who have been convicted of or are at risk for Aggravated Prostitution convictions. As part of its

services, the Trans Services program helps participants legally change their names to align with their gender identities. Legal name changes are not possible for people on the Registry, so OUTMemphis is unable to effectively provide this service for clients with Aggravated Prostitution convictions, in frustration of its mission.

258.     OUTMemphis's OUTLast Emergency Assistance program links housing, food assistance, and HIV services in a holistic program for transgender people of color, LGBTQ+ seniors, undocumented LGBTQ+ individuals, and people living with HIV. OUTLast provides financial support for rent, utilities, and transportation; hosts a food pantry and weekly hot meal; and provides HIV testing, PrEP counseling, education on HIV, condoms, and other preventative sexual health materials to participants.

259.     The Metamorphosis Project is OUTMemphis's LGBTQ+ youth program. This includes the Youth Emergency Center, which provides housing and emergency assistance to young adults aged 18 to 24. This assistance includes help with rent, utilities, transportation, medical referrals, and in-house case management. Participants also receive PrEP counseling, education about HIV, condoms and other preventative sexual health materials, and free HIV testing. More than 10% of the youth participants in this program in 2023 are living with HIV and the Metamorphosis program accounts for 41% of OUTMemphis's annual budget in 2023.

260.     The registry has required OUTMemphis to divert more resources to its OUTLast Emergency Assistance program and Metamorphosis project than would otherwise be necessary. Through OUTLast, OUTMemphis provides up to three months of rental assistance. This assistance is frequently necessary for people on the registry because the registry makes finding work and affordable housing more difficult.

261.    Within the Metamorphosis Project, OUTMemphis coordinates a Rapid Rehousing program, in which they work with landlords to place formerly unhoused clients in apartments where OUTMemphis will provide 100% rental assistance for up to two years. This program has had great difficulty working with landlords to find places for its clients with Aggravated Prostitution convictions that comply with registry requirements. It takes much more time, effort, and resources to find a registry-compliant living situation than it takes to provide this service for non-registrants, which frustrates OUTMemphis's mission.

262.    Registry requirements also come up frequently in OUTMemphis's job navigation programs, particularly through the Trans Services Program and the Metamorphosis Project. OUTMemphis staff, including two full-time case managers, support clients with job searches, including searching for job openings, outreach to potential employers, and convening job fairs. This program is made more costly and time-consuming and is frustrated by clients' Aggravated Prostitution convictions and Registry status, as many job opportunities are unavailable to people with felony convictions and who are on the Registry.

**B.  Jane Doe 1**

263.    Jane Doe 1 is a Black transgender woman in her 30s who currently resides in Memphis, Tennessee.

264.    Jane Doe 1 learned that she was HIV-positive in 2008.

265.    Several years later, Jane Doe 1 was arrested after an undercover officer approached and propositioned her and a friend on the street. She was convicted of attempt to commit Aggravated Prostitution pursuant to T.C.A. § 39-13-516. In 2012, she was convicted of an additional count of Aggravated Prostitution, also as a result of a police interaction.

266.     Jane Doe 1 experienced a pattern of harassment as a transgender woman. There is a high police presence in the area where transgender sex workers can be found, and police routinely stop women and go through their purses and belongings, removing their condoms so they cannot have protected sex and telling them to go home. Once, Jane Doe 1 was forced to hide in an alleyway behind a dumpster to avoid police harassment, even though all she had been doing was walking with a friend.

267.     As a result of her Aggravated Prostitution convictions and no other convictions, Jane Doe 1 is required to register as a sex offender for life pursuant to T.C.A. §§ 40-39-202(31)(X) (defining Aggravated Prostitution committed on or after July 1, 2010, as a "violent sexual offense") and 40-39-207(g)(2)(B) (requiring lifetime registration for convictions of "violent sexual offenses").

268.     The registration requirements and restrictions are so difficult to comply with that that at times Jane Doe 1 has felt she had no option but to continue to engage in sex work to survive, since it was too difficult to find stable employment, particularly as a transgender woman.

269.     When Jane Doe 1 pled guilty to Aggravated Prostitution, she was not informed by anyone, including her attorney, that she would have to register as a sex offender. It was not until her sentencing hearing for her first charge that the sentencing judge informed her of the registration requirement. Even then, she was not informed that she would be subjected to the registration requirements for her entire life. In fact, when she went to register for the first time, she was told by the TBI that she could appeal the registration requirement after 25 years, which is not true.

270.    All of Jane Doe 1's convictions for Aggravated Prostitution (including her most recent conviction in 2012) pre-date significant amendments to TN-SORA. At the time of Jane Doe 1's convictions, TN-SORA did not impose any restrictions on where she could live or work or how she could spend time with children, as those restrictions were not added until 2014.[137] She was also not subject to community notification systems, added in 2014.[138] Nor were there any requirements that she report her internet usage to the TBI, a requirement that was added in 2015.[139] Jane Doe 1 is required to comply with these additional obligations even though they were added to Tennessee law after she was convicted.

271.    Jane Doe 1 has suffered significant harm because of the mandatory lifetime sex offender registration requirements imposed pursuant to her Aggravated Prostitution convictions, especially as those requirements have changed over time.

272.    Jane Doe 1 has lost several job offers as a result of being on the registry. This experience is typical of people on the registry because of an Aggravated Prostitution conviction. Indeed, only 23% of Aggravated Prostitution registrants report being employed.[140]

273.    Jane Doe 1 has had an extremely difficult time finding affordable and safe housing outside the Exclusion Zones.

274.    Jane Doe 1 was unhoused for about a year as she struggled to find somewhere to live that complied with the registration requirements. At one point during this year, she found a good housing option, but when she called the TBI to verify its compliance with registry

---

[137] 2014 Tenn. Pub. Acts, ch. 992, § 1, 1674.
[138] 2014 Tenn. Pub. Acts, ch. 751, § 1, 703–04.
[139] 2015 Tenn. Pub. Acts, ch. 516, § 1, 733.
[140] Cisneros et al., *supra* note 108, at 17.

requirements, she was told she could not live there because it was about 930 feet from a daycare provider.

275.    During the period in which she was unhoused, Jane Doe 1 had to report monthly to the TBI, which made keeping a job even more difficult. Every month it took hours to complete registration; one time she went in promptly at 8 a.m. to try to avoid missing any work but was kept waiting until noon.

276.    Jane Doe 1 has a nephew she loves, but she cannot have a close relationship with him due to the restrictions on her ability to interact with children. Even though Jane Doe 1's convictions had nothing to do with children, she cannot legally be alone with her nephew.

277.    Jane Doe 1 has been turned away from employment-support service agencies because she is on the registry and children are often present in those establishments.

278.    Years after her Aggravated Prostitution convictions, Jane Doe 1 was arrested for violating the registry requirements after the apartment she was staying in caught fire. The residence was rendered uninhabitable by the fire, but she was unable to report the change in residence because the TBI was closed for the weekend. A police officer conducted a random check of her registered address, and she was not present. When she went to register the change after the weekend, she was found in violation. She spent weeks in jail and was convicted of attempt to violate the sex offender registry. This resulted in her being fired from a job and losing her housing.

279.    Jane Doe 1's experience is typical of others registered because of an Aggravated Prostitution conviction. Indeed, 61% of Aggravated Prostitution registrants have a Registry violation.[141]

280.    Jane Doe 1 has spent more than a thousand dollars on registration and administrative fees since she first registered.

281.    Jane Doe 1 has also experienced embarrassment, shame, fear, and humiliation due to her HIV status and registration as a "violent sexual offender" being made publicly available. One stranger humiliated her by confronting her partner about her HIV status after learning that fact from looking at the Registry. Another individual attempted to extort her through a scam phone call scheme, referencing her registry information and threatening that she would be arrested for violating the registry unless she paid them to clear a non-existent arrest warrant.

282.    The stigma experienced by Jane Doe 1 is so intense that she has decided not to have children of her own because of the impact the publicly available information about her would have on her child.

**C. Jane Doe 2**

283.    Jane Doe 2 is a Black cisgender woman in her 60s who currently resides in Memphis, Tennessee. She has a large family including six grandchildren. She is not currently working and receives disability benefits due to health issues that have led to periods of being bedridden.

284.    Jane Doe 2 learned that she was HIV-positive in 2003.

---

[141] *See id.*

285.     Jane Doe 2 has been convicted of Aggravated Prostitution pursuant to T.C.A. §
39-13-516 on several occasions, most recently in late 2010. All her arrests resulted from
interactions that were initiated by police officers.

286.     Jane Doe 2 explains that, around the time of her arrests, it was typical for police
officers to approach people walking down the street, say "come here," and place them under
arrest.

287.     As a result of these convictions and no others, Jane Doe 2 is required to register as
a sex offender for life pursuant to T.C.A. §§ 40-39-202(31)(X) (defining Aggravated Prostitution
committed on or after July 1, 2010 as a "violent sexual offense"); 40-39-202(20)(A)(iii)
(defining Aggravated Prostitution committed before July 1, 2010 as a "sexual offense"); and 40-
39-207(g)(2) (requiring lifetime registration for multiple convictions of "sexual offenses" or any
conviction of a "violent sexual offense").

288.     Jane Doe 2 was not told of the registration requirements until after she was
released following her first Aggravated Prostitution conviction.

289.     All of Jane Doe 2's convictions for Aggravated Prostitution (including her most
recent conviction in 2010) pre-date significant amendments to TN-SORA. At the time of Jane
Doe 2's convictions, TN-SORA did not yet require registrants to report to the TBI prior to travel,
nor did it allow libraries to exclude registrants; those restrictions were added in 2011.[142] The
state also did not impose any restrictions on where she could live or work or how she could
spend time with children, as those restrictions were not added until 2014.[143] Nor were there any
requirements that she report her internet usage to the TBI, a requirement that was added in

---

[142] 2011 Tenn. Pub. Acts, ch. 266, § 1, 631; 2011 Tenn. Pub. Acts, ch. 287, § 1, 685.
[143] 2014 Tenn. Pub. Acts, ch. 992, § 1, 1674.

2015.[144] Jane Doe 2 is required to comply with these additional obligations even though they were added to Tennessee law after her most recent conviction.

290.    Jane Doe 2 has suffered significant harm because of the mandatory lifetime sex offender registration requirements imposed pursuant to her Aggravated Prostitution convictions. She has long been trying to find a new place to live but has not been able to find a location that complies with the registration requirements. She has also experienced embarrassment, shame, fear, and humiliation, especially as the Registry requirements have changed over time. Most significantly, the Registry limits her ability to spend time with her grandchildren and causes her fear when she does so, even though her convictions had nothing to do with children.

**D.  Jane Doe 3**

291.    Jane Doe 3 is a Black cisgender woman with eight grandchildren. She is in her 50s and resides in Memphis, Tennessee.

292.    Jane Doe 3 learned that she was HIV-positive in the 1990s.

293.    The first time Jane Doe 3 was convicted of Aggravated Prostitution pursuant to T.C.A. § 39-13-516, she was initially only charged with Prostitution, but the charge was elevated to Aggravated Prostitution upon determination that she was living with HIV. She pled guilty to Aggravated Prostitution without being informed she would have to register as a sex offender.

294.    When Jane Doe 3 was first subjected to the TN-SORA, the requirements and restrictions were so difficult to comply with and made it so hard to find stable employment that she felt she had no option but to continue to engage in sex work to survive.

---

[144] 2015 Tenn. Pub. Acts, ch. 516, § 1, 733.

295.    Jane Doe 3 was convicted of an additional count of Aggravated Prostitution in 2008. Both charges arose from interactions initiated by police officers.

296.    As a result of these convictions and no others, Jane Doe 3 is required to register as a sex offender for life pursuant to T.C.A. §§ 40-39-202(20)(A)(iii) (defining Aggravated Prostitution committed before July 1, 2010, as a "sexual offense") and 40-39-207(g)(2) (requiring lifetime registration for multiple convictions of "sexual offenses").

297.    All of Jane Doe 3's convictions for Aggravated Prostitution (including her most recent conviction in 2008) pre-date significant amendments to TN-SORA. At the time of Jane Doe 3's convictions, the state did not yet prohibit registrants who did not have victims who were minors from being on the premises of a school, day care center, park, playground, recreation center, or field if they believe children are present, nor did the state yet prohibit standing or sitting idly within 1,000 feet of those locations while children were present. The state added those restrictions in 2009.[145] TN-SORA also did not yet require registrants to provide copies of passports, immigration documents, and professional licenses, nor did it require them to always have a driver's license or photo ID labeling them as sex offenders on their person; these restrictions were added in 2010, alongside prohibitions on more than two registrants living in the same residence.[146] TN-SORA also did not yet require registrants to report to the TBI prior to travel, nor did it allow libraries to exclude registrants; those restrictions were added in 2011.[147] The state also did not impose any restrictions on where she could live or work or how she could spend time with children, as those restrictions were not added until 2014. Nor were there any

---

[145] 2014 Tenn. Pub. Acts, ch. 992, § 1, 1674.
[146] 2010 Tenn. Pub. Acts, ch. 1138, §§ 7, 13, 967–68; 2010 Tenn. Pub. Acts, ch. 1145, § 1, 984.
[147] 2011 Tenn. Pub. Acts, ch. 266, § 1, 631; 2011 Tenn. Pub. Acts, ch. 287, § 1, 685.

requirements that she report her internet usage to the TBI, a requirement that was added in 2015.[148] Jane Doe 3 is required to comply with these additional obligations even though they were added to Tennessee law after she was convicted.

298.    Jane Doe 3 has suffered harm, including denial of employment and housing opportunities, restrictions on her ability to see family, as well as embarrassment, shame, fear, and humiliation, because of the mandatory lifetime sex offender registration requirements imposed pursuant to her Aggravated Prostitution convictions, especially as those requirements have changed over time. She is dismayed that she is required to register for life, when she knows of others, convicted of sexual offenses other than Aggravated Prostitution, who were removed from the registry after a period of time.

299.    The registry requirements have deprived Jane Doe 3 of the housing and employment she needs to get her life back on track. She has had an incredibly difficult time finding housing due to the registry residence restrictions, as it feels like there is a school, park, daycare, or playground on almost every block. She is also barred from most rental units owned by private companies, as the companies typically run background checks and will not rent to her after discovering her registry status. She can typically only rent from individual owners, although it is common for individual landlords to run background checks as well. She has thus been unhoused for significant periods of time.

300.    Jane Doe 3 lost a job she had held for six months after her workplace came under new management and fired her due to her registry status. On top of losing this income, she has been burdened by the registry's annual registration fees, paying hundreds of dollars before she

---

[148] 2015 Tenn. Pub. Acts, ch. 516, § 1, 733.

became eligible for waiver of the fees. She is currently utilizing emergency assistance methods to pay her bills and is still actively looking for a less expensive place to stay.

301.    For Jane Doe 3, the worst aspect of the registry is the way it limits her ability to spend time with her grandchildren. She yearns to be able to see her grandkids and take them to the park or watch them graduate but is afraid to do so for fear of violating the registry requirements—even though her convictions had nothing to do with children. She is afraid that the stigma of her violent sex offender status and HIV status will also cause her grandchildren to be embarrassed or harassed.

### E.  Jane Doe 4

302.    Jane Doe 4 is a cisgender woman with six grandchildren. She is currently incarcerated in the Tennessee Department of Correction.

303.    Jane Doe 4 learned that she was HIV-positive in 2004.

304.    Jane Doe 4's first conviction of attempt to commit Aggravated Prostitution was the result of a police officer stopping her on the street and asking her what she was doing. When she replied that she was trying to get some money, he arrested her. She pled guilty without being informed about Tennessee's sex offender registration requirements.

305.    When Jane Doe 4 was first subjected to the Registry, the requirements and restrictions made finding lawful and compliant employment so difficult she felt she had no option but to continue to engage in sex work to survive.

306.    Jane Doe 4 was convicted of an additional count of Aggravated Prostitution in 2009, also as a result of a police sting.

307.    Due to these convictions and no others, Jane Doe 4 is required to register as a sex offender for life pursuant to T.C.A. §§ 40-39-202(20)(A)(iii) (defining Aggravated Prostitution

committed before July 1, 2010, as a "sexual offense") and 40-39-207(g)(2) (requiring lifetime

registration for multiple convictions of "sexual offenses").

308.    All of Jane Doe 4's convictions for Aggravated Prostitution (including her most

recent conviction in 2009) pre-date significant amendments to TN-SORA. At the time of Jane

Doe 4's convictions, the state did not yet prohibit registrants who did not have victims who were

minors from being on the premises of a school, day care center, park, playground, recreation

center, or field if they believe children are present, nor did the state yet prohibit standing or

sitting idly within 1,000 feet of those locations while children were present. The state added

those restrictions in 2009.[149] TN-SORA also did not yet require registrants to provide copies of

passports, immigration documents, and professional licenses, nor did it require them to always

have a driver's license or photo ID labeling them as sex offenders on their person; these

restrictions were added in 2010, alongside prohibitions on more than two registrants living in the

same residence.[150] TN-SORA also did not yet require registrants to report to the TBI prior to

travel, nor did it allow libraries to exclude registrants; those restrictions were added in 2011.[151]

The state also did not impose any restrictions on where she could live or work or how she could

spend time with children, as those restrictions were not added until 2014.[152] Nor were there any

requirements that she report her internet usage to the TBI, a requirement that was added in

2015.[153] Jane Doe 4 is required to comply with these additional obligations even though they

were added to Tennessee law after she was convicted in 2009.

---

[149] 2009 Tenn. Pub. Acts, ch. 597, § 1, 1133–34.
[150] 2010 Tenn. Pub. Acts, ch. 1138, §§ 7, 13, 967–68; 2010 Tenn. Pub. Acts, ch. 1145, § 1, 984.
[151] 2011 Tenn. Pub. Acts, ch. 266, § 1, 631; 2011 Tenn. Pub. Acts, ch. 287, § 1, 685.
[152] 2014 Tenn. Pub. Acts, ch. 992, § 1, 1674.
[153] 2015 Tenn. Pub. Acts, ch. 516, § 1, 733.

309.    Jane Doe 4 has found it incredibly hard to comply with all the registry requirements, especially as those requirements have changed over time. As a result, Jane Doe 4 has been convicted of violating the sex offender registry requirements on multiple occasions. Between her attempted Aggravated Prostitution convictions and her registry violations, she has spent over a decade incarcerated.

310.    Jane Doe 4 has suffered harm, including denial of employment and housing opportunities, restrictions on her ability to travel and see family, as well as embarrassment, shame, fear of being harassed or attacked, and humiliation, because of the mandatory lifetime sex offender registration requirements imposed pursuant to her Aggravated Prostitution convictions.

311.    Jane Doe 4 has also paid hundreds of dollars in registration fees over the years, which, when coupled with court and probation fees and the challenges of finding stable employment while registered, created a huge financial burden.

312.    When not incarcerated, Jane Doe 4 was not able to travel freely or easily attend doctor's appointments, since she was required to report to the TBI every vehicle she rode in, even if she was not the driver. This required having the driver report to the TBI with her so they could provide photographs and identifying vehicle information.

313.    Jane Doe 4 has lost jobs upon her employers finding out about her registry status, struggled to find a place to live that complies with residency requirements, and lived in constant fear of being found in violation. The registry requirements make finding a job and a place to live so difficult that she feels like she is in prison even when she is not and feels hopeless about getting her life back on track.

314.     Despite becoming eligible to seek parole, Jane Doe 4 has decided not to pursue release from prison because the combination of parole restrictions and registry requirements would be too difficult to comply with. She worries that she would violate a requirement, resulting in another conviction.

315.     When not incarcerated, Jane Doe 4's sex offender registry status makes it difficult to seek addiction treatment because many inpatient treatment facilities do not accept registered sex offenders. She has also sought help at halfway houses, but most only accept men, and the ones that accept women generally do not accept registered sex offenders.

316.     Even in prison, Jane Doe 4's sex offender status deprives her of important opportunities. Some prison programming, including certain educational and vocational training programs that would help her get her life back on track, is not available to her because of her registry status.

317.     Jane Doe 4 has six grandchildren, who she would love to spend more time with, but, due to the registry requirements, she cannot have them visit or, when not imprisoned, even take them to a park, even though her convictions had nothing to do with children.

**VII.     Infectious Diseases that Are Comparable to HIV**

318.     The individual Plaintiffs are experiencing the above harms due to criminalization of their HIV status. There are many other infectious diseases that are similarly or even more prevalent in Tennessee and that are comparable to or more severe than HIV but are not criminalized. For example, COVID-19, chlamydia, influenza, Meningococcal disease, syphilis, and tuberculosis are all transmissible through intimate contact and have potentially serious—and even fatal—consequences. None of these, however, are subject to criminal liability or sex offender registration.

76

319.    As shown below, Hepatitis B, genital herpes, and human papillomavirus (HPV) are particularly comparable to HIV in terms of transmissibility through sexual activity, severity, and duration of symptomology; availability, effectiveness, and ease of treatment and prevention; and lethality. None of these other infections are subject to the Aggravated Prostitution statute or resulting Sex Offender Registration requirements.

### A. Prevalence of HIV in Tennessee

320.    In 2020, there were 650 newly reported cases of HIV in Tennessee.[154]

321.    The overall rate of newly reported cases of HIV for Tennessee in 2020 was 9.4 cases per 100,000 persons.[155]

### B. Hepatitis B

322.    Hepatitis B is a virus that can lead to serious liver disease, including liver failure and death.[156]

323.    In the United States, an estimated 880,000 to 1.89 million people are chronically infected with the Hepatitis B virus ("HBV"). New cases of HBV infection in the United States had been decreasing until 2012. Since that time, reported cases of acute Hepatitis B have been fluctuating at around 3,000 cases per year. In 2020, 2,157 cases of acute Hepatitis B were

---

[154] *Tennessee HIV Epidemiological Profile, 2021*, Tennessee Dep't of Health (Aug. 2023), at 73, https://www.tn.gov/content/dam/tn/health/program-areas/hiv/2021-Tennessee-HIV-Epidemiological-Profile.pdf.
[155] *Id.*
[156] U.S. Dep't of Health and Hum. Servs., *Hepatitis B: General Information*, Centers for Disease Control and Prevention (June 2016), https://www.cdc.gov/hepatitis/hbv/pdfs/hepbgeneralfactsheet.pdf.

reported; however, because of low case detection and reporting, the CDC estimates that there were 14,000 acute HBV infections that year.[157]

324.    In 2020, there were 279 newly reported confirmed and probable cases of acute Hepatitis B in Tennessee.[158]

325.    In 2020, the rate of newly reported cases of acute Hepatitis B in Tennessee was 4.1 cases per 100,000 persons.[159]

326.    HBV is transmitted by sexual and non-sexual contact when blood, semen, vaginal secretions, or other bodily fluids from an infected person enter the body of an uninfected person. This occurs most often through sexual contact or needle sharing for medical or recreational drug use.[160]

327.    Once infected, a person enters the acute stage of Hepatitis B infection, during which a person experiences a range of symptoms including fever, fatigue, loss of appetite, nausea, vomiting, abdominal pain, dark urine, clay-colored stool, joint pain, and jaundice. These symptoms last between four and 24 weeks.

328.    During this acute phase, the great majority of adults become immune (about 90%) and cannot become infected again. Around 5% of adults develop chronic Hepatitis B, as do 90% of infants who do not receive medical care.[161]

---

[157] *See Hepatitis B Basic Information*, U.S. Dep't of Health and Hum. Servs., https://www.hhs.gov/hepatitis/learn-about-viral-hepatitis/hepatitis-b-basics/index.html (last reviewed Mar. 31, 2023).

[158] Tenn. Dep't of Health – Viral Hepatitis Program, *Tennessee Viral Hepatitis Epidemiological Profile, 2020*, Tenn. State Gov't. (Dec. 2022), at 7, https://www.tn.gov/content/dam/tn/health/documents/2020%20Viral%20Hepatitis%20Epidemiological%20Profile_FINAL.pdf.

[159] *Id.*

[160] *Id.* at 2.

[161] *Hepatitis B: General Information*, *supra* note 156.

329.     Chronic Hepatitis B is a lifetime infection that can cause serious liver damage, cirrhosis, and liver cancer.[162]

330.     On average, 25% of fetuses or babies infected during pregnancy or childbirth and 10% of those infected as adults will ultimately die from liver disease directly related to HBV infection.

331.      Treatment for HBV infection is very similar to treatment for HIV infection, with some of the same medications being used for both infections. Treatment for HBV infection can suppress the virus and halt its destruction of the liver. This requires taking oral medication for life.

332.     There is no cure for Hepatitis B infection.

333.     The risk of drug resistance, rendering HBV infection treatments ineffective, can increase over years of treatment if the medications are not taken regularly. This can lead to exacerbated symptoms and more rapid progression of liver problems.[163]

334.     HBV infection can be prevented with vaccination, given as a series of 2, 3 or 4 shots over a period of 6 months in adults.[164]

---

[162] *Tennessee Hepatitis Epidemiological Profile 2021*, Tenn. State Gov't (Dec. 2022), at 7, https://www.tn.gov/content/dam/tn/health/documents/2020%20Viral%20Hepatitis%20Epidemiological%20Profile_FINAL.pdf.
[163] Fabien Zoulim, *Hepatitis B virus resistance to antiviral drugs: where are we going?*, 31 Liver Int'l 111 (2011).
[164] *Hepatitis B Basic Information*, *supra* note 157.

335.    HBV is transmissible much like HIV; however, HBV can be 100 times more concentrated in an infected person's blood than HIV.[165] As a result, Hepatitis B is 50 to 100 times easier to transmit through sexual activity than HIV.[166]

### C.  Genital Herpes

336.    Genital herpes, caused by the Herpes simplex viruses (HSV-1 and -2) is a viral illness that commonly causes painful lesions on and around the genitals and anus and potentially serious complications such as aseptic meningitis (inflammation of the membranes lining the brain and spinal cord). Historically, genital herpes has been a persistent and incurable viral infection transmitted by intimate sexual activity. The FDA first approved effective treatment to suppress, but not cure, this viral illness, in the early 1980s.[167]

337.    Nationwide, 11.9% of persons aged 14 to 49 years have HSV-2 infection, the virus that most commonly causes genital herpes. However, the prevalence of genital herpes infection is higher than that because an increasing number of genital herpes infections are caused by the HSV-1 virus, which more commonly causes oral herpes.

338.    From 2015 to 2016, 15.9% of females and 8.2% of males aged 14–49 had genital herpes.[168]

---

[165] *Every week hundreds of people get hepatitis B*, New York State Dep't of Health (Oct. 2012), https://www.health.ny.gov/publications/2340.pdf.
[166] *Hepatitis B: General Information*, *supra* note 156.
[167] *Genital Herpes – CDC Detailed Fact Sheet*, Centers for Disease Control and Prevention, https://www.cdc.gov/std/herpes/stdfact-herpes-detailed.htm (last reviewed Jul. 22, 2021).
[168] *Id.*

339.     The Tennessee Department of Health does not require healthcare providers to report cases of herpes, so statistics regarding its prevalence are not included in Tennessee STI Epidemiological Profile.[169]

340.     Genital herpes occurs following genital-to-genital contact with a person with herpes lesions, their mucosal membranes, genital secretions, or oral secretions, even when lesions are not present.[170]

341.     The first outbreak of genital herpes typically includes a longer duration of the genital lesions, increased viral shedding time associated with higher transmission rates, and fever, body aches, swollen lymph nodes, or headache.[171]

342.     Subsequent outbreaks, which consist of genital pain at the site of the herpes lesions or pain in the legs, hips, or buttocks, are shorter in duration and less severe than the first outbreak.[172]

343.     36% of women and 13% of men with genital herpes develop meningitis as a complication.[173]

344.     Once a person with genital herpes develops meningitis, there is a 19 to 42% chance of meningitis recurring over the person's lifetime.[174]

---

[169] Tenn. Dep't of Health, *2023 Tennessee Reportable Disease List for Healthcare Providers*, Tenn. State Gov't., https://www.tn.gov/content/dam/tn/health/documents/reportable-diseases/2023-Provider-list.pdf (last visited Oct. 4, 2023).
[170] *See* Inst. for Quality and Efficiency in Health Care, *Genital Herpes: How Can You Prevent the Spread of Herpes in Sexual Relationships?*, National Library of Medicine (Jul. 12, 2018), https://www.ncbi.nlm.nih.gov/books/NBK525787/.
[171] *Genital Herpes – CDC Detailed Fact Sheet*, *supra* note 167.
[172] *Id.*
[173] Teresa Chu, *Viral Meningitis: An Overview,* U.S. Pharmacist (Apr. 18, 2014), https://www.uspharmacist.com/article/viral-meningitis-an-overview.
[174] *Id.*

345.    While most patients recover, meningitis resulting from genital herpes can cause neurologic complications, and immunocompromised patients may experience long-term cognitive effects, including short-term memory loss, cognitive impairment, sleep disturbance, fatigue, and depression.[175]

346.    Genital herpes can also lead to congenital neonatal herpes, where the infection is transmitted from a pregnant person to a fetus or child during pregnancy or childbirth.[176]

347.    There is no cure for genital herpes, however there are several effective and well-tolerated medications that can be used to return the virus to a latent state.

348.    The same medications used to treat genital herpes are also used to prevent transmission of the virus to persons without genital herpes.[177]

349.    The likelihood of being infected with genital herpes during sex depends on many factors, including how often one has sex, whether and how frequently condoms are used, and how long one's partner has been infected. An individual who has had the virus for a long time is less contagious than one who was recently infected.

350.    Use of latex condoms only reduces the risk of transmission by 30%.[178]

351.    Overall, the genital herpes transmission rate without any medication is 3.6%. However, the transmission rate is 1.9% if the susceptible partner takes valacyclovir (an antiviral drug).[179]

---

[175] *Id.*

[176] *Genital Herpes – CDC Detailed Fact Sheet*, *supra* note 167.

[177] *See id.*

[178] Emily T. Martin et al., *A Pooled Analysis of the Effect of Condoms in Preventing HSV-2 Acquisition* 1 (July 13, 2010) (unpublished manuscript) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2860381/pdf/nihms-192381.pdf).

[179] *See What is the transmission rate of Genital Herpes (HSV2)?*, STD Testing Near Me, https://stdtestingnearme.org/what-is-the-herpes-transmission-rate/ (last visited Oct. 4, 2023).

352.     Use of antiviral mediations can reduce the frequency of recurrent outbreaks by 70 to 80%, reduce transmissibility, and reduce the length and severity of outbreaks, depending on the type of antivirals used.

353.     Suppressive antiviral therapy requires taking oral medication one to two times daily, whereas episodic therapy, taken upon outbreak, is taken one to three times daily for up to five to ten days.

354.     Some people, and in particular immunocompromised people, may encounter drug-resistance when receiving herpes treatment. Between 0.1 and 0.6% of immunocompetent patients experience drug-resistant HSV, compared to 3.5 to 10% of immunocompromised patients.[180]

### D.  Human Papillomavirus (HPV)

355.     Human papillomavirus (HPV) is the most common sexually transmitted infection in the United States.[181]

356.     As of 2013, an estimated 42.5% of adults in the United States aged 18–59 had genital HPV. Strains of HPV that pose a high risk to health were experienced by an estimated 22.7% of adults.[182]

---

[180] Yu-Chen Jiang et al., *New strategies against drug resistance to herpes simplex virus*, 8 Int J. Oral Sci. 1, 2 (2016).

[181] *Genital HPV Infection – Basic Fact Sheet*, Centers for Disease Control and Prevention, https://www.cdc.gov/std/hpv/stdfact-hpv.htm (last reviewed Apr. 12, 2022).

[182] Geraldine McQuillan et al., *Prevalence of HPV in Adults Aged 18–69: United States, 2011–2014*, Nat'l Ctr. for Health Stat. (Apr. 2017), at 3–4, https://www.cdc.gov/nchs/data/databriefs/db280.pdf.

357.    The Tennessee Department of Health does not require healthcare providers to report cases of HPV, so statistics regarding the prevalence of HPV infection are not included in Tennessee's STI Epidemiological Profile.[183]

358.    About 10% of HPV infections become symptomatic, leading to genital warts and potentially life-threatening squamous cell cancer, including cervical, anal, throat, vaginal, vulvar, and penile cancers.[184]

359.    Genital warts caused by HPV affect roughly 340,000 to 360,000 people yearly. About 19,400 women and 12,100 men experience cancers caused by HPV each year. More than 4,000 women die of cervical cancer caused by HPV each year.[185]

360.    There are more than 150 HPV strains, most of which do not lead to cancer. HPV vaccines protect against four to nine of the HPV strains that pose the highest health risks if received prior to infection, preventing 97% of skin cell changes that could lead to cancer and preventing almost 100% of genital warts.[186]

361.    HPV-related cancers develop years or decades after HPV infection, and genital warts vary in duration throughout the course of infection.

362.    HPV is the cause of 99% of cervical cancers, 90% of anal cancer, 65% of vaginal cancers, 50% of vulvar cancers, and 45 to 90% of oropharyngeal (throat) cancers.[187]

---

[183] *2023 Tennessee Reportable Disease List for Healthcare Providers*, *supra* note 169.

[184] *See Genital HPV Infection – Basic Fact Sheet*, *supra* note 181.

[185] *Id.*

[186] Pamela Deak, *What I Tell Every Patient About the HPV Vaccine*, Am. Coll. of Obstetricians and Gynecologists, https://www.acog.org/womens-health/experts-and-stories/the-latest/what-i-tell-every-patient-about-the-hpv-vaccine (last reviewed Sept. 2022).

[187] Aida Petca et al., *Non-sexual HPV transmission and role of vaccination for a better future (Review)*, 20 Experimental and Therapeutic Med. 186, 186–87 (2020).

363.     HPV is transmitted from person-to-person by skin-to-skin contact and is most commonly transmitted through intimate sexual activity.[188]

364.     Modelling studies have estimated a transmission probability of 80% per any new partner if either partner is infected and the other is not.[189]

365.     There is no way to completely prevent transmission of HPV. Latex condoms are only partially effective. They will protect against HPV transmission when the ulcers or infections in the genital areas are covered or protected by the condom. Since a condom may not cover the infected portion of skin, consistent and correct use of latex condoms would be expected to protect against transmission of genital ulcer diseases and HPV in some, but not all, instances.

366.     There is no cure for HPV, although genital warts can be controlled with treatment using freezing, burning, or lasering techniques.[190]

## CLAIMS FOR RELIEF

367.     As set forth in the preceding paragraphs of this Complaint, all of which Plaintiffs incorporate as though fully set forth herein, the Aggravated Prostitution statute and the associated sex offender registration requirements are irrational, discriminatory, harmful, and illegal.

## COUNT I

**Aggravated Prostitution Statute: Title II of the Americans with Disabilities Act
OUTMemphis Against Bill Lee and Jonathan Skrmetti**

368.     OUTMemphis brings this claim against Bill Lee and Jonathan Skrmetti in their official capacities.

---

[188] *See Genital HPV Infection – Basic Fact Sheet*, *supra* note 181.
[189] *Id.*
[190] *Id.*

369.     OUTMemphis serves individuals living with HIV, a disability protected under the Americans with Disabilities Act.

370.     Defendants Bill Lee and Jonathan Skrmetti are public officials for the state of Tennessee and the Tennessee Attorney General's office, respectively. Both are state government entities within the meaning of Title II of the ADA.

371.     Defendants' maintenance, administration, and enforcement of the Aggravated Prostitution statute has resulted in qualified individuals with a disability who are served by OUTMemphis being subjected to discrimination by a public entity by reason of their disability. But for those individuals' HIV status, they would not have been subjected to that discrimination.

372.     The statute explicitly singles out people with HIV for different treatment based on disability by categorizing as a felony behavior that, if undertaken by individuals not living with HIV, would qualify as a misdemeanor under the general Prostitution statute.

373.     As a result of Defendants' unlawful conduct, OUTMemphis's mission is being frustrated, and it is forced to divert resources to address the harms—including felony incarceration, registration as a "sex offender" or "violent sex offender," embarrassment, humiliation, shame, fear, and stigma—caused by Defendants' actions.

374.     OUTMemphis has no adequate remedy at law or other effective means of enforcing the right to be free of disability discrimination other than by seeking declaratory and injunctive relief from the Court.

## COUNT II

### Aggravated Prostitution Statute: Fourteenth Amendment Equal Protection
### OUTMemphis Against Bill Lee and Jonathan Skrmetti

375.    OUTMemphis brings this claim against Bill Lee and Jonathan Skrmetti in their official capacities.

376.    Defendants' maintenance, administration, and enforcement of the Aggravated Prostitution statute singles out people living with HIV, deprives them of their right to equal protection, and stigmatizes them as second-class citizens. The Aggravated Prostitution statute's discriminatory treatment of people living with HIV as compared to (1) those who are convicted of misdemeanor Prostitution, including those living with other infectious diseases with similar transmissibility and symptoms, and (2) those who are convicted of Patronizing Prostitution, including those living with HIV or other infectious diseases with similar transmissibility and symptoms, bears no rational relationship to furtherance of a legitimate government interest. Therefore, Defendants' maintenance, administration, and enforcement of the Aggravated Prostitution statute violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

377.    In addition, because Defendants' conduct is motivated by a desire to harm a politically unpopular and vulnerable group and rests on unfounded prejudice and antipathy toward members of that group, Defendants' conduct should be provided no deference and should receive searching, evidence-based review to ensure that it in fact furthers a legitimate government interest and is not arbitrary, irrational, or unreasonable.

378.    All Defendants' actions have been and are being taken under color of law and their authority as state officers.

87

379.    As a result of Defendants' unlawful conduct, OUTMemphis's mission is being

frustrated, and it is forced to divert resources to address the harms—including felony

incarceration, registration as a "sex offender" or "violent sex offender," embarrassment,

humiliation, shame, fear, and stigma—caused by Defendants.

380.    OUTMemphis has no adequate remedy at law or other effective means of

enforcing the Fourteenth Amendment right to equal protection other than by seeking declaratory

and injunctive relief from the Court.

## COUNT III

**Aggravated Prostitution Statute: Fourteenth Amendment Substantive Due Process**
**OUTMemphis Against Bill Lee and Jonathan Skrmetti**

381.    OUTMemphis brings this claim against Bill Lee and Jonathan Skrmetti in their

official capacities.

382.    Defendants' maintenance, administration, and enforcement of the Aggravated

Prostitution statute has no rational relationship to a legitimate governmental interest, but rather is

premised solely on discriminatory treatment of people with HIV, in violation of substantive due

process under the Fourteenth Amendment to the United States Constitution.

383.    All Defendants' actions have been and are being taken under color of law and

their authority as state officers.

384.    As a result of Defendants' unlawful conduct, OUTMemphis's mission is being

frustrated, and it is forced to divert resources to address the harms—including felony

incarceration, registration as a "sex offender" or "violent sex offender," embarrassment,

humiliation, shame, fear, and stigma—caused by Defendants.

385.    OUTMemphis has no adequate remedy at law or other effective means of enforcing the Fourteenth Amendment right to substantive due process other than by seeking declaratory and injunctive relief from the Court.

## COUNT IV

**Aggravated Prostitution Registry Requirement:**
**Title II of the Americans with Disabilities Act (ADA)**
**All Plaintiffs Against Bill Lee, David Rausch, Frank Strada, and Jonathan Skrmetti**

386.    All Plaintiffs bring this claim against Bill Lee, David Rausch, Frank Strada, and Jonathan Skrmetti in their official capacities.

387.    Plaintiffs are or serve individuals living with HIV, a disability protected under the Americans with Disabilities Act.

388.    Defendants Bill Lee, David Rausch, Frank Strada, and Jonathan Skrmetti are public officials for the state of Tennessee, the Tennessee Bureau of Investigation, the Tennessee Department of Correction, and the Tennessee Attorney General's office, respectively. These are state government entities within the meaning of Title II of the ADA.

389.    Defendants' maintenance, administration, and enforcement of the sex offender registration requirements as to persons with Aggravated Prostitution convictions subjects Plaintiffs or those they serve to discrimination by a public entity due to their disability. But for the HIV status of Plaintiffs or those they serve, they would not be subjected to that discrimination.

390.    The inclusion of Aggravated Prostitution on the list of registrable offenses facially singles out people living with HIV for registration as sex offenders for behavior that, if undertaken by an individual not living with HIV, would not require sex offender registration.

391.    As a result of Defendants' unlawful conduct, individual Plaintiffs are suffering harm, including incarceration or the risk of incarceration, registration as a "sex offender" or "violent sex offender," embarrassment, humiliation, shame, fear, and stigma.

392.    As a result of Defendants' unlawful conduct, OUTMemphis's mission is being frustrated, and it is forced to divert resources to address the harms—including incarceration, registration as a "sex offender" or "violent sex offender," embarrassment, humiliation, shame, fear, and stigma—caused by Defendants' actions.

393.    Plaintiffs have no adequate remedy at law or other effective means of enforcing the right to be free of disability discrimination other than by seeking declaratory and injunctive relief from the Court.

**COUNT V**

**Aggravated Prostitution Registry Requirement: Fourteenth Amendment Equal Protection**
**All Plaintiffs Against Bill Lee, David Rausch, Frank Strada, and Jonathan Skrmetti**

394.    Plaintiffs bring this claim against Bill Lee, David Rausch, Frank Strada, and Jonathan Skrmetti in their official capacities.

395.    Defendants' maintenance, administration, and enforcement of the Aggravated Prostitution Registry requirement singles out people living with HIV, deprives them of their right to equal protection, and stigmatizes them as second-class citizens. The Aggravated Prostitution Registry requirement's discriminatory treatment of people living with HIV as compared to (1) those who are convicted of misdemeanor Prostitution, including those living with other infectious diseases with similar transmissibility and symptoms, and (2) those who are convicted of Patronizing Prostitution, including those living with HIV or other infectious diseases with similar transmissibility and symptoms, bears no rational relationship to furtherance of a

90

legitimate governmental interest. Therefore, Defendants' maintenance, administration, and enforcement of the Aggravated Prostitution Registry requirement violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

396.   In addition, because Defendants' conduct is motivated by a desire to harm a politically unpopular and vulnerable group and rests on unfounded prejudice and antipathy toward members of that group, Defendants' conduct should be provided no deference and should receive searching, evidence-based review to ensure that it in fact furthers a legitimate government interest and is not arbitrary, irrational, or unreasonable.

397.   All Defendants' actions have been and are being taken under color of law and their authority as state officers.

398.   As a result of Defendants' unlawful conduct, the individual Plaintiffs are suffering harm, including incarceration, registration as a "sex offender" or "violent sex offender," embarrassment, humiliation, shame, fear, and stigma.

399.   As a result of Defendants' unlawful conduct, OUTMemphis's mission is being frustrated, and it is forced to divert resources to address the harms—including incarceration, registration as a "sex offender" or "violent sex offender," embarrassment, humiliation, shame, fear, and stigma—caused by Defendants' actions.

400.   Plaintiffs have no adequate remedy at law or other effective means of enforcing the Fourteenth Amendment right to equal protection other than by seeking declaratory and injunctive relief from the Court.

**COUNT VI**

**Aggravated Prostitution Registry Requirement:**
**Fourteenth Amendment Substantive Due Process**
**All Plaintiffs Against Bill Lee, David Rausch, Frank Strada, and Jonathan Skrmetti**

401.    Plaintiffs bring this claim against Bill Lee, David Rausch, Frank Strada, and

Jonathan Skrmetti in their official capacities.

402.    Defendants' maintenance, administration, and enforcement of the Aggravated

Prostitution Registry requirement has no rational relationship to a legitimate governmental

interest, but rather is premised solely on discriminatory treatment of people with HIV, in

violation of Plaintiffs' rights to substantive due process under the Fourteenth Amendment to the

United States Constitution.

403.    All Defendants' actions have been and are being taken under color of law and

their authority as state officers.

404.    As a result of Defendants' unlawful conduct, individual Plaintiffs are suffering

harm, including incarceration, registration as a "sex offender" or "violent sex offender,"

embarrassment, humiliation, shame, fear, and stigma.

405.    As a result of Defendants' unlawful conduct, OUTMemphis's mission is being

frustrated, and it is forced to divert resources to address the harms—including incarceration or

the threat of incarceration, registration as a "sex offender" or "violent sex offender,"

embarrassment, humiliation, shame, fear, and stigma—caused by Defendants' actions.

406.    Plaintiffs have no adequate remedy at law or other effective means of enforcing

the Fourteenth Amendment right to substantive due process other than by seeking declaratory

and injunctive relief from the Court.

## COUNT VII

### Aggravated Prostitution Registry Requirement: Eighth Amendment
### All Plaintiffs Against Bill Lee, David Rausch, Frank Strada, and Jonathan Skrmetti

407.    Plaintiffs bring this claim against Bill Lee, David Rausch, Frank Strada, and Jonathan Skrmetti in their official capacities.

408.    Defendants' maintenance, administration, and enforcement of the Aggravated Prostitution Registry requirement constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

409.    The registration requirements are punitive, in that they inflict what has been regarded in our history and traditions as punishment, impose an affirmative disability or restraint, promote the traditional aims of punishment, and bear no rational connection to their purported non-punitive purpose. The requirements are also excessive with respect to their purported purpose.

410.    The registration requirements are categorically disproportionate to the offense of Aggravated Prostitution. There is a national consensus against lifetime sex offender registration for similar crimes, the culpability of people convicted of Aggravated Prostitution is low, and the severity of the requirements greatly outweigh their culpability, particularly given the lack of evidence demonstrating the registry's effectiveness.

411.    All Defendants' actions have been and are being taken under color of law and their authority as state officers.

412.    As a result of Defendants' unlawful conduct, the individual Plaintiffs are suffering harm, including incarceration, registration as a "sex offender" or "violent sex offender," embarrassment, humiliation, shame, fear, and stigma.

413.    As a result of Defendants' unlawful conduct, OUTMemphis's mission is being

frustrated, and it is forced to divert resources to address the harms—including incarceration,

registration as a "sex offender" or "violent sex offender," embarrassment, humiliation, shame,

fear, and stigma—caused by Defendants' actions.

414.    Plaintiffs have no adequate remedy at law or other effective means of enforcing

the Eighth Amendment right to be free from cruel and unusual punishment other than by seeking

declaratory and injunctive relief from the Court.

**COUNT VIII**

**Aggravated Prostitution Registry Requirement: Ex Post Facto**
**Jane Does 1–4 Against Bill Lee, David Rausch, Frank Strada, and Jonathan Skrmetti**

415.    Jane Does 1–4 bring this claim against Bill Lee, David Rausch, Frank Strada, and

Jonathan Skrmetti in their official capacities.

416.    As of the date of Jane Does 1–4's most recent Aggravated Prostitution

convictions, the Registry did not impose restrictions on where they could live and work, nor how

they could spend time with children. These new rules, among others, have been imposed on

individual Plaintiffs' retroactively.

417.    The effect of the current version of TN-SORA is punitive and

imposes punishment. The retroactive application of the current version of TN-SORA violates the

Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1, because it makes more

burdensome the punishment imposed for offenses committed before enactment of each

amendment to SORA, and each amendment applies SORA retroactively.

418.    The cumulative effect of the amendments to SORA creates a regulatory scheme

that has been historically and traditionally viewed as punishment. The current version of TN-

SORA imposes affirmative disabilities and restraints, promotes the traditional goals of

94

punishment, lacks a rational connection to a nonpunitive purpose, and is excessive in relation to its non-punitive purpose.

419.    All Defendants' actions have been and are being taken under color of law and their authority as state officers.

420.    As a result of Defendants' unlawful conduct, individual Plaintiffs are suffering harm, including being retroactively subjected to a lifetime of punitive Registry restrictions, embarrassment, humiliation, shame, fear, and stigma.

421.    Plaintiffs have no adequate remedy at law or other effective means of enforcing their right to protection against an ex post facto law other than by seeking declaratory and injunctive relief from this Court.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court:

A.    Declare that Defendants' maintenance, administration, and enforcement of Tennessee's Aggravated Prostitution statute violates Title II of the Americans with Disabilities Act, and the United States Constitution's Fourteenth Amendment right to substantive due process and equal protection;

B.    Declare that Defendants' maintenance, administration, and enforcement of Tennessee's Sex Offender Registry violates Title II of the Americans with Disabilities Act, the United States Constitution's Fourteenth Amendment right to substantive due process and equal protection, and the Eighth Amendment to the United States Constitution, insofar as it requires all individuals convicted under the Aggravated Prostitution statute to register as sex offenders for the rest of their lives;

95

C.      Declare that Defendants' retroactive enforcement of Tennessee's amended Sex Offender Registry Requirements against Jane Does 1–4 violates the ex post facto clause of the United States Constitution;

D.      Issue permanent injunctive relief restraining Defendants and their employees, agents, and successors in office from enforcing the Aggravated Prostitution statute;

E.      Order Defendants to remove Plaintiffs and all others with Aggravated Prostitution convictions (but no other registrable sexual offenses) from the Tennessee sex offender registry;

F.      Order Defendants to expunge all State records indicating that Plaintiffs and all others with Aggravated Prostitution convictions (but no other sexual offenses) were ever registered on the Tennessee sex offender registry;

G.      Order Defendants to alert all agencies who were provided information regarding the registration of Plaintiffs and all others with Aggravated Prostitution convictions (but no other sexual offenses) as sex offenders (including the Department of Motor Vehicles, courts, police departments, sheriff's departments, and the Federal Bureau of Investigation) that this information is no longer valid;

H.      Order Defendants to cease and desist from placing any individual convicted under the Aggravated Prostitution statute on the Tennessee sex offender registry and requiring anyone convicted of Aggravated Prostitution to comply with the Registry scheme;

I.      Grant Plaintiffs authority to monitor Defendants' compliance with any injunctive relief ordered by the Court;

J.      Award Plaintiffs attorneys' fees and costs; and

K.      Order such other relief as this Court deems just and proper.

Dated: Memphis, Tennessee
      October 24, 2023

Respectfully submitted,

/s/ Stella Yarbrough
Stella Yarbrough (BPR No. 033637)
Jeff Preptit (BPR No. 038451)
Lucas Cameron-Vaughn (BPR No. 036284)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Phone: (615) 320-7142
SYarbrough@aclu-tn.org
JPreptit@aclu-tn.org
Lucas@aclu-tn.org

Alexis Agathocleous* (NY Bar 4227062)
Alexis Alvarez* (NY Bar 5854278)
Jon W. Davidson* ** (CA Bar 89301)
Rachel Meeropol* (NY Bar 4100954)
AMERICAN CIVIL LIBERTIES UNION
125 Broad St., New York, NY 10004
Phone: (929) 585-0061
AAgathocleous@aclu.org
AlexisA@aclu.org
JonDavidson@aclu.org
RMeeropol@aclu.org

Lynly S. Egyes* (NY Bar 4838025)
Milo Inglehart* (NY Bar 5817937)
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: (510) 587-9696 Ext. 353
Lynly@transgenderlawcenter.org
Milo@transgenderlawcenter.org

Dale Melchert* (NY Bar 5366554)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696 Ext. 354
Dale@transgenderlawcenter.org

*Pro Hac Vice application forthcoming
** Admitted only in California

97

# APPENDIX A

## Memphis Full



8/22/2023

1:235,691

98

**Memphis Q1**



8/22/2023

1:117,845

**Memphis Q2**



8/22/2023

1:117,845

## Memphis Q3



8/22/2023

1:117,845

**Memphis Q4**



8/22/2023

1:117,845

## Downtown Nashville



9/20/2023

1:34,833