## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| OUTMEMPHIS; JANE DOE 1; JANE DOE 2; JANE DOE 3; and JANE DOE 4, | ) ) ) ) | |
| Plaintiffs, | ) | **Case No. 2:23-CV-2670** |
| v. | ) ) | |
| BILL LEE, in his official capacity as Governor of Tennessee; JONATHAN SKRMETTI, in his official capacity as Attorney General and Reporter of Tennessee; DAVID RAUSCH, in his official capcity as Director of the Tennessee Bereau of Investigation; and FRANK STRADA, in his offical capacity as Commissioner of the Tennessee Department of Correction, | ) ) ) ) ) ) ) ) ) ) ) ) | **Chief Judge Lipton**  **Magistrate Judge Claxton** |
| Defendants. | ) | |

---

### MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

---

Respectfully Submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

JOHN R. GLOVER (BPR # 037772)
Assistant Attorney General
CODY N. BRANDON (BPR# 037504)
Managing Attorney
Assistant Attorney General
DAVID RUDOLPH (BPR# 13402)
Senior Assistant Attorney General
Law Enforcement &
Special Prosecutions Division
Office of the Tennessee
Attorney General & Reporter
PO Box 20207
Nashville, TN  37202
Off. (615) 532-2552

Fax (615) 532-4892
John.Glover@ag.tn.gov
Cody.Brandon@ag.tn.gov
David.Rudolph@ag.tn.gov

# TABLE OF CONTENTS

Table of Authorities ....................................................................................................... ii

Introduction .................................................................................................................... 1

Background ..................................................................................................................... 3

      I.  Tennessee's Longstanding Law Against Engaging in Prostitution While Knowingly HIV-Positive ................................................................................ 2

      II.  Plaintiffs' Unprecedented Constitutional and ADA Challenges ........... 4

Legal Standard ............................................................................................................... 6

Argument ....................................................................................................................... 8

I.      Sovereign Immunity Requires Dismissing Several Claims and Defendants. ............... 7

    A.     Sovereign immunity bars all claims against Defendants Lee and Skrmetti.... 8

    B.     Sovereign immunity bars all claims against Defendant Strada. ..................... 9

    C.     Sovereign immunity bars certain claims against Defendant Rausch............ 10

II.     The Doctrine of Standing Requires Dismissing Several Claims and Defendants............ ............................................................................................................................. 11

    A.  OUTMemphis does not have standing. ................................................... 11

      1.  OUTMemphis lacks standing to bring any claim. ............................... 11

        a.  No associational standing ................................................. 11

        b.  No third-party standing ........................................................ 14

        c.  No injury-in-fact.................................................................. 15

      2.  OUTMemphis, at a minimum, lacks standing to bring Claims I-IV................. 15

        a.  No standing for aggravated prostitution claims ............................ 15

        b.  No standing for ADA claims ................................................ 16

    B.  All claims against Defendants Lee, Skrmetti, and Strada fail for lack of standing... 16

    C.  Certain claims against Defendant Rausch fail for lack of standing........................... 17

III.    The Complaint Fails to State a Valid ADA Claim (Count I, IV). ................................. 17

    A.  OUTMemphis does not have a cause of action under the ADA. .............................. 17

    B.  The ADA claims fail on their own terms. ................................................................ 19

      1.  OUTMemphis is not a "qualified individual with a disability." ..................... 20

      2.  The Complaint does not allege discrimination in the provision of public services, programs, or benefits.............................................................................. 20

      3.  Applying Title II as Plaintiffs suggest would create serious constitutional problems.................................................................................................................. 24

IV.    The Complaint Fails to State a Valid Equal-Protection (Counts II, V) or Substantive-Due-Process Claim (Counts III, VI)................................................................................ 30

    A.  Rational-basis review applies, and the challenged statutes are rational. ................ 31

    B.  The Complaint identifies no similarly situated comparator to show  discrimination. ................................................................................................................ 34

V.     The Complaint Fails to State an Eighth Amendment (Count VII) or Ex Post Facto (Count VIII) Claim. ......................................................................................... 36

VI.    The Court Lacks Jurisdiction to Grant Plaintiffs' Requested Relief. ........................... 38

Conclusion ...................................................................................................................... 41

Certificate of Service ...................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albright v. Oliver*,
    510 U.S. 266 (1994)................................................................................................20

*Am. Chem. Council v. Dep't of Transp.*,
    468 F.3d 810 (D.C. Cir. 2006)................................................................................13

*Anderson v. City of Blue Ash*,
    798 F.3d 338 (6th Cir. 2015) .................................................................................21

*Andrews, Trustee of Gloria M. Andrews Trust Dated April 23, 1998 v. City of
    Mentor, Ohio*,
    11 F.4th 462 (6th Cir. 2021) .................................................................................32

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................7, 20

*Ass'n of Am. Physicians & Surgeons v. FDA*,
    13 F.4th 531 (6th Cir. 2021) ............................................................................12, 14

*Barnes v. Glen Theatre, Inc.*,
    501 U.S. 560 (1991)...................................................................................29, 32, 34

*Bd. of Trustees of Univ. of Ala. v. Garrett*,
    531 U.S. 356 (2001)..................................................................................... *passim*

*Bevan & Assocs., LPA, Inc. v. Yost*,
    929 F.3d 366 (6th Cir. 2019) .................................................................................25

*Blessing v. Freestone*,
    520 U.S. 329 (1997)................................................................................................20

*Block v. Canepa*,
    74 F.4th 400 (6th Cir. 2023) .................................................................................15

*Bradley v. Jefferson Cnty. Pub. Sch.*,
    598 F. Supp. 3d 552 (W.D. Ky. 2022)...................................................................11

*Bullington v. Bedford Cnty., Tn.*,
    905 F.3d 467 (6th Cir. 2018) .................................................................................29

*California Dep't of Corrections v. Morales*,
    514 U.S. 499 (1995)................................................................................................38

*California v. Texas*,
    141 S. Ct. 2104 (2021).....................................................................................40

*Castells v. Fisher*,
    No. 05.............................................................................................................31

*Children's Healthcare is a Legal Duty, Inc. v. Deters*,
    92 F.3d 1412 (6th Cir. 1996) ........................................................................10

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001)......................................................................................23

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)..........................................................................26, 27, 29

*In re City of Detroit*,
    841 F.3d 684 (6th Cir. 2016) ........................................................................24

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021)...........................................................................17, 18

*CSX Transp., Inc. v. Alabama Dept. of Revenue*,
    562 U.S. 277 (2011)......................................................................................23

*Cutshall v. Sundquist*,
    193 F.3d 466 (6th Cir. 1999) ........................................................................37

*Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trustees*,
    411 F.3d 777 (6th Cir. 2005) ........................................................................25

*Directv, Inc. v. Treesh*,
    487 F.3d 471 (6th Cir.2007) ...........................................................................7

*Do No Harm v. Pfizer Inc.*,
    No. 1:22-cv-07908, 2022 WL 17740157 (S.D.N.Y. Dec. 16, 2022), *appeal docketed*, No. 23-15 (2d Cir. Jan. 4, 2023) ...............................................14

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022)...............................................................................40, 41

*Doe v. Bredesen*,
    507 F.3d 998 (6th Cir. 2007) ........................................................................47

*Doe v. Univ. of Maryland Med. Sys. Corp.*,
    50 F.3d 1261 (4th Cir. 1995) ........................................................................21

*Does #1–9 v. Lee*,
    574 F. Supp. 3d 558 (M.D. Tenn. 2021), *appeal docketed*, No. 23-5248 (6th Cir. Mar. 28, 2023) ..................................................................................24

iv

*Doran v. Salem Inn*,
    422 U.S. 922 (1975) ................................................................................................40

*EJS Properties, LLC v. City of Toledo*,
    698 F.3d 845 (6th Cir. 2012) ..............................................................................36

*Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*,
    880 F.3d 450 (9th Cir. 2018), *amended,* 881 F.3d 792 (9th Cir. 2018)................32

*F.C.C. v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993)..............................................................................................35

*Fair Elections Ohio v. Husted*,
    770 F.3d 456 (6th Cir. 2014) ..........................................................................24, 25

*Fed. Election Comm'n v. Cruz*,
    596 U.S. 289 (2022)........................................................................................12, 16

*In re Flint Water Cases*,
    384 F. Supp. 3d 802 (E.D. Mich. 2019)..............................................................34

*Fritz v. Charter Twp. of Comstock*,
    592 F.3d 718 (6th Cir. 2010) ...............................................................................7

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018)..........................................................................................40

*Green v. Corrections Corp. of America*,
    198 F.3d 245, 1999 WL 1045087 (6th Cir. 1999) ...............................................25

*Heller v. Doe*,
    509 U.S. 312 (1993)..............................................................................................35

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)..............................................................................................13

*Johnson v. City of Saline*,
    151 F.3d 564 (6th Cir.1998) ................................................................................23

*Keen v. Helson*,
    940 F.3d 799 (6th Cir. 2019) ...............................................................................18

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ................................................................................29

*Klingler v. Director, Mo. Dept. of Revenue*,
    366 F.3d 614 (8th Cir. 2004) ...............................................................................31

*Kornblau v. Dade County*,
    86 F.3d 193 (11th Cir. 1996) ...............................................................................25

*Kowalski v. Tesmer*,
543 U.S. 125 (2004)...................................................................................................14

*L. W. by and through Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) ......................................................................................40

*Lawson v. Shelby County*,
211 F.3d 331 (6th Cir. 2000) ......................................................................................10

*League of Women Voters of Ohio v. Brunner*,
548 F.3d 463 (6th Cir. 2008) ......................................................................................10

*Lewis v. Casey*,
518 U.S. 343 (1996).....................................................................................................12

*Loesel v. City of Frankenmuth*,
692 F.3d 452 (6th Cir. 2012) ......................................................................................35

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).....................................................................................................16

*Lyshe v. Levy*,
854 F.3d 855 (6th Cir. 2017) .........................................................................................7

*McCullum v. Orlando Reg'l Healthcare Sys., Inc.*,
768 F.3d 1135 (11th Cir. 2014) ...........................................................................18, 19

*Memphis A. Philip Randolph Inst. v. Hargett*,
2 F.4th 548 (6th Cir. 2021) .........................................................................................15

*Menuskin v. Williams*,
145 F.3d 755 (6th Cir. 1998) ......................................................................................24

*Miller v. Florida*,
482 U.S. 423 (1987).....................................................................................................39

*MX Grp., Inc. v. City of Covington*,
293 F.3d 326 (6th Cir. 2002) ...............................................................................17, 19

*Ne. Ohio Coal. for the Homeless v. Husted*,
837 F.3d 612 (6th Cir. 2016) ......................................................................................15

*Nevada Dept. of Human Res. v. Hibbs*,
538 U.S. 721 (2003).....................................................................................................26

*Pennhurst State School & Hosp. v. Halderman*,
465 U.S. 89 (1984).......................................................................................................41

*Pineda v. Hamilton Cnty.*,
977 F.3d 483 (6th Cir. 2020) ......................................................................................20

*Popovich v. Cuyahoga Cnty. Court of Common Pleas, Domestic Rels. Div.*,
150 F. App'x 426–27 (6th Cir. Sept. 27, 2005) ........................................................19

*Priorities USA v. Nessel*,
462 F. Supp. 3d 792 (E.D. Mich. 2020)................................................................15

*R. K. by and through J. K. v. Lee*,
53 F.4th 995 (6th Cir. 2022) ...............................................................................10

*Russell v. Lundergan-Grimes*,
784 F.3d 1037 (6th Cir. 2015) ....................................................................7, 8, 10

*Safety Specialty Ins. Co. v. Genesee Cnty. Bd. Of Comm'rs*,
53 F.4th 1014 (6th Cir. 2022) ..............................................................................12

*Schweiker v. Wilson*,
450 U.S. 221 (1981)..............................................................................................34

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996)...........................................................................................8, 29

*Smart v. Ashcroft*,
401 F.3d 119 (2d Cir. 2005)..................................................................................35

*Smith v. Doe*,
538 U.S. 84 (2003)..........................................................................................37, 38

*State v. Whitfield*,
134 P.3d 1203 (Wash. Ct. App. 2006) ..................................................................34

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)..............................................................................................13

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)........................................................................................13, 14

*Tennessee v. Lane*,
541 U.S. 509 (2004) (ADA prohibits "discrimination against persons with
disabilities in three major areas of public life: employment, which is covered
by Title I of the statute; *public services, programs, and activities, which are
the subject of Title II*; and public accommodations, which are covered by Title
III" (emphasis added)) .........................................................................22, 26, 28, 31

*Thompson v. Greenwood*,
507 F.3d 416 (6th Cir. 2007) ................................................................................21

*Thompson v. Williamson County, Tenn.*,
965 F. Supp. 1026 (M.D. Tenn. 1997)..................................................................24

*Town of Chester, N.Y. v. Lareo Estates, Inc.*,
581 U.S. 433 (2017)................................................................................................12

*McCarthy ex rel. Travis v. Hawkins*,
381 F.3d 407 (5th Cir. 2004) (Garza, J., concurring in part and dissenting in
part) ............................................................................................................................31

*Tucker v. Tennessee*,
539 F.3d 526 (6th Cir. 2008), *abrogated on other grounds in Lewis v.
Humboldt Acquisition Corp.,* 681 F.3d 312 (6th Cir.2012) (en banc) ...................23

*United States v. Lopez*,
514 U.S. 549 (1995)................................................................................................30

*United States v. Morrison*,
529 U.S. 598 (2000)................................................................................................30

*Universal Life Church Monastery Storehouse v. Nabors*,
35 F.4th 1021 (6th Cir. 2022) ......................................................................... *passim*

*Velzen v. Grand Valley State Univ.*,
902 F. Supp. 2d 1038 (W.D. Mich. 2012) .............................................................17

*Vinson v. Thomas*,
288 F.3d 1145 (9th Cir. 2002) ................................................................................20

*Virginia Office for Protection and Advocacy v. Stewart*,
563 U.S. 247 (2011)................................................................................................40

*WCI, Inc. v. Ohio Dep't of Pub. Safety*,
18 F.4th 509 (6th Cir. 2021) (equating the *Ex parte Young* inquiry with the
requirements for Article III standing) ....................................................................16

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021)..............................................................................................8, 40

*Wickard v. Filburn*,
317 U.S. 111 (1942)................................................................................................39

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989).......................................................................................8, 9, 11, 34

*Williams v. Pennsylvania Human Relations Comm'n*,
870 F.3d 294 (3d Cir. 2017)...................................................................................20

*Yates v. United States*,
574 U.S. 528 (2015)................................................................................................22

*Ex parte Young*,
209 U.S. 123 (1908)......................................................................................... *passim*

*Zimmerman v. Oregon Dep't of Justice*,
   170 F.3d 1169 (9th Cir. 1999) ........................................................................23, 24

**Statutes**

42 U.S.C.A. § 12101(b)(4).......................................................................................35

42 U.S.C. 12131(2) ..................................................................................................33

42 U.S.C. § 12131(2) ..........................................................................................30, 31

42 U.S.C. §§ 12131(2), 12132 ................................................................................34

42 U.S.C. § 12132......................................................................................19, 22, 25, 30

42 U.S.C. § 12133.....................................................................................................16

2007 WL 1100850, at *3 (E.D.N.Y. Mar. 24, 2007) ..............................................40

ADA .................................................................................................................*passim*

ADA Title I ........................................................................................................33, 36

ADA Title II .....................................................................................................*passim*

Alaska's Sex Offender Registration Act .................................................................46

*id.* § 40-35-111(3) .....................................................................................................4

*id.* § 40-35-111(e)(2)..............................................................................................3, 4

*id.* § 40-39-202(20)(A)(iii), (31)(X) .........................................................................4

*id.* § 40-39-206(a), (b).............................................................................................11

*Id.* § 40-39-211...................................................................................................4, 9

*id.* §§ -203(m), 206(d), 214(a) ..................................................................................9

*id.* § -211 .................................................................................................................18

Ky. Rev. Stat. § 529.090 ..........................................................................................28

Ky. Rev. Stat. § 529.090(2) ......................................................................................12

La. Rev. Stat. § 14:43.5 (1987).................................................................................28

*New Anti-LGBTQ+ Laws*, http://tinyurl.com/mrynb6f (last visited Jan. 10, 2024) .....................14

Pub. L. No. 101-336, § 1...........................................................................................31

Sexual Offender and Violent Sexual Offender Registration, Verification and
Tracking Act ................................................................................................11

Tenn. Code Ann. § 8-7-103(1) ...................................................................5

Tenn. Code Ann. § 39-13-513(b)(1) ......................................................3, 37

Tenn. Code Ann. § 39-13-516 ...............................................................3, 4

Tenn. Code Ann. § 40-39-203 ...................................................................9

Tenn. Code Ann. § 40-39-203(a)(1), (b), (i) ...............................................4

Tenn. Code Ann. §§ 40-39-204(a), -206(a),(e) (2007) ...........................4, 39

Tenn. Code Ann. §§ 40-39-206(d), 214(a) ...............................................11

Tenn. Code Ann. § 40-39-207(f) (2007) ..................................................39

Tenn. Code Ann. § 40-39-208(a) .........................................................9, 11

Tenn. Code. Ann. § 40-39-301, et seq. ..................................................6, 11

Tenn. Code. Ann. § 40-39-302(b)(1) .......................................................11

1991 Tenn. Pub. Acts, c. 281, § 2 .............................................................3

W. Va. Code Ann. § 16-4-20 (1921) .......................................................28

**Other Authorities**

28 CFR § 35.139 ....................................................................................34

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
Texts* (Thomson/West 2012) ................................................................22

CDC, *HIV by the Numbers – 2021*, http://tinyurl.com/yzpsw9ej ...............33

CDC, *HIV Risk Among Persons Who Exchange Sex for Money or Nonmonetary
Items*, http://tinyurl.com/yh7mfwkm ...............................................2, 3, 34

CDC, *HIV Surveillance --- United States, 1981 – 2008*, http://tinyurl.com/2t5j2unj ...................33

CDC, *Update: Mortality Attribute to HIV Infection Among Persons Aged 25-44
Years—United States, 1991 and 1992* (Nov. 19, 1993),
http://tinyurl.com/3mjktwmf (last visited January 10, 2024) ...................3

CDC, *Ways HIV Can Be Transmitted*, http://tinyurl.com/2wmsxvym ............3

https://www.hiv.gov/hiv-basics/overview/history/hiv-and-aids-timeline/#year-
1992 ....................................................................................................33

https://www.hiv.gov/hiv-basics/overview/history/hiv-and-aids-timeline/#year-
    1994 ..............................................................................................................................33

OUTMemphis, *Tennessee Boasts One of the Broadest Scopes of New Anti-
    LGBTQ+ Laws*, http://tinyurl.com/mrynb6f (last visited Jan. 10, 2024). ...............................5

Rep. 101-116 (Aug. 30, 1989), p. 37 .......................................................................................36

Sun Lee, *Criminal Law and HIV Testing: Empirical Analysis of How At-Risk
    Individuals Respond to the Law* .........................................................................................28

U.S. Const. amend. XIV, § 5 .....................................................................................................26

## INTRODUCTION

HIV is a deadly disease that "cannot currently be cured." (Dkt. 1 at 10, ¶ 32.) Left untreated, HIV causes AIDS, which causes death within one to three years on average. (*Id.* at 9, ¶ 29.) Particularly relevant, the Centers for Disease Control states that current "risk of HIV" is "high among persons who exchange sex for money or nonmonetary items."[1]

For over thirty years, Tennessee has guarded against that heightened risk by enhancing the criminal punishment for those who engage in prostitution while knowingly infected with HIV and by subjecting those offenders to the requirements of the Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act (TN-SORA). (Dkt. 1 at 9–10, 18, ¶¶ 31, 78.)

Plaintiffs—four unidentified HIV-positive persons and an LGBTQ+ advocacy group— now bring this novel challenge to Tennessee's longstanding laws under the U.S. Constitution and the Americans with Disabilities Act of 1990 (ADA). (Dkt. 1.) Plaintiffs do not dispute that sexual intercourse transmits HIV, nor that lawmakers enacted the challenged prohibition at a time when HIV was "invariably fatal." (*Id.* at 9–10, ¶¶ 31, 33.) Instead, the Complaint insists that Tennessee's approach to stemming the spread of HIV no longer reflects "best practices" in light of "[c]ontemporary [s]cience," (*see id.* at 8–18, 45, ¶¶ 24–63, 185), and recent medical advances. Citing these putative changes in HIV science, the Complaint contends that Tennessee's laws irrationally and unlawfully discriminate against HIV-positive persons.

This Court should reject all of Plaintiffs' claims. At the outset, standing and sovereign immunity bar many claims and require wholesale dismissal of Governor Lee, Attorney General Skrmetti, and Commissioner Strada as defendants. And on the merits, Plaintiffs fail to state a

---

[1] CDC, *HIV Risk Among Persons Who Exchange Sex for Money or Nonmonetary Items*, http://tinyurl.com/yh7mfwkm (last visited Jan. 10, 2024); *see also Bradley v. Jefferson Cnty. Pub. Sch.*, 598 F. Supp. 3d 552 (W.D. Ky. 2022) (allowing "judicial notice of information posted on official public websites of government agencies").

claim under the ADA (Counts I, IV), and holding otherwise would raise significant doubts about the ADA's constitutionality. Plaintiffs' equal-protection and substantive-due-process claims (Counts II-III, V-VI) also fail because Plaintiffs have not identified any similarly situated individuals the laws favor, and lawmakers rationally enacted the challenged statutes to stem the spread of HIV. Plaintiffs' Eighth Amendment claim (Count VII) fails because the provisions of the TN-SORA enforced by Director Rausch—the only defendant with authority under that statute—are not punitive. Plaintiffs' Ex Post Facto claim (Count VIII) fails for that same reason, and for the additional reason that those provisions are not retroactive to Plaintiffs. Thus, the Complaint presents no actionable legal claims and should be dismissed in its entirety.

## BACKGROUND

### I.    Tennessee's Longstanding Law Against Engaging in Prostitution While Knowingly HIV-Positive

Tennessee's aggravated prostitution statute dates back to 1991. 1991 Tenn. Pub. Acts, c. 281, § 2. At that time, HIV was "invariably fatal," (Dkt. 1 at 12, ¶ 31–32), with the HIV/AIDS epidemic ranking as the *ninth* leading cause of death in the United States.[2] In 1991, as now, sexual contact was among the most common ways HIV is transmitted.[3] Thus, it is unsurprising that the risk of HIV is "high" among sex workers.[4] Against this backdrop and higher-than-ever HIV death rates, Tennessee lawmakers took up the question of how to combat "the growing problem of HIV" in the State's communities. (Dkt. 1 at 21, ¶ 77.)

---

[2] *See* CDC, *Update: Mortality Attribute to HIV Infection Among Persons Aged 25-44 Years—United States, 1991 and 1992* (Nov. 19, 1993), http://tinyurl.com/3mjktwmf (last visited January 10, 2024).

[3] CDC, *Ways HIV Can Be Transmitted*, http://tinyurl.com/2wmsxvym (last visited Jan. 10, 2024).

[4] CDC, *HIV Risk Among Persons Who Exchange Sex for Money or Nonmonetary Items*, http://tinyurl.com/yh7mfwkm (last visited Jan. 10, 2024).

Like other States, Tennessee opted for an approach that elevated the penalties for engaging in prostitution while knowingly infected with HIV.  *See* Tenn. Code Ann. § 39-13-516; *see also, e.g.*, Ky. Rev. Stat. § 529.090(2).  Prostitution generally is a Class B misdemeanor in Tennessee. Tenn. Code Ann. § 39-13-513(b)(1); *see id.* § 40-35-111(e)(2) ("The authorized terms of imprisonment and fines" for a Class B misdemeanor are "not greater than six (6) months or a fine not to exceed five hundred dollars ($500), or both, unless otherwise provided by statute. . . ."). Aggravated prostitution, however, is a Class C felony.  *Id.* § 39-13-516.  Thus, any person who commits prostitution "knowing" that they are "infected with HIV" faces a term of imprisonment "not less than" three years and a fine of up to $10,000.  *Id.*; *id.* § 40-35-111(3).  Persons convicted of aggravated prostitution must also register under, and comply with, the TN-SORA.  *See id.* § 40-39-202(20)(A)(iii), (31)(X).

Fortunately—as the Complaint details—HIV treatment has advanced in the thirty years since the enactment of the aggravated prostitution statute.  (*See generally* Dkt. 1 at 8–18, 44–57, ¶¶ 24–63, 179–236.)  Yet as Plaintiffs also acknowledge, HIV remains a deadly disease that "cannot currently be cured."  (*Id.* at 10, ¶ 32.)  Left untreated, HIV causes AIDS, which causes death within one to three years on average.  (*Id.* at 9, ¶ 29.)  And the risk of HIV infection remains high among sex workers.[5]

Recognizing those public-health risks, Tennessee included aggravated prostitution as a registerable offense when adopting its sex offender registry in 1995.  (*Id.* at 21, ¶ 78.)  Individuals convicted of aggravated prostitution therefore must register with their incarcerating facility within 48 hours prior to their release, and they are required to update their information with their registering agency regularly.  *See, e.g.*, Tenn. Code Ann. § 40-39-203(a)(1), (b), (i).  The TBI

---

[5] *See id.*

maintains a database of registered sex offenders in Tennessee and publishes that database to the public. *See id.* §§ 40-39-204(a), -206(a). The TN-SORA also creates restrictions on registered offenders, including limits on where they may live and work. *Id.* § 40-39-211. Local district attorneys general have exclusive power to prosecute criminal violations of those restrictions. *See id.* § 8-7-103(1).

## II.     Plaintiffs' Unprecedented Constitutional and ADA Challenges

Plaintiffs are four anonymous HIV-positive individuals (together, "Doe Plaintiffs") and OUTMemphis, an advocacy group that describes its mission as supporting LGBTQ+ individuals in the Memphis area against Tennessee's so-called "hate agenda."[6] The Doe Plaintiffs were convicted of aggravated prostitution and are therefore subject to the TN-SORA's registry-related obligations. (*Id.* at 5, ¶ 17.) Three of the Doe Plaintiffs reside in the community; the final one, Jane Doe 4, is currently incarcerated for a registry violation. (*Id.* at 64–73.)

The Complaint challenges Tennessee's aggravated prostitution statute as well as the associated obligations and prohibitions imposed on offenders by the TN-SORA. Together, the Doe Plaintiffs and OUTMemphis assert eight claims, broken down as follows:

***OUTMemphis's Aggravated Prostitution Claims (Counts I-III).*** OUTMemphis presses three claims (Counts I-III) exclusively against Governor Lee and Attorney General Skrmetti. Each claim facially challenges the aggravated prostitution statute, asserting that the statute discriminates against people "living with HIV" in violation of the ADA (Count I), the Equal Protection Clause (Count II), and substantive due process (Count III). (*Id.* at 85–89, ¶¶ 368–385.)

***All Plaintiffs' Registry Claims (Counts IV-VII).*** The remaining five claims challenge the registry-related obligations under the TN-SORA for those convicted of aggravated prostitution.

---

[6] OUTMemphis, *Tennessee Boasts One of the Broadest Scopes of New Anti-LGBTQ+ Laws*, http://tinyurl.com/mrynb6f (last visited Jan. 10, 2024).

Four claims—numbered Counts IV through VII—are each brought by all Plaintiffs against all Defendants. These claims allege that the TN-SORA's reporting requirements and "exclusion zones" violate the ADA (Count IV), the Equal Protection Clause (Count V), substantive due process (Count VI), and the Eighth Amendment (Count VII). (*Id.* at 89–94, ¶¶ 386–414.)

**Doe Plaintiffs' Registry Claim (Count VIII).** The final claim is brought by the Doe Plaintiffs against all Defendants. It alleges that the TN-SORA retroactively increased the Doe Plaintiffs' punishment for their aggravated prostitution convictions in violation of the Ex Post Facto Clause. (*Id.* at 94–95, ¶¶ 415–421.)

The cross-cutting theory of the Complaint is that the challenged statutes unlawfully "single[] out people with HIV" for worse punishment vis-à-vis other HIV-negative offenders. (*E.g.*, *id.* at 87, ¶ 376.) That is so, the Complaint principally contends, because the rationale for Tennessee's aggravated prostitution statute conflicts with "contemporary" understandings of "How HIV Operates," the "Risk of HIV Transmission" through various types of sex, empirical studies on public health, and the absence of comparable laws aimed at other "Infectious Diseases that Are Comparable to HIV." (*Id.* at 8–18, 44–57, 76–85.) The Doe Plaintiffs allege that this disparate treatment has caused them "significant harm," (*see e.g., id.* at 66, ¶ 271), while OUTMemphis alleges that the challenged laws have "frustrated" its mission to serve "constituents who are living with HIV," (*id.* at 5, ¶¶ 15–16).

The Complaint presses claims against four official-capacity defendants. First, Plaintiffs sue Defendant Lee, alleging he generally maintains responsibility to enforce "applicable federal and state laws" and administer state departments. (*Id.* at 6, ¶ 18.) Second, Plaintiffs sue Defendant Skrmetti, alleging he has a duty to "defend the constitutionality and validity" of all statewide legislation. (*Id.*, ¶ 19.) Third, Plaintiffs sue Commissioner Strada, citing his authority under a separate, unchallenged statute—Tennessee's Serious and Violent Sex Offender Monitoring Pilot

Project Act, Tenn. Code. Ann. § 40-39-301, et seq.—to establish a program to monitor certain sex offenders while they are on probation.  (*Id.* at 7, ¶ 21.)  The Complaint otherwise alleges no connection between the challenged statutes and Defendants Lee, Skrmetti, or Strada.  Fourth, Plaintiffs sue Defendant Rausch, who as TBI Director helps administer aspects of the TN-SORA. (*Id.* at 6–7, ¶ 20.)

## LEGAL STANDARD

Under Federal Rules of Civil Procedure 12(b)(1) and (h)(3), a court "must dismiss" any claim over which it lacks subject matter jurisdiction.  A court lacks jurisdiction if a plaintiff has no standing, or if a defendant is immune from suit.  *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015).

Courts assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) must "construe the complaint in the light most favorable to the plaintiff, accept [the plaintiff's] allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir.2007).  "However, 'a legal conclusion couched as a factual allegation' need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient."  *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quotation omitted).  A complaint must plead claims that are facially plausible—*i.e.*, supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The mere "possibility that a defendant has acted unlawfully" is insufficient.  *Id.*

## ARGUMENT

Plaintiffs' Complaint should be dismissed in its entirety because its claims are jurisdictionally barred under the doctrines of sovereign immunity or standing, or else fail on the merits. At a minimum, this Court cannot enjoin the challenged laws statewide.

## I.   Sovereign Immunity Requires Dismissing Several Claims and Defendants.

Sovereign immunity generally bars courts from hearing claims against the State without the State's consent. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). And a claim against "a state official in his or her official capacity" is generally treated as a claim against "the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). The Supreme Court, in *Ex parte Young*, 209 U.S. 123 (1908), created an "exception" to that rule, allowing suit to enjoin a state official "from enforcing state laws" in ways that run "contrary to federal law." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). But that exception to sovereign immunity is "narrow," *id.*, reaching only officials with "the right and power to enforce" the "act alleged to be unconstitutional," *Ex parte Young*, 209 U.S. at 157, 161. And there must be "a realistic possibility the official will take legal or administrative actions against the plaintiff's interests." *Russell*, 784 F.3d at 1048.

Many of Plaintiffs' claims fall outside of *Ex parte Young*'s narrow exception. Defendants Lee, Skrmetti, and Strada do not enforce Tennessee's aggravated prostitution statute, nor do they enforce the TN-SORA's registry-related obligations and prohibitions. Thus, sovereign immunity bars all claims (Counts I-VIII) against Defendants Lee and Skrmetti, as well as all claims (Counts IV-VIII) against Defendant Strada. And *Ex parte Young* permits claims against Defendant Rausch only to the extent Plaintiffs allege harms flowing from his limited authority to maintain and publish Tennessee's sex offender registry. Sovereign immunity otherwise bars Plaintiffs' claims against

Defendant Rausch in Counts IV-VIII "connect[ed] with" the TN-SORA's registry-related obligations that he does not "enforce[]." *See Ex parte Young*, 209 U.S. at 157.

### A.    Sovereign immunity bars all claims against Defendants Lee and Skrmetti.

*Ex parte Young* does not permit Plaintiffs' official-capacity claims against Defendants Lee and Skrmetti because neither has the requisite enforcement authority. *See Mich. Dep't of State Police*, 491 U.S. at 71. Under Tennessee law, the Governor and Attorney General generally do not play a role in criminal enforcement; the law reserves that authority to locally elected district attorneys general. *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1032 (6th Cir. 2022) (citing Tenn. Code Ann. § 8-7-103(1)). The Governor and "[t]he Attorney General never step[] in" to "initiate criminal prosecutions." *See id.* at 1032.

That general rule applies to the aggravated prostitution statute and violations of the TN-SORA. Defendants Lee and Skrmetti are not empowered to initiate or prosecute alleged violations of the aggravated prostitution statute. They lack authority to require sex offenders to register with local registering agencies. *See* Tenn. Code Ann. § 40-39-203. They do not require sex offenders to disclose any personal information, *see id.*, nor do they collect, compile, or publish that information, *see id.* §§ -203(m), 206(d), 214(a). And they do not keep sex offenders away from any schools, parks, or playgrounds, *see id.* § -211. Instead, all the criminal prohibitions Plaintiffs cite are enforced by local district attorneys via local prosecutions, *see* Tenn. Code Ann. § 40-39-208(a); *Nabors*, 35 F.4th at 1032, with limited TN-SORA administration otherwise falling to the TBI. Because Defendants Lee and Skrmetti have no "right [or] power to enforce" the "act[s] alleged to be unconstitutional," sovereign immunity bars all claims against them. *Ex parte Young*, 209 U.S. at 157, 161; *Nabors*, 35 F.4th at 1032.

Plaintiffs cannot sidestep *Ex parte Young*'s limits by pointing to Defendant Lee's general duty to "take care that" Tennessee's "laws [are] faithfully executed." (*See* Dkt 1 at 6, ¶ 18 (citing

Tenn. Const. art. III, § 10).)  Any "[g]eneral authority" Defendant Lee may have "to enforce the laws of the state is not sufficient to make" the Governor a "proper part[y] to [this] litigation." *Russell*, 784 F.3d at 1048 (citation omitted); *see also Nabors*, 35 F.4th at 1031; *R. K. by and through J. K. v. Lee*, 53 F.4th 995, 999 (6th Cir. 2022).[7]  Nor is Defendant Skrmetti's duty to "defend the constitutionality and validity of all legislation of statewide applicability" sufficient to defeat sovereign immunity.  (Dkt. 1 at 6, ¶ 19 (citing Tenn. Code Ann. § 8-6-109(b)(9).)  A duty to *defend* Tennessee's laws in litigation is different than a grant of authority to *enforce* those laws against the public.  "*Young*" thus "does not apply" to Defendant Lee or Skrmetti, as they have "neither enforced nor threatened to enforce the allegedly unconstitutional state statute[s]." *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996).

### B.    Sovereign immunity bars all claims against Defendant Strada.

In Counts IV-VIII, Plaintiffs raise statutory and constitutional challenges to offenders' obligations under the TN-SORA against Defendant Strada, among others.  But as with Defendants Lee and Skrmetti, the Complaint fails to allege that Defendant Strada enforces the challenged TN-SORA requirements or prohibitions, because he does not.  Sovereign immunity likewise bars Counts IV-VII against him.  *Ex parte Young*, 209 U.S. at 157, 161; *Nabors*, 35 F.4th at 1032.

It makes no difference that Commissioner Strada administers Tennessee's program for monitoring certain violent sexual offenders who have been paroled or granted probation.  (*See* Dkt.

---

[7] The Sixth Circuit has sometimes allowed suits against governors.  *See, e.g., League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 n.16 (6th Cir. 2008); *Lawson v. Shelby County*, 211 F.3d 331, 335 (6th Cir. 2000). These two cases permitted suits against the Governor concerning elections and the right to vote, matters over which the Governor had specific authority to control. But those cases did not—and cannot, consistent with earlier Sixth Circuit precedent—create the rule that generalized executive power is always enough to render the Governor a proper defendant under *Ex Parte Young*.  *See Children's Healthcare*, 92 F.3d at 1416.  Though such a "general" theory "would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law," the Supreme Court has rejected this approach as an affront to sovereign immunity.  *Ex Parte Young*, 209 U.S. at 157 (citation omitted).

1 at 6, ¶ 21(citing Tenn. Code. Ann. § 40-39-302(a)). For one thing, that program is authorized by an entirely separate, unchallenged statute. *See* Tenn. Code. Ann. § 40-39-301, et seq. Defendant Strada's power to "develop[] [and] implement guidelines for the continuous satellite-based monitoring of serious offenders and violent sexual offenders," Tenn. Code. Ann. § 40-39-302(b)(1), thus does not provide him enforcement authority over separate TN-SORA reporting requirements and restrictions. Moreover, the Complaint nowhere alleges that any plaintiff is currently paroled or otherwise subject to the monitoring program that Defendant Strada administers. Sovereign immunity thus prohibits Plaintiffs' claims against Defendant Strada.

### C. Sovereign immunity bars certain claims against Defendant Rausch.

Defendant Rausch's official actions also enjoy sovereign immunity, meaning they cannot be subject to suit unless covered by *Ex parte Young*'s exception. *See Mich. Dep't of State Police*, 491 U.S. at 71. Unlike the other named defendants, Defendant Rausch does administer limited parts of the TN-SORA. *See, e.g.*, Tenn. Code Ann. §§ 40-39-206(d), 214(a). Most relevant here, Defendant Rausch maintains the sex-offender registry database and makes it available to the public and law enforcement. *See id.* § 40-39-206(a), (b). Thus, while claims against those limited provisions would fail on the merits, *see infra* (V), *Ex parte Young* would permit them to advance.

But sovereign immunity bars Plaintiffs' remaining TN-SORA claims against Defendant Rausch. Again, to advance under *Ex parte Young*, such official-capacity claims "must be 'based on a theory that the officer['s] . . . *statutory authority* . . . is unconstitutional'" and therefore cannot be employed consistent with federal law. *Children's Healthcare*, 92 F.3d at 1415 (emphasis added) (citation omitted). But Defendant Rausch has no statutory authority to enforce the TN-SORA's reporting requirements or "exclusion zones" at the core of Plaintiffs' registry claims. Again, local district attorneys enforce those obligations by prosecuting their violation as a separate criminal offense. *See* Tenn. Code Ann. § 40-39-208(a); *Nabors*, 35 F.4th at 1032. Thus, to the

extent Plaintiffs' TN-SORA claims (Counts IV-VIII) rest on provisions that Defendant Rausch has no "right [or] power to enforce"—namely, "exclusion zones" and reporting requirements—those claims are barred by sovereign immunity. *See Ex parte Young*, 209 U.S. at 157.

## II.    The Doctrine of Standing Requires Dismissing Several Claims and Defendants.

Article III to the U.S. Constitution "limited the jurisdiction of federal courts to 'Cases' and 'Controversies'" brought by parties with standing. *Safety Specialty Ins. Co. v. Genesee Cnty. Bd. Of Comm'rs*, 53 F.4th 1014, 1020 (6th Cir. 2022) (citation omitted).  To establish standing, the plaintiff must show "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 296 (2022).  And standing is not "dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  Rather, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Lareo Estates, Inc.*, 581 U.S. 433, 439 (2017) (citation omitted).  As discussed below, several plaintiffs and claims fail to carry this standing burden.

### A.    OUTMemphis does not have standing.

OUTMemphis lacks standing to sue, whether on a theory of associational or third-party standing, or based on its own asserted injuries.  OUTMemphis's lack of standing bars its ability to bring any claim and requires outright dismissal of those claims it brings individually (Counts I, II, and III).

#### 1.    OUTMemphis lacks standing to bring any claim.

##### a.    No associational standing

OUTMemphis only asserts claims on behalf of "its constituents who are living with HIV." (*See* Dkt. 1 at 5, ¶ 16.)  Although the Supreme Court has recognized "associational standing" in certain cases, *see Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 542 (6th Cir. 2021), the doctrine imposes stringent requirements.  An organization must show that (1) "its members

would otherwise have standing to sue in their own right"; (2) the "interests" that the suit "seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

OUTMemphis's associational-standing argument fails because it has not identified a single member with individual standing to sue. To satisfy this prong of the test, OUTMemphis must specifically "identify members who have [or will] suffer[] the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (internal citations omitted). The mere "possib[ility] . . . that one individual will meet all of th[e] criteria," or a "likelihood" that harm will befall an "unknown member," does not suffice. *Id*. Yet here, the Complaint eschews any mention of OUTMemphis's members, instead noting only that OUTMemphis has a "mission" to "serve[] lesbian, gay, bisexual, transgender, and queer (LGBTQ+) people in the Mid-South." (Dkt. 1 at 4–5, ¶¶ 14, 16.)[8] If anything, these allegations suggest that OUTMemphis lacks *any* members; at a minimum, the Complaint's failure to point to even "one specifically-identified member [who will] suffer[] an injury-in-fact," *Am. Chem. Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006), means OUTMemphis has not plausibly pled associational standing.

Nor could OUTMemphis merely name an "at risk" member to support its standing. (*See* Dkt. 1 at 61, ¶ 249.) Any such member would have standing to bring "a pre-enforcement challenge" only if "the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). In other words, OUTMemphis must allege that its member "intend[s] to engage" in

---

[8] While the Complaint contains information about the individual Doe Plaintiffs, it does not state or even suggest that they are "members" of OUTMemphis. (Dkt. 1 at 64–65, ¶¶ 263–317.) Rather, the Complaint only alleges the Doe Plaintiffs are among the individuals in the community that OUTMemphis "serves." (*Id*. at 5, ¶ 15.)

aggravated prostitution or a TN-SORA violation "and there exists a credible threat of prosecution thereunder." *Id.* at 159.  It has not.

OUTMemphis's allegations of "the stigma and harassment experienced by its constituents" do not excuse the Complaint's deficiencies.  (Dkt. 1 at 5, ¶ 16.)  OUTMemphis has not alleged that these "constituents" are members as associational standing requires.  Regardless, even accepting that individuals with HIV "may wish not to publicize their identities," OUTMemphis must still "bear[] [its] burden of establishing the Court's Article III power to adjudicate its case." *Do No Harm v. Pfizer Inc.*, No. 1:22-cv-07908, 2022 WL 17740157, at *9 (S.D.N.Y. Dec. 16, 2022), *appeal docketed*, No. 23-15 (2d Cir. Jan. 4, 2023).  To the extent OUTMemphis had concerns about satisfying that burden while "keeping information confidential," it could have "request[ed] to proceed anonymously when warranted and the requisite showing is made." *Id*.  OUTMemphis's stigma argument is no substitute for satisfying a jurisdictional requirement. *See Ass'n of Am. Physicians*, 13 F.4th at 542.

### b.    No third-party standing

Nor does OUTMemphis fit into the narrow class of plaintiffs that can obtain prudential standing to assert the rights of third parties.  Generally, plaintiffs cannot establish standing based on the legal rights or interest of others. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).  There are "limited" exceptions to this rule, such as where a "close relationship" exists between the party asserting the right and the party possessing it or where a "hindrance" exists to the possessor's ability to protect the right. *Id*. at 129–30.  But OUTMemphis's services to "constituents" do not resemble the close bond embodied by the lawyer-client or doctor-patient relationships recognized by the Supreme Court in *Kowalski*.  (*See* Dkt. 1 at 6, ¶ 16.)  Allegations that an organization has developed a "close relationship" based on its "missions and outreach efforts in various communities" is an "unavailing distinction" that does not confer prudential standing. *Priorities*

*USA v. Nessel*, 462 F. Supp. 3d 792, 808 (E.D. Mich. 2020). OUTMemphis has not identified a reason why individuals could not pursue their own legal challenges either affirmatively or as a defense to a prosecution—and indeed, individual challenges to the TN-SORA are routine. *See e.g.*, *Does #1–9 v. Lee*, 574 F. Supp. 3d 558 (M.D. Tenn. 2021), *appeal docketed*, No. 23-5248 (6th Cir. Mar. 28, 2023).

### c.    No injury-in-fact

An organization may also claim standing when it has suffered its own palpable injury that is traceable to a defendant's challenged conduct and redressable by the requested relief. *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 555 (6th Cir. 2021). Notably, OUTMemphis—a corporate entity—does not allege an intent to commit aggravated prostitution or a violation of the TN-SORA, let alone that it fears "prospective prosecution" under those statutes. *See Block v. Canepa*, 74 F.4th 400, 409 (6th Cir. 2023) (detailing when "reasonable fear of prosecution" satisfies the injury-in-fact requirement) (citation omitted). Rather, OUTMemphis alleges that it has standing "in its own right" because advising its "constituents" on complying with the aggravated prostitution statute and the TN-SORA's registry-related obligations "frustrate[s]" its "mission" and "diverts resources." (Dkt. 1 at 5, 61, ¶¶ 15, 248–49.)

OUTMemphis's argument ignores this Circuit's standing precedents, which distinguish between not-yet-enacted and existing laws for purposes of assessing an entity's injury-in-fact. An organization facing proposed legislation might have standing to challenge that legislation, should its enactment require the organization's "plans to redirect" money and resources. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016).

But existing laws are a different story. Specifically, an organizational plaintiff does not have standing "merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law." *Fair Elections Ohio v. Husted*,

770 F.3d 456, 460 (6th Cir. 2014). This rule denies standing based on OUTMemphis's asserted injuries, which rest on past expenses and efforts that it simply would like to *discontinue* by prevailing in a challenge to existing laws. *Cf. id.* (no standing where plaintiff "decides that the government is violating the law, and decides to stop it by suing").

### 2.  OUTMemphis, at a minimum, lacks standing to bring Claims I-IV.

#### a.  No standing for aggravated prostitution claims

The same lack of enforcement authority that renders *Ex parte Young* inapplicable to Defendants Lee and Skrmetti also means that OUTMemphis lacks standing to bring Counts I-III against those same officials. *See WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 514 (6th Cir. 2021) (equating the *Ex parte Young* inquiry with the requirements for Article III standing). Even had OUTMemphis properly alleged an Article III injury-in-fact based on harm to its resources and expenditures, such injuries are not fairly traceable to enforcement of the aggravated prostitution statute by either Defendant Lee or Defendant Skrmetti.  And because neither defendant has authority to enforce the statute, an order enjoining them from doing so would not redress OUTMemphis's alleged injuries. *See Cruz*, 596 U.S. at 296.  Local prosecutors would remain free to prosecute violations of the laws challenged in the Complaint.  Because OUTMemphis's alleged injuries "result [from] the independent action of some third party not before the court," its aggravated prostitution claims are neither traceable to, nor redressable by an order against, Defendant Lee or Defendant Skrmetti. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

#### b.  No standing for ADA claims

Separately, OUTMemphis lacks statutory standing to sue under the ADA (Counts I and IV).  Title II of the ADA allows "any person alleging discrimination on the basis of disability in violation of section 12132" to bring an action.  42 U.S.C. § 12133.  Title II does not expressly allow an organization to bring an action against a public entity on the theory that it has suffered an

injury, and the Sixth Circuit has permitted organizations to bring claims under Title II of the ADA only where there was some discrimination *against the organization itself*. *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335 (6th Cir. 2002) (requiring an organization to allege that "it has been discriminated against on the basis of its association with a disabled person").

OUTMemphis does not allege that it has faced discrimination or been denied a benefit under the ADA because of its association with HIV-positive constituents. Rather, the organization claims that its HIV-positive constituents face discrimination under the aggravated prostitution statue, and the organization "divert[s] resources" to help them understand and comply with the law. (Dkt. 1 at 5, ¶ 15.) But the "diversion of resources and advocacy efforts" are insufficient to confer organizational standing for an ADA claim. *Velzen v. Grand Valley State Univ.*, 902 F. Supp. 2d 1038, 1044 (W.D. Mich. 2012); *see MX Grp.*, 293 F.3d at 326. OUTMemphis lacks standing to pursue ADA claims (Counts I and IV) for this additional reason.

## B. All claims against Defendants Lee, Skrmetti, and Strada fail for lack of standing.

The doctrine of standing independently requires dismissing Defendants Lee, Skrmetti, and Strada as defendants, because any alleged injury cannot be traced to, or redressed by, these parties.

Plaintiffs must "separately" demonstrate standing to sue each defendant on each claim for each form of relief. *Nabors*, 35 F.4th at 1031. Standing's "traceab[ility]" prong requires Plaintiffs to prove that their alleged injury "can be traced to [the] 'allegedly unlawful conduct of' the [defendants], not to the provision of law that is challenged." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) (internal citations omitted). And the "redressability" prong requires Plaintiffs to show "how the requested relief against" each defendant "could redress [its] alleged injuries-in-fact." *Nabors*, 35 F.4th at 1031.

In short, when it comes to challenging enforcement of a statute, standing requires a connection between that enforcement and the particular defendant who has been sued. Yet here,

as mentioned, neither Defendant Lee, Defendant Skrmetti, nor Defendant Strada has any authority to enforce the challenged statutes. *See supra* p. (I)(A)-(B). Under Sixth Circuit precedent, Plaintiffs thus lack standing to sue—and the Court lacks jurisdiction to enjoin—Defendant Lee, Defendant Skrmetti, and Defendant Strada. *See Nabors*, 35 F.4th 1031–32; *R. K.*, 53 F.4th at 999–1000.

### C.      Certain claims against Defendant Rausch fail for lack of standing.

For similar reasons, Plaintiffs have only limited standing to bring their claims against Defendant Rausch. Because Article III's "traceab[ility]" prong requires Plaintiffs to prove that their alleged injury "can be traced to [the] 'allegedly unlawful conduct of'" each defendant, they have standing to bring Counts IV-VIII only to the extent that they allege harms from the aspects of the TN-SORA that Defendant Rausch oversees. *See Collins*, 141 S. Ct. at 1779. And Defendant Rausch does not enforce the obligations that cause the harms at the core of Plaintiffs' challenges to the TN-SORA—like reporting requirements and "exclusion zones." *See supra* (I)(C). Thus, Plaintiffs lack standing to bring such claims against Defendant Rausch, and they have standing under Counts IV-VIII only stemming from his maintaining and publishing the TN-SORA registry, which Plaintiffs have not alleged here.

### III.      The Complaint Fails to State a Valid ADA Claim (Count I, IV).

### A.      OUTMemphis does not have a cause of action under the ADA.

"To sue someone, you must have a cause of action. And you only have a cause of action under a federal statute if the statute's text provides you one." *Keen v. Helson*, 940 F.3d 799, 800 (6th Cir. 2019). Here, the text of the ADA does not provide OUTMemphis a cause of action because the Complaint does not allege that the organization itself has suffered "exclusion, [a] denial of benefits, or discrimination." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1143 (11th Cir. 2014). Nor can OUTMemphis permissibly reroute this claim under § 1983.

17

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  And Congress granted "any person alleging discrimination on the basis of disability" a cause of action to enforce Title II's protections.  42 U.S.C. § 12132.  "It is widely accepted" that Title II's enforcement provision grants organizations a private right of action "when *they are injured*" under the ADA—meaning, discriminated against—"because of their association with a disabled person." *McCullum*, 768 F.3d at 1142 (emphasis added).  Courts have for instance permitted Title II suits by drug rehabilitation centers denied zoning permits because of their clientele.  *MX Grp.*, 293 F.3d at 335.

By contrast, courts consistently dismiss claims brought by non-disabled individuals seeking relief "for injuries other than exclusion, denial of benefits, or discrimination that they themselves suffer." *McCullum*, 768 F.3d at 1143–44; *Popovich v. Cuyahoga Cnty. Court of Common Pleas, Domestic Rels. Div.*, 150 F. App'x 426–27 (6th Cir. Sept. 27, 2005).  Here, the Complaint does not allege that *OUTMemphis* has been excluded, denied benefits, or discriminated against.  Instead, OUTMemphis alleges that it has taken steps to mitigate the effects of discrimination *its constituents* have suffered.  The ADA does not confer OUTMemphis with a right to proceed in this context.  *See McCullum*, 768 F.3d at 1143–44.  As the Eleventh Circuit noted, to hold otherwise "would mean that Congress granted non-disabled persons more rights under the ADA . . . than it granted to disabled persons, who can recover only if they are personally excluded, denied benefits, or discriminated against on the basis of their disability"—a reading that "cannot be right." *Id.*  Because OUTMemphis has no cause of action for ADA-based relief, Count I should be dismissed outright.  *See id.* at 1145 (affirming dismissal of ADA claim on similar grounds); *see also MX Grp.*, 293 F.3d at 225.

18

OUTMemphis cannot pursue its failed ADA claims under Section 1983.  While that statute generally permits claims to enforce federal rights "elsewhere conferred," *Albright v. Oliver*, 510 U.S. 266, 271 (1994), Congress may carve off certain statutes from enforcement via § 1983 by "creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983," *Blessing v. Freestone*, 520 U.S. 329, 341 (1997); *accord Williams v. Pennsylvania Human Relations Comm'n*, 870 F.3d 294, 298–99 (3d Cir. 2017).  And at least four circuits have held the comprehensive remedial scheme Congress established in Title II means "that a plaintiff cannot bring an action under [Section] 1983 against a State official in her individual capacity to vindicate rights created by Title II of the ADA." *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (joining "the Fifth, Eighth, and Eleventh Circuits").  Indeed, while the Sixth Circuit has not "squarely decided" the issue, the Court recognized in *Bullington v. Bedford Cnty., Tn.*, 905 F.3d 467, 471 (6th Cir. 2018), that "[o]ther circuits . . . have held that the ADA does preclude § 1983 claims for violations of the statute."

Defendants Lee, Skrmetti, and Strada are particularly inappropriate defendants for § 1983 enforcement.  "Because vicarious liability is inapplicable to Section 1983 suits," Plaintiffs "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.  They must also show "a causal connection between the defendant's unconstitutional action and the plaintiff's injury." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 490 (6th Cir. 2020); *R. K.*, 53 F.4th at 1001 (6th Cir. 2022).  Plaintiffs have not made—and cannot make—that necessary showing, because Defendants Lee, Skrmetti, and Strada play no role in enforcing the aggravated prostitution statute.

### B.    The ADA claims fail on their own terms.

A claim under Title II requires proof that the plaintiff (1) had a disability, (2) was otherwise qualified to participate in the public program, service, or activity at issue, and (3) was excluded

from participation in the public program or was discriminated against by the public entity—including a state or local government—because of his or her disability. *See Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015). Here, the Complaint falls short of alleging a prima facie case under Title II.

### 1. OUTMemphis is not a "qualified individual with a disability."

A "qualified individual with a disability" covered by Title II's protections is "an individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). That does not describe OUTMemphis. Aside from not being an "individual" and failing to allege a qualifying disability of its own, OUTMemphis cannot advance Counts I or IV because it has not alleged that it is otherwise eligible for any (unnamed) service or benefit it allegedly has been denied. *See Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1265, 1267 (4th Cir. 1995) (holding that "a hospital does not violate . . . Title II of the ADA when it terminates an HIV-positive" worker because "he poses a significant risk to the health or safety of its patients that cannot be eliminated by reasonable accommodation and therefore is not an otherwise qualified individual with a disability.").

### 2. The Complaint does not allege discrimination in the provision of public services, programs, or benefits.

Best read, Title II of the ADA serves to guarantee equal access to the programming, services, and benefits States provide—not to block the enforcement of criminal laws aimed at individuals' knowing conduct and nonpunitive portions of the SORA. All Plaintiffs' claims under Counts I and IV thus fall outside of Title II's scope.

The proper "starting point" is the text of Title II itself. *Thompson v. Greenwood*, 507 F.3d 416, 419 (6th Cir. 2007). That provision specifies that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of

the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Title II's text thus focuses on public entities' affirmatively providing equal access to public services, programs, and activities.  *See Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004) (ADA prohibits "discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; *public services, programs, and activities, which are the subject of Title II*; and public accommodations, which are covered by Title III" (emphasis added)).

Title II's structure and history reinforce this reading.  As mentioned, Title II covers only "qualified individual[s]."  42 U.S.C. § 12132.  The definition of "qualified individual" in turn requires showing that a plaintiff meets "the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2) (emphases added); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 225 (Thomson/West 2012) ("[I]nterpretation clauses are to be carefully followed.").  The "title of" Plaintiffs' cited section—"Public Services," Pub. L. No. 101-336, § 1—is yet another "cue[] that Congress did not intend" Title II to "sweep within its reach" Plaintiffs' novel criminal-statute and SORA challenges.  *Yates v. United States*, 574 U.S. 528, 540 (2015).  Title II's history is likewise telling.  "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state *services and programs*, including systemic deprivations of fundamental rights."  *Lane*, 541 U.S. at 524 (emphasis added).  Absent from this historical record is discrimination based on individuals' knowingly engaging in unlawful conduct that risks transmitting deadly diseases to others.  *See infra* (III)(B)(3).

The Complaint does not allege that any plaintiff has been denied *any* public service or benefit.  Instead, they argue that Congress intended Title II to generally invalidate all State laws

that draw any distinctions based on disability, including laws regulating the knowing exposure of deadly communicable diseases.  (*See* Dkt. 1 at 86, 89 ¶¶ 371, 389.)

This position flouts the "limits to the obligations" Title II imposes on public entities. *Tucker v. Tennessee*, 539 F.3d 526, 530 (6th Cir. 2008), *abrogated on other grounds in Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir.2012) (en banc).  As the Sixth Circuit has put it, the requirements of Title II are "subject to the bounds of reasonableness."  *Johnson v. City of Saline,* 151 F.3d 564, 569 (6th Cir.1998).  Courts have accordingly held that certain criminal enforcement activities—like arrests—are not "service[s], program[s], or activit[ies]" covered by Title II because they are not "voluntarily provided by the police" and do not provide a benefit. *Tucker*, 539 U.S. at 534 (citing *Rosen v. Montgomery County, Maryland*, 121 F.3d 154 (4th Cir.1997)).  Thus, general enforcement of a State's criminal code is not reasonably considered a covered "service, program, or activity." *See Johnson*, 151 F.3d at 569.

Title II's residual clause—prohibiting "discrimination by any [public] entity"—does not license striking down all state statutes that distinguish based on disability.  *See Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1175 (9th Cir. 1999).  "Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114 (2001) (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991)).  This *ejusdem generis* principle requires reading Title II's residual phrase "to give independent effect" to the preceding terms.  *Id*. at 114–15; *see CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 295 (2011) ("We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless.").  Read in context, Title II's residual clause, "like the first, prohibits discrimination only in a public entity's 'outputs.'" *Zimmerman*, 170 F.3d at 1176.  A contrary, broader reading would cause the residual

clause to swallow the remainder of Title II—contrary to the general rule that "no clause, sentence, or word of a statute should be read as superfluous, void, or insignificant." *In re City of Detroit*, 841 F.3d 684, 696–97 (6th Cir. 2016) (internal quotation marks and citation omitted). It also would conflict with Title II's limited definition of "qualified individual with a disability" by offering a remedy regardless of whether the disabled individual is otherwise eligible for some public program or service. *See* 42 U.S.C. 12131(2).

Plaintiffs' expansive reading of Title II's residual clause also cannot be squared with binding precedent interpreting Title I of the ADA, which prohibits employment discrimination. In *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001), the Supreme Court held that Congress lacked authority to abrogate the States' sovereign immunity for failing to comply with Title I's provisions. *Id.* at 374. Yet under Plaintiffs reading, Title II's residual clause would permit suit for the same employment discrimination that Title I could not constitutionally reach.

This Court should reject reading Title II's residual clause to make a hash of myriad other ADA provisions. *See Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998) ("[Courts] must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (citation omitted). Instead, it should adopt the sounder reading that squares with the ADA's text, structure, history and precedent. Under that view, Title II's residual clause "prohibit[s] *intentional* discrimination" against disabled persons in the provision of public programs and benefits, whereas the first clause "prohibit[s] *disparate treatment* of the disabled"— regardless of whether such treatment reflects discriminatory intent. *Zimmerman*, 170 F.3d at 1176 (emphasis in original). That reading gives full independent effect to each term in Title II and makes sense of Title II's definitional sections. It also corresponds to the elements courts regularly use to analyze ADA claims. *See Thompson v. Williamson County, Tenn.*, 965 F. Supp. 1026, 1036

(M.D. Tenn. 1997) ("To show a violation of the ADA, Plaintiff[s] must show disability, denial of public benefit, and that such denial or discrimination was by reason of the disability."); *Kornblau v. Dade County*, 86 F.3d 193, 194 (11th Cir. 1996); *see Green v. Corrections Corp. of America*, 198 F.3d 245 (Table), 1999 WL 1045087, at *1 (6th Cir. 1999).

Ultimately, because Plaintiffs have not alleged that they have been denied public services or benefits that they otherwise would qualify for, they have failed to state a claim under Title II. 42 U.S.C. §§ 12131(2), 12132.

### 3. Applying Title II as Plaintiffs suggest would create serious constitutional problems.[9]

Federal courts are obliged to avoid constitutional questions if an alternative interpretation of the statute is possible. *See Bevan & Assocs., LPA, Inc. v. Yost*, 929 F.3d 366, 376–77 (6th Cir. 2019) (citing *Arizona v. Inter Tribal Council of Ariz., Inc*., 570 U.S. 1, 18 (2013)). For reasons just given, the best reading of Title II is that it does not cover Plaintiffs' claims. At a minimum, this reading is "reasonable," and thus "must be resorted to in order to save" Title II from the constitutional defects that would attend application to Plaintiffs' claims in this case. *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trustees*, 411 F.3d 777, 785–86 (6th Cir. 2005) (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895)).

---

[9] There can be no doubt about Plaintiffs' desired application of Title II: their construction would subject *all* statutes to facial challenges under Title II. Plaintiffs have already argued that all statutes must, in their enacted language, "provide for such an individualized assessment" that complies with the federal regulations implementing Title II. (D.E. 47, PageID#: 233.) Plaintiffs' absurd construction would require the "individualized assessment" to include "a reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk." 28 CFR § 35.139.

Congress enacted the ADA pursuant to Section 5 of the Fourteenth Amendment and the Commerce Clause.  42 U.S.C.A. § 12101(b)(4).  Applying Title II in the manner Plaintiffs seek would not be a valid exercise of either power.

Section 5 empowers "Congress . . . to enforce, by appropriate legislation, the provisions" of the Fourteenth Amendment.  U.S. Const. amend. XIV, § 5.  This grant of authority, the Supreme Court has held, permits Congress to "enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct."  *Nevada Dept. of Human Res. v. Hibbs*, 538 U.S. 721, 727–28 (2003); *contra Lane*, 541 U.S. at 560 (Scalia, J., dissenting).  But such prophylactic legislation may not work a "substantive redefinition of the Fourteenth Amendment right at issue."  *Hibbs*, 538 U.S at 728 (quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 81 (2000)).

Under *City of Boerne v. Flores*, 521 U.S. 507, 529–36 (1997), courts consider three factors to determine whether legislation is a valid exercise of Congress's Section 5 authority: (1) the nature of the constitutional right at issue; (2) the extent to which Congress passed the remedial statute in response to a documented history of relevant constitutional violations; and (3) whether the statute is "congruent and proportional" to the specific class of violations at issue, given the nature of the relevant constitutional right and the identified history of violations.  *See also Lane,* 541 U.S. at 522, 529–30.  Under that rubric, applying Title II as Plaintiffs suggest exceeds Congress's Section 5 authority.

***Nature of Constitutional Right.***  To determine the appropriateness of applying the ADA to a State, it is necessary to identify "with some precision the scope of the constitutional right at issue."  *Garrett*, 531 U.S. at 365.  Here, Plaintiffs' core contention is that Title II enforces the Equal Protection Clause of the Fourteenth Amendment by prohibiting the State from "singl[ing] out people with HIV for different treatment."  (*See* Dkt. 1 at 86, 88, ¶¶ 372, 379–80.)  But as the

Complaint implicitly concedes, (*see e.g.*, *id.* at 87–88, ¶¶ 376–77, 382), legislative classifications based on disability status are subject to only rational-basis review. *Garrett*, 531 U.S. at 366. Ultimately, Plaintiffs must "negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 367. That is, the Complaint must allege that the State is irrationally discriminating against persons who knowingly commit prostitution with HIV. And they cannot do so here. *See infra* (IV).

**No Congressional Record of Discrimination.** Having "determined the metes and bounds of the constitutional right in question," the next step is determining whether Title II was "responsive to, or designed to prevent unconstitutional behavior." *City of Boerne*, 521 U.S. at 532. Doing so requires examining the "legislative record of the ADA" to understand what specific evils Title II was meant to address. *Garrett*, 531 U.S. at 368. On this score, it is not enough for Congress to have generally considered and debated historical discrimination against the disabled. Rather, Congress's historical findings "[w]ith respect to the particular services at issue" must prove Title II was meant to remedy a pattern of the types of wrongs asserted by the plaintiff. *City of Boerne*, 521 U.S. at 527 (emphasis added).

Thus, here, the question is whether Congress identified a "history and pattern" of state criminal laws which irrationally discriminated against the disabled. *Garrett*, 531 U.S. at 368. The answer is a resounding "no." While Congress considered what the ADA meant for people with HIV, that review was limited to the employment context covered by Title I. *See, e.g.*, Senate Committee on Labor and Human Resources, Rep. 101-116 (Aug. 30, 1989), p. 37 (citing *School Board of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.16 (1987)). The path Congress chose is telling: Title I prohibits employment discrimination against people with HIV, but Congress recognized that an employer may "deny employment to an applicant or . . . fire an employee" with HIV if the individual "poses a direct threat to the health or safety of others." *Id.* at 25. Thus, the

only consideration Congress gave to States' treatment of individuals with HIV shows Congress intended to preserve States' ability to mitigate harm of transmission to others.

And Congress's silence about past irrationally discriminatory prosecutions is particularly notable because States were criminalizing the spread of communicable diseases—including HIV—well before Congress enacted the ADA. *See* Sun Lee, *Criminal Law and HIV Testing: Empirical Analysis of How At-Risk Individuals Respond to the Law*, 14 Yale J. Health Pol'y. L. & Ethics 194, 202 (2014) (collecting state statutes criminalizing HIV-prostitution).[10]  Yet the congressional record does not identify a history or pattern of the States enforcing these laws to irrationally discriminate against people with HIV or other communicable diseases.

***Lack of Congruence and Proportionality.***  Even if Plaintiffs could proffer some scattered examples of prior unconstitutional discrimination by the States—something they have not and cannot do—"the rights and remedies created by the ADA against the States would raise . . . concerns as to congruence and proportionality" if applied in the manner sought by Plaintiffs. *Garrett*, 531 U.S. at 372.  Whether Title II is an appropriate response to a purported class of constitutional violations depends on whether its remedy is well-tailored to the nature of the right and the history of violations.  "Difficult and intractable problems often require powerful remedies," but "[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *Lane*, 541 U.S. at 523.  Thus, while Congress has a wider berth to craft remedies vindicating fundamental rights that are subject to heightened scrutiny, *see id*. at 533–34, when non-fundamental rights are at stake, Congress must draft focused statutes grounded in a comprehensive legislative record. *See Garrett*, 531 U.S. at 369–70.

---

[10] *See, e.g.*, W. Va. Code Ann. § 16-4-20 (1921); La. Rev. Stat. § 14:43.5 (1987); Ky. Rev. Stat. § 529.090.

Here, no fundamental right is at stake because no Plaintiff has any right to engage in prostitution or to be free from the TN-SORA obligations resulting from their prior criminal conduct. Thus, it would be "out of proportion to a supposed remedial or preventive object" if Title II imposed liability against Tennessee for enforcing its aggravated prostitution statute and the TN-SORA. *City of Boerne*, 521 U.S. at 536. Indeed, those statutes advance Tennessee's fundamental interests in public health and safety. *See Kentucky v. Biden*, 23 F.4th 585, 609 (6th Cir. 2022) ("Since the Framing, the power to regulate the public health has been 'part and parcel' of states 'traditional police power.'"). And the Supreme Court has suggested that the congruence and proportionality of a remedial statute also depends, to a degree, on whether the statute "curtail[s] [States'] traditional regulatory power" or imposes heavy costs. *City of Boerne*, 521 U.S. at 536. Applying Title II to invalidate the statutes challenged here not only infringes on Tennessee's traditional authority over moral and public-health issues, *see Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 560 (1991), but it also imposes significant costs on the State's public health system by removing a tool for limiting the spread of HIV. That result would be "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532. In such a case, Title II is not a valid exercise of Congress's Section 5 authority.

The Commerce Clause likewise offers no constitutional ground to extend Title II to Plaintiffs' claims. As a threshold matter, Congress cannot use Article I powers to abrogate States' sovereign immunity, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996), nor can Plaintiffs defend their proposed application of Title II as a valid exercise of the Commerce Clause power based on their seeking only injunctive and declaratory relief.

Plaintiffs allege they are "subjected to discrimination by a public entity" via the State's "maintenance, administration, and enforcement" of the aggravated prostitution statute and TN-

SORA, and that these state actions are themselves regulated by Title II.[11]  (Dkt. 1 at 86, 89 ¶¶ 371, 389.)  Because the aggravated prostitution statute simply makes a felony out of engaging in prostitution while knowing one is infected with HIV, Plaintiffs tacitly argue that the criminalization of prostitution, or increasing punishments for certain types of prostitution, are activities that substantially affect interstate commerce.

But it strains credulity to suggest that a State's enforcement of its criminal statutes is an "economic endeavor."  *United States v. Morrison*, 529 U.S. 598, 609 (2000) (rejecting generalized "costs of crime" and "national productivity" arguments as evidence of criminal law enforcement's substantial effect on interstate commerce); *see United States v. Lopez*, 514 U.S. 549, 551 (1995) (holding that federal law prohibiting possession of firearm in school zone did not "regulate a commercial activity").  The relevant question is not whether the regulated activity affects commerce; it is whether the regulated activity *is* commerce.  *See Lopez*, 514 U.S. at 560–61.  Enforcement of duly enacted legislation prohibiting conduct known to spread a deadly disease is a far cry from the type of commercial activity contemplated by *Lopez* and *Morrison*.  Even in *Wickard v. Filburn*, 317 U.S. 111 (1942), which the Supreme Court has described as "perhaps the most far-reaching example of Commerce Clause," the statute at issue strictly pertained to commercial conduct.  *Lopez*, 514 U.S. at 560.

Title II cannot be applied as proposed by Plaintiffs because to do so would push the Commerce Clause power of Congress beyond the outermost limits recognized by *Wickard*.  Criminal prosecutions are not an economic activity.  To impose Title II on state enforcement of its

---

[11] Plaintiffs' allegations demand a reading of the final phrase of 42 U.S.C. § 12132 that treats the enactment of legislation as a commercial activity in and of itself, which only further demonstrates why Plaintiffs' nonsensical construction of Title II should be rejected on the grounds of constitutional avoidance.

criminal laws under the precept of regulating commerce would blatantly usurp traditional police powers explicitly reserved to the States and upset fundamental principles of federalism.

Some federal courts have recognized that certain applications of Title II are not legitimate exercises of Commerce Clause power.  *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 433 (5th Cir. 2004) (Garza, J., concurring in part and dissenting in part) ("Title II of the ADA is not permissible Commerce Clause legislation to the extent that it regulates states' decisions regarding who will participate in or receive the benefits of state entitlement programs."); *Klingler v. Director, Mo. Dept. of Revenue*, 366 F.3d 614, 620 (8th Cir. 2004)[12]; *see also Castells v. Fisher*, No. 05 CV 4866 (SJ), 2007 WL 1100850, at *3 (E.D.N.Y. Mar. 24, 2007) ("What *Garrett* made quite clear…was that Congress could not assert its power under the Commerce Clause in order to remedy past discrimination.").

For these reasons, application of Title II to invalidate Tennessee's aggravated prostitution statute and the TN-SORA would exceed Congress's constitutional authority and should be avoided by adopting Defendants' reasonable interpretation instead.  *See supra* (III)(B)(2).

## IV.    The Complaint Fails to State a Valid Equal-Protection (Counts II, V) or Substantive-Due-Process Claim (Counts III, VI)

The Fourteenth Amendment to the U.S. Constitution prohibits States from "depriv[ing] any person of life, liberty, or property, without due process of law" or "deny[ing] any person within its jurisdiction the equal protection of the laws."  The Due Process Clause "provides substantive, as well as procedural, protection for 'liberty[,]'" but only for "two categories of substantive rights—those rights guaranteed by the first eight Amendments to the Constitution and those rights deemed fundamental that are not mentioned anywhere in the Constitution."  *Dobbs v. Jackson Women's*

---

[12] *Klingler* was vacated and remanded by the Supreme Court in light of *Tennessee v. Lane*.  Once the Supreme Court decided *Lane*, Missouri dropped its constitutional challenge altogether.

*Health Org.*, 597 U.S. 215, 237 (2022).  "In deciding whether a right falls into either of these categories," courts must carefully consider the "history of the right at issue."  *Id.* at 238.

### A.      Rational-basis review applies, and the challenged statutes are rational.

To their credit, Plaintiffs do not allege that the U.S. Constitution guarantees a fundamental right to knowingly engage in prostitution while HIV-positive without facing heightened criminal consequences.  *Cf. Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d 450, 459 (9th Cir. 2018), *amended,* 881 F.3d 792 (9th Cir. 2018). (no right to engage in prostitution); *Barnes*, 501 U.S. at 560 (States maintain traditional police power "to provide for the public health, safety, and morals").  Nor do Plaintiffs contest precedent holding that disability status is not a suspect classification.  *Garrett*, 531 U.S. at 367.

This leaves Plaintiffs to argue that the challenged statutes fail rational-basis review—and thus violate equal protection and substantive due process—because they arbitrarily discriminate against HIV-positive persons.  Showing that a statute fails rational-basis review is an "uphill climb" for Plaintiffs, "given that under the rational basis standard, government action is afforded a strong presumption of validity, and [courts] will uphold it so long as there is a rational relationship between the disparity of treatment and some legitimate government purpose." *Andrews, Trustee of Gloria M. Andrews Trust Dated April 23, 1998 v. City of Mentor, Ohio*, 11 F.4th 462, 477 (6th Cir. 2021) (citation omitted).  This "highly deferential" standard places the "burden … on plaintiffs to negate every conceivable basis which might support the government's disparate treatment."  *Id.* (citation omitted).

The challenged statutes' approaches to stemming the spread of a dangerous, communicable disease more than pass rational-basis muster.  Plaintiffs admit that HIV is an incurable disease. (Dkt. 1 at 10, ¶ 32.)  If left untreated, HIV will almost always lead to the final stage of the infection or AIDS, followed by death in one to three years. (*Id.* at 9, ¶ 29.)  As of 2022, HIV/AIDS has killed

over 608,000 people in the United States, and despite recent advances in HIV therapies, more than 32,000 new cases of the deadly disease were recorded in 2021.[13]

And when Tennessee adopted its aggravated prostitution statute and made offenders register under the TN-SORA, things were worse. When HIV/AIDS first entered the public consciousness in the 1980s, the medical community was particularly concerned about the disease's devastating impact on "previously healthy persons."[14] HIV was declared an epidemic in the United States in 1981.[15] That year saw only 318 new cases of HIV reported, but by 1992, new cases peaked at 75,457.[16] That period also saw "sharp increases" in the number of HIV-related deaths.[17] There were only 451 HIV-related deaths in 1981, but by 1992, HIV/AIDS was the number one cause of death for men ages 25 to 44.[18] Two years later, HIV/AIDS became the leading cause of death for *all* people ages 25 to 44.[19] In 1995, HIV/AIDS killed 50,628 people in the United States.[20]

To help stop the spread of this deadly disease, Tennessee's legislature created a separate offense for individuals who commit prostitution knowing that they are HIV-positive. The

---

[13] CDC, *HIV by the Numbers – 2021*, http://tinyurl.com/yzpsw9ej (last visited Jan. 10, 2024).

[14] CDC, *HIV Surveillance --- United States, 1981 – 2008*, http://tinyurl.com/2t5j2unj (last visited Jan. 10, 2024).

[15] *Id.*

[16] *Id*.

[17] *Id*.

[18] *Id.*; https://www.hiv.gov/hiv-basics/overview/history/hiv-and-aids-timeline/#year-1992

[19] https://www.hiv.gov/hiv-basics/overview/history/hiv-and-aids-timeline/#year-1994

[20] CDC, *HIV Surveillance --- United States, 1981 – 2008*, http://tinyurl.com/2t5j2unj (last visited Jan. 10, 2024)

legislature recognized that "[t]he risk of HIV . . . is high among persons who exchange sex for money or nonmonetary items."[21]  Thus, the legislature rationally concluded that it was possible to stem the spread of HIV by deterring individuals in this high-risk category—particularly individuals who *know* that they risk exposing others—from continuing to engage in behavior that could spread the disease.  Such a decision is in the heartland of the State's traditional interests.  *See Barnes*, 501 U.S. at 560.

To be sure, Plaintiffs contest "the wisdom of the challenged action."  *In re Flint Water Cases*, 384 F. Supp. 3d 802, 844 (E.D. Mich. 2019).  But "[a]s long as the classificatory scheme chosen by [the legislature] rationally advances a reasonable and identifiable governmental objective," courts should "disregard the existence of other" means it might "have preferred."  *See Schweiker v. Wilson*, 450 U.S. 221, 235 (1981).  Discouraging HIV-positive individuals from engaging in prostitution rationally advances the legislature's goal to stop the spread of HIV.  *See, e.g.*, *State v. Whitfield*, 134 P.3d 1203, 1212 (Wash. Ct. App. 2006) (recognizing "a reasonable relationship" between a statute criminalizing knowingly exposing others to HIV and Washington's "legitimate state objective—to stop the transmission of a deadly disease . . . .").

For similar reasons, lawmakers' decision to require those convicted of aggravated prostitution to register and comply with the TN-SORA is rationally related to the State's interests in protecting public health and safety.  The TN-SORA "assist[s] law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts"—i.e., prostitution—with the added benefit of helping to identify and deter individuals who continue committing prostitution while knowingly HIV-positive.  *See Michigan Dep't of State Police*, 490 F.3d at 500–01.  And even if Tennessee's justifications arguably "sweep[] too

---

[21] CDC, *HIV Risk Among Persons Who Exchange Sex for Money or Nonmonetary Items*, http://tinyurl.com/yh7mfwkm (last visited Jan. 10, 2024).

broadly," *id.*, the "strong presumption of validity" accorded to states laws means that "any reasonably conceivable state of facts . . . [can] provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 319 (1993).

Plaintiffs dispute the efficacy of the statutes in achieving Tennessee's goals, citing new methods for treating HIV and stopping its spread. But the rationality of a law is judged at the time of passage; that an approach is arguably "unfair, outdated, and in need of improvement" thus "does not mean that the statute when enacted was wholly irrational or, for purposes of rational basis review, unconstitutional." *Smart v. Ashcroft*, 401 F.3d 119, 123 (2d Cir. 2005). Nor, under rational-basis review, may courts subject a "legislative choice … to courtroom fact-finding." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). Instead, lawmakers' approach may be based on rational speculation unsupported by evidence or empirical data." *Id.* That rule governs here, where the General Assembly, faced with the high-risk of HIV associated with prostitution, rationally concluded that public health would be aided by discouraging knowingly HIV-positive individuals from committing prostitution.

In sum, the Complaint concedes that rational basis-review applies. And the challenged statutes satisfy rational-basis review. The Complaint accordingly fails to state a valid equal-protection or substantive due process claim, requiring dismissal of Counts II, III, V, and VI.

### B.    The Complaint identifies no similarly situated comparator to show discrimination.

Plaintiffs' equal-protection claims fail also because the Complaint does not identify any "similarly situated" individuals who are treated more favorably under the challenged laws.

To prevail on a discrimination-based claim, Plaintiffs "have the burden of demonstrating that they were treated differently than" others who were "similarly situated in *all material respects*." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012) (emphasis in original). Though this standard does "not demand exact correlation," *id.* (citation omitted), it requires at least

"relevant similarity" among those allegedly within and outside the classes at issue. *Id.* at 462–63 (citations omitted). Plaintiffs' claims fail this comparator requirement.

*First*, it is the knowing *conduct* Tennessee criminalizes, not *being* HIV positive. This reality forecloses Plaintiffs' differential-treatment theory. Contrary to the Complaint's contentions, the aggravated-prostitution statute does not discriminate based on HIV-positive status. (*See, e.g.*, Dkt. 1 at 90–91, ¶ 395.) Rather, to trigger heightened penalties, a person must know that they are HIV-positive and nonetheless choose to engage in prostitution, which can entail high-risk sexual encounters. Non-infected individuals who commit prostitution are materially different, as they do not pose the same public health risks that HIV-positive offenders pose. Tennessee likewise "would be justified" in treating HIV-positive individuals who knowingly expose others to a deadly, highly infectious disease more harshly than those HIV-positive individuals who lack knowledge of their condition, and thus do not consciously place others at risk. *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 865 (6th Cir. 2012).

*Second*, Plaintiffs cannot properly compare HIV-positive offenders to individuals "who are convicted of misdemeanor Prositution" and have "other infectious diseases with similar transmissibility and symptoms." (Dkt. 1 at 90, ¶ 395.) As discussed above, HIV/AIDS has been a particularly dangerous disease with unique public health challenges. Certainly, Tennessee "would be justified" in treating HIV differently than other types of infectious diseases. *EJS Properties, LLC*, 698 F.3d at 865.

*Third*, individuals "who are convicted of Patronizing Prostitution, including those with HIV or other infectious diseases with similar transmissibility and symptoms," (Dkt 1 at 87, 90, ¶¶ 376, 395), are also poor comparators. One material difference is that individuals who patronize prostitution commit a different crime than individuals who commit prostitution. Indeed, while the crimes are complementary, Tennessee already punishes prostitution and patronizing prostitution

35

differently.  *Compare* Tenn. Code Ann. § 39-13-513(b)(1) (Class B misdemeanor) *with* § 39-13-513(b)(1) (Class A misdemeanor).  Tennessee is justified in treating different crimes differently.

## V.    The Complaint Fails to State an Eighth Amendment (Count VII) or Ex Post Facto (Count VIII) Claim.

For reasons given, Defendant Rausch is the only permissible defendant under Counts VII and VIII.  *See supra* (I)(C).  Thus, Plaintiffs' claims can survive only to the extent that Defendant Rausch's duties under the TN-SORA violate the Eighth Amendment and the Ex Post Facto Clause.  *See Children's Healthcare*, 92 F.3d at 1415–16 (requiring claims under *Ex parte Young* be "based on a theory that the officer['s] . . . *statutory authority* . . . is unconstitutional") (citation and quotation marks omitted); *Lujan*, 504 U.S. at 560–61 (requiring "a causal connection" between a plaintiff's alleged injuries and "the challenged action of the defendant" to satisfy Article III standing).  But, as explained above, *supra* (I)(C), Defendant Rausch's responsibilities under the TN-SORA are limited to maintaining and publishing the sex offender registry.  Because those duties are neither punitive nor retroactive to Plaintiffs, Counts VII and VIII must fail.

***Eighth Amendment Claim.***  To establish their Eighth Amendment claim, Plaintiffs must show that Defendant Rausch's maintaining and publishing the TN-SORA's sex offender registry "impose[s] punishment."  *See Cutshall v. Sundquist*, 193 F.3d 466, 477 (6th Cir. 1999).  But the Supreme Court rejected an identical argument in *Smith v. Doe*, 538 U.S. 84 (2003), which considered the constitutionality of Alaska's Sex Offender Registration Act.  Like Tennessee, Alaska's law contained "a registration requirement and a notification system."  *Id.*  Alaska required sex offenders to report their "name, aliases, identifying features, address, place of employment, date of birth, conviction information, driver's license number, information about vehicles to which he has access, and postconviction treatment history" and permitting law enforcement "to photograph and fingerprint him."  *Id*.  And the offender's name, aliases, address, photograph, physical description, license number, vehicle identification numbers, place of employment, date

of birth, crime of conviction, date of conviction, place and court of conviction, length and conditions of sentence were made available to the public online. *Id.* at 91. These obligations, the Court held, were part of a "nonpunitive regime." *Id.* at 96; *see also id.* at 102–03.

Indeed, the Sixth Circuit relied on *Smith* to conclude that the TN-SORA's specific "registration, reporting, and surveillance components are not of a type that we have traditionally considered as a punishment." *Doe v. Bredesen*, 507 F.3d 998, 1005 (6th Cir. 2007). Those requirements "do not increase the length of incarceration for covered sex offenders, nor do they prevent them from changing jobs or residences or traveling to the extent otherwise permitted by their conditions of parole or probation." *Id.* Thus, "the challenged provisions . . . create a civil, nonpunitive regime." *Id.* at 1004. And because the provisions of the TN-SORA administered by Defendant Rausch "do[] not impose punishment . . . [they] do[] not violate the Eighth Amendment's prohibition on cruel and unusual punishment." *Cutshall*, 193 F.3d at 477.

***Ex Post Facto Claim.*** That the TN-SORA's registration and publication requirements are nonpunitive also requires dismissal of Plaintiffs' ex post facto claim. *See Bredesen*, 507 F.3d at 1004–05. "[T]he focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of disadvantage,' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *California Dep't of Corrections v. Morales*, 514 U.S. 499, 506 n.3 (1995). As just explained, the TN-SORA's registration, reporting, and publication requirements are not punitive or unduly burdensome, and so Plaintiffs "claim under the federal Ex Post Factor Clause fails." *See Bredesen*, 507 F.3d at 1004–07, 1008. Other circuits have "consistently and repeatedly rejected ex post facto challenges to state statutes that retroactively require sex offenders convicted before their effective date to comply with similar registration, surveillance, or reporting requirements." *Id.* at 1007.

Plaintiffs' ex post facto claim fails for an even more fundamental reason: The provisions of the TN-SORA that Defendant Rausch implements are not retroactive to Plaintiffs. According to the Complaint, Jane Doe #1 committed aggravated prostitution as recently as 2012, Jane Doe #2 committed aggravated prostitution as recently as 2010, Jane Doe #3 committed aggravated prostitution as recently as 2008, and Jane Doe #4 committed aggravated prostitution as recently as 2009. (Dkt. 1 at 64, 69, 71, 73, ¶¶ 265, 285, 295, 306.) But aggravated prostitution has been a registerable offense since 1995. (*Id.* at 21, ¶ 78.) The lifetime registration requirements for offenders convicted of one or more prior sexual offenses and for violent sexual offenders were in place before 2008. *See* Tenn. Code Ann. § 40-39-207(f) (2007). And even then, Director Rausch was required to maintain a centralized record system of information submitted by offenders and publish information about registered offenders online. Tenn. Code Ann. §§ 40-39-204(a), -206(a),(e) (2007). The Ex Post Facto Clause is implicated only if a law "changes the legal consequences of acts committed before its effective date." *Miller v. Florida*, 482 U.S. 423, 430 (1987). And here, Plaintiffs fail to identify a provision of the TN-SORA that (1) is properly before the Court in light of Director Rausch's limited enforcement authority and (2) applies against them retroactively. These failures preclude their ex post facto claim.

## VI.     The Court Lacks Jurisdiction to Grant Plaintiffs' Requested Relief.

Plaintiffs seek sweeping declaratory and injunctive relief that is untethered to their claims and beyond the jurisdiction of this Court. For example, Plaintiffs ask the Court to enjoin *all* enforcement of the aggravated prostitution statute and to bar Defendants "from placing *any* individual convicted under the Aggravated Prostitution Statute" on the sex offender registry. (Dkt. 1 at 96, ¶ H.) They also ask that this Court order expungements of all records of sex offender registration for any person registered due to an aggravated prostitution conviction. (*Id.* at ¶ F.) They further request relief ordering Defendants to "alert all agencies" that have received

information about any person who registered due to an aggravated prostitution conviction "that this information is no longer valid." (*Id.* at ¶ G.) And, finally, Plaintiffs ask to monitor Defendants' compliance with their sweeping demands. (*Id.* at ¶ I.) The Court lacks jurisdiction to grant these requests.

*First*, this Court cannot grant sweeping relief to non-parties. A valid remedy "ordinarily operate[s] with respect to specific parties,'" not on "legal rules in the abstract." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (cleaned up). And any remedy "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). "District courts 'should not issue relief that extends further than necessary to remedy the plaintiff's injury.'" *L. W. by and through Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023) (citation omitted).

"A court order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power." *Id.* "[N]o court may 'lawfully enjoin the world at large,' or purport to enjoin challenged 'laws themselves.'" *Whole Woman's Health,* 595 U.S. at 44 (citation omitted). "[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs[;] the State is free to prosecute others who may violate the statute." *Doran v. Salem Inn*, 422 U.S. 922, 931 (1975). Any relief must be limited to the Plaintiffs before this Court.

*Second*, the narrow jurisdiction of federal courts does not permit the extensive remedial relief Plaintiffs seek—such as expungements of state records and alerts to non-parties—much less ongoing "monitor[ing]" by Plaintiffs themselves. (Dkt 1 at 96, ¶ I.) The *Ex Parte Young* doctrine permits "a federal court [to command] a state official to do nothing more than refrain from violating federal law . . . The doctrine is limited to that precise situation." *Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247, 255 (2011). Plaintiffs cannot micromanage the administration of state statutes beyond the narrow prospective injunctive relief *Ex Parte Young*

39

authorizes.  *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984).  The

Court should dismiss or otherwise strike Plaintiffs' requests for relief that exceed its jurisdiction.

## CONCLUSION

The Complaint should be dismissed in its entirety.  For the Court's convenience,

Defendants have appended to this Memorandum a chart summarizing Plaintiffs' claims and the

various bases for their dismissal. *See* <u>Exhibit A</u>.

Respectfully Submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

*/s/ John R. Glover*
JOHN R. GLOVER (BPR # 037772)
Assistant Attorney General
CODY N. BRANDON (BPR# 037504)
Managing Attorney
Assistant Attorney General
DAVID RUDOLPH (BPR# 13402)
Senior Assistant Attorney General
Law Enforcement &
Special Prosecutions Division
Office of the Tennessee
Attorney General & Reporter
PO Box 20207
Nashville, TN  37202
Off. (615) 532-2552
Fax (615) 532-4892
John.Glover@ag.tn.gov
Cody.Brandon@ag.tn.gov
David.Rudolph@ag.tn.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2024, a true and exact copy of the foregoing was served

via the court's service system upon Plaintiffs' counsel as follows:

Stella Yarbrough (BPR No. 033637)
Jeff Preptit (BPR No. 038451)
Lucas Cameron-Vaughn (BPR No. 036284)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Phone: (615) 320-7142
SYarbrough@aclu-tn.rog
JPreptit@aclu-tn.org
Lucas@aclu-tn.org

Alex Agathocleous (NY Bar 4227062)
Alexis Alvarez (NY Bar 5854278)
Jon W. Davidson (CA Bar 89301)
Rachel Meeropol (NY Bar 4100954)
AMERICAN CIVIL LIBERTIES UNION
125 Broad St., New York, NY 10004
Phone: (929) 585-0061
AAgathocleous@aclu.org
AlexisA@aclus.org
JonDavidson@aclu.org
RMeeropol@aclu.org

Lynly S. Egyes (NY Bar 4838025)
Milo Inglehart (NY Bar 5817937)
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: 510 587-9898 Ext. 353
Lynly@transgenderlawcenter.org
Milo@transgenderlawcenter.org

Dale Melchert (NY Bar 5366554)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696 Ext. 354
Dale@transgenderlawcenter.org

/s/ John R. Glover
JOHN R. GLOVER (BPR # 037772)
Assistant Attorney General

41