**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

OUTMEMPHIS, et al.,

                Plaintiffs,

                v.

BILL LEE, et al.,

                Defendants.

Civil Action No.: 2:23-cv-2670-SHL-CGC

**ORAL ARGUMENT REQUESTED**

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**</u>
<u>**MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**</u>

Alexis Agathocleous* (NY Bar 4227062)
Alexis Alvarez* (NY Bar 5854278)
Jon W. Davidson* ** (CA Bar 89301)
Rachel Meeropol* (NY Bar 4100954)
American Civil Liberties Union
125 Broad St., New York, NY 10004
Phone: (929) 585-0061
RMeeropol@aclu.org

Stella Yarbrough (BPR No. 033637)
Jeff Preptit (BPR No. 038451)
Lucas Cameron-Vaughn (BPR No. 036284)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
NASHVILLE, TN 37212
Phone: (615) 320-7142
JPreptit@aclu-tn.org

Lynly S. Egyes* (NY Bar 4838025)
Milo Inglehart* (NY Bar 5817937)
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: (510) 587-9696 Ext. 353
Milo@transgenderlawcenter.org

Dale Melchert* (NY Bar 5366554)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696 Ext. 354
Dale@transgenderlawcenter.org

*Admitted Pro Hac Vice
**Admitted only in California

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ............................................................................................ iii

**INTRODUCTION** .......................................................................................................... 1

**ARGUMENT** ................................................................................................................ 3

I.   Sovereign Immunity Does Not Bar Plaintiffs' Claims Against Any Defendants. ............. 3

    A.   Congress Abrogated Sovereign Immunity via the ADA and Defendants have Consented to Rehabilitation Act Claims .............................................................. 3

    B.   *Ex Parte Young* Allows Suit Against Each Defendant ....................................... 3

        i. Governor Lee ............................................................................................. 3

        ii. Attorney General Skrmetti ........................................................................ 7

        iii. Director Rausch ....................................................................................... 9

        iv. Commissioner Strada ............................................................................. 11

II.  Plaintiffs Adequately Allege Standing to Bring Their Claims ................................... 12

    A.   OUTMemphis Has Sufficiently Alleged Organizational Standing to Challenge the Aggravated Prostitution Statute and TN-SORA ............................................... 12

        i. OUTMemphis Has Alleged Injury in Fact ................................................. 13

        ii. OUTMemphis's Injuries Are Traceable to and Redressable by Defendants Lee and Skrmetti (Counts I–III) ...................................................................... 14

        iii. OUTMemphis Has Standing to Bring ADA and Rehabilitation Act Claims (Counts I, IV, IX, & X) ............................................................................ 16

    B.   Plaintiffs Allege Standing for All Claims Against All Defendants ...................... 18

III. Plaintiffs Adequately State ADA and Rehabilitation Act Claims ............................... 18

    A.   OUTMemphis Has a Cause of Action Under the ADA and Rehabilitation Act ...... 19

    B.   The ADA Prohibits Discrimination Related to Activities of a Public Entity ......... 20

    C.   Applying Title II to Defendants' Conduct Raises No Constitutional Concerns ..... 24

        i.  Section 5 of the Fourteenth Amendment ................................................... 24

        a.  Nature of Constitutional Right………………………………………………25

        b.  Congressional Record of Discrimination……………………………………25

        c.  Congruence and Proportionality…………………………….………………27

        ii. The Commerce Clause ............................................................................. 29

        a.  Congress Had More Than a Rational Basis for Title II's Prohibition of Disability Discrimination Across a Wide Range of Economic Activities….. 30

        b.  Application of Title II to Tennessee's Discriminatory Actions Is Authorized Under the Commerce Clause…………………………………………………...32

D.    Plaintiffs Have Adequately Alleged Rehabilitation Act Claims
(Counts IX and X) ................................................................................. 37

i.   Plaintiffs Allege Discrimination "Solely" By Reason of Disability ................ 38

ii.  Plaintiffs are "Otherwise Qualified" .......................................... 40

iii. Tennessee Has Consented to Plaintiffs' Claims .......................... 41

IV. Plaintiffs State Valid Equal Protection Claims (Counts II and V) ............................. 45

A.    Plaintiffs are Similarly Situated to Individuals Convicted of Misdemeanor
Prostitution or Patronizing Prostitution ...................................................... 46

B.    Aggravated Prostitution and its Inclusion in TN-SORA Are Irrational ................ 48

i.   Heightened Rational Basis Review Applies ................................................ 48

ii.  The Laws' Rationality Must Be Evaluated Based on Current Science ............ 50

iii. Aggravated Prostitution is Irrational, Now and When Enacted .................... 52

iv.  The Inclusion of Aggravated Prostitution in TN-SORA Is Irrational ............. 53

V.  Plaintiffs State Valid Substantive Due Process Claims (Counts III & VI) .................... 54

VI. The Inclusion of Aggravated Prostitution in TN-SORA Violates the Eighth Amendment,
and the Ex Post Facto Clause as Applied to Individual Plaintiffs ............................... 56

VII.   This Court Has Jurisdiction to Grant Plaintiffs' Requested Relief ........................... 57

**CONCLUSION** ............................................................................................. 60

# TABLE OF AUTHORITIES

## CASES

*A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356 (4th Cir. 2008) ............................. 17

*Addiction Specialists, Inc., v. Twp. of Hampton*, 411 F.3d 399 (3d Cir. 2005) ........................... 17

*Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982) ..................................... 3, 4, 5

*American Exp. Travel Related Services Co., Inc. v. Kennedy*, 641 F.3d 685 (6th Cir. 2011) ....... 50

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) .................................... 43

*Ass'n for Disabled Am., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954 (11th Cir. 2005) ......................... 27

*Autism Soc. of Mich. v. Fuller*, No. 05:05-CV-73, 2006 WL 1519966
   (W.D. Mich. May 26, 2006) .................................................................................................. 17

*Barbour v. Washington Metro. Area Transit Auth.*, 374 F.3d 1161 (D.C. Cir. 2004) ........... 41, 42

*Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) ................................................ 23

*Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072 (11th Cir. 2007) .................................................... 21

*Block v. Canepa*, 74 F.4th 400 (6th Cir. 2023) ............................................................................. 3

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ........................................................................... 44

*Bradley v. Univ. of Texas M.D. Anderson Cancer Ctr.*, 3 F.3d 922 (5th Cir. 1993) ..................... 41

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013).... 20

*Brown v. Lee*, No. 3:20-CV-00916, 2020 WL 7864252 (M.D. Tenn. Dec. 30, 2020) .................... 4

*Burlington N.R.R. Co. v. Dep't of Pub. Serv. Regulation*, 763 F.2d 1106 (9th Cir. 1985) ........... 52

*Burns v. Helper*, No. 3:18-CV-01231, 2019 WL 5987707 (M.D. Tenn. Oct. 24, 2019) ................. 7

*Bush v. Commonwealth Edison Co.*, 990 F.2d 928 (7th Cir. 1993) .............................................. 39

*California v. Texas*, 593 U.S. 659 (2021) ..................................................................................... 57

*Caspar v. Snyder*, 77 F. Sup. 3d 616 (E.D. Mich. 2015) ............................................................. 58

*Castells v. Fisher*, No. 05 CV 4866 (SJ), 2007 WL 1100850 (E.D.N.Y. Mar. 24, 2007) ........... 37

*Chastleton Corp. v. Sinclair*, 264 U.S. 543 (1924) ...................................................................... 50

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ................................................. 58

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ......................................................................... 24, 27

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ................................. 28, 29, 45, 49

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) .................................................................................... 18

*Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) ....... 27

*Craft v. Memphis Light, Gas & Water Div.*, 534 F.2d 684 (6th Cir. 1976) ................................... 58

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365 (6th Cir. 2011) ........................... 46

*Cummings v. Beeler*, 223 S.W.2d 913 (Tenn. 1949) ....................................................................... 7

*Cutter v. Wilkinson*, 423 F.3d 579 (6th Cir. 2005) ........................................................ 44

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)......................... 43

*Dias v. City & Cnty. of Denver*, 567 F.3d 1169 (10th Cir. 2009) ........................................ 51

*Directv, Inc. v. Treesh*, 487 F.3d 471 (6th Cir. 2007)................................................... 41

*Doe #11 v. Lee*, No. 3:22-CV-00338, 2022 WL 2181800 (M.D. Tenn. June 16, 2022)............... 57

*Doe v. County of Centre*, 242 F.3d 437 (3d Cir. 2001).................................................. 40

*Doe v. Gwyn*, No. 3:17-CV-504, 2018 WL 1957788 (E.D. Tenn. April 25, 2018) .....................11

*Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117 (M.D. Tenn. Nov. 9, 2017)..........4, 5, 11

*Doe v. Lee*, No. 3:21-CV-00028, 2021 WL 1907813 (M.D. Tenn. May 12, 2021) ...................... 4

*Doe v. Lee*, No. 3:21-CV-010, 2022 WL 452454 (E.D. Tenn. Feb. 14, 2022)......................... 4, 57

*Doe v. Lee*, No. 3:22-CV-00712, 2023 WL 1974712 (M.D. Tenn. Feb. 10, 2023)...................... 57

*Doe v. Michigan Dep't of State Police*, 490 F.3d 491 (6th Cir. 2007) ......................... 50

*Doe v. Rausch*, 382 F. Supp. 3d 783 (E.D. Tenn. 2019).................................................. 57

*Doe v. Rausch*, 461 F. Supp. 3d 747 (E.D. Tenn. 2020).................................................. 57

*Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261 (4th Cir. 1995).................................... 41

*Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016) .................................................... 56

*Eisenstadt v. Baird*, 405 U.S. 438 (1972)............................................................ passim

*EJS Properties, LLC v. City of Toledo*, 698 F.3d 845 (6th Cir. 2012)................................... 46

*Est. of Mauro ex rel. Mauro v. Borgess Med. Ctr.*, 137 F.3d 398 (6th Cir. 1998) ....................... 40

*Ex Parte Young*, 209 U.S. 123 (1908)................................................................... 3

*Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014) ...................................... 14

*Franklin v. Gwinnet Cnty. Pub. Schs.*, 503 U.S. 60 (1992) ...................................... 43

*Friends of George's, Inc. v. Tennessee*, 667 F. Supp. 3d 755 (W.D. Tenn. 2023) ......................... 8

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc.*, 528 U.S. 167 (2000) .................. 16

*Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985)............................. 34

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) ............................... 42

*Gill v. Whitford*, 585 U.S. 48 (2018)................................................................. 57

*Gohier v. Enright*, 186 F.3d 1216 (10th Cir. 1999).................................................. 21

*Gonzales v. Raich*, 545 U.S. 1 (2005)............................................................... passim

*Granholm v. Heald*, 544 U.S. 460 (2005) ........................................................... 51

*Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192 (5th Cir. 2000) ..................... 33, 37

*Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582 (1983) ...................... 42

*Haberle v. Troxell*, 885 F.3d 170 (3d Cir. 2018) ........................................... 21

*Harvey v. Lee*, No. 3:22-CV-39, 2022 WL 2334983 (E.D. Tenn. June 28, 2022) .................... 4, 7

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................ 14, 16

*Haybarger v. Lawrence Cnty. Adult Prob. and Parole*, 551 F.3d 193 (3d Cir. 2008) .......... 42, 45

*Heffner v. Murphy*, 745 F.3d 56 (3d Cir. 2014)................................................ 52

*Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000)................................ 28, 40

*Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*,
    943 F.2d 644 (6th Cir. 1991)................................................................ 14

*Hughes v. Peshina*, 96 F. App'x 272 (6th Cir. 2004) ........................................ 13

*Innovative Health Sys. Inc., v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997) ............. 16, 17, 21

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) .................................... 43

*Johnson v. City of Saline*, 151 F.3d 564 (6th Cir. 1998) .................................. passim

*Johnson v. State Tech. Ctr. at Memphis*, 24 F. Supp. 2d 833 (W.D. Tenn. 1998)....................... 29

*Katzenbach v. McClung*, 379 U.S. 294 (1964) ............................................... 31

*Kelly v. Lee*, No. 1:18-CV-00170, 2020 WL 2120249 (E.D. Tenn. May 4, 2020)....................7, 11

*Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022)............................................. 42

*Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000)............................................. 24

*Klingler v. Dir., Dep't of Revenue*, 455 F.3d 888 (8th Cir. 2006) ................................ 27

*Klingler v. Dir., Dept. of Revenue*, 366 F.3d 614 (8th Cir. 2004) ................................ 37

*Klingler v. Dir., Dept. of Revenue*, 545 U.S. 1111 (2005)........................................ 37

*Koslow v. Pennsylvania*, 302 F.3d 161 (3d Cir. 2002) ...................................... 44, 45

*Lamar v. Knoxville Crim. Ct. Dist. Att'y*, No. 3:23-CV-00120, 2023 WL 6979346
    (M.D. Tenn. Oct. 23, 2023)................................................................... 4

*Lane v. Pena*, 518 U.S. 187 (1996)........................................................... 42

*Lawrence v. Texas*, 539 U.S. 558 (2003)...................................................... 15, 49

*Lawson v. Shelby Cnty.*, 211 F.3d 331 (6th Cir. 2000) .................................... 5, 6

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008) ............................ 5, 6

*Long v. Robinson*, 316 F. Supp. 22 (D. Md. 1970) ........................................ 52

*Lovell v. Chandler*, 303 F.3d 1039 (9th Cir. 2002)........................................... 44

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................... 12, 13

*M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436 (6th Cir. 2021) ..................... 39

*MacDonald v. Moose*, 710 F.3d 154 (4th Cir. 2013)............................................ 15

*Magnum v. Lee*, No. 22-5660, 2023 WL 6130306 (6th Cir. July 10, 2023)................................. 56

*Maryland v. Wirtz*, 392 U.S. 183 (2017)....................................................... 31

v

*Massachusetts v. United States*, 435 U.S. 444 (1978) .................................................... 44

*Mathews v. Lucas*, 427 U.S. 495 (1976) .......................................................................... 48

*McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407 (5th Cir. 2004) ............................... 37

*McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135 (11th Cir. 2014) ............. 17, 19

*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185 (2014) ........................................ 51

*Miller v. Texas Tech Univ. Health Scis. Ctr.*, 421 F.3d 342 (5th Cir. 2005) ............................... 44

*Milliken v. Bradley*, 418 U.S. 717 (1974) ................................................................. 58, 60

*Mingus v. Butler*, 591 F.3d 474 (6th Cir. 2010) .......................................................... 24

*Moore v. Tennessee*, No. 3:22-CV-363, 2023 WL 4503543 (E.D. Tenn. Apr. 10, 2023) ............... 4

*Mote v. City of Chelsea*, 284 F. Supp. 3d 863 (E.D. Mich. 2018) ................................... 17

*MX Grp., Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002) ............................ 12, 16, 17, 19

*Nashville, C. & St. L. Ry. v. Walters*, 294 U.S. 405 (1935) ........................................ 50

*Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003) .......................................... 3

*Newsome v. Lee*, No. 3:21-CV-00041, 2021 WL 1697039 (M.D. Tenn. Apr. 29, 2021) .............. 4

*Nihiser v. Ohio E.P.A.*, 269 F.3d 626 (6th Cir. 2001) ................................................ 42

*North v. Widener Univ.*, 869 F. Supp. 2d 630 (E.D. Pa. 2012) ..................................... 39

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) ........................................ 34, 38, 39

*Onishea v. Hopper*, 171 F.3d 1289 (11th Cir. 1999) ................................................... 40

*Online Merchs. Guild v. Cameron*, 995 F.3d 540 (6th Cir. 2021) ................................. 14

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) ................................................. 23, 26

*Parsons v. U.S. Dep't of Just.*, 801 F.3d 701 (6th Cir. 2015) .................................... 16

*Pearson v. City of Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992) ................................... 54

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ............................. 41, 43

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) .............................. 60

*Perez v. United States*, 402 U.S. 146 (1971) .............................................................. 31

*Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000) ....................................................... 46

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) .................................................. 51

*Popovich v. Cuyahoga Cnty. Ct. of Common Pleas, Domestic Rels. Div.*,
150 F. App'x 424 (6th Cir. 2005) ................................................................................. 19

*R. K. ex rel. J.K. v. Lee*, 53 F.4th 995 (6th Cir. 2022) ............................................... 6

*Range v. Douglas*, 763 F.3d 573 (6th Cir. 2014) ....................................................... 54

*Reese v. Michigan*, 234 F.3d 1269 (6th Cir. 2000) .................................................... 30

*Reid v. Lee*, 476 F. Supp. 3d 684 (M.D. Tenn. 2020) ............................................... 57

*Reno v. Condon*, 528 U.S. 141 (2000) ........................................................................... 36

*Romer v. Evans*, 517 U.S. 620 (1996) ..................................................................... 49, 53

*Rosen v. Montgomery Cnty.*, 121 F.3d 154 (4th Cir. 1997) ........................................ 22

*Royster Guano Co. v. Virginia*, 253 U.S. 412 (1920) ................................................. 54

*Russell v. Lundergan-Grimes*, 784 F.3d 1037 (6th Cir. 2015) ............................... 6, 12

*Russell v. United States*, 471 U.S. 858 (1985) ........................................................... 36

*S. Dakota v. Dole*, 483 U.S. 203 (1987) ..................................................................... 44

*Sandison v. Michigan High School Athletic Ass'n, Inc.*, 64 F.3d 1026 (6th Cir. 1995) ............... 38

*Sch. Bd. of Nassau Cnty. v. Arline,* 480 U.S. 273 (1987) ..................................... 28, 40

*Seaboard Air Line R.R. Co. v. City of West Palm Beach*, 373 F.2d 328 (5th Cir. 1967) ............... 51

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) ............................................... 29

*Sharpe v. Cureton*, 319 F.3d 259 (6th Cir. 2003) ....................................................... 58

*Sheffield v. City of Fort Thomas*, 620 F.3d 596 (6th Cir. 2010) ............................... 54

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ............................................................. 51

*Skatemore, Inc. v. Whitmer*, 40 F.4th 727 (6th Cir. 2022) ............................................ 3

*Smart v. Ashcroft*, 401 F.3d 119 (2d Cir. 2005) ......................................................... 51

*Southeastern Community College v. Davis*, 442 U.S. 397 (1979) ............................... 38

*State v. Allen*, 593 S.W.3d 145 (Tenn. 2020) ............................................................. 11

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1 (1971) ............................... 58

*Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear*,
   459 F. Supp. 3d 847 (E.D. Ky. 2020) ..................................................................... 58

*Tennessee v. Lane*, 541 U.S. 509 (2004) ............................................................ passim

*Thomas More L. Ctr. v. Obama*, 651 F.3d 529 (6th Cir. 2011) ................................... 33

*Tri-Cities Holdings LLC v. Tenn. Admin. Procs. Div.*, 726 F. App'x 298 (6th Cir. 2018) ............ 22

*Tucker v. Tennessee*, 539 F.3d 526 (6th Cir. 2008) ..................................................... 22

*Turner v. City of Englewood*, 195 F. App'x 346 (6th Cir. 2006) .......................... 18, 19

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ..................................... 28, 49, 53

*United States v. Carolene Products*, 304 U.S. 144 (1938) .................................... 50, 51

*United States v. Chambers*, 441 F.3d 438 (6th Cir. 2006) ......................................... 33

*United States v. Coleman*, 675 F.3d 615 (6th Cir. 2012) ...................................... 29, 36

*United States v. Faasse*, 265 F.3d 475 (6th Cir. 2001) ............................................... 29

*United States v. Georgia*, 546 U.S. 151 (2006) ......................................................... 24

*United States v. Laton*, 352 F.3d 286 (6th Cir. 2003) ............................................... 34

*United States v. Lopez*, 514 U.S. 549 (1995) ........................................................... passim

*United States v. McHenry*, 97 F.3d 125 (6th Cir. 1996) ........................................ 33

*United States v. Mississippi Dep't of Pub. Safety*, 321 F.3d 495 (5th Cir. 2003)............. 31, 32, 36

*United States v. Moore*, 644 F.3d 553 (7th Cir. 2011) ..................................... 51

*United States v. Morrison*, 529 U.S. 598 (2000) ........................................... 30, 31, 36

*United States v. Pina*, 724 F. App'x 413 (6th Cir. 2018) ................................. 36

*United States v. Todd*, 627 F.3d 329 (9th Cir. 2010) ...................................... 33

*United States v. Tucker*, 90 F.3d 1135 (6th Cir. 1996) ................................... 34

*Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022) ........... 6, 9

*Velzen v. Grand Valley State Univ.*, 902 F. Supp. 2d 1038 (W.D. Mich. 2012)........................... 17

*Virginia Off. for Prot. and Advoc. v. Stewart*, 563 U.S. 247 (2011)................................ 60

*W.G. Nichols, Inc. v. Ferguson.*, No. CIV.A. 01-834, 2002 WL 1335118 (E.D. Pa. Jun.7, 2002) 17

*Walker v. Snyder*, 213 F.3d 344 (7th Cir. 2000) ........................................... 30

*Warth v. Seldin*, 422 U.S. 490 (1975).......................................................... 12

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ........................................... 50

*Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016) ........................... 58

*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021) .................................. 59

*Williamson v. Univ. of Louisville*, No. 3:20-cv-266-DJH, 2023 WL 5108590 (W.D. Ky. Aug. 9, 2023) .......................................................................... 39

*Zimmerman v. Or. Dep't of Just.*, 170 F.3d 1169 (9th Cir. 1999) ......................... 21, 23

**STATUTES**

29 U.S.C. § 701(b)(1) ........................................................................... 43

29 U.S.C. § 794(a) ............................................................................... 43

29 U.S.C. § 794a(a)(2) ......................................................................... 19

42 U.S.C. § 12101 ........................................................................... 26, 32

42 U.S.C. § 12131(2) ........................................................................... 23

42 U.S.C. § 12132 ............................................................................... 20

42 U.S.C. § 12133 ........................................................................... 16, 19

42 U.S.C. § 2000d–7 ........................................................................... 41

T.C.A. § 29-14-107 ............................................................................... 7

T.C.A. § 39-13-512(6) ......................................................................... 47

T.C.A. § 39-13-513 ....................................................................... 38, 39, 47

T.C.A. § 39-13-516.......................................................................... passim

T.C.A. § 40-39-201(b)(1) ............................................................................................... 54, 55

T.C.A. § 40-39-201(b)(2) ............................................................................................... 54, 55

T.C.A. § 40-39-202(2) ...........................................................................................................11

T.C.A. § 40-39-202(20) ....................................................................................................... 59

T.C.A. § 40-39-202(31) ....................................................................................................... 59

T.C.A. § 40-39-203 .............................................................................................................. 10

T.C.A. § 40-39-203(a)(3)–(7) ............................................................................................. 35

T.C.A. § 40-39-203(a)(7) ..................................................................................................... 36

T.C.A. § 40-39-203(b)(1) ........................................................................................... 9, 10, 12

T.C.A. § 40-39-204 .............................................................................................................. 10

T.C.A. § 40-39-204(a) .......................................................................................................... 10

T.C.A. § 40-39-205(a) ............................................................................................................ 9

T.C.A. § 40-39-206(a) .......................................................................................................... 10

T.C.A. § 40-39-206(b) .......................................................................................................... 10

T.C.A. § 40-39-206(d) .................................................................................................... 10, 36

T.C.A. § 40-39-206(f) .......................................................................................................... 10

T.C.A. § 40-39-207(a)(3) ..................................................................................................... 10

T.C.A. § 40-39-207(b) .......................................................................................................... 10

T.C.A. § 40-39-208(g) .......................................................................................................... 12

T.C.A. § 40-39-211 .............................................................................................................. 10

T.C.A. § 40-39-211(a)(1) ..................................................................................................... 35

T.C.A. § 40-39-214(a) ..................................................................................................... 10, 36

T.C.A. § 8-47-101 ................................................................................................................ 15

T.C.A. § 8-47-109 ................................................................................................................ 15

T.C.A. § 8-6-109 .................................................................................................................... 9

T.C.A. § 8-6-109(9) .............................................................................................................. 15

T.C.A. § 8-6-109(b)(2) ...................................................................................................... 8, 15

T.C.A. § 8-6-109(b)(9) ........................................................................................................... 7

T.C.A. § 8-7-106(a)(2) ......................................................................................................... 8, 9

Tenn. Const. art. III, § 10 ....................................................................................................... 5

Tenn. Const. art. VI, § 5 ......................................................................................................... 9

**OTHER AUTHORITIES**

134 Cong. Rec. E1004-02 (1998) .................................................................. 44

ADA: Title II Tech. Assistance Manual § II-2.8000 (U.S. Dep't Just. 1993) .............................. 28

H.R. Rep. 101-485, pt. 2 (1990) ................................................. 32, 34, 35

H.R. Rep. No. 101-596 (1990) .................................................................. 26

Petition for Writ of Certiorari, *Heffner v. Murphy*, 2014 WL 3530761 (U.S.) (No. 14-53) ......... 51

**REGULATIONS**

28 C.F.R. § 35.139(b) ........................................................... 25, 28, 35

28 C.F.R. Pt. 35 ..................................................................... 21

## INTRODUCTION

The individual Plaintiffs in this case are all women who have long been living with HIV. Each was convicted more than a decade ago of Aggravated Prostitution, a Tennessee felony identical to misdemeanor Prostitution save one element: knowledge of being HIV positive. Without any consideration of whether their actions posed any risk of transmission of HIV, the individual Plaintiffs were sentenced to *years* in prison and subsequently forced to register as "sex offenders" or "violent sex offenders" under Tennessee's Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act (TN-SORA).

TN-SORA makes every aspect of their lives immeasurably more difficult: it restricts where they may live, work, and even stand or sit. It limits how they may spend time with their families, including their grandchildren, undermining their community ties. It has made finding stable housing, employment, treatment, and educational opportunities near impossible.

All this flows from Tennessee's assumption that an individual living with HIV who engages in sex work is uniquely, categorically, and invariably dangerous. But that assumption is belied by the fact that the Aggravated Prostitution statute prohibits large amounts of conduct that cannot transmit HIV, a daily pill or prophylactic measures can now *entirely* eliminate any risk of HIV transmission, and HIV is now a treatable condition. The individual Plaintiffs are no more inherently dangerous than anyone else with any number of common health conditions. The discrimination that they are experiencing is based not on science, public health, or safety needs, but rather on three-decades-old animus. Plaintiffs' contention here is not, as Defendants would have it, that Tennessee has deviated from "best practices"—it is that its treatment of people living with HIV is so arbitrary as to be illegal.

Individual Plaintiffs are joined by OUTMemphis, a non-profit organization that provides services to the Mid-South LGBTQ+ community, including people with or at risk of Aggravated Prostitution convictions. OUTMemphis sees first-hand the devastating consequences of Tennessee's enforcement of these laws and is forced to divert significant resources to mitigate the havoc Defendants' actions wreak on already-vulnerable populations.

Defendants' chief and repeated response to Plaintiffs' First Amended Complaint (FAC), ECF No. 62, in their Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (MTD), ECF No. 66-1, is to point the finger elsewhere, claiming that they are not responsible for these laws and cannot fix their effects. As Plaintiffs show below, this does not reflect the facts. Defendants' second repeated retort is that, despite transformative advances in HIV treatment and prevention, Tennessee's 30-year-old perception of public health risks justifies its discriminatory conduct today. Not only is that legally unfounded, but it ignores Plaintiffs' allegations that Aggravated Prostitution and its inclusion in TN-SORA not only fail to advance public health and safety principles—they undermine them.

Tennessee's singling out of HIV is irrational and discriminatory, in violation of the Americans with Disabilities Act (ADA), the Rehabilitation Act, and the Constitution's guarantee of equal protection, substantive due process, and freedom from cruel and unusual punishment. Meanwhile, the retroactive application of new and onerous restrictions to the individual Plaintiffs under TN-SORA violates the Ex Post Facto Clause. Plaintiffs advance factual allegations to support each of these claims, which must all survive Defendants' motion to dismiss.

Plaintiffs request oral argument to answer any questions the Court may have in its adjudication of the complex questions of statutory and constitutional law presented in this matter.

2

## ARGUMENT

### I.  Sovereign Immunity Does Not Bar Plaintiffs' Claims Against Any Defendants.

Defendants argue that all of Plaintiffs' claims must be dismissed because sovereign immunity bars courts from hearing claims against a state without consent. MTD at 7. For numerous reasons laid out below, this argument fails.

### A.  Congress Abrogated Sovereign Immunity via the ADA and Defendants have Consented to Rehabilitation Act Claims.

Congress may abrogate a state's sovereign immunity if it makes its intention to do so clear in the language of a statute and acts pursuant to a valid exercise of its power. *See Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003). As demonstrated *infra* in Sections III(C)(i) and III(D)(iii), Congress validly abrogated state sovereign immunity for the ADA claims, and Defendants have waived sovereign immunity for the Rehabilitation Act claims. If the Court agrees, it need not decide whether *Ex Parte Young* exceptions apply to Defendants for Counts I, IV, IX and X. Regardless, *Ex Parte Young* exceptions apply to all Defendants for all claims.

### B.  *Ex Parte Young* Allows Suit Against Each Defendant.

Though sovereign immunity generally protects state officials from liability, a private party may seek relief against state officials in their official capacities when those officials violate the plaintiff's federal constitutional or statutory rights. *See Ex Parte Young*, 209 U.S. 123, 154 (1908); *Block v. Canepa*, 74 F.4th 400, 406 (6th Cir. 2023) (citing *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 733 (6th Cir. 2022)). Because Defendants have responsibility for enforcing the Aggravated Prostitution statute and TN-SORA, the *Ex Parte Young* exception applies.

#### i.  Governor Lee

In *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656, 665 n.5 (6th Cir. 1982), the Sixth Circuit explained that an *Ex Parte Young* action may properly be brought against a governor to

challenge an unconstitutional law when it is necessary to vindicate one's rights. There, plaintiff corporations named Ohio's governor in a challenge to an Ohio law regulating motion picture marketing. *Id.* at 659. The court denied the governor sovereign immunity, holding that *Ex Parte Young* allowed suit "[e]ven in the absence of specific state enforcement provisions" based upon "the substantial public interest" that the governor "use his general authority to see that state laws are enforced." *Id.* at 665 n.5. Importantly, "[w]ere this action unavailable to the plaintiffs, they would be unable to vindicate the alleged infringement of their constitutional rights . . . . Such a result is clearly what the doctrine in Ex Parte Young was in part designed to avoid." *Id.*

District courts analyzing challenges to TN-SORA have routinely applied *Allied Artists*' reasoning to deny Tennessee governors' claims of sovereign immunity. *See Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *9 (M.D. Tenn. Nov. 9, 2017) (finding the "substantial public interest" in enforcement of TN-SORA "sufficient to expose the governor to suit under *Allied Artists*"); *Doe v. Lee*, No. 3:21-CV-00028, 2021 WL 1907813, at *6–8 (M.D. Tenn. May 12, 2021) (finding the governor an appropriate defendant in a TN-SORA challenge); *Doe v. Lee*, No. 3:21-CV-010, 2022 WL 452454, at *6–7 (E.D. Tenn. Feb. 14, 2022) (same); *see also Brown v. Lee*, No. 3:20-CV-00916, 2020 WL 7864252, at *6 (M.D. Tenn. Dec. 30, 2020) (citing *Haslam* to find that Tennessee's sovereign immunity does not shield governor from SORA claims); *Newsome v. Lee*, No. 3:21-CV-00041, 2021 WL 1697039, at *5 (M.D. Tenn. Apr. 29, 2021) (same); *Moore v. Tennessee*, No. 3:22-CV-363, 2023 WL 4503543, at *5 (E.D. Tenn. Apr. 10, 2023) (same); *Harvey v. Lee*, No. 3:22-CV-39, 2022 WL 2334983, at *3 (E.D. Tenn. June 28, 2022) (same); *Lamar v. Knoxville Crim. Ct. Dist. Att'y*, No. 3:23-CV-00120, 2023 WL 6979346, at *2 n.3 (M.D. Tenn. Oct. 23, 2023) (same).

*Haslam* is representative and closely analogous to the present case. There, Plaintiffs sued Tennessee's governor and the Director of the Tennessee Bureau of Investigation ("TBI") over TN-SORA. 2017 WL 5187117, at *6–7. Relying on *Allied Artists*, the court rejected the governor's claim of sovereign immunity, observing that "[t]he Sixth Circuit … recognize[s] the special role served by governors as *Ex Parte Young* defendants in actions to challenge the constitutionality of state laws, particularly where there is no clear alternative defendant who bears sole responsibility for the law's administration." *Id.* at *9. The court explained that:

> [d]efendants' own briefing establishes … there is no single body or administrator who bears full responsibility for the Tennessee registration scheme. Much of the administrative responsibility falls on the TBI, but the responsibility of case-by-case enforcement is shared by various local police and prosecutors …. Where enforcement and administration responsibilities are diffused among different agencies and levels of state and local government, it is appropriate, under *Allied Artists*, to sue the governor, who bears the ultimate constitutional responsibility to "take care that the laws be faithfully executed."

*Id.* (citing Tenn. Const. art. III, § 10). The court's analysis in *Haslam* is directly applicable here. An elaborate, statewide network of law enforcement officials take part in the enforcement of Aggravated Prostitution and TN-SORA. *Id.* Forcing Plaintiffs to sue every relevant local official, rather than the governor, is inconsistent with *Ex Parte Young*. *Allied Artists*, 679 F.2d at 665 n.5.

Defendants admit that a governor may be an appropriate defendant in some challenges to state laws, but only attempt to distinguish this case from *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008), and *Lawson v. Shelby Cnty.*, 211 F.3d 331 (6th Cir. 2000), ignoring the many cases Plaintiffs cite *supra*. MTD at 9 n.7. Their efforts fail: neither case turns on, or even *mentions*, the governor's "specific authority to control" elections or the right to vote, as Defendants claim. *Id.* In *League of Women Voters*, the defendants unsuccessfully sought to shift responsibility for errors to local Boards of Election, 548 F.3d at 475 n.16, just as Defendants here seek to place all responsibility on local district attorneys. MTD at 8, 11. The Sixth Circuit

rejected this theory, denying the governor sovereign immunity based on his role as the state's

chief executive officer. *League of Women Voters*, 548 F.3d at 475 n.16. Similarly, nowhere in

*Lawson* did the court limit its denial of sovereign immunity to the governor to any voting-

specific authority. 211 F.3d at 335.

Defendants cite a handful of additional cases to support their sovereign immunity

argument, none of which disturb, or even engage with, *Allied Artists*. In *Universal Life Church*

*Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022), plaintiffs challenged regulations

about solemnizing marriage. The court granted the governor sovereign immunity because

plaintiffs made only "sparse" rather than "specific, plausible allegations" against him. *Id.* at

1031. Here, Plaintiffs have made specific allegations that Governor Lee has supreme executive

power, must take care that applicable federal and state laws are faithfully executed, and is

responsible for the administration of state departments that enforce these laws, including TBI and

the Tennessee Department of Correction (TDOC). FAC ¶ 18.

Another case Defendants cite, *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047–49 (6th

Cir. 2015), did not involve a governor and *rejected* sovereign immunity claims by state officials,

including the attorney general. While the court did observe that *Ex Parte Young* does not reach

officials who lack a "special relation to the particular statute" and "[are] not expressly directed to

see to its enforcement," *id.* at 1047 (citation omitted), Defendants ignore its further observation

that "*Young's* applicability has been tailored to conform as precisely as possible to those specific

situations in which it is necessary to permit the federal courts to vindicate federal rights and hold

state officials responsible to the supreme authority of the United States." *Id.* at 1049 (citation

omitted). Defendants also seek to rely on *R. K. ex rel. J.K. v. Lee*, 53 F.4th 995 (6th Cir. 2022),

but that case was decided on standing grounds and did not address *Ex Parte Young* or *Allied*

*Artists*. Here, where responsibility for enforcement of Aggravated Prostitution and TN-SORA is diffuse, but Governor Lee has authority to see that they are enforced and is responsible for administration of TBI and TDOC, FAC ¶¶ 18, 20–21, *Ex Parte Young* applies.

### ii.    Attorney General Skrmetti

Attorney General Skrmetti is also a proper Defendant. First, Defendant Skrmetti's role in "defend[ing] the constitutionality and validity of all legislation of statewide applicability," T.C.A. § 8-6-109(b)(9) , makes him a proper defendant under *Ex Parte Young*. For example, in *Kelly v. Lee*, an Ex Post Facto challenge to TN-SORA, the court relied on T.C.A. § 29-14-107, requiring service on the attorney general and an opportunity to be heard in any constitutional challenge to a statute of statewide effect, to conclude that "[the attorney general] is a proper party in this case to the extent that the constitutionality of the Act is being challenged." No. 1:18-CV-00170, 2020 WL 2120249, at *3 (E.D. Tenn. May 4, 2020) (citation omitted); *see also Burns v. Helper*, No. 3:18-CV-01231, 2019 WL 5987707, at *5 (M.D. Tenn. Oct. 24, 2019), *report and recommendation adopted*, No. 3:18-CV-01231, 2019 WL 5964546 (M.D. Tenn. Nov. 13, 2019) (holding attorney general is an appropriate party because Tennessee law requires the attorney general "to be a party defendant in any proceeding where the constitutionality of the Act of the legislature is before the Court on declaratory judgments proceeding.") (quoting *Cummings v. Beeler*, 223 S.W.2d 913, 916 (Tenn. 1949) (internal quotations omitted)); *Harvey*, 2022 WL 2334983, at *3 (attorney general is appropriate defendant in TN-SORA challenge).

Defendant Skrmetti also plays a direct role in ensuring criminal laws are enforced. Under a recent Tennessee law, "[i]f a district attorney general peremptorily and categorically refuses to prosecute all instances of a criminal offense without regard to facts or circumstances, then the attorney general and reporter may petition the supreme court for appointment of a district

attorney general pro tem." T.C.A. § 8-7-106(a)(2). Because this law is new, few cases have examined its impact for *Ex Parte Young* purposes. However, in *Friends of George's, Inc. v. Tennessee*, 667 F. Supp. 3d 755, 761 (W.D. Tenn. 2023), a case challenging the constitutionality of a Tennessee statute criminalizing the performance of "adult cabaret entertainment," the district court considered the attorney general's similar argument that he was not tasked with the law's enforcement for purposes of causation and redressability. The court found that "Tennessee's divided prosecutorial scheme giving the Attorney General power to begin a criminal prosecution should the local district attorney 'peremptorily and categorically' refuse to enforce criminal laws" created a reasonable risk the attorney general "may investigate and criminally prosecute[] Plaintiff for its performances." *Id.* Given this "reasonable risk," the court declined to allow the state enforcement mechanism's "ambiguity" to prevent suit. *Id*. The same analysis applies here, establishing the attorney general's direct role in enforcement.[1]

Moreover, the attorney general's office also has responsibility for all criminal and civil appeals, defending all Aggravated Prostitution convictions through the Tennessee appeals and supreme courts, T.C.A. § 8-6-109(b)(2)—further establishing his enforcement responsibilities.

---

[1] The Attorney General's enforcement power under this provision is not merely hypothetical. The U.S. Department of Justice recently found that the Aggravated Prostitution statute and related TN-SORA requirements violate the ADA and demanded that the Shelby County District Attorney "[c]ease enforcement of the aggravated prostitution statute, including new prosecutions." Rebecca B. Bond, *The United States' Findings and Conclusions Based on its Investigation of the State of Tennessee and the Shelby County District Attorney General's Office under Title II of the Americans with Disabilities Act, DJ No. 204-70-85*, 10 (Dec. 1, 2023), https://perma.cc/ER8J-99BN. In response, the Shelby County District Attorney's Office appears to have disavowed intent to prosecute Aggravated Prostitution cases, releasing a statement indicating it was "aware of the DOJ's letter. It's important to note that the incidents listed in the letter occurred before August 2022- preceding DA Mulroy taking office. However, once our office was made aware, we let the DOJ know that we would fully cooperate and we will continue to do so." *See* Kim Chaney, *DOJ: TN & Shelby County violated rights of people with HIV with enforcement of aggravated prostitution statute*, ABC24 (Dec. 1, 2023), https://perma.cc/924E-PHRY.

Defendants rely on *Nabors* in arguing for sovereign immunity for Defendant Skrmetti, MTD at 8–9, but there the Sixth Circuit declined to find standing to enjoin the attorney general because he had no authority with respect to the challenged statute; the court acknowledged the outcome would be different if the attorney general "could still bring about those prosecutions by commanding the district attorneys general to prosecute." *Nabors*, 35 F.4th at 1032. This power to "step[] in" now exists. *Id.* Prior to passage of T.C.A. § 8-7-106(a)(2), when a district attorney refused to prosecute a case, it was the job of the local district court to intervene. *Id.* (citing Tenn. Const. art. VI, § 5; T.C.A. § 8-6-109). Under T.C.A. § 8-7-106(a)(2), Defendant Skrmetti now has the power that the *Nabors* court found lacking. *Nabors*, 35 F.4th at 1032. This change resolves any lingering doubt as to his sovereign immunity claim.

### iii.    Director Rausch

Defendants concede that Plaintiffs' TN-SORA claims may proceed against Rausch under *Ex Parte Young* "to the extent Plaintiffs allege harms flowing from his limited authority to maintain and publish Tennessee's sex offender registry," but contend that *Ex Parte Young* "otherwise" bars Claims IV–VIII and X. MTD at 8. These arguments are meritless.

Defendants claim that Rausch has "no statutory authority to enforce [] TN-SORA's reporting requirements or 'exclusion zones' at the core of Plaintiffs' registry claims." MTD at 11. To clarify, Plaintiffs challenge the enforcement of *all aspects* of TN-SORA against them and all people convicted of Aggravated Prostitution. But more fundamentally, Defendants significantly downplay TBI's statutory role in TN-SORA's enforcement. As a threshold matter, to register, individuals must complete and sign a "TBI registration form." T.C.A. § 40-39-203(b)(1). These forms include "instructions for compliance" with TN-SORA, triggering TN-SORA's panoply of requirements. T.C.A. § 40-39-205(a). Then, TBI:

- Establishes, maintains, and updates a centralized record system of offender registration, verification, and tracking information, and forwards information received from sources to the appropriate law enforcement agency for investigation and verification, T.C.A. § 40-39-206(a);
- Places information it gathers about registrants on the Sex Offender Registry, T.C.A. § 40-39-206(d);
- Disseminates registration information to law enforcement agencies, school and public housing agencies, employment-related agencies, social service entities, volunteer organizations, and any others who request such notifications, T.C.A. § 40-39-214(a); and
- "[M]aintain[s]" a connection to the registry through the Tennessee Information Enforcement System (TIES). T.C.A. § 40-39-204(a). "[A]s required by the TBI," any agency collecting relevant registration information must enter it into TIES. *Id*.

Further, Tennessee law clearly imbues TBI with authority to ensure enforcement of TN-SORA:

> Whenever there is a factual basis to believe that an offender has not complied with [any of TN-SORA's provisions], pursuant to the powers enumerated in subsection (e), *the TBI shall make the information available* through the SOR to the district attorney general, designated law enforcement agencies and the probation officer, parole officer or other public officer or employee assigned responsibility for the offender's supervised release.

T.C.A. § 40-39-206(b) (emphasis added). TBI also has "the authority to promulgate any

necessary rules to implement and administer this section." T.C.A. § 40-39-206(f). Of course,

these provisions encompass the reporting requirements, T.C.A. §§ 40-39-203, 40-39-204, and

exclusion zones, T.C.A. § 40-39-211, for which Defendants disavow responsibility, MTD at 11.

Indeed, while disclaiming enforcement power in legal filings, TBI boasts of its role in "joint sex

offender registry compliance checks" on Facebook, replete with photographs. *See* Decl. of

Rachel Meeropol in Support of Mot. to Proceed Using Pseudonyms, ECF No. 57-3, Ex. B, at 10.

Moreover, even if none of this were true, Defendants ignore the obvious point that but for

their registration—which Defendants concede *is* Rausch's responsibility, MTD at 10—individual

Plaintiffs would not be subject to *any* of these restrictions. *See* T.C.A. § 40-39-203(b)(1).

Similarly, TBI is the agency with the authority to "terminat[e]" registration and thus TN-SORA's

restrictions. *See* T.C.A. §§ 40-39-207(a)(3), (b) (stating that "an offender required to register …

10

may file a request for termination of registration requirements *with TBI*," and describing TBI's review process for terminations) (emphasis added).

Given these responsibilities, it is not surprising that in *Haslam*, the court found the exact arguments Defendants make here to be "wholly without merit." 2017 WL 5187117, at *9–10. The court rejected the contention that the TBI Director was not an appropriate defendant in a TN-SORA challenge, finding that "[w]hile TBI may not have standalone authority to prosecute violations of the registry requirements, those prosecutions are merely the tip of a long spear that TBI itself constructs and provides." *Id.* at *10 (relying, *inter alia*, on TBI's "statutory mandate to inform local prosecutors and probation and parole officials" about registry violations); *see also Kelly*, 2020 WL 2120249, at *4  (finding that "[b]ecause the TBI is intricately involved in the administration of the Act, the TBI Director is an appropriate party to this action"); *accord Doe v. Gwyn*, No. 3:17-CV-504, 2018 WL 1957788, at *3–4 (E.D. Tenn. April 25, 2018) ("[t]he TBI's duties in the administration of Tennessee's statutory scheme are numerous and significant" and there was a "'realistic possibility' that the TBI will take legal or administrative action against [plaintiff's] interests.") (citation omitted).[2] Defendant Rausch's ample role in TN-SORA's enforcement means he is not entitled to sovereign immunity.

### iv.    Commissioner Strada

Finally, Defendants' claim that Defendant Strada also has no enforcement authority is similarly without merit. MTD at 9–10. TDOC is a designated agency for TN-SORA reporting purposes. T.C.A. § 40-39-202(2). Individuals incarcerated in a state penitentiary who are on the

---

[2] While TBI's general enforcement authority is more than adequate to make Rausch a proper defendant, it is notable that TBI has also undertaken extraordinary action, beyond its explicit statutory authority, to enforce TN-SORA. In *State v. Allen*, 593 S.W.3d 145 (Tenn. 2020), for example, TBI filed a motion to intervene in a state criminal proceeding despite unclear statutory authority to do so in an attempt to require the defendant to continue to register for life.

registry are required to register with the warden or their designee. T.C.A. § 40-39-203(b)(1).

TDOC may also play a role in enforcement, for example by requesting registry records from the

TN-SORA custodian in a prosecution for a registry violation. T.C.A. § 40-39-208(g). This means

that Jane Doe 4, who is currently in TDOC custody, FAC ¶ 302, will be required to register with

TDOC within 48 hours before her release from prison. T.C.A. § 40-39-203(b)(1). The other

individual Plaintiffs would face the same requirement if incarcerated. Thus, all individual

Plaintiffs face "a realistic possibility [TDOC] will take legal or administrative actions against

[their] interests." *Russell*, 784 F.3d at 1048. Defendant Strada is properly named.

## II.  Plaintiffs Adequately Allege Standing to Bring Their Claims.

Next, Defendants challenge Plaintiffs' standing. To establish Article III standing, a

plaintiff must allege (1) an injury in fact that is both (a) concrete and particularized, and (b)

actual or imminent; (2) that is fairly traceable to the defendant's conduct; and (3) that is likely to

be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)

(citations omitted). Though they concede "limited standing" against Defendant Rausch on

Counts IV–VIII, Defendants broadly argue that Plaintiffs do not have adequate standing to

advance any of their claims. MTD at 11–18. They are wrong as to each Count.

### A.  OUTMemphis Has Sufficiently Alleged Organizational Standing to Challenge the Aggravated Prostitution Statute and TN-SORA.

Defendants begin by arguing that OUTMemphis does not have associational or third-

party standing, MTD at 12–14, neither of which it seeks. OUTMemphis asserts standing "on its

own behalf because it has suffered a palpable injury as a result of the defendants' actions." *MX

Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002) (citing *Warth v. Seldin*, 422

U.S. 490, 511 (1975)). Its allegations satisfy each of the three *Lujan* requirements.

12

i.    **OUTMemphis Has Alleged Injury in Fact.**

Defendants argue that OUTMemphis does not satisfy the injury-in-fact requirement

because it does not itself fear prosecution, and it cannot rely on allegations about advising its

constituents about the challenged laws. MTD at 14. This ignores long-established precedent that

an organization may establish an injury that confers standing by alleging that is has "divert[ed]

its resources away from the other … services it provides and frustrat[ed] its mission." *Hughes v.

Peshina*, 96 F. App'x 272, 274 (6th Cir. 2004). "At the pleading stage, general factual allegations

of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts]

presume that general allegations embrace those specific facts that are necessary to support the

claim." *Lujan*, 504 U.S. at 561 (quotation omitted).

OUTMemphis has alleged that enforcement of both Aggravated Prostitution and TN-

SORA has caused it to divert resources and has frustrated its mission across its HIV services,

FAC ¶¶ 248–50, sexual health services, FAC ¶ 252, mental health programming, FAC ¶ 255,

outreach programming, FAC ¶ 256, name-change services for transgender people, FAC ¶ 257,

and general community programming, FAC ¶¶ 253–54. The Aggravated Prostitution statute, for

example, deters its clients from being tested for HIV, making its work of encouraging testing

more difficult and thus frustrating its mission. FAC ¶ 250. And because, for example, TN-

SORA's employment and housing restrictions limit stable housing and employment options,

OUTMemphis must provide more rental, food, utility and transportation assistance, and

emergency housing to its clients—causing a diversion of its resources. FAC ¶¶ 251, 258–62.

These impacts go well beyond what Defendants describe as "past expenses and efforts

that [OUTMemphis] simply would like to *discontinue*," MTD at 15, but rather identify core

resources that OUTMemphis must divert to mitigate the impact of the challenged laws, FAC ¶¶

13

249, 253, 256, 258–62, and aspects of its mission it resultantly cannot fulfill, FAC ¶¶ 250, 254–

55, 257, 258–62. Enforcement of these laws has "perceptibly impaired" OUTMemphis's ability

to provide services for LGBTQ+ Tennesseans, and thus "there can be no question that the

organization has suffered injury in fact. Such concrete and demonstrable injury to the

organization's activities—with the consequent drain on the organization's resources—constitutes

far more than simply a setback to the organization's abstract social interests." *Havens Realty*

*Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Hous. Opportunities Made Equal, Inc. v.*

*Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991) (fair housing organization alleged

injury sufficient to confer standing because it had to "devote resources to investigate and negate

the impact of [discriminatory housing advertisements]"); *Online Merchs. Guild v. Cameron*, 995

F.3d 540, 548 (6th Cir. 2021) (organization likely to establish organizational injury because it

"diverted resources that could have been expended elsewhere").

Ignoring these allegations, Defendants rely on *Fair Elections Ohio v. Husted*, 770 F.3d

456, 458 (6th Cir. 2014), in which a voter outreach organization challenged the deadline for

requesting an absentee ballot. While the organization alleged it diverted resources "to retrain[] its

volunteers and inform[] its members and constituents of the risks" regarding the deadline, the

evidence showed that this "retraining" occurred during a preplanned session and involved no

diversion of resources. *Id.* at 459–60. The organizational plaintiff was thus unable to offer

"specific facts" demonstrating injury for summary judgment. *Id.* at 460. OUTMemphis's

allegations are far fuller, and proof is not necessary to defeat a motion to dismiss.

### ii. OUTMemphis's Injuries Are Traceable to and Redressable by Defendants Lee and Skrmetti (Counts I–III).

Defendants next argue that OUTMemphis's injuries for Counts I–III are not traceable to

or redressable by Defendants Lee and Skrmetti because neither has authority to enforce

Aggravated Prostitution. MTD at 15. But as demonstrated in Sections I(B)(i), (ii), *supra*,
Plaintiffs have plausibly alleged that Defendants Lee and Skrmetti do have enforcement
authority over the statute. Thus, OUTMemphis's injuries are traceable to both.

Defendants next argue that even were Plaintiffs' claims to succeed, Defendants Lee and
Skrmetti could not redress their injuries because "[l]ocal prosecutors would remain free to
prosecute violations of the [challenged] laws." MTD at 15. This incorrectly assumes that local
prosecutors can enforce laws declared unconstitutional or unlawful. *See, e.g.*, *MacDonald v.
Moose*, 710 F.3d 154, 167 (4th Cir. 2013) (reversing denial of habeas relief to an individual
convicted under an anti-sodomy statute that became facially unconstitutional following
*Lawrence v. Texas*, 539 U.S. 558 (2003)). Local prosecutors must swear to support the U.S.
Constitution. Tenn. Const. art. X, § 1. Were a local prosecutor to knowingly enforce the invalid
law, Governor Lee would have to direct the attorney general or another local prosecutor to
initiate removal proceedings against that prosecutor for "misconduct" and "neglect to perform [a]
duty[.]" T.C.A. §§ 8-47-101; 8-47-109.

This argument also ignores Attorney General Skrmetti's duty "[t]o defend the
constitutionality and validity of all legislation of statewide applicability." T.C.A. § 8-6-109(9). If
local prosecutors chose the unlikely path of ignoring this Court's declaration, the validity of any
criminal charges would undoubtedly be challenged in the criminal proceeding. The Attorney
General, who would be bound by this case, has the duty to "attend to all business of the state,
both civil and criminal in the court of appeals, the court of criminal appeals and the supreme
court," T.C.A. § 8-6-109(b)(2), and could not defend the constitutionality of such an unlawful
prosecution on appeal or in a habeas proceeding.

All that is required to establish standing is "whether it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 715 (6th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc.*, 528 U.S. 167, 181 (2000)). Defendants' conjecture regarding aberrant prosecutors ignoring this Court's judgment does not defeat OUTMemphis's standing.

### iii.  OUTMemphis Has Standing to Bring ADA and Rehabilitation Act Claims (Counts I, IV, IX, & X).

Erroneously relying on *MX Grp.*, Defendants further argue that OUTMemphis does not have standing to bring ADA or Rehabilitation Act claims because it has not alleged that "it has been discriminated against on the basis of its association with a disabled person." MTD at 16. Defendants' argument misquotes *MX Grp.*, and incorrectly seeks to apply prudential standing rules, which "may bar a[n] … entity from asserting standing on behalf of the rights of others." *MX Grp.*, 293 F.3d at 332.

 "Prudential barriers do not apply in all cases," *id.* at 332, and do not apply to OUTMemphis's ADA or Rehabilitation Act claims. As the Sixth Circuit observed in *MX Grp.*, "an entity may sue in its own right for injuries sustained as a result of a defendant's actions, without prudential standing concerns, where Congress has provided the entity such a right." *Id.* at 333 (*citing Havens*, 455 U.S. at 372, 378–79). Title II of the ADA's enforcement provision, the court observed, extends relief to "'any person alleging discrimination on the basis of disability,'" *id.* at 334 (quoting 42 U.S.C. § 12133), and this broad language "evinces a congressional intention to define standing … as broadly as is permitted by Article III of the Constitution." *Id.* (quoting *Innovative Health Sys. Inc., v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997), *superseded on other grounds by Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001)).

16

Thus, in *MX Grp.*, the Sixth Circuit held that a methadone provider denied a zoning permit had standing under Title II, explicitly adopting the Second Circuit's reasoning in *Innovative Health* that an organizational plaintiff need only establish Article III standing to bring a claim under Title II of the ADA or the Rehabilitation Act, which is interpreted consistently with the ADA. *Id.* at 332, 335 (*citing Innovative Health*, 117 F.3d at 47). Other circuits have found the same. *See Addiction Specialists, Inc., v. Twp. of Hampton*, 411 F.3d 399, 407 (3d Cir. 2005) *abrogated on other grounds by Rufo v. Fox*, No. 21-3318, 2022 WL 16646689 (3d Cir. Nov. 3, 2022) ("the broad language of the ADA and [Rehabilitation Act] enforcement provisions evidences a Congressional intent to extend standing to the full limits of Article III … prudential limits imposed in pure associational standing cases do not apply"); *A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 362–63 (4th Cir. 2008) (same).[3]

Because OUTMemphis has sufficiently pled an injury in fact stemming from Defendants' discrimination against the disabled population it serves, *see supra*, it may bring ADA and Rehabilitation Act claims. *See, e.g.*, *Mote v. City of Chelsea*, 284 F. Supp. 3d 863, 887 (E.D. Mich. 2018) (organization had Title II standing because it "suffered by having to divert its resources toward attempts to secure ADA compliance by the defendants" and that diversion of resources impacted its capacity to provide other services to disabled persons); *Turner v. City of*

---

[3] Only the Eleventh Circuit has rejected this approach to Title II standing. *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1143 (11th Cir. 2014). Defendants also cite *Velzen v. Grand Valley State Univ.*, 902 F. Supp. 2d 1038, 1044 (W.D. Mich. 2012), which relies on *Autism Soc. of Mich. v. Fuller*, No. 05:05-CV-73, 2006 WL 1519966, at *16 (W.D. Mich. May 26, 2006), which, in turn, relies on *W.G. Nichols, Inc. v. Ferguson.*, No. CIV.A. 01-834, 2002 WL 1335118, at *15 (E.D. Pa. Jun.7, 2002), a district court opinion from outside of this Circuit that concludes that Article III standing is insufficient for a Title II claim. Neither *Fuller* nor *Velzen* engage with *MX Grp.* beyond a cursory citation, and *Fuller* actually misquotes *MX Grp.* in the same way that Defendants do. *Fuller*, 2006 WL 1519966, at *13.

*Englewood*, 195 F. App'x 346, 351–52 (6th Cir. 2006) (plaintiff that "cares for and/or associates with individuals who have disabilities" had standing under Title II to challenge rezoning that prohibited it from leasing to individuals who would provide services to people with disabilities).

**B.  Plaintiffs Allege Standing for All Claims Against All Defendants.**

Defendants further argue that all Plaintiffs lack standing to bring any Count against Defendants Lee, Skrmetti, and Strada because these Defendants lack enforcement power over the challenged laws, and Plaintiffs have only "limited standing" against Defendant Rausch for their TN-SORA claims in Counts IV–VIII and X because Rausch "does not enforce the obligations that cause the harms at the core of" these claims, such as the reporting requirements or exclusion zones. MTD at 17–18. As detailed above, these lack of enforcement arguments are plainly incorrect. *See supra* Section I(B). Accordingly, Plaintiffs' injuries "can be traced to 'allegedly unlawful conduct'" by each of the Defendants. *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) (citation omitted).

**III.  Plaintiffs Adequately State ADA and Rehabilitation Act Claims.**

Turning to the merits of Plaintiffs' claims, we begin with the ADA and Rehabilitation Act. Plaintiffs allege that the Aggravated Prostitution statute and its inclusion in TN-SORA facially discriminate based on HIV-status, in violation of those laws' clear mandate prohibiting, *inter alia*, disability discrimination related to the activities of a public entity. Defendants seek to avoid liability on multiple procedural and substantive grounds, several of which simply reiterate previously addressed issues. Plaintiffs respond to each argument below.

### A. OUTMemphis Has a Cause of Action Under the ADA and Rehabilitation Act.

Defendants first assert that OUTMemphis does not have a cause of action under the ADA or the Rehabilitation Act because OUTMemphis *itself* has not suffered "exclusion, [a] denial of benefits, or discrimination." MTD at 18–21. But the ADA and the Rehabilitation Act provide a cause of action, respectively, to "any person alleging discrimination on the basis of disability," 42 U.S.C. § 12133, and "any person aggrieved by" disability discrimination, 29 U.S.C. § 794a(a)(2). OUTMemphis alleges discrimination on the basis of disability, FAC ¶¶ 372, 432, and that it is aggrieved by such discrimination, FAC ¶¶ 373, 435. This is sufficient. *See MX Grp.*, 293 F.3d at 334–35 (adopting Second Circuit's analysis that ADA and Rehabilitation Act confer right to judicial relief not only to "qualified individual[s] with a disability" but also entities that "associate[] with disabled people"); *Turner*, 195 F. App'x at 352 (noting a "congressional intent to not limit [ADA or RA claims] to just [a] disabled person.").

Whether OUTMemphis is a proper plaintiff to make these allegations is a matter of *standing*, as all the cases cited by Defendants demonstrate. *See* MTD at 18–19 (*citing McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1143 (11th Cir. 2014)) (regarding standing for non-disabled family members); *Popovich v. Cuyahoga Cnty. Ct. of Common Pleas, Domestic Rels. Div.*, 150 F. App'x 424, 426–27 (6th Cir. 2005) (same)). Plaintiffs have already addressed the question of standing above. *See supra* Section II.

Defendants make a related argument that OUTMemphis is not a "qualified individual with a disability" and cannot advance Count I or IV because it has not alleged it is eligible for, and was denied, any services or benefits. MTD at 22. But again: OUTMemphis alleges that it *serves* qualified individuals with disabilities, FAC ¶¶ 369, 387, 422, 430, who are experiencing discrimination in the activities of a public entity, FAC ¶¶ 371–72, 389–90, 425–26, 432–33.

19

Nothing more is required. *Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, No. 22-3935, 2023 WL 8081677, at \*14 (6th Cir. Nov. 21, 2023) (to sue under ADA, "an entity need only generally show that it serves or is otherwise associated with disabled persons"); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 640 (S.D.N.Y. 2013) (equating "qualified individuals with disabilities" and "organizations that advocate on their behalf" for purposes of ADA claim).

As Plaintiffs have a cause of action directly under the ADA and Rehabilitation Act, Defendants' arguments as to the applicability of section 1983 are irrelevant. MTD at 20–21.

## B. The ADA Prohibits Discrimination Related to Activities of a Public Entity.

Defendants next argue that Plaintiffs fail to adequately allege discrimination under the ADA. MTD at 22. Title II of the ADA guarantees that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, *or activities* of a public entity, *or be subjected to discrimination by any such entity*." 42 U.S.C. § 12132 (emphasis added). Ignoring the word "activities" and the final clause of the provision, Defendants argue Title II is "best read" to guarantee only "equal access" to "programming, services, and benefits States provide" so Plaintiffs' claims should be dismissed for failure to allege eligibility for and denial of a "public service or benefit." MTD at 22–23.

The Sixth Circuit reads Title II differently. Under *Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998), Title II prohibits disability discrimination arising from "all of the activities of a public entity." In *Johnson*, the operator of the City of Saline's public access cable station brought a Title II claim arising from the inaccessible nature of his workplace. *Id.* at 567–68. The district court dismissed Johnson's claim on a theory like Defendants'—the cable studio was not "a service, program, or activity of a public entity" that Johnson was trying to access. *Id.* at 569.

20

On appeal, Johnson argued that the catchall provision of Title II forbids any discrimination by a public entity, regardless of whether it can be categorized as a "service, program, or activity."[4] *Id.* The Sixth Circuit declined to decide whether Johnson was correct, instead "reach[ing] a similar result by other means .... (1) [T]he discrimination referenced in the statute must *relate to* services, programs, or activities; and (2) services, programs, and activities *include all government activities.*" *Id.* (emphasis added). Whether Title II's catchall provision has independent operation is a "distinction without a difference," because "the word 'activities' ... offers little basis to exclude any actions of a public entity," and thus Johnson's claim was reinstated. *Id.* at 569–70; *see also* 28 C.F.R. Pt. 35, App. B ("title II applies to anything a public entity does"); *Tennessee v. Lane*, 541 U.S. 509, 517 (2004) (Title II "prohibits any public entity from discriminating against 'qualified' persons with disabilities in the provision or operation of public services, programs, *or activities.*") (emphasis added).

Plaintiffs allege disability discrimination through Defendants' maintenance, administration, and enforcement of Aggravated Prostitution and related TN-SORA requirements. FAC ¶¶ 371, 389. This is discrimination "relate[d]" to an "activity"—the enforcement of criminal and civil laws—of a public entity. *Johnson*, 151 F.3d at 569. Nothing more is required. *Cf. Tri-*

---

[4] *Johnson*'s understanding of Title II has significant support. *See Haberle v. Troxell*, 885 F.3d 170, 180 (3d Cir. 2018) ("§ 12132 is framed in the alternative and we can look instead to the second phrase"); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007) ("the final clause of § 12132 protects qualified individuals with a disability from being subjected to discrimination by any such entity, and is not tied directly to the services, programs, or activities of the public entity") (internal citations and punctuation omitted); *Gohier v. Enright*, 186 F.3d 1216, 1220 (10th Cir. 1999) (plaintiff has two grounds for a Title II claim, either that the plaintiff was excluded from the services, programs, or activities of a public entity or that the plaintiff was subjected to discrimination by said entity); *Innovative Health*, 117 F.3d at 44–45 ("Title II's anti-discrimination provision does not limit the ADA's coverage to conduct that occurs in the 'programs, services, or activities' ... it is a catch-all phrase that prohibits all discrimination by a public entity"); *but see Zimmerman v. Or. Dep't of Just.*, 170 F.3d 1169, 1176 (9th Cir. 1999).

*Cities Holdings LLC v. Tenn. Admin. Procs. Div.*, 726 F. App'x 298, 313–14 (6th Cir. 2018)

("classifications that appear to treat people with disabilities differently raise serious concerns

under the ADA and RA").

      Defendants' only acknowledgment of *Johnson* is to quote its warning that the

requirements of Title II are "subject to the bounds of reasonableness" and to imply that the Sixth

Circuit or other courts have rejected application of Title II to "certain criminal enforcement

activities" on reasonableness grounds. MTD at 24. This is misleading. The concept of

"reasonableness" in ADA cases arises with respect to potential accommodations; it does not

operate to limit the non-discrimination mandate. *See Johnson*, 151 F.3d at 571. And contrary to

Defendants' implication, in *Tucker v. Tennessee*, 539 F.3d 526, 535 (6th Cir. 2008) *abrogated on*

*other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en

banc), the Sixth Circuit did not decide whether the ADA applies to arrests. Nor does the *Tucker*

court's description (without adoption) of the reasoning in *Rosen v. Montgomery Cnty.*, 121 F.3d

154 (4th Cir. 1997), have relevance here, as that case turned on the reasonableness of certain

accommodations during the exigent circumstances of an arrest. *Tucker*, 539 F.3d at 534–35. A

criminal law that facially discriminates based on disability presents an entirely different question

than a rapidly unfolding, potentially volatile police interaction.

      Defendants also assert the principle of *ejusdem generis*, postulating that Title II's

residual clause should be treated like "general words follow[ing] specific words in a statutory

enumeration" and interpreted to "embrace only objects similar in nature to those objects

enumerated by the preceding specific words." MTD at 24. This argument ignores the Sixth

Circuit's explanation that "the word 'activities,' on its face, suggests great breadth" and requires

interpreting "services, programs, or activities," to "encompass[ ] virtually everything that a

public entity does." *Johnson*, 151 F.3d at 569–70. Defendants rely heavily on *Zimmerman v. Or. Dep't of Just.*, 170 F.3d 1169 (9th Cir. 1999) for this argument, but *Zimmerman*'s definition of the "activities" of a public entity directly contradicts *Johnson*'s definition of the same.[5]

Defendants next object that Title II covers "qualified individual[s]," and the definition of a qualified individual requires showing a plaintiff meets "essential eligibility requirements" for participation in a public entities' programs and services. MTD at 23 (*citing* 42 U.S.C. § 12131(2)). But the Supreme Court has already rejected an attempt to use similar semantic arguments to narrow the reach of Title II, explaining that "[a] drug addict convicted of drug possession, for example, might, as part of his sentence, be required to 'participate' in a drug treatment program for which only addicts are 'eligible.'" *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211 (1998).[6] We are all "eligible" for participation in the criminal legal system, and people living with HIV and found to have engaged in sex work are "qualified" for conviction of Aggravated Prostitution and resultant lifetime sex offender registration.

Defendants' final two arguments require little response. First, Defendants complain that Plaintiffs' interpretation of Title II "cannot be squared" with *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001). MTD at 25. But *Garrett* says nothing about what types of activities Title II covers; it prohibited Title I employment suits *for damages* based on a lack of Congressional authority, while leaving open suits for injunctive relief. *Garrett*, 531 U.S. at 374. And finally, Defendants' proffered interpretation of Title II's catchall to prohibit "intentional

---

[5] *Compare Zimmerman*, 170 F.3d at 1174 (buying lawnmowers and hiring people to operate them is not an "activity of the Parks Department") *with Johnson*, 151 F.3d at 569 ("activities include all government activities, including contracting").
[6] *Yeskey*, 524 U.S. at 212, also rejects relying on the title of the provision—Public Services—to narrow its reach.

discrimination" only in public programs and benefits, MTD at 15, again ignores the term "activities," which *Johnson* forbids, 151 F.3d at 569.

**C. Applying Title II to Defendants' Conduct Raises No Constitutional Concerns.**

Defendants argue that their narrow and atextual interpretation of Title II is "reasonable" and must control to save Title II from constitutional defect. MTD at 26. As explained above, because Defendants' interpretation completely ignores binding Sixth Circuit precedent, it is neither reasonable nor even colorable. Moreover, there is no constitutional issue to avoid, as Congress has ample power to prohibit Tennessee's intentional disability discrimination under both § 5 of the Fourteenth Amendment and the Commerce Clause.

**i.    Section 5 of the Fourteenth Amendment**

First, there is no question that Congress has § 5 power to prohibit the actions Plaintiffs challenge if the Court agrees with Plaintiffs that those actions also state plausible equal protection and substantive due process claims. *See infra* Sections IV, V. Congress' broad enforcement power under § 5 includes "the authority both to remedy and to deter violation of rights." *Lane*, 541 U.S. at 518 (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000)). This means that Congress may prohibit disability discrimination that violates the Fourteenth Amendment. *See United States v. Georgia*, 546 U.S. 151, 158 (2006) ("no one doubts that § 5 grants Congress the power to 'enforce … the provisions' of the [Fourteenth] Amendment by creating private remedies against the States for *actual* violations of those provisions") (emphasis in original); *see also Mingus v. Butler*, 591 F.3d 474, 483 (6th Cir. 2010). Only if the Court *dismisses* those counts must it determine whether Plaintiffs' ADA claims fit within Congress' prophylactic power. *Lane*, 541 U.S. at 518. Regardless, Plaintiffs easily satisfy each of the three elements of the relevant *City of Boerne v. Flores*, 521 U.S. 507 (1997) test.

24

### a.  Nature of Constitutional Right

First, a court must "identify the constitutional right or rights that Congress sought to enforce when it enacted Title II." *Lane*, 541 U.S. at 522. The Supreme Court has already found that Title II seeks to prohibit "irrational disability discrimination." *Id.* To avoid such equal protection or due process violations while protecting public safety, the ADA's direct threat exception allows public entities to consider disability if they:

> make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures … will mitigate the risk.

28 C.F.R. § 35.139(b). Tennessee's Aggravated Prostitution statute and related sex offender registration requirements violate the ADA by failing to include *any* individualized inquiry whatsoever, irrationally punishing individuals who present zero risk of transmitting HIV. *See* FAC ¶¶ 4, 93, 118.

### b.  Congressional Record of Discrimination

Next, a court must consider the harm Title II was designed to address. *Lane*, 541 U.S. at 524. The Supreme Court has already determined that Congress had ample support for its prohibition of persistent disability discrimination by public entities across a wide range of services and activities. *Id.* at 529. Bipartisan passage of the ADA in 1990 was a result of "decades of deliberation and investigation" which led Congress to conclude that "individuals with disabilities are a discrete and insular minority who have been faced with restrictions and … subjected to a history of purposeful unequal treatment … resulting from stereotypic assumptions." *Id.* at 516. This history of "pervasive unequal treatment" included discriminatory state laws touching on voting, marriage, and jury service, "unjustified commitment," and unequal

treatment in the penal system and in the administration of justice. *Id.* at 524–25. Based on this record, Congress concluded that disability discrimination persists in such critical areas as, *inter alia,* institutionalization[7] and access to public services. *Id.* at 529 (*citing* 42 U.S.C. § 12101(a)(3)). "This finding, together with the extensive record … make[] clear beyond peradventure" that Title II "was an appropriate subject for prophylactic legislation." *Id.* at 529.

Defendants ignore these findings, arguing that Congress identified no "'history and pattern' of state criminal laws which irrationally discriminated against the disabled." MTD at 28. Untrue: included in the history of discrimination relied upon in *Lane*, were state criminal laws singling out individuals with disabilities for particular restrictions. *See* 541 U.S. at 524 n.8. Congress also considered public health laws in crafting the ADA's direct threat exception. *See* H.R. Rep. No. 101-596, at 70 (1990) (Conf. Rep.) ("for example, if a state has a law which required people with certain contagious diseases, such as tuberculosis, to take certain precautions[], that law would [] not be preempted by the ADA as long as [its] requirements … were designed to protect against individuals who pose a direct threat to the health or safety of others."). And *Nevada Dep't. of Hum. Res. v. Hibbs*, 538 U.S. 721 (2003), shows that a court may look to a pattern of discriminatory laws regardless of whether they were explicitly summarized in congressional findings. *See id.* at 729 (cataloguing state laws limiting women's employment opportunities in upholding Family Medical Leave Act under § 5). Notably, Defendants concede a pattern of state laws criminalizing HIV. MTD at 28–29; FAC ¶¶ 73.

Defendants cite *City of Boerne* for the proposition that it is not enough for Congress to have considered disability discrimination broadly, but rather must have identified historical

---

[7] *See Yeskey*, 524 U.S. at 211–12 (ADA's "reference to discrimination 'in … institutionalization,' … can be thought to include penal institutions.") (citation omitted).

findings "[w]ith respect to the particular services at issue." MTD at 28 (quoting *City of Boerne*, 521 U.S. at 527). *City of Boerne* does not say this, or anything like it. 521 U.S. at 527. And while the Supreme Court in *Lane* did *describe* the "particular services" involved, it did not begin its as-applied analysis until it reached the third step, addressing congruence and proportionality. 541 U.S. at 530. *Lane* is therefore best read to definitively answer *City of Boerne*'s first two prongs, leaving only the question of Title II's congruence and proportionality as applied to particular rights. *See Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005) (*Lane*'s analysis of cumulative effect of disability discrimination across many contexts satisfies the historical inquiry into the harms sought to be addressed by Title II); *accord Klingler v. Dir., Dep't of Revenue*, 455 F.3d 888, 896 (8th Cir. 2006); *Ass'n for Disabled Am., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005).

Whether Congress' explicit references to people living with HIV involve only HIV-related *employment* discrimination, MTD at 28, is thus utterly beside the point. Congress need not make findings specific to every single type of disability in every title of the ADA to support the need for a broad anti-discrimination mandate.

### c. Congruence and Proportionality

The final step is to determine whether Title II is an appropriate response to this history of unequal treatment as applied to the activity in question. *Lane*, 541 U.S. at 530. A court must consider whether Congress' chosen remedy is "congrue[nt] and proportional[]" to the targeted violation such that the legislation does not "become substantive in operation and effect." *City of Boerne*, 521 U.S. at 520. This question turns on whether Congress' remedy is "designed to identify and counteract state laws likely to be unconstitutional." *Id.* at 534.

27

Pivotally, the ADA's carefully crafted direct threat exception is well-designed to identify which state laws are irrationally motivated by fear or animus rather than legitimate government goals. *See* 28 C.F.R. § 35.139(b) (2010).[8] The exception, which requires a "*reasonable judgment*" based on science, guards against animus- or fear-based classifications that would, if uncovered, fail rational basis review, but that are difficult to identify given the unlikelihood of an entity acknowledging such a motivation on the public record. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 444–47 (1985) (states may not rely on a classification "whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational" or which reflects "a bare … desire to harm a politically unpopular group" (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973))). By requiring classifications based on "reasonable" medical judgment, rather than "prejudice, stereotypes, or unfounded fear," *Sch. Bd. of Nassau Cnty. v. Arline,* 480 U.S. 273, 287 (1987), the ADA *assists identification of*, but does not substantively change, the Fourteenth Amendment's prohibitions. Deference to a congressional scheme designed to guard against irrational decision-making "is particularly appropriate in the context of disabled individuals" as the question of "[h]ow this large and diversified group is to be treated under the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary."

---

[8] A state's "determination that a person poses a direct threat to the health or safety of others may not be based on generalizations or stereotypes about the effects of a particular disability." ADA: Title II Tech. Assistance Manual § II-2.8000 (U.S. Dep't Just. 1993); *see also Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 (1987) (forbidding "deprivations based on prejudice, stereotypes, or unfounded fear."); *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) ("The thesis of the [ADA] is simply this: That people with disabilities … should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant medical evidence.") (citations omitted).

*Johnson v. State Tech. Ctr. at Memphis*, 24 F. Supp. 2d 833, 840–41 (W.D. Tenn. 1998) (quoting *Cleburne*, 473 U.S. at 442–43).

Congress' approach is also appropriately limited. *See Lane*, 541 U.S. at 531. Title II does not prohibit *all* classifications—only those unfounded in science. Contrary to Defendants' claim, this does not "remov[e] a tool for limiting the spread of HIV," MTD at 30, as Defendants' actions are not rationally designed to accomplish this goal, *see, e.g.*, FAC ¶ 93 (Aggravated Prostitution applies regardless of whether act or individual in question is capable of transmitting HIV); *see also infra* Section IV(B)(iii). Because Title II's application here defines *how* rationality should be measured in the context of disability, rather than seeking to substantively elevate such discrimination to a stricter standard of review, the *City of Boerne* test is satisfied.

### ii.    The Commerce Clause

Should the Court disagree, the Commerce Clause provides an alternative source of authority for both Title II and the particular application Plaintiffs seek.[9] Under the Commerce Clause, Congress may regulate: (1) the channels of interstate commerce; (2) persons or things in interstate commerce, even though the threat may come only from intrastate activities; and (3) activities having a substantial relation to interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). A court will invalidate statutes "only if they bear no rational relationship to any of these powers." *United States v. Coleman*, 675 F.3d 615, 619 (6th Cir. 2012) (citing *United States v. Faasse*, 265 F.3d 475, 481 (6th Cir. 2001)). With respect to the third prong, for example, a court "need not determine whether [the activities in question], taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so

---

[9] As Plaintiffs do not seek damages, Defendants' citation to *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996), is irrelevant. *See* MTD at 30.

concluding." *Gonzales v. Raich*, 545 U.S. 1, 22 (2005) (citing *Lopez*, 514 U.S. at 557); *see also United States v. Morrison*, 529 U.S. 598, 607 (2000) ("respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds").

Title II of the ADA is a valid exercise of congressional power both as a whole and as applied here, as it regulates economic activity that substantially affects interstate commerce and regulates an instrumentality of, and a thing in, interstate commerce.

### a. Congress Had More Than a Rational Basis for Title II's Prohibition of Disability Discrimination Across a Wide Range of Economic Activities.

Title II of the ADA prohibits discrimination across a large swath of economic activity by public entities—e.g., transportation, roads and bridges, court operations, hospitals, and prisons—much of which has a direct impact on interstate commerce. This may be why Commerce Clause challenges to Title II are rare, with courts assuming its legitimacy. *See, e.g.*, *Reese v. Michigan*, 234 F.3d 1269 (6th Cir. 2000) (unpublished table decision) ("the ADA is a valid exercise of Congress's power under the Commerce Clause to prohibit even rational discrimination on the basis of disability"); *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000) *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) ("commerce clause gives Congress ample authority to enact the ADA").

Defendants do not question Congress' authority with respect to Title II in general, or the ADA as a whole. Instead, they argue the *application* Plaintiffs seek is beyond the reach of federal power. But unlike the case-by-case congruence and proportionality analysis required under § 5, *see supra*, when a "class of activities" is regulated under the Commerce Clause and "that class is within the reach of federal power, the courts have no power 'to excise, as trivial,

individual instances' of the class." *Perez v. United States*, 402 U.S. 146, 154 (1971) (quoting

*Maryland v. Wirtz*, 392 U.S. 183, 193 (2017)). The differences posed by application of a

statutory scheme to a specific context "might be sufficient to justify a policy decision exempting

the narrower class" from congressional regulation, but that is not for a court to decide. *Gonzales*,

545 U.S. at 26. Rather, a court need only consider whether it is rational to include the narrower

class of activities as "an essential part of the larger regulatory scheme." *Id.*

For this reason, the cases Defendants rely on are inapposite. Both *Morrison*, 529 U.S. at

617–19 (invalidating the Violence Against Women Act), and *Lopez*, 514 U.S at 567 (invalidating

the Gun-Free School Zones Act), involved regulation of a single, non-economic activity, which

"fell outside Congress' commerce power in its entirety." *Gonzales*, 545 U.S. at 23. Ensuring that

a state cannot criminalize disability, however, can rationally be understood as an essential part of

Title II's purpose: removing barriers to engagement in society for people with disabilities.[10]

While Congress need not make any formal findings regarding the impact of regulated

activities on interstate commerce, *Katzenbach v. McClung*, 379 U.S. 294, 304 (1964), the ADA

includes such findings. Congress heard testimony about "staggering levels of unemployment and

---

[10] The Court may also consider the entire ADA as a "comprehensive framework" for addressing
disability discrimination, with Title II serving as an "essential part of a larger regulation of
economic activity." *Gonzales*, 545 U.S. at 24 (quoting *Lopez*, 514 U.S at 561). It would be hard
to argue that Title I and III or the ADA, in regulating employment and public accommodations,
do not constitute valid Commerce Clause legislation. *See United States* v. *Mississippi Dep't of
Pub. Safety*, 321 F.3d 495, 500–501 (5th Cir. 2003) (Congress had a rational basis for concluding
regulation of employment discrimination was necessary to regulate the national market of
employment); *cf. Katzenbach* v. *McClung*, 379 U.S. 294, 299–300, 304 (1964) (Congress had
more than a rational basis for concluding that racial discrimination by restaurants directly
impacts interstate travel and interstate commerce). Ending discrimination in employment and
public accommodations requires addressing the stigma that attaches to disability. It was thus
perfectly rational for Congress to conclude that addressing discrimination by public entities—
especially facially discriminatory laws—is an essential component to ending discriminatory
behavior in the national marketplace.

poverty" among people with disabilities, H.R. Rep. 101-485, pt. 2, at 32 (1990), and found that

disability discrimination and prejudice "costs the United States billions of dollars in unnecessary

expenses resulting from dependency and nonproductivity," 42 U.S.C. § 12101 (a)(8). These

findings "ably demonstrate that Congress realized the effect that disability discrimination was

having (and would continue to have) on interstate commerce in the absence of the ADA."

*Mississippi Dep't of Pub. Safety*, 321 F.3d at 501.

The ADA was comprehensively designed "to provide clear, strong, consistent, and

enforceable standards addressing discrimination against individuals with disabilities," H.R. Rep.

101-485, pt. 2, at 50, because "a break in any link in the chain that connects individuals with

disabilities to the workplace or prevents them from functioning independently creates a barrier

which many times cannot be bridged," *id.* at 48 (statement of Jay Rouclin). State action—

through criminal law, regulation, or other means—that imposes felony liability and residency,

employment, and movement restrictions on the basis of disability could not be more

diametrically opposed to this endeavor.

### b. Application of Title II to Tennessee's Discriminatory Actions Is Authorized Under the Commerce Clause.

Precedent is clear that even *wholly* intrastate activity is subject to congressional

regulation when the activity in question substantially affects interstate commerce. *Lopez*, 514

U.S. at 558–60 (including as examples the regulation of intrastate coal mining, intrastate

extortionate credit transactions, and the production of wheat for private consumption, among

others). Defendants ignore this power, claiming that Tennessee's enforcement of its criminal law

is not an "economic endeavor." MTD at 31. But *Lopez* established that "Congress may regulate

even noneconomic local activity if that regulation is a necessary part of a more general

regulation of interstate commerce …. The relevant question is simply whether the means chosen

are 'reasonably adapted' to the attainment of a legitimate end under the commerce power."

*Gonzales*, 545 U.S. at 37 (Scalia, J. concurring); *see also Thomas More L. Ctr. v. Obama*, 651

F.3d 529, 542 (6th Cir. 2011), *abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v.*

*Sebelius*, 567 U.S. 519 (2012) ("Congress may also regulate even non-economic intrastate

activity if doing so is essential to a larger scheme that regulates economic activity.").

Moreover, this Court has no need to rule on Title II's application to state criminal laws

writ large; it must instead look at the laws relevant here. Aggravated Prostitution, of course,

explicitly regulates economic and commercial activity. *See* T.C.A. § 39-13-516 (prohibiting

engaging in "sexual activity as a business"). And Prostitution is economic activity that, in

aggregate, impacts interstate commerce. Just as the production of marijuana for private

consumption "has a substantial effect on supply and demand in the national market for that

commodity," *Gonzales*, 545 U.S. at 19, Congress has found that "prostitution in American cities

encourage[s] and enlarge[s]" the broader market. *United States v. Todd*, 627 F.3d 329, 333 (9th

Cir. 2010) (citation omitted). Congress can regulate purely local prostitution as economic activity

that impacts interstate commerce, just as it can regulate in diverse contexts like purely local

carjacking, *United States v. McHenry*, 97 F.3d 125, 127–28 (6th Cir. 1996), and purely local

possession of child pornography, *United States v. Chambers*, 441 F.3d 438, 450–55 (6th Cir.

2006).

It follows that Congress also has the power to regulate the state's regulation of this

commercial activity. *Cf. Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 207–08

(5th Cir. 2000) (local efforts to exclude the disabled from the community by refusing to provide

reasonable accommodations to zoning laws may be regulated on a federal level if that local

regulation affects the national economy). *Lopez* directs courts to ensure that federal legislation

"regulates an activity that substantially affects interstate commerce …. [T]his mandate [is] satisfied when a necessary element of the criminal offense involves an activity that falls within Congress's jurisdiction." *United States v. Tucker*, 90 F.3d 1135, 1141 (6th Cir. 1996).

Defendants complain of federal usurpation of "traditional police powers explicitly reserved to the States," MTD at 31, but the Supreme Court has rejected "as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional.'" *United States v. Laton*, 352 F.3d 286, 293 n.6 (6th Cir. 2003) (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546–47 (1985)); *see also Gonzales*, 545 U.S. at 29 ("It is beyond peradventure that federal power over commerce is superior to that of the States to provide for the welfare or necessities of their inhabitants, however legitimate or dire those necessities may be.") (citations omitted).

While the commercial and interstate nature of sex work is all that is needed to establish congressional authority to prohibit the state's enforcement of its Aggravated Prostitution statute, an alternative analysis is also available to this Court. Criminalization of Plaintiffs' HIV status is an act of discrimination that itself has a significant impact on interstate commerce by directly contributing to the stigmatization of disease and the resultant economic barriers experienced by people living with disabilities. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 601 (1999) ("[C]onfinement in an institution severely diminishes the everyday life activities of individuals, including … work options, economic independence, educational advancement, and cultural enrichment"); *see also* H.R. Rep. 101-485, pt. 2, at 31 (widespread HIV discrimination "has serious repercussions for both the individual who experiences it and for this nation's efforts to control the epidemic," causing reluctance "to come forward for testing, counseling, and care").

34

Congress could rationally conclude that prohibiting state criminalization of disability is "reasonably adapted" to its overall goal of removing barriers to public engagement and economic opportunity by individuals living with disabilities and addressing the stigma and fear that continue to interfere with those goals.[11] *See id*. at 30 (noting that disability "discrimination often results from false presumptions, generalizations, misperceptions, patronizing attitudes, ignorance, irrational fears, and pernicious mythologies"). Through the direct threat exception to Title II, *see supra*, Congress drew a careful balance, requiring a public entity to determine the "nature, duration and severity" of any risk through an individualized, scientifically-sound assessment. 28 C.F.R. § 35.139(b). The Aggravated Prostitution statute's irrational and sweeping criminalization of HIV status directly interferes with this balance, sending a message that people living with HIV present an unmitigable danger to the public, in direct conflict with the integrative principles Congress determined were rational to address the huge economic losses— measuring in the billions—caused by disability discrimination.

Application of Title II to TN-SORA requirements presents an even clearer connection to interstate commerce. TN-SORA restricts local *and interstate* economic and commercial activity. *See* T.C.A. §§ 40-39-211(a)(1) (regulating where registrants may lawfully purchase or rent a home and work); 40-39-203(a)(3)–(7) (restricting registrants' ability to travel to other states and use the internet). These commercial activities, even when undertaken in a wholly intrastate manner, have a significant impact on interstate commerce. For example, "the local rental of an

---

[11] The logic of this approach is not negated by the fact that people living with disabilities might still be impacted by Tennessee's misdemeanor Prostitution statute should the State be forced to abandon Aggravated Prostitution prosecutions. Such charges would not contribute to the stigmatization of disease, which Congress found necessary to address as part of its "larger regulatory scheme" designed to ameliorate the economic impact of disability discrimination. Nor would they cause the devastating economic consequences of a felony record and prison time.

35

apartment unit is merely an element of a much broader commercial market in rental properties," and thus, the "congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class." *Russell v. United States*, 471 U.S. 858, 862 (1985). So too, there is a "national labor market and … even local acts of discrimination, when considered in the aggregate, can have a substantial effect on that market." *Mississippi Dep't of Pub. Safety*, 321 F.3d at 500.

More fundamentally, the internet is an instrument of interstate commerce, *United States v. Pina*, 724 F. App'x 413, 422 (6th Cir. 2018), and the information Defendants extract from Plaintiffs, which they publish on the internet, T.C.A. § 40-39-206(d), and submit to the National Sex Offender Registry, T.C.A. § 40-39-214(a), is a "thin[g] in interstate commerce." *Reno v. Condon*, 528 U.S. 141, 148 (2000) (alteration in original) (quoting *Lopez*, 514 U.S. at 549). As Congress can regulate things in, and the instrumentalities of, interstate commerce, *Lopez*, 514 U.S. at 558–59, its power to regulate Tennessee's sex offender registry and enforce registrants' restrictions on internet use, T.C.A. § 40-39-203(a)(7), need not depend on any *impact* on interstate commerce. *Cf. United States v. Coleman*, 675 F.3d 615, 620–21 (6th Cir. 2012) (federal Sex Offender Registration and Notification Act is valid exercise of Commerce Clause power under *Lopez* prongs I and II).

Contrary to Defendants' concerns, and in contrast to the laws invalidated in *Lopez* and *Morrison*, Plaintiffs need not resort to complicated causal chains regarding the "costs of crime" and "national productivity" that would "allow Congress to regulate *any crime*." *Morrison*, 529 U.S. at 612, 615 (emphasis added). Application of Title II's anti-discrimination mandate here regulates a thing—the sex offender registry—in interstate commerce, restrictions on commercial and economic activity inside and outside the state, and a criminal law that stigmatizes disability.

36

"Unlike *Lopez* or *Morrison*, it does not serve the balance of federalism to allow local communities to discriminate against the disabled. Local authorities cannot 'experiment' by creating communities that exclude the disabled." *Groome Res. Ltd., L.L.C.*, 234 F.3d at 215.

Finally, Defendants assert that "some federal courts" have found "certain applications" of Title II illegitimate under the Commerce Clause. MTD at 31–32. For this proposition Defendants cite a single judge's *concurrence and dissent* in a case that explicitly declined to rule on the constitutionality of Title II under the Commerce Clause, *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 416 (5th Cir. 2004), and a *vacated* circuit court decision, *Klingler v. Director, Dept. of Revenue*, 366 F.3d 614 (8th Cir. 2004).[12] Defendants' final citation is to *Castells v. Fisher*, No. 05 CV 4866 (SJ), 2007 WL 1100850, at *3 (E.D.N.Y. Mar. 24, 2007), a case which says *nothing* about the scope of congressional power under the Commerce Clause.

**D. Plaintiffs Have Adequately Alleged Rehabilitation Act Claims (Counts IX and X).**

Defendants next oppose Plaintiffs' Rehabilitation Act claims, arguing that: (1) Plaintiffs fail to name a proper defendant; (2) OUTMemphis is not a "qualified individual with a disability"; (3) Plaintiffs have not been discriminated against "solely" on the basis of disability and (4) are not "otherwise qualified"; and (5) Tennessee has not consented to the claim. MTD at 32–39. Defendants' "qualified individual" argument mirrors their identical assertion regarding the ADA and fails for the same reasons. *See supra* Section III(A). Plaintiffs address the rest of Defendants' arguments below.[13]

---

[12] *Klingler* was not vacated by the Supreme Court solely in light of *Lane* as Defendants claim, MTD at 32 n.12, but also in light of *Gonzales v. Raich*, 545 U.S. 1 (2005). *Klingler v. Director, Dept. of Revenue*, 545 U.S. 1111 (2005). Thus, the Eighth Circuit's Commerce Clause analysis in *Klingler* is no longer good law.

[13] As Defendants' "proper defendant" argument overlaps with their consent argument, the two are addressed together *infra* in Subsection (iii).

i.     **Plaintiffs Allege Discrimination "Solely" By Reason of Disability.**

Plaintiffs allege that Defendants are engaging in disability discrimination by singling out

people with HIV for a felony and subjecting them to sex offender registration when neither

would result from identical conduct undertaken by individuals not living with HIV. FAC ¶¶ 425–

26, 432–33. Defendants counter that Plaintiffs cannot show that such discrimination occurred

"solely by reason of" a disability as required by the Rehabilitation Act. MTD at 34.

As the Sixth Circuit explained in *Sandison v. Michigan High School Athletic Ass'n, Inc.*,

64 F.3d 1026, 1031 (6th Cir. 1995), "[f]ew cases explain the meaning of the term 'solely by

reason of' disability." What is clear is that it disallows suit if the defendant acted according to a

rule that is "neutral … with respect to disability." *Id*. at 1032. The statutes challenged in this case

are not "neutral." To the contrary, they facially subject people who are living with HIV to far

more severe penalties for engaging in prostitution than they would face if they were not living

with HIV or were living with some condition other than HIV. *Compare* T.C.A. § 39-13-516 *with*

*id*. § 39-13-513; *see also* FAC ¶¶ 118–68.

Defendants assert that the statutes do not discriminate solely by reason of HIV because

they also require knowledge of HIV status and the act of prostitution. MTD at 34. This argument

fails. First, one cannot know one is living with HIV unless one *has* HIV; the latter is a but-for

cause of the former, not an independent reason for the discrimination. Second, the Rehabilitation

Act applies the same meaning of discrimination as Title VII and requires "'evenhanded treatment

of handicapped persons' relative to those persons who do not have disabilities." *Olmstead*, 527

U.S. at 618–19 (Thomas, J., dissenting) (quoting *Southeastern Community College v. Davis*, 442

U.S. 397, 410 (1979)). And while not part of the majority decision, five justices signed on to

Justice Thomas' approval in *Olmstead*, of the understanding that, under Title VII, a fired Black

38

employee "'had to show that although he was not a good employee, equally bad employees were treated more leniently by [his employer] if they happened not to be black.'" *Id.* at 618 (alteration in original) (quoting *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir. 1993)); *see also id.* at 611 (Kennedy, J., concurring). Thus, if a plaintiff is fired because they have a disability and are often late to work, their disability may not be the sole cause of being fired. But if others were late to work as frequently and not fired, the plaintiff would have a valid claim of discrimination solely by reason of disability.

Here, Defendants treat individuals who engage in the exact same conduct (prostitution) who are not living with HIV more leniently than those who are. T.C.A. § 39-13-513. People who *know* they are living with conditions other than HIV such as COVID-19, Hepatitis B, genital herpes, or Human Papillomavirus ("HPV"), many of which are easier to transmit and/or harder to treat than HIV, *see* FAC ¶¶ 318–66, are also treated more leniently. Thus, it is *solely* by reason of their HIV status that Plaintiffs and those they serve are discriminated against relative to similarly situated groups of individuals with or without other potentially contagious conditions. *See M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 453 (6th Cir. 2021) (plaintiffs must show they were treated worse than comparable others to state a Rehabilitation Act claim); *Williamson v. Univ. of Louisville*, No. 3:20-cv-266-DJH, 2023 WL 5108590, at *7 (W.D. Ky. Aug. 9, 2023) (same); *North v. Widener Univ.*, 869 F. Supp. 2d 630, 635–36 (E.D. Pa. 2012) (holding that "solely by reason of disability" requirement was met by allegations that plaintiff was treated worse than similarly-situated peers).

ii.    Plaintiffs are "Otherwise Qualified."

Defendants next suggest that Plaintiffs are not "otherwise qualified" because people living with HIV present a "direct threat to the health or safety of other individuals." MTD at 35. This ignores Plaintiffs' allegations and clear precedent.

The Rehabilitation Act protects people living with disabilities "from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns … as avoiding exposing others to significant health and safety risks." *Arline*, 480 U.S. at 287. Thus, whether someone presents a direct threat requires "an individualized inquiry" based on reasonable medical judgments about how transmission occurs, how long a carrier is infectious, the severity of the risk of potential harm and the probability the disease will be transmitted and cause varying degrees of harm. *Id.* at 288.

The laws Plaintiffs challenge do not allow for any individualized inquiry: they punish individuals living with HIV who are arrested for sex work regardless of whether transmission is *possible*, much less whether their conduct poses a *significant* risk. This violates the Rehabilitation Act. *See Doe v. County of Centre*, 242 F.3d 437, 458 (3d Cir. 2001) (reversing summary judgment where policy regarding placement of foster child in a home with an HIV-positive child did not include individualized inquiry into risk); *see also Holiday*, 206 F.3d at 643–44, 645 (district court erred in accepting a physician's report about job applicant living with HIV where "there [was] no indication that the physician conducted the individualized inquiry").

All the cases Defendants cite involve review of a district court's determination of direct threat *after* summary judgment or trial, based on factual and expert evidence. *See Onishea v. Hopper*, 171 F.3d 1289, 1299 (11th Cir. 1999) (post-trial, expert evidence of threat); *Est. of Mauro ex rel. Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 403 (6th Cir. 1998) (summary

40

judgment, based on CDC guidance); *Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261,

1263 (4th Cir. 1995) (same); *Bradley v. Univ. of Texas M.D. Anderson Cancer Ctr.*, 3 F.3d 922,

924 (5th Cir. 1993) (same). By contrast, Plaintiffs have alleged that they received no

individualized inquiry *whatsoever*. FAC ¶ 4.[14] On a motion to dismiss, this allegation must be

taken as true, and ends the inquiry. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

### iii.    Tennessee Has Consented to Plaintiffs' Claims.

Spending Clause legislation, including the Rehabilitation Act, requires a clear statement

by Congress conditioning a state agency's receipt of federal funds on its waiver of sovereign

immunity. MTD at 36–37; *Barbour v. Washington Metro. Area Transit Auth.*, 374 F.3d 1161,

1167–68 (D.C. Cir. 2004). While Defendants do not appear to dispute that, having accepted

federal funds, Defendants' agencies have waived immunity to Rehabilitation Act claims *in

general*, they rely on *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981), and its

progeny to argue that Defendants did not "knowingly" waive immunity from "suits alleging

discrimination in its criminal code and sex offender registry laws." MTD at 36–37.

This argument fails for two reasons. First, unlike the statute at issue in *Pennhurst*, there is

no question that the Rehabilitation Act Amendments[15] "put States on notice that they waive

Eleventh Amendment immunity to RA claims when they accept federal funds." *Haybarger v.*

---

[14] While the statutes' failure to provide for an individualized inquiry is determinative, Plaintiffs also affirmatively allege lack of a direct threat. *See* FAC ¶ 4 ("The Aggravated Prostitution law does not specifically target sexual behavior that can transmit HIV. Nor does it account for the fact that either partner to a sexual interaction can mitigate or entirely eliminate the risk of transmission of HIV …. [T]he individual plaintiffs and others convicted of Aggravated Prostitution need not and did not pose a threat to anyone's health or safety.")
[15] *See* 42 U.S.C. § 2000d–7 (a "State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of section 504 of the Rehabilitation Act of 1973.").

41

*Lawrence Cnty. Adult Prob. and Parole*, 551 F.3d 193, 199 (3d Cir. 2008); *Nihiser v. Ohio E.P.A.*, 269 F.3d 626, 628 (6th Cir. 2001); *see also Barbour*, 374 F.3d at 1164 (noting accord on this point by every circuit that has considered the question, along with the Supreme Court in dicta in *Lane v. Pena*, 518 U.S. 187, 198 (1996)). The text of the amended Rehabilitation Act makes "undeniably clear … the simple choice offered to states: if they accept federal funds, they will lose their immunity to Rehabilitation Act suits for discriminatory acts; if they decline the money, they remain free of the Act's proscriptions." *Barbour*, 374 F.3d at 1165.

Beyond requiring clarity as to whether funding is, in fact, conditioned on waiver, *Pennhurst* may also limit certain damages actions, but, critically, *not actions for injunctive relief*. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) ("[w]hen Congress attaches conditions to the award of federal funds under its spending power … we examine closely the propriety of private actions *holding the recipient liable in monetary damages* … [to] ensur[e] that 'the receiving entity of federal funds [has] notice that it will be liable for a monetary award.'") (emphasis added) (citation omitted). If a grantee was not "aware that it was administering the program in violation of the [condition]," injunctive relief is available, but money damages are not. *Id.* (alteration in original). This distinction makes sense, as "a court may identify the violation and enjoin its continuance … incident to the receipt of federal money," and then "the recipient has the option of withdrawing and hence terminating the prospective force of the injunction." *Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 596 (1983).[16]

---

[16] While *Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022), relied upon by Defendants, was not a damages action, it involved plaintiffs' effort to enjoin Treasury from initiating enforcement proceedings to recoup misused funds. The challenged offset provision was "not 'unconstitutional' under the Spending Clause," rather it was "unenforceable" in a situation which would have resulted in a state incurring monetary liability without adequate notice. *Id.* at 347.

Second, the Supreme Court has also made clear that "the [*Pennhurst*] notice problem does not arise in a case … in which intentional discrimination is alleged." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182–83 (2005) (alteration in original) (quoting *Franklin v. Gwinnet Cnty. Pub. Schs.*, 503 U.S. 60, 74–75 (1992)). *Pennhurst* is no bar "where the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Id.* at 183 (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)). Because Plaintiffs seek only injunctive relief against intentional discrimination in a context where there can be no question that receipt of federal funds waives immunity for Rehabilitation Act claims, *Pennhurst* has no application.

Moreover, even if *Pennhurst*'s clear statement rule were to apply, the Rehabilitation Act does not require Defendants to "accept conditions of which they are 'unaware' or … '*unable to ascertain*.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (emphasis added) (quoting *Pennhurst*, 451 U.S. at 17). The Rehabilitation Act prohibits disability "discrimination under any program or activity receiving Federal financial assistance" and defines "program or activity" as "*all of the operations* of … a department, agency … or other instrumentality of a State." 29 U.S.C. § 794(a) (emphasis added). And while Defendants selectively cite certain of Congress' "purposes" in passing the Act, they leave out that Congress sought to "empower individuals with disabilities to maximize … integration into society, through … the guarantee of equal opportunity." 29 U.S.C. § 701(b)(1). Tennessee could "ascertain" that it is discriminatory to single out individuals with disabilities for harsher punishment than those who engage in the same behavior but are not living with disabilities. Indeed, the portion of the federal record cited by Defendants *confirms* Plaintiffs' position, making it abundantly clear that states remain free to "take normal good faith efforts" to "prevent the spread of contagious

43

disease" *so long as they* undertake the individualized determination "reaffirmed by the Supreme

Court in the *Arline* decision." 134 Cong. Rec. E1004-02 (1998); MTD at 37.

Most fundamentally, if Defendants' argument were accepted, *every* new application of

the Rehabilitation Act would present a question of congressional authority, grafting something

like qualified immunity rules onto a wholly separate area of the law. There is no precedent for

this approach. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 675–78 (2020) (rejecting argument

that new applications of a statute that "are both unexpected and important" render clear statutory

text ambiguous). Even were application of the Rehabilitation Act to Plaintiffs' claims

"unexpected," "to refuse enforcement just because of that … [would] neglect the promise that all

persons are entitled to the benefit of the law's terms." *Id.* at 677–78.

Defendants also raise *South Dakota v. Dole*, which explains that "conditions on federal

grants might be illegitimate if they are unrelated 'to the federal interest in particular national

projects or programs.'" 483 U.S. 203, 207 (1987) (quoting *Massachusetts v. United States*, 435

U.S. 444, 461 (1978)) (plurality opinion). MTD at 37. All this means is that a condition on

federal funding must be "'reasonably calculated to address' the federal interest." *Cutter v.*

*Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005) (*quoting Dole*, 483 U.S. at 209). The Rehabilitation

Act expresses Congress' clear interest in eliminating disability-based discrimination by

federally-funded entities. "That interest, which is undeniably significant and clearly reflected in

the legislative history, flows with every dollar spent by a department or agency receiving federal

funds. The waiver of … immunity from Rehabilitation Act claims" by a recipient agency

"furthers that interest directly." *Koslow v. Pennsylvania*, 302 F.3d 161, 176 (3d Cir. 2002);

*accord Miller v. Texas Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 350 (5th Cir. 2005); *Lovell v.*

*Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002) ("Congress has a strong interest in ensuring that

44

federal funds are not used in a discriminatory manner and in holding states responsible when they violate funding conditions."). That the waiver of immunity "applies on an agency-by-agency, or a department-by-department, basis … helps ensure the waiver accords with the 'relatedness' requirement articulated in *Dole.*" *Koslow*, 302 F.3d at 176.

Defendants' final argument is that the Rehabilitation Act only applies to programs or agencies receiving federal funds. MTD at 38. Essentially the same argument is advanced separately in Defendants' Section III(C)(1), MTD at 32, claiming Plaintiffs have not named a proper defendant. Both arguments simply ignore Plaintiffs' allegations that each of Defendants' agencies receive such funding. *See* FAC ¶¶ 18–21, 424, 431. And, as established in Section I(B), *supra*, each of these agencies is actively involved in the challenged discrimination. Contrary to Defendants' argument, Plaintiffs do not need to show that federal funding subsidizes the agencies' *enforcement of the challenged statutes.* MTD at 39.[17] Accepting federal funds waives Eleventh Amendment immunity for Rehabilitation Act claims "against that program, department or agency …. Once the department or agency is identified … the statute encompasses all of its operations, regardless of whether a particular operation is federally assisted." *Haybarger*, 551 F.3d at 199; *see also Koslow*, 302 F.3d 170–71 (collecting cases holding same).

## IV. Plaintiffs State Valid Equal Protection Claims (Counts II and V).

Plaintiffs' equal protection claims also survive. Equal Protection directs "that all persons similarly situated should be treated alike," and at a minimum demands that any distinction among classes of persons be "rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 439–40 (citation omitted); *see also Eisenstadt v. Baird*, 405 U.S. 438, 447 (1972) (noting that

---

[17] Regardless, TN-SORA's website explicitly acknowledges that the program is supported by a grant from the U.S. Department of Justice. *See* Tennessee Sex Offender Registry Information, https://sor.tbi.tn.gov/info (last visited Mar. 12, 2024).

the classification "must be reasonable, not arbitrary, and must rest upon some ground of

difference having a fair and substantial relation to the object of the legislation") (citation

omitted); *see also Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir.

2011). Here, Plaintiffs allege that they are irrationally singled out for uniquely harsh treatment

under Tennessee's Aggravated Prostitution statute and TN-SORA. FAC ¶¶ 318, 376, 395.

## A. Plaintiffs are Similarly Situated to Individuals Convicted of Misdemeanor Prostitution or Patronizing Prostitution.

Defendants argue that Plaintiffs have not identified similarly situated individuals. MTD at

43. "When evaluating whether parties are similarly situated, 'courts should not demand exact

correlation, but should instead seek relevant similarity.'" *EJS Properties, LLC v. City of Toledo*,

698 F.3d 845, 864–65 (6th Cir. 2012) (quoting *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir.

2000)). Plaintiffs clearly allege that they are similarly situated to those convicted of Patronizing

Prostitution while living with HIV, and those convicted of misdemeanor Prostitution who may or

may not be living with comparable infectious diseases. FAC ¶ 395.

First, Plaintiffs are *identically* situated to people who patronize prostitution while living

with HIV. Defendants respond that "prostitution" is a "different crime" than "patronizing

prostitution" and Tennessee may "treat different crimes differently." MTD at 43–44. But the

pertinent question for equal protection purposes is whether the "evil, as perceived by the State,

would be identical." *Eisenstadt*, 405 U.S. at 454. An individual living with HIV who patronizes a

sex worker poses the exact same risk of HIV transmission as an individual living with HIV who

engages in prostitution. *Compare* FAC ¶¶ 101–02 *with* ¶¶ 96, 98. And yet, that individual is

subject to neither felony conviction nor sex offender registration. *Id.*

Second, Plaintiffs are similarly situated to individuals convicted of misdemeanor

prostitution who know that they have comparable communicable diseases. "HIV is now a

46

chronic, treatable condition, similar to diabetes, hypertension, chronic Hepatitis B infection, or herpes simplex infection," FAC ¶ 31, rather than the "deadly, highly infectious disease" that Defendants claim, MTD at 44. Defendants simply fail to engage with any of Plaintiffs' detailed allegations regarding diseases comparable to or *more* severe than HIV in terms of transmissibility through sexual activity, severity, duration, lethality, and ease of treatment and prevention. FAC ¶¶ 318–19, 332–35 (Hepatitis B), 336–54 (genital herpes), 355–65 (HPV).

Finally, Plaintiffs are also similarly situated to individuals convicted of misdemeanor prostitution who *may or may not* be living with an infectious disease, including HIV. Defendants argue Aggravated Prostitution does not criminalize simply "being HIV positive" but rather the "*conduct*" of "knowingly expos[ing]" others to HIV, so the two groups do not pose the same public health risks. MTD at 43–44. But Aggravated Prostitution does not require conduct involving *exposure* to HIV, FAC ¶¶ 93–94; it only requires *knowledge* that one is living with HIV. The Aggravated Prostitution and Prostitution statutes are identical, save that one element:

| | Prostitution, T.C.A. § 39-13-513[18] | Aggravated Prostitution, T.C.A. § 39-13-516 |
|---|---|---|
| Element 1 | "Engag[es] in, or offer[s] to engage in…" | "Engages in…" |
| Element 2 | "…sexual activity as a business or [is] an inmate in a house of prostitution or loiter[s] in a public place for the purpose of being hired to engage in sexual activity." | "…sexual activity as a business or is an inmate in a house of prostitution or loiters in a public place for the purpose of being hired to engage in sexual activity…" |
| Element 3 | N/A | "knowing that such person is infected with HIV[.]" |

In both groups there are individuals who pose a risk of transmitting HIV or another communicable disease and individuals who do not. First, HIV is easily treated through use of antiretroviral therapy ("ART"), rendering the virus undetectable and entirely *untransmittable*. FAC ¶¶ 37–39. Sexual partners can also eliminate any risk of acquiring HIV by taking

---

[18] The elements of Prostitution, T.C.A. § 39-13-513, are defined in T.C.A. § 39-13-512(6).

antiretroviral medications like PrEP or PEP or through use of latex condoms. FAC ¶¶ 44–51.

Thus, many encounters punished by Aggravated Prostitution involve no exposure to HIV

whatsoever. Second, even without mitigation, most sexual acts punished by the statute (such as

manual or oral sex), FAC ¶ 223, carry a zero to minuscule risk of transmission, FAC ¶¶ 53–59.

Meanwhile, the "riskiest" sexual encounter only carries a 1.4% risk of transmission. FAC ¶¶ 52–

62. Those convicted of misdemeanor Prostitution also include some individuals who pose no risk

of transmitting an infectious disease, and others who do. The groups are thus indistinguishable.[19]

Thus, engaging in sex work while simply *knowing* that you are living with HIV predicts

nothing: it poses no inherent risk of exposure or transmission. People who engage in sex work

knowing they are living with HIV *may or may not* pose a risk of transmitting an infectious

disease, just as someone who engages in sex work and does not know whether or not they have

HIV or some other infectious disease also *may or may not* pose that risk. Standing alone, mere

knowledge of having HIV is not a "relevant" distinguishing factor.

**B.  Aggravated Prostitution and its Inclusion in TN-SORA Are Irrational.**

Having adequately pled similarly situated groups, the analysis must next turn to whether

their differential treatment survives the proper level of scrutiny.

**i.    Heightened Rational Basis Review Applies.**

Defendants are broadly correct that Plaintiffs' equal protection claims are subject to

rational basis review. MTD at 39. Where a law treats similarly situated individuals differently,

courts closely examine whether the distinction in treatment of those groups advances a legitimate

governmental purpose. *Mathews v. Lucas*, 427 U.S. 495, 510 (1976) (noting that the rational

---

[19] Indeed, people who *know* they are living with HIV actually pose a much lower risk of
transmission than people who are HIV positive but do not yet know that fact. FAC ¶¶ 180–84.

basis test "is not a toothless one"). However, rational basis review is applied with particular vigor

where, as here, individual liberty and human dignity are at stake. *See, e.g.*, *Eisenstadt*, 405 U.S.

at 446–55 (overturning ban on distribution of contraceptives to unmarried people); *Moreno*, 413

U.S. at 533–38 (1973) (overturning ban on food stamps for households with unmarried persons).

And "[w]hen a law exhibits … a desire to harm a politically unpopular group, [courts] have

applied a more searching form of rational basis review to strike down such laws." *Lawrence*, 539

U.S. at 580 (O'Connor, J., concurring); s*ee also Cleburne*, 473 U.S. at 448 (invalidating laws

targeting people with intellectual disabilities under rational basis review by rejecting purported

justifications that applied equally to groups not targeted); *Romer v. Evans*, 517 U.S. 620, 635

(1996) (invalidating anti-gay law as irrational).

     The Aggravated Prostitution statute and related registry requirements, explicitly and

exclusively targeting sex workers living with HIV, were adopted in 1991 and 1995 respectively,

during the first decade of the HIV epidemic. FAC ¶¶ 75, 78. This was an era of great fear, panic,

and drastically exaggerated misconceptions about HIV. FAC ¶¶ 64–78 (noting that HIV was

known as "gay cancer" and associated with politically unpopular groups). Without hearing any

scientific evidence regarding the likelihood or prevalence of HIV transmission through sex work

or the potential public health implications of the proposed law, Tennessee's legislators rushed to

pass the law based on vague references to an HIV "problem down in Memphis." FAC ¶ 77.

Similarly, in 1995, Aggravated Prostitution was classified as a registrable sex offense without

any examination of the effectiveness of doing so, FAC ¶ 115, then reclassified in 2010 as a

"violent sexual offense" requiring lifetime registration based on incorrect representations about

the federal Sex Offender Registration and Notification Act. FAC ¶¶ 115–16.

That the statutes were reflexively motivated by HIV-related animus is illustrated by their sheer sweep: they do not require transmission, intent to transmit, or any inquiry *whatsoever* into the underlying facts and circumstances—including whether it is even *possible* to transmit HIV through the acts alleged. FAC ¶¶ 92–93, 118. Instead, they treat people living with HIV as uniquely, categorically, and invariably dangerous. FAC ¶¶ 318 (unique treatment of HIV in Tennessee's criminal code), 119 (same for TN-SORA). Given that these laws target and harm a politically unpopular group, this Court must review Defendants' purported rationales with greater skepticism than rational review might otherwise afford. *American Exp. Travel Related Services Co., Inc. v. Kennedy*, 641 F.3d 685, 691–92 (6th Cir. 2011).

### ii.    The Laws' Rationality Must Be Evaluated Based on Current Science.

With only a passing nod to the huge advances in prevention of HIV transmission and its treatment detailed in Plaintiffs' complaint, FAC ¶¶ 31, 36–51, Defendants insist that "rationality is judged at the time of [a law's] passage." MTD at 42. This ignores the use of the present tense in the applicable standard: courts "ask whether the statute at issue *is* 'rationally related to legitimate government interests.'" *Doe v. Michigan Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997)) (emphasis added). For example, in *United States v. Carolene Products*, the Supreme Court evaluated the rationality of a law prohibiting the shipment of "filled milk" at the time of its review, not the law's passage, stating that "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." 304 U.S. 144, 153 (1938) (citing *Chastleton Corp. v. Sinclair*, 264 U.S. 543 (1924)); *see also Nashville, C. & St. L. Ry. v. Walters*, 294 U.S. 405, 415 (1935) (rejecting the view that a court cannot consider "whether the provisions of [a law] have been rendered burdensome or unreasonable by

50

changed [] conditions," and describing as "settled" the rule that "[a] statute valid when enacted

may become invalid by change in the conditions to which it is applied") (internal quotation

marks and citations omitted).[20]

While the Sixth Circuit does not appear to have expressly considered the issue, the

weight of circuit court authority follows this approach. *See, e.g.*, *Dias v. City & Cnty. of Denver*,

567 F.3d 1169, 1183 (10th Cir. 2009) (permitting claim that that 20-year-old law banning pit

bulls was "no longer rational" in light of current science, even if such bans "may have been

justified by the then-existing body of knowledge"); *United States v. Moore*, 644 F.3d 553, 554–

56 (7th Cir. 2011) (holding that constitutionality of laws maybe be challenged by showing

previous facts "have ceased to exist" (quoting *Carolene Products*, 304 U.S. at 153–54); *Seaboard

Air Line R.R. Co. v. City of West Palm Beach*, 373 F.2d 328, 329 n.3 (5th Cir. 1967) (holding

"reasonableness [must] be determined by the conditions existing at the date of [a law's]

---

[20]    Defendants do not cite any case holding that rational basis analysis is confined to the time
when a law was enacted, instead citing a Second Circuit case which simply states that it is
incorrect to assume that laws that are later amended by subsequent legislation lacked a rational
basis when enacted. MTD at 42 (citing *Smart v. Ashcroft*, 401 F.3d 119, 123 (2d Cir. 2005)).
        Considering present-day facts is consistent with many other legal doctrines, including
*stare decisis*, *see, e.g.*, *Planned Parenthood v. Casey*, 505 U.S. 833, 855 (1992), *overruled on
other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) (asking "whether
facts have so changed, or come to be seen so differently, as to have robbed the old rule of
significant application or justification"), the First Amendment, *see, e.g.*, *McCutcheon v. Fed.
Election Comm'n*, 572 U.S. 185, 216–17 (2014) (considering current facts to evaluate the
rationality of previously-upheld aggregate limits on campaign contributions), evaluation of laws
burdening interstate commerce, *see, e.g.*, *Granholm v. Heald*, 544 U.S. 460, 467 (2005)
(considering advancements in technology when evaluating state's regulations on out-of-state
wineries), and voting, *see, e.g.*, *Shelby Cnty. v. Holder*, 570 U.S. 529, 551–53 (2013)
(invalidating provision of the Voting Rights Act because it was predicated on "decades-old data
and eradicated practices"). That courts frequently analyze rationality based on the circumstances
upon a law's enactment simply reflects the fact that lawsuits are typically brought within a few
years of enactment, so there are no relevant changed circumstances to consider. *See* Petition for
Writ of Certiorari, *Heffner v. Murphy*, 2014 WL 3530761 (U.S.) (No. 14-53) (analyzing over 150
Supreme Court rational review cases and finding all were brought within a few years of
enactment).

challenge, not those contemporary with its passage," and noting the "fallacy" of a rule requiring

otherwise); *Long v. Robinson*, 316 F. Supp. 22, 27–28 (D. Md. 1970), *aff'd*, 436 F.2d 1116 (4th

Cir. 1971) (striking down law because its "basis no longer exists"); *but see Burlington N.R.R. Co.*

*v. Dep't of Pub. Serv. Regulation*, 763 F.2d 1106, 1111 (9th Cir. 1985) (observing that the

Supreme Court "has been ambivalent on whether changed circumstances can transform a once-

rational statute into an irrational law"); *Heffner v. Murphy*, 745 F.3d 56, 86 (3d Cir. 2014)

(rejecting *Carolene Products* approach).

### iii.    Aggravated Prostitution is Irrational, Now and When Enacted.

Defendants offer no analysis of Aggravated Prostitution's rationality today, thereby

avoiding Plaintiffs' allegations that in the decades since its enactment, the science around HIV

has changed drastically. Even without mitigation, many sexual acts (such as manual sex and

nearly all forms of oral sex) carry a zero percent risk of transmission. FAC ¶¶ 52–62. And as

explained *supra*, the low risk of transmission presented by other sex acts can now be entirely

eliminated by either party to a sexual encounter through use of ART, PrEP, PEP, and condoms.

FAC ¶¶ 37–39, 44–51. Defendants contend (albeit while attempting to rationalize the law at the

time it was passed) that Aggravated Prostitution is rationally drawn to stem the spread of HIV.

MTD at 41. Measured today, this purported rationale is completely untethered from the above

facts about HIV treatment and prevention strategies.

The impact of an HIV diagnosis has also changed. HIV is now a chronic, treatable

condition, similar to diabetes, hypertension, chronic Hepatitis B, or herpes, and those diagnosed

and treated in a timely manner experience few, if any, noticeable effects on their physical health.

FAC ¶¶ 37–39, 44–51. Indeed, Hepatitis B, genital herpes, and HPV are now comparable to or

even more severe than HIV in terms of transmissibility through sexual activity, severity,

duration, lethality, and ease of treatment and prevention, FAC ¶¶ 319, 332–65, and yet do not trigger enhanced criminal liability or registration requirements. FAC ¶ 318. Without any scientifically-sound justification for singling out HIV, the only explanation for the distinction is animus. This is constitutionally impermissible. *See, e.g.*, *Romer*, 517 U.S. at 634 (noting that a "bare … desire to harm a politically unpopular group cannot constitute a legitimate governmental interest" (alteration in original) (quoting *Moreno*, 413 U.S. at 534)).

Even if the Court were to agree with Defendants that rationality must be measured at the time of passage, MTD at 42, Aggravated Prostitution was irrational then too: it did not and does not rationally address HIV transmission, because all that is required under the statute beyond misdemeanor prostitution is knowledge that one is living with HIV—not risk of transmission, intent to transmit, or actual transmission. T.C.A. § 39-13-516. Defendants argue that at the time of its passage, the legislature "rationally concluded that it was possible to stem the spread of HIV by deterring individuals in this high-risk category … from continuing to engage in behavior that could spread the disease." MTD at 41. But this rationale offers no explanation for the differential treatment of people convicted of patronizing prostitution who are living with HIV. *Compare* FAC ¶¶ 89, 96 *with* ¶¶ 100–02. In both instances, the "evil, as perceived by the State, [is] identical, and the underinclusion [is] invidious." *Eisenstadt*, 405 U.S. at 454.

### iv.    The Inclusion of Aggravated Prostitution in TN-SORA Is Irrational.

Defendants posit that requiring registration for Aggravated Prostitution is rationally related to "protecting public health and safety" and "assist[s] … in preventing and protecting against the commission of future criminal sexual acts." MTD at 42. Plaintiffs have already demonstrated it is completely arbitrary to treat them more harshly than those who engage in

patronizing prostitution and misdemeanor prostitution while living with HIV or other infectious diseases, and those arguments apply equally here. *See supra*.

Nor does requiring Plaintiffs—and not those with whom they are similarly situated—to register as sex offenders "rest upon some ground of difference having a fair and substantial relation" to TN-SORA's stated goals. *Eisenstadt*, 405 U.S. at 447 (citing *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). Neither Prostitution, Aggravated Prostitution, nor Patronizing Prostitution include elements of violence, coercion, lack of consent, or involvement of minors. T.C.A. § 39-13-516. Thus, all three are similarly situated with respect to allowing the public to "adequately protect themselves and their children," T.C.A. § 40-39-201(b)(2), and addressing the "extreme threat to the public safety" posed by "sexual offenders who use physical violence and sexual offenders who prey on children," T.C.A. § 40-39-201(b)(1). Again, there can be no rational basis for this dissimilar treatment. *Eisenstadt*, 405 U.S. at 454.

## V.  Plaintiffs State Valid Substantive Due Process Claims (Counts III & VI).

"Substantive due process is '[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (alteration in original) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)). As Defendants acknowledge, MTD at 39, "even legislation that does not proscribe fundamental liberties nonetheless violates the Due Process Clause where it imposes burdens without any 'rational basis' for doing so." *Sheffield v. City of Fort Thomas*, 620 F.3d 596, 613 (6th Cir. 2010) (citation omitted). Plaintiffs have plausibly alleged that Aggravated Prostitution and its inclusion in TN-SORA violate substantive due process by singling out people with HIV, with no rational relationship to a legitimate government interest and premised solely on discrimination.

54

Defendants contend that the laws are rationally designed to deter those who are living with HIV from engaging in sex work, MTD at 41, but research shows that public registries are likely to *increase* recidivism. FAC ¶¶ 206–11. Moreover, Aggravated Prostitution appears to primarily target those who engage in "survival sex," wherein people who are unhoused or financially struggling intermittently trade sex for food, shelter, or other basic needs. FAC ¶¶ 231–32. TN-SORA's severe restrictions on employment and housing only exacerbate their challenges by, for example, leading to further housing instability, which is consistently correlated with higher recidivism. FAC ¶ 209. Indeed, three Plaintiffs have alleged that TN-SORA makes finding lawful employment so difficult they felt they had no option but to continue to engage in sex work to survive. FAC ¶¶ 268, 294, 305. Research also shows that criminalization is *counterproductive* to HIV public health approaches in general, as it disincentivizes testing. FAC ¶¶ 179–98.

Nor does inclusion of Aggravated Prostitution as a registrable offense advance the stated goals of TN-SORA. It does not address the "extreme threat to the public safety" posed by "sexual offenders who use physical violence and sexual offenders who prey on children," T.C.A. § 40-39-201(b)(1), as it includes no element of physical violence or victims who are minors. T.C.A. § 39-13-516. As for allowing the public to "adequately protect themselves and their children," T.C.A. § 40-39-201(b)(2), those who patronize prostitution voluntarily elect to do so and can protect themselves and their families by making a different choice, or by using mitigation techniques that eliminate the risk of HIV transmission. Further, no one on the registry for Aggravated Prostitution has convictions for any other registrable offense. FAC ¶ 235. Thus, these individuals do not pose any general public safety threat. The inclusion of Aggravated Prostitution on TN-SORA simply serves no legitimate governmental purpose.

**VI.   The Inclusion of Aggravated Prostitution in TN-SORA Violates the Eighth
Amendment, and the Ex Post Facto Clause as Applied to Individual Plaintiffs.**

Plaintiffs allege that their registration as sex offenders or violent sex offenders violates

the Eighth Amendment because it imposes punishment that is categorically disproportionate to

the offense of Aggravated Prostitution. FAC ¶¶ 409–10. The individual Plaintiffs also plead an

Ex Post Facto claim, alleging that since their most recent Aggravated Prostitution convictions,

TN-SORA has retroactively imposed significant new restraints. FAC ¶¶ 416–17. Defendants'

response to both arguments is completely dependent on their untenable claim that Rausch lacks

statutory authority to enforce much of TN-SORA. Defendants would have this Court examine

only those aspects of the sex offender scheme over which Defendant Rausch concedes

responsibility—maintaining and publishing the registry—and determine whether those aspects

are punitive and retroactive. MTD at 44–47. However, as Plaintiffs show in detail in Section

I(B)(iii), *supra*, Defendant Rausch plays a pivotal role in enforcing *all* aspects of TN-SORA;

there is no factual or legal basis for reviewing the impact of the registry piecemeal.

Plaintiffs clearly plead, first, that TN-SORA is punitive, FAC ¶¶ 408–09; and second, that

certain punitive registry restrictions are being retroactively applied against individual Plaintiffs,

*see generally* FAC ¶¶ 416–18; *see also* FAC ¶¶ 270 (listing Michelle Anderson's retroactive

requirements); ¶ 289 (same for JD2); ¶ 297 (same for JD3); ¶ 308 (same for JD4).

Defendants do not dispute, and thus concede, that these allegations state plausible claims

for relief. Nor could they dispute this. *See Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016)

(finding Michigan's similar sex offender registry punitive due to, *inter alia*, its employment and

residence restrictions); *Magnum v. Lee*, No. 22-5660, 2023 WL 6130306, at *2 (6th Cir. July 10,

2023) (finding that "Tennessee's sex offender registration regime has many similarities with

Michigan's SORA," and applying *Snyder* to reverse dismissal of ex post facto challenge to TN-

SORA); *Doe v. Lee*, No. 3:22-CV-00712, 2023 WL 1974712, at *1 (M.D. Tenn. Feb. 10, 2023)

("Although *Snyder* did not directly involve the State of Tennessee, the federal district courts of

this state have repeatedly, if not quite unanimously, concluded that the same analysis applies (or,

as the procedural posture in each given case called for, likely or plausibly applies) to Tennessee's

own, very similar scheme and policies.").[21] Having failed to advance any alternative argument,

should the Court agree with Plaintiffs that Rausch's authority is more robust than he

acknowledges, *see supra* Section I(B)(iii), Plaintiffs' Eighth Amendment and ex post facto

claims survive.

## VII.    This Court Has Jurisdiction to Grant Plaintiffs' Requested Relief.

Finally, Defendants argue that this Court cannot grant all the relief Plaintiffs seek because

it would extend to non-parties. MTD at 47. This ignores the fact that Plaintiffs include

OUTMemphis, whose injuries arise from the enforcement of the Aggravated Prostitution statute

and TN-SORA against the individuals they serve. *See supra* Section II(A); FAC ¶¶ 247–62.

OUTMemphis is a "specific [party]" to this case, *California v. Texas*, 593 U.S. 659, 672 (2021)

(citation omitted), and its injuries will not be redressed unless enforcement is halted, *all*

individuals currently on the registry are removed, and records of their registration are expunged.

This relief is appropriately "tailored to redress [OUTMemphis's] particular injury." *Gill v.*

*Whitford*, 585 U.S. 48, 73 (2018). The cases about non-parties on which Defendants rely are not

applicable.

---

[21] *Magnum* cites *Doe #11 v. Lee*, No. 3:22-CV-00338, 2022 WL 2181800, at *25 (M.D. Tenn. June 16, 2022) (Richardson, J.); *Doe v. Lee*, No. 3:21-CV-010, 2022 WL 452454, at *4 (E.D. Tenn. Feb. 14, 2022) (Jordan, J.); *Reid v. Lee*, 476 F. Supp. 3d 684, 708 (M.D. Tenn. 2020) (Trauger, J.); *Doe v. Rausch*, 461 F. Supp. 3d 747, 769 (E.D. Tenn. 2020) (Reeves, C.J.); *Doe v. Rausch*, 382 F. Supp. 3d 783, 799–800 (E.D. Tenn. 2019) (Phillips, J.)).

Even leaving aside OUTMemphis's claims, "[c]ourts have regularly held that a plaintiff

may seek an injunction applicable to all similarly-situated individuals harmed by the same

unconstitutional practice, without the necessity of seeking class-action treatment." *Caspar v.*

*Snyder*, 77 F. Supp. 3d 616, 642 (E.D. Mich. 2015) (citing *Craft v. Memphis Light, Gas & Water*

*Div.*, 534 F.2d 684, 686 (6th Cir. 1976)) ("[T]he district court properly recognized that such

[injunctive] relief to the extent granted [would] … accrue to the benefit of others similarly

situated") (alterations in original) (quotation marks omitted)), *aff'd*, 436 U.S. 1 (1978); *see also*,

CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FED. PRACTICE & PROCEDURE

§ 1771 (4th ed. 2023) ("In most civil-rights cases plaintiff seeks … [to] strike down a statute,

rule, or ordinance on the ground that it is constitutionally offensive. Whether plaintiff proceeds

as an individual or on a class-suit basis, the requested relief generally will benefit … all other

persons subject to the practice or the rule under attack."); *Sharpe v. Cureton*, 319 F.3d 259, 273

(6th Cir. 2003) ("district courts are not categorically prohibited from granting injunctive relief

benefitting an entire class in an *individual suit*….") (emphasis in original).

Once a constitutional violation is found, relief must be tailored to fit "the nature and

extent of the constitutional violation." *Milliken v. Bradley*, 418 U.S. 717, 744 (1974) (citing

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971)). "[I]f the arguments and

evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting

its enforcement is proper." *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 603 (2016)

(citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 333 (2010)), *abrogated on other*

*grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022); *see also Tabernacle*

*Baptist Church, Inc. of Nicholasville v. Beshear*, 459 F. Supp. 3d 847, 856 (E.D. Ky. 2020)

58

(granting statewide injunctive relief because constitutional violation impacted entire state, not just plaintiff).

Here, Plaintiffs properly plead facial challenges to the Aggravated Prostitution statute and its inclusion in TN-SORA. They are thus entitled to ask for an injunction prohibiting enforcement of those laws. Plaintiffs do not, as Defendants claim, seek to "enjoin the world at large, or purport to enjoin challenged laws themselves." MTD at 48 (citation omitted). Instead, they ask this Court to do what it is authorized to: "enjoin named defendants from taking specified unlawful actions." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Those actions include named Defendants' illegal enforcement of the challenged statutes. *See supra* Section I.

Nor is Plaintiffs' request for relief unduly "extensive," as Defendants claim, MTD at 48. Instead, it is precisely drawn: it would extend only to individuals "with Aggravated Prostitution convictions (but no other registrable offenses)" and is designed to remedy the precise injury Plaintiffs have identified: unlawful inclusion on TN-SORA. And because sex offender registration automatically results from an Aggravated Prostitution conviction irrespective of individual circumstances, T.C.A. §§ 40-39-202(20), (31), the relief being sought is straight-forward and does not involve case-by-case considerations.

Defendants' argument that this Court is not permitted to order expungements of state records and alerts to non-parties, MTD at 48, is similarly unfounded. Defendants' illegal enforcement of the challenged laws includes the maintenance of records indicating that people convicted of Aggravated Prostitution are registered as sex offenders, and the distribution of that information to state and federal agencies. FAC ¶¶ 122–23, 137, 140. Because relief must be tailored to fit the nature and extent of the constitutional violation—here, unlawful enforcement of

TN-SORA against those convicted of Aggravated Prostitution—Plaintiffs are entitled to expungement of those records to remedy that violation.[22] *See Milliken*, 418 U.S. at 744.

Neither of the cases Defendants cite suggests anything to the contrary. MTD at 48. Defendants' incomplete quote from *Virginia Off. for Prot. and Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011), is entirely misleading: the case does not address scope of relief but rather

> [*Ex Parte Young*'s] premise—less delicately called a "fiction,"—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation, and does not apply "when 'the state is the real, substantial party in interest.'"

*Id*. (citations omitted). The "precise situation" described is a state official's violation of federal law, not the scope of relief a federal court may order, as defendants seem to suggest. The same is true of *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984): the footnote Defendants cite speaks to whether the suit at issue "operated against the state" as opposed to a state officer for Eleventh Amendment purposes. Neither case is remotely relevant to this Court's power to order the relief that Plaintiffs here seek.

## **CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss should be denied. To the extent this Court agrees with any dispositive deficiency raised by Defendants, Plaintiffs respectfully request leave to amend.

DATED: March 14, 2024

Respectfully submitted,

*/s/ Rachel Meeropol*
Rachel Meeropol* (NY Bar 4100954)
Alexis Agathocleous* (NY Bar 4227062)
Alexis Alvarez* (NY Bar 5854278)

---

[22] Plaintiffs do not seek expungement of their underlying criminal convictions. FAC at 99.

Jon W. Davidson* ** (CA Bar 89301)
AMERICAN CIVIL LIBERTIES UNION
125 Broad St., New York, NY 10004
Phone: (929) 585-0061
AAgathocleous@aclu.org
AlexisA@aclu.org
JonDavidson@aclu.org
RMeeropol@aclu.org

Stella Yarbrough (BPR No. 033637)
Jeff Preptit (BPR No. 038451)
Lucas Cameron-Vaughn (BPR No. 036284)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Phone: (615) 320-7142
SYarbrough@aclu-tn.org
JPreptit@aclu-tn.org
Lucas@aclu-tn.org

Lynly S. Egyes* (NY Bar 4838025)
Milo Inglehart* (NY Bar 5817937)
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: (510) 587-9696 Ext. 353
Lynly@transgenderlawcenter.org
Milo@transgenderlawcenter.org

Dale Melchert* (NY Bar 5366554)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696 Ext. 354
Dale@transgenderlawcenter.org

*Admitted Pro Hac Vice
** Admitted only in California

61

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and exact copy of the foregoing was filed and served via the

Court's electronic filing system on the 14th day of March 2024, upon:

CODY N. BRANDON (BPR# 037504)
Managing Attorney
Assistant Attorney General

JOHN R. GLOVER (BPR# 037772)
Assistant Attorney General

DAVID RUDOLPH (BPR# 13402)
Senior Assistant Attorney General

Law Enforcement &
Special Prosecutions Division
Office of the Tennessee
Attorney General & Reporter
PO Box 20207
Nashville, TN 37202
Off. (615) 532-2552
Fax (615) 532-4892
Cody.Brandon@ag.tn.gov
John.Glover@ag.tn.gov
David.Rudolph@ag.tn.gov

*/s/ Rachel Meeropol*
Rachel Meeropol