## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

OUTMEMPHIS, et al.,

               Plaintiffs,

               v.

BILL LEE, et al.,

               Defendants.

Civil Action No. 2:23-CV-2670 (SHL)(CC)

### NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff OUTMemphis ("Plaintiff") hereby gives notice of the existence of new authority: *Mission Working Dogs v. Brookfield Properties Retail, Inc.*, No. 2:23-CV-00230-JAW, 2025 WL 744048, (D. Me. Mar. 7, 2025) (attached as Exhibit 1). The case supports Plaintiff's Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, ECF No. 67, on the issue of whether an organization may sue under the ADA based on allegations that it serves individuals with disabilities and has been injured by discrimination against such individuals on the basis of disability.

Defendants argued in their Motion to Dismiss that OUTMemphis cannot advance a claim under the ADA because it is "not a 'qualified individual with a disability.'" ECF No. 66-1 at 49. Brookfield Properties sought to dismiss on a similar ground, arguing that "[Mission Working Dogs], a non-profit organization, lacks standing to sue pursuant to the ADA . . . because th[at] statute[] 'provides a remedy *only to an individual* 'who is being subjected to discrimination on the basis of a disability.'" *Mission Working Dogs*, 2025 WL 744048, at *21. The Court

1

disagreed, holding that "an organization, such as MWD, can seek relief on its own behalf

pursuant to the ADA." *Id.* at *34. As Plaintiffs argued and the *Mission Working Dogs* court

agreed, this is a question of prudential standing, *id.* at *30, and allowing an organization which

has been harmed to seek injunctive relief based on its association with individuals with

disabilities "is consistent with the Supreme Court's directive for lower courts to take a broad

view of standing in civil cases, including those addressing the ADA," *id.* at *34 (citing

*Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972)).

Dated: March 21, 2025

<div style="margin-left: 40%;">

Respectfully submitted,

*/s/ Rachel Meeropol*
Rachel Meeropol* (NY Bar 4100954)
Alexis Agathocleous* (NY Bar 4227062)
Alexis Alvarez* (NY Bar 5854278)
Jon W. Davidson* ** (CA Bar 89301)
AMERICAN CIVIL LIBERTIES UNION
125 Broad St., New York, NY 10004
Phone: (929) 585-0061
AAgathocleous@aclu.org
AlexisA@aclu.org
JonDavidson@aclu.org
RMeeropol@aclu.org

Stella Yarbrough (BPR No. 033637)
Lucas Cameron-Vaughn (BPR No. 036284)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Phone: (615) 320-7142
SYarbrough@aclu-tn.org
Lucas@aclu-tn.org

Lynly S. Egyes* (NY Bar 4838025)
Milo Inglehart* (NY Bar 5817937)

</div>

TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: (510) 587-9696 Ext. 353
Lynly@transgenderlawcenter.org
Milo@transgenderlawcenter.org

Dale Melchert* (NY Bar 5366554)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696 Ext. 354
Dale@transgenderlawcenter.org

*Admitted Pro Hac Vice
** Admitted only in California

**Certificate of Service**

I hereby certify that a true and exact copy of the foregoing was filed and served via the

Court's electronic filing system on this the 21th day of March 2025, upon:

CODY N. BRANDON (BPR# 037504)
Managing Attorney
Assistant Attorney General

STEVEN J. GRIFFIN (BPR#40708)
Senior Counsel for Strategic Litigation

DAVID RUDOLPH (BPR# 13402)
Senior Assistant Attorney General

Law Enforcement &
Special Prosecutions Division
Office of the Tennessee
Attorney General & Reporter
PO Box 20207
Nashville, TN  37202
Off. (615) 532-2552
Fax (615) 532-4892
Cody.Brandon@ag.tn.gov
Steven.Griffin@ag.tn.gov
David.Rudolph@ag.tn.gov

Dated: March 21, 2025                    Respectfully submitted,

                                         */s/ Rachel Meeropol*
                                         Rachel Meeropol* (NY Bar 4100954)
                                         AMERICAN CIVIL LIBERTIES UNION
                                         125 Broad St., New York, NY 10004
                                         Phone: (929) 585-0061
                                         rmeeropol@aclu.org

                                         *Admitted Pro Hac Vice*

# EXHIBIT 1

2025 WL 744048
Only the Westlaw citation is currently available.
United States District Court, D. Maine.

MISSION WORKING DOGS, et al., Plaintiffs,

v.

BROOKFIELD PROPERTIES
RETAIL, INC., et al., Defendants.

No. 2:23-cv-00230-JAW
|
Signed March 7, 2025

**Attorneys and Law Firms**

Amy P. Dieterich, Skelton, Taintor & Abbott, Lewiston, ME, for Plaintiffs.

K. Joshua Scott, Jackson Lewis LLP, Portsmouth, NH, for Defendants.

**ORDER ON SUMMARY JUDGMENT**

JOHN A. WOODCOCK, JR., UNITED STATES DISTRICT JUDGE

*1 Disabled and non-disabled individuals and an organization sued both the owner and the operator of a public accommodation, alleging disability discrimination in violation of the Americans with Disabilities Act (ADA) and the Maine Human Rights Act (MHRA), false imprisonment, and retaliation. The defendants jointly moved for summary judgment on all claims. The court grants in part and dismisses in part the defendants' motion, concluding genuine disputes of material fact remain and a reasonable jury could find in favor of the plaintiffs on the ADA, MHRA, and false imprisonment claims, but dismissing the retaliation claim because defendants have shown there is no genuine dispute as to any material fact and the movants are entitled to judgment as a matter of law.

**I. PROCEDURAL HISTORY**

On June 5, 2023, Mission Working Dogs (MWD), Christina Gardner, Andre Beaudoin, Trina Beaudoin, Colleen Landry, Angelica Dwyer, Jolee Beattie, Anastasia Ames, Joshua Gould, Theresa Brilliant, and Melanie Sparks (collectively, the Plaintiffs) filed a four-count complaint[1] against Brookfield Properties Retail, Inc. and GGP-Maine Mall, LLC (collectively, the Defendants) for public accommodation discrimination in violation of the Americans with Disabilities Act (ADA) and the Maine Human Rights Act (MHRA), false imprisonment, and retaliation under the MHRA. *Compl.* (ECF No. 1). The Defendants answered the complaint on July 5, 2023. *Defs.' Answer to Compl.* (ECF No. 6) (*Answer*).

On November 15, 2024, the Defendants filed a motion for summary judgment and an accompanying statement of undisputed material facts. *Def[s].'[ ] Mot. for Summ. J.* (ECF No. 34) (*Defs.' Mot.*); *Def[s].'[ ] Supporting Statement of Material Facts in Support of [Their] Mot. for Summ. J.* (ECF No. 35) (DSMF). On December 13, 2024, the Plaintiffs filed their joint opposition to the motion and their response to the Defendants' statement of material facts as well as their own statement of additional facts. *Pls.' Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 40) (*Pls.' Opp'n*); *Pls.' Opp'n to Defs.' Statement of Material Facts in Support of Their Mot. for Summ. J. and Additional Statement of Material Facts* (ECF No. 41) (PRDSMF, PSAMF[2]). The Defendants filed their reply to the Plaintiffs' opposition and their response to the Plaintiffs' statement of additional material facts on January 3, 2025. *Defs.' Reply to Pl.'s Obj. to Defs.' Mot. for Summ. J.* (ECF No. 42); *id.*, Attach. 1, *Defs.' Reply to Pls.' Statement of Additional Material Facts* (DRPSAMF).

**II. STATEMENT OF FACTS**

**A. The Parties**

*2 Defendant Brookfield Properties, Retail, Inc., is the property management company responsible for operating the Maine Mall, a place of public accommodation as defined by 42 U.S.C. § 12181(7)(E) and 🔖 5 M.R.S. § 4592.[3] DSMF ¶ 1; PRDSMF ¶ 1; PSAMF ¶¶ 125-126, 128; DRPSAMF ¶¶ 126-127, 129. Defendant GGP-Maine Mall, LLC, owns the real property that houses the Maine Mall. *Id.*

Plaintiff Mission Working Dogs is a nonprofit corporation with seven board members, one paid employee (an administrative assistant), and fifty-three active volunteers. DSMF ¶ 2; PRDSMF ¶ 2. MWD was founded in July of 2020 to address the need for service and therapy dog training in Maine. PSAMF ¶ 98; DRPSAMF ¶ 98. MWD's mission is to support the community by training service dogs for veteran and non-veteran individuals with mental and physical disabilities so that those individuals can live more independently.[4] PSAMF ¶ 99; DRPSAMF ¶ 99.

**\*3** Plaintiff Christina Gardner is the founder and President of MWD. DSMF ¶ 3; PRDSMF ¶ 3. Prior to starting MWD, Ms. Gardner was a dog trainer for approximately ten years, training service animals, therapy dogs, and some pets. PSAMF ¶ 97; DRPSAMF ¶ 97. Ms. Gardner has worked with service dog trainers in multiple states as well as Walter Reed National Military Medical Center's Warrior Canine Connections. *Id.* Although universities in the United States offer service dog training degrees, there is no official service dog training credential in the United States and Ms. Gardner thus does not possess one. [5] *Id.* Ms. Gardner herself has multiple disabilities and a disability rating from the United States Department of Veterans Affairs (VA) of 100%. PSAMF ¶ 108; DRPSAMF ¶ 108. Her disabilities include a traumatic brain injury (TBI), post-traumatic stress disorder (PTSD), epilepsy, loss of several fingers, a spinal cord injury, and a double amputation below the knee. *Id.* Ms. Gardner was wearing shorts on May 7, 2022, the day of the incident giving rise to this case, so at least one of her disabilities was open and obvious to the Maine Mall's employees and agents. PSAMF ¶ 109; DRPSAMF ¶ 109. Since approximately 2008 or 2009, Ms. Gardner has had a service dog. PSAMF ¶ 110; DRPSAMF ¶ 110. Ms. Gardner's first service dog was named Moxie; Douglas is her current service dog and performs mobility assistance and PTSD-related tasks for Ms. Gardner. *Id.*

Plaintiff Anastasia Ames is a disabled individual whose disabilities include cyclical vomiting syndrome, anxiety, Ehlers-Danlos syndrome, and postural orthostatic tachycardia syndrome (POTS). PSAMF ¶ 111; DRPSAMF ¶ 111. These medical issues substantially limit Ms. Ames's ability to move, endure temperature swings, and leave her home, and she has two service dogs she generally takes with her when she goes out. *Id.* The first, Kia, performs tasks for Ms. Ames that mitigate the effects of her disabilities, including picking up items for her, finding things for her, alerting her to heartrate spikes, making her sit down until she is safe, and performing deep pressure therapy when Ms. Ames is anxious or undergoing an episode of cyclical vomiting syndrome, and alerting Ms. Ames, who also has celiac disease, to the presence of gluten. *Id.* Her second dog, Madrid, performs a majority of the same tasks and additionally alerts Ms. Ames to chest pain before it occurs. *Id.*

Plaintiff Trina Beaudoin is a disabled individual whose disabilities include memory challenges from a TBI, anxiety, and chronic depression. PSAMF ¶ 115; DRPSAMF ¶ 116.

Plaintiff Andre Beaudoin is not disabled under the ADA or MHRA. DSMF ¶ 7; PRDSMF ¶ 7.

Plaintiff Jolee Beattie is a disabled individual diagnosed with level 1 autism, attention-deficit/hyperactivity disorder (ADHD), and an intellectual disability which limit her major life activities. PSAMF ¶ 117; DRPSAMF ¶ 118.

Plaintiff Theresa Brilliant is a disabled individual with diagnosed disabilities of ADHD, PTSD, anxiety, and depression. PSAMF ¶ 121; DRPSAMF ¶ 122. She has a service dog, Buddy, who performs a number of disability-related tasks for her. *Id.*

Plaintiff Angelica Dwyer is Ms. Beattie's Behavioral Health Professional (BHP). PSAMF ¶ 118; DRPSAMF ¶ 119.

Plaintiff Joshua Gould has multiple disabilities, including PTSD, migraines, and lateral instability of his knees. PSAMF ¶ 122; DRPSAMF ¶ 123. He has a disability rating from the VA of 100%. *Id.*

Plaintiff Colleen Landry is not disabled under the ADA or MHRA. DSMF ¶ 12; PRDSMF ¶ 12.

Plaintiff Melanie Sparks is not disabled under the ADA or MHRA. DSMF ¶ 28; PRDSMF ¶ 28.

### B. The Maine Mall

The Maine Mall is a shopping center open to the public and located in South Portland, Maine. PSAMF ¶ 127; DRPSAMF ¶ 128. Since 2019, the Maine Mall has had a policy that individuals with both service dogs and service dogs in training are permitted at the Maine Mall. [6] PSAMF ¶ 124A; DRPSAMF ¶ 124A. This policy was in effect on May 7, 2022. *Id.*

**\*4** The Maine Mall's then Senior General Manager, Craig Gorris, understood that it was important to follow the law and not discriminate against individuals with disabilities. PSAMF ¶ 127A; DRPSAMF ¶ 127A. BPR's legal or human resources department set the company's policies in accordance with state and federal law. *Id.* Between 2009 and 2023, Maine Mall employees received no training on the MHRA, although they did receive an annual training on discrimination which included the ADA. [7] *Id.*

Since 2018, the Maine Mall and its security contractor, Professional Security Consultants, Inc. (PSC), has known that only two questions may be asked of individuals with service dogs pursuant to the ADA: (1) is this service animal required because of a disability? and (2) what work or task has the animal been trained to perform? [8] PSAMF ¶ 123A; DRPSAMF ¶ 123A.

It was not the Maine Mall's policy in October of 2021 that individuals with service animals in training could only visit the mall with a prior appointment. PSAMF ¶ 125A; DRPSAMF ¶ 125A. The Maine Mall's policy permitting the presence of both service animals and service animals in training is stated on their website. PSAMF ¶ 126A; DRPSAMF ¶ 126A.

### C. Christina Gardner's Experiences with Service Animals at the Maine Mall Ahead of the May 7, 2022 Training

Prior to May 7, 2022, Ms. Gardner visited the Maine Mall with a service dog multiple times. [9] PSAMF ¶ 130; DRPSAMF ¶ 130A. In March or April of 2021, Ms. Gardner was at the Maine Mall with a disabled friend; each individual was accompanied by a service dog. *Id.* A Maine Mall security guard came over to the pair while they were eating, and yelled at them because they had service dogs, both laying under the table at the time. *Id.* The Security Guard told Ms. Gardner and her friend that no dogs were allowed in the Maine Mall. *Id.* When Ms. Gardner and her friend explained that their dogs were service animals, the Security Guard indicated it did not matter because no dogs were allowed in the mall. *Id.* Ms. Gardner told the security guard that they were not leaving the mall; however, when the security guard departed, Ms. Gardner and her friend finished their meal and then left to avoid further confrontation. *Id.*

**\*5** Several months later, on October 16, 2021, Ms. Gardner was at the Maine Mall with her service dog, Douglas, and a small group of individuals from MWD when a Security Guard detained them for twenty minutes and asked a number of questions Ms. Gardner perceived as rude and inappropriate about her health and her service dog. [10] PSAMF ¶ 131; DRPSAMF ¶ 131. At no point during this interaction was Ms. Gardner asked if Douglas was a service animal which Ms. Gardner required due to her disability, or what work or task Douglas had been trained to perform. *Id.* The Maine Mall security guard told Ms. Gardner that if she wanted to be in the mall with her service dog, she would need to call

Maine Mall Security in advance to schedule a time when they could visit the Mall to shop. *Id.* Ms. Gardner stated they were legally allowed to be in the Maine Mall and that she was not obligated to make an appointment to shop because this was not a requirement imposed on the general public. *Id.* Even after Ms. Gardner asserted her rights and explained the state of the law, including the two above-referenced questions the Security Guard was permitted to ask about her service animal, the Security Guard continued to detain the individuals until the guard received an emergency radio call and left. *Id.*

### D. The Mission and Work of Mission Working Dogs

MWD trains and provides mobility assistance service dogs and PTSD service dogs and is participating in a pilot program with the VA to provide psychiatric service dogs to veterans diagnosed with anxiety and depression. [11] PSAMF ¶ 101; DRPSAMF ¶ 101. Service dogs which provide mobility assistance to disabled individuals perform a variety of tasks based on the needs of the individual with whom they work, such as help fetching things and reaching items where an individual cannot. PSAMF ¶ 102; DRPSAMF ¶ 102. Specifically, PTSD service dogs perform a variety of tasks based on the needs of the individual with whom they work, often related to anxiety and depression, including a maneuver called "bracing" where the dog braces between that person's legs targeting pressure points, watching an individual's back, alerting an individual when someone approaches them from behind, and inserting themselves between their individual and someone who gets close or aggressive. PSAMF ¶ 103; DRPSAMF ¶ 103.

MWD's training standards for service dogs meet international accreditation standards, and in order to "graduate" as an MWD service dog, an animal must have at least 120 hours of training, master more than sixty commands, pass a fourteen-part public access test, pass a skills test, and pass a restaurant test. PSAMF ¶ 100; DRPSAMF ¶ 100. MWD's training typically starts when the dogs are three days old, and by six or seven months of age, most dogs in MWD's training program have mastered at least four or five tasks. [12] *Id.*

### E. The Purpose of the May 7, 2022 Training at the Maine Mall

**\*6** MWD scheduled a training session for its "novice" service dogs in training at the Maine Mall on May 7, 2022, from 10:00 to 11:30 a.m. DSMF ¶ 32; PRDSMF ¶ 32. The training goal on May 7, 2022 was to acclimate the dogs to

the general public so they could go through different elements of public settings and thus practice tasks that are required for accessing public spaces. [13] DSMF ¶ 37; PRDSMF ¶ 37. The term "novice" described the dogs, not the trainers. DSMF ¶ 33; PRDSMF ¶ 33. The "novice" categorization was based on a dog's age, not skill level; older dogs were only put into this group if they were "owner-trained" rather than owned by MWD. [14] DSMF ¶ 34; PRDSMF ¶ 34.

### F. The Service Dogs Present at the May 7, 2022 Training

The dogs present at the Maine Mall for the May 7, 2022 training were named, respectively: Moxie, Abigail Adams, Gator Girl, Lady Hope, Andre Rush, Sherman Tank, Urban Ghost, Lady Eleanor, and Biscuit. [15] PSAMF ¶ 105; DRPSAMF ¶ 105. All dogs present at the Maine Mall on May 7, 2022, except for Biscuit, were owned by MWD; Lady Eleanor was in the process of transitioning from MWD's ownership to Mr. Gould. [16] DSMF ¶ 31; PRDSMF ¶ 31; PSAMF ¶ 105; DRPSAMF ¶ 105.

**\*7** MWD's service dogs present at the Mall were in the process of being trained in a task called "deep pressure therapy," a scientifically backed task whereby a dog is trained to press on certain pressure points in order to release positive hormones in their individual. [17] PSAMF ¶ 104; DRPSAMF ¶ 104. Similarly, the service dogs present on May 7, 2022 were practicing mobility assistance and/or PTSD service and had already mastered some of these initial skills. [18] PSAMF ¶ 106; DRPSAMF ¶ 106.

Not all MWD's dogs in training become service animals; some become facility or therapy dogs. [19] DSMF ¶ 35; PRDSMF ¶ 35. One of the dogs present at the May 7, 2022 training, Abigail, failed out of training and was not ultimately certified as a service animal by MWD, but as of May 7, 2022, had mastered several disability-related tasks, including mobility support and emotional support. [20] DSMF ¶ 36; PRDSMF ¶ 36.

### G. The Individual Plaintiffs' Arrival at the Maine Mall on May 7, 2022

**\*8** On May 7, 2022, Ms. Gardner transported all MWD dogs from the MWD facility to the Maine Mall using MWD's bus. DSMF ¶ 38; PRDSMF ¶ 38. All dogs present at the Maine

Mall on the day in question wore vests that read "service dog in training" or "in training." DSMF ¶ 39; PRDSMF ¶ 39.

Volunteers arrived on their own and met Ms. Gardner and the MWD dogs at the Maine Mall between 9:30 and 9:45 a.m. on May 7, 2022. DSMF ¶ 40; PRDSMF ¶ 40. Volunteers were then assigned dogs based on the experience of the volunteer; however, Mr. Gould and Veronica, a MWD volunteer present on May 7, 2022 but not a party to this case, were respectively paired with their service animals, Lady Eleanor and Biscuit. [21] DSMF ¶ 41; PRDSMF ¶ 41. Once assigned, the volunteers took all the dogs to walk around outside before entering the Maine Mall. DSMF ¶ 42; PRDSMF ¶ 42.

Plaintiffs and MWD's dogs entered the mall as a group from the side entrance near the Best Buy at approximately 10:00 a.m. DSMF ¶ 43; PRDSMF ¶ 43. Plaintiffs conducted their training session by walking around the Maine Mall and into stores. DSMF ¶ 44; PRDSMF ¶ 44; PSAMF ¶ 133; DRPSAMF ¶ 133.

### H. The Individual Plaintiffs' Capacities at the May 7, 2022 Training

All individual Plaintiffs besides Ms. Gardner were volunteers on May 7, 2022. [22] DSMF ¶ 4; PRDSMF ¶ 4. MWD's volunteers receive training before they work with the organization's service dogs, including first aid, CPR, grooming, hygiene and etiquette training, and learning the task and skill vocabulary for commands. PSAMF ¶ 107; DRPSAMF ¶ 107. After completing training, volunteer trainers are expected to commit to volunteering consistently and if they miss significant time, they will have to re-train. *Id.* Ms. Gardner supervises volunteers at MWD trainings. [23] *Id.*

**\*9** Ms. Gardner's service dog, Douglas, was not present at the Maine Mall on May 7, 2022; however, other MWD service dogs were present if Ms. Gardner had needed their assistance. [24] DSMF ¶¶ 5-6; PRDSMF ¶¶ 5-6; PSAMF ¶ 132; DRPSAMF ¶ 132.

Mr. Beaudoin was assigned a MWD dog to handle on May 7, 2022. DSMF ¶ 8; PRDSMF ¶ 8. Prior to May 7, 2022, Mr. Beaudoin's service animal training experience was limited to prior volunteering with MWD. DSMF ¶ 9; PRDSMF ¶ 9.

Ms. Beaudoin was assigned a MWD dog to handle on May 7, 2022. DSMF ¶ 10; PRDSMF ¶ 10. Before May 7, 2022,

Ms. Beaudoin's service animal training was limited to prior volunteering with MWD. DSMF ¶ 11; PRDSMF ¶ 11.

Ms. Landry was assigned a MWD dog to handle at the May 7, 2022 training. DSMF ¶ 14; PRDSMF ¶ 14. Ms. Landry's prior service animal training experience was limited to her volunteering with MWD. DSMF ¶ 13; PRDSMF ¶ 13.

Ms. Beattie has the support of a BHP, Ms. Dwyer, due to her disabilities. PSAMF ¶ 118; DRPSAMF ¶ 119. Ms. Beattie and Ms. Dwyer volunteered with MWD together as part of this work. *Id.* Both had volunteered with MWD before May 7, 2022.[25] DSMF ¶ 16; PRDSMF ¶ 16. Prior to May 7, 2022, Ms. Beattie's service animal training experience was limited to her volunteering with MWD. DSMF ¶ 18; PRDSMF ¶ 18. Ms. Beattie was assigned a MWD dog to handle on May 7, 2022, and Ms. Dwyer was not. DSMF ¶¶ 15, 17; PRDSMF ¶¶ 15, 17; PSAMF ¶ 132; DRPSAMF ¶ 132.

**\*10** Ms. Ames was not initially assigned a MWD dog to handle at the May 7, 2022 training but was accompanied by MWD's service dog Sherman Tank during the interaction with mall security.[26] DSMF ¶ 19; PRDSMF ¶ 19; PSAMF ¶ 113; DRPSAMF ¶ 113. Prior to May 7, 2022, Ms. Ames gained service animal training experience by training her own service animal, Kia, with the assistance of a service dog trainer and through volunteering with MWD. DSMF ¶ 20; PRDSMF ¶ 20; PSAMF ¶ 111; DRPSAMF ¶ 111. She has a Good Citizen certificate from the American Kennel Club. PSAMF ¶ 112; DRPSAMF ¶ 112. Ms. Ames did not bring Kia with her to the Maine Mall on May 7, 2022.[27] DSMF ¶ 21; PRDSMF ¶ 21.

Mr. Gould was assigned an MWD dog, Lady Eleanor, to handle on May 7, 2022. DSMF ¶ 22; PRDSMF ¶ 22. At the time of the May 7, 2022 training, Eleanor was already a trained service animal and was in the process of being specifically trained to pair with Mr. Gould.[28] *Id.* As of May 7, 2022, Eleanor had not completed specific task training for Mr. Gould.[29] DSMF ¶ 24; PRDSMF ¶ 24; PSAMF ¶ 124; DRPSAMF ¶ 125. Eleanor was owned by MWD but had begun living with Mr. Gould at the time of the training.[30] DSMF ¶ 25; PRDSMF ¶ 25. Mr. Gould is a veteran and during his service he worked, in part, as a military police officer training bomb and drug dogs. PSAMF ¶ 123; DRPSAMF ¶ 124. Mr. Gould has experience training service dogs in general obedience but his training experience was limited to his volunteering with MWD ahead of May 7, 2022. DSMF ¶ 23; PRDSMF ¶ 23; PSAMF ¶ 123; DRPSAMF ¶ 124.

**\*11** Ms. Brilliant was assigned a MWD dog to handle on May 7, 2022. DSMF ¶ 26; PRDSMF ¶ 26. Prior to May 7, 2022, Ms. Brilliant was self-taught and her formal service animal training experience was limited to her volunteering with MWD.[31] DSMF ¶ 27; PRDSMF ¶ 27.

Ms. Sparks's service animal training experience prior to May 7, 2022 was limited to her volunteering with MWD, and she was assigned a MWD dog to handle at the Maine Mall training. DSMF ¶¶ 29-30; PRDSMF ¶¶ 29-30.

### I. The Maine Mall's Response to the May 7, 2022 Training

#### 1. The Call from Bath & Body Works

During the training, but prior to any direct interaction between the dogs and mall security, Maine Mall's security dispatch received a complaint that two dogs were off leash in Bath & Body Works and were being allowed to "run around in the store."[32] DSMF ¶ 45; PRDSMF ¶ 45; PSAMF ¶¶ 133-134; DRPSAMF ¶¶ 133-134. The staff at Bath & Body Works appeared happy to see the Plaintiffs. PSAMF ¶ 134; DRPSAMF ¶ 134. At no point on May 7, 2022 did a Maine Mall representative suggest or mention to Ms. Gardner there had been a complaint made by an employee of Bath & Body Works about MWD. PSAMF ¶ 135; DRPSAMF ¶ 135.

#### 2. The Arrival of Mall Security and Mall Security's Interactions with Ms. Beattie and Ms. Dwyer

At some point during the training, while inside JCPenney, the dog assigned to Ms. Beattie was not cooperating and needed a break. DSMF ¶ 46; PRDSMF ¶ 46. Ms. Beattie and Ms. Dwyer exited JCPenney, walked down the hallway, and were confronted by a Mall security guard. DSMF ¶ 47; PRDSMF ¶ 47. The security guard asked Ms. Dwyer if the dog that Ms. Beattie was assigned to handle was a service animal. DSMF ¶ 48; PRDSMF ¶ 48. In response, Ms. Dwyer told the security guard that the dog was a service animal in training, and that the dog has a right to be at the Maine Mall regardless of whether they were in training or not.[33] DSMF ¶ 49; PRDSMF ¶ 49; PSAMF ¶ 136; DRPSAMF ¶ 136. The Mall security guard then told Ms. Dwyer and Ms. Beattie that they were not allowed to be inside the Maine

Mall with a service dog in training and informed them that they had to leave. [34] DSMF ¶ 50; PRDSMF ¶ 50 PSAMF ¶ 137; DRPSAMF ¶ 137. Ms. Dwyer told the security guard that they could not leave with the dog because it belonged to the training group, not to Ms. Beattie or Ms. Dwyer. DSMF ¶ 51; PRDSMF ¶ 51. She additionally informed the security guard that the training group was inside JCPenney. DSMF ¶ 52; PRDSMF ¶ 52. At some point during this conversation, the security guard tried to reach for Ms. Dwyer, indicating he was going to put his hands on her, and she asked him not to touch her; the guard initiated physical contact with Ms. Dwyer by grabbing her shoulder. PSAMF ¶ 138; DRPSAMF ¶ 138.

*12 Ms. Dwyer and Ms. Beattie walked away from the Mall security guard, and Ms. Dwyer proceeded to call Ms. Gardner. DSMF ¶ 53; PRDSMF ¶ 53. On their phone call, Ms. Dwyer told Ms. Gardner that she and Ms. Beattie were approached by a security guard and told to leave, and that the Mall's security guard touched Ms. Dwyer's body without her permission. [35] DSMF ¶ 54; PRDSMF ¶ 54. Ms. Gardner told Ms. Dwyer to come back to the group and meet in the hallway outside of JCPenney. DSMF ¶ 55; PRDSMF ¶ 55. Ms. Dwyer and Ms. Beattie walked to the entrance of JCPenney and met Ms. Gardner and the rest of the group. DSMF ¶ 56; PRDSMF ¶ 56. Ms. Dwyer explained her encounter with the Mall security guard to Ms. Gardner and handed the dog that Ms. Beattie was assigned to handle to Ms. Gardner. DSMF ¶ 57; PRDSMF ¶ 57.

### 3. Mall Security's Interactions with Ms. Gardner

At this point, Ms. Gardner was approached by the Mall's security guard. DSMF ¶ 58; PRDSMF ¶ 58. She instructed the group to find a spot to sit and wait while she talked to security. [36] DSMF ¶ 59; PRDSMF ¶ 59; PSAMF ¶¶ 119, 149; DRPSAMF ¶¶ 120, 149. The group sat against the wall while Ms. Gardner spoke with the security guard. DSMF ¶ 60; PRDSMF ¶ 60.

The Mall security guard asked Ms. Gardner for the "certification papers" for the service dogs, which Ms. Gardner told him was illegal and that she had a legal right to be at the Maine Mall under the ADA "with our service dogs"; the security guard told Ms. Gardner that service animals in training were not allowed inside the Mall and that the group needed to leave. [37] DSMF ¶ 61; PRDSMF ¶ 61; PSAMF ¶ 140; DRPSAMF ¶ 140. Ms. Gardner additionally explained

the dogs did not yet have certification papers because they had not graduated from MWD's program. PSAMF ¶ 139; DRPSAMF ¶ 139. Ms. Gardner told the Mall security guard that they were not leaving and had a legal right to be there. DSMF ¶ 62; PRDSMF ¶ 62.

### 4. Mall Security Involves Management

*13 The mall security guard then radioed the security director, Bruce Barber. DSMF ¶ 63; PRDSMF ¶ 63. Mr. Barber walked to the JCPenney area where the Plaintiffs were. DSMF ¶ 65; PRDSMF ¶ 65. Mr. Barber called the Maine Mall's operations manager, Paul Pettingill, and informed him "there were ten service dogs in a group, that they had received a complaint that the dogs had been set free in some of the stores and were just running around and asked me what I wanted to do with that." [38] DSMF ¶ 64; PRDSMF ¶ 64. Mr. Barber additionally told Mr. Pettingill that the group was refusing to leave. DSMF ¶ 71; PRDSMF ¶ 71. Mr. Pettingill arrived at the JCPenney area where the group was and told Ms. Gardner that the group was trespassing. [39] DSMF ¶¶ 72-73; PRDSMF ¶¶ 72-73. Ms. Gardner was specifically threatened that she and the group would be arrested for trespassing upon the arrival of law enforcement. PSAMF ¶ 147; DRPSAMF ¶ 147.

Mr. Gorris, the general manager of the Maine Mall, was not present at the Mall on May 7, 2022, but Mr. Pettingill communicated with Mr. Gorris during this incident and relayed the information to Mr. Barber. PSAMF ¶ 128A; DRPSAMF ¶ 128A; DSMF ¶ 95; PRDSMF ¶ 95. Mr. Barber claims he overheard Mr. Gorris tell Mr. Pettingill over the phone that the Mall's policy was not to allow entry of service animals in training, only service animals that were "fully trained," but Mr. Gorris did not provide that information to Mr. Pettingill and that was not the Mall's policy. [40] *Id.* On his phone call with Mr. Pettingill during the incident, Mr. Gorris also recommended that he call Vice President of Brookfield Properties Retail, Inc., Janell Vaughan, which Mr. Pettingill did. PSAMF ¶ 129A; DRPSAMF ¶ 129A. Ms. Vaughan agreed that ten dogs in training on a busy Saturday was inappropriate and that the Mall would accommodate service animals in training if MWD let them know ahead of time. [41] *Id.*

### 5. Management's Interactions with Plaintiffs

**\*14**  Approximately three or four individuals, including two security guards wearing yellow shirts and two men in civilian clothes (the latter the Court assumes to be Mr. Barber and Mr. Pettingill), were present in the area of the Mall where the Plaintiffs were located.[42]  PSAMF ¶ 142; DRPSAMF ¶ 142. Mr. Barber told Ms. Gardner that the group was not allowed in the Mall with their service dogs in training. DSMF ¶¶ 65-66; PRDSMF ¶¶ 65-66. Mr. Barber told Ms. Gardner that the group had to leave.[43]  DSMF ¶ 67; PRDSMF ¶ 67; PSAMF ¶ 141; DRPSAMF ¶ 141. Ms. Gardner responded that service animals and service animals in training are protected by Maine state law.[44]  DSMF ¶ 68; PRDSMF ¶ 68. She asserted the group was legally allowed to be in the Maine Mall on the same terms as the general public; however, it appeared to Ms. Gardner that the Mall's representatives did not care what she said, and they again ordered the group to leave. PSAMF ¶ 143; DRPSAMF ¶ 143. No one looked up the laws that Ms. Gardner provided, including Maine's White Cane Laws, 17 M.R.S. § 1312, as the basis for MWD's right to be present in the Mall.[45]  *Id.*

Ms. Gardner additionally explained that the Maine Mall's own policy permitted the group to be there, and showed the Defendants' representatives the Mall's website, stating both service animals and service animals in training were allowed. PSAMF ¶ 144; DRPSAMF ¶ 144. A security guard told Ms. Gardner that the Maine Mall is private property and thus it can "make [its] own rules," and said the Mall's representatives know their rights and "do this all the time," which Ms. Gardner inferred to mean the Mall ejected individuals without certificates for their service animals.[46]  PSAMF ¶¶ 145-146; DRPSAMF ¶¶ 145-146.

### 6. The Parties Call the South Portland Police

**\*15**  Based on Ms. Gardner's refusal to leave, Mall personnel called the South Portland police. DSMF ¶ 74; PRDSMF ¶ 74. While waiting for the South Portland police to arrive, Ms. Gardner also called the police. DSMF ¶ 75; PRDSMF ¶ 75.

### 7. Developments While The Parties Waited for the Police

As the parties waited for the police to arrive, Mr. Pettingill ordered a mall security guard to keep his eyes on the group and not let them leave; Mr. Barber told mall security to not allow the group to come any further into the Maine Mall.[47]  DSMF ¶ 76; PRDSMF ¶ 76; PSAMF ¶ 147; DRPSAMF ¶ 147. A Mall security guard was initially positioned in between the group and the main foyer of the Mall; no guards were positioned to block the nearby exit.[48]  DSMF ¶¶ 77-78; PRDSMF ¶¶ 77-78. Mr. Gould told the security guard that they did not have a legal right to detain anyone, and the guard responded that they "do it all the time"; Mr. Gould interpreted this to mean they detained people regularly.[49]  PSAMF ¶ 148; DRPSAMF ¶ 148.

**\*16**  During the interaction between Mall security and Ms. Gardner, Ms. Ames texted her father, "[w]e got stopped by security and are holding our ground." DSMF ¶ 69; PRDSMF ¶ 69. At the same time, one of the MWD volunteers messaged in the MWD Scheduling/RSVP group chat, "[w]e will be late for the 2nd class as we are waiting for the police as security asked us to leave and we are within Maine state law. @ChristyGardner asks that you Wait ... in your cars, or by the bus, walk around but it might be a while ...[.] We are holding our ground and educating the public." DSMF ¶ 70; PRDSMF ¶ 70. The Plaintiffs waited for the South Portland police to arrive for approximately one hour. PSAMF ¶ 150; DRPSAMF ¶ 150.

Mr. Barber and Mr. Pettingill left the group and walked back to the Mall's management office as they waited for the police to arrive. DSMF ¶ 79; PRDSMF ¶ 79. Mr. Gould, with the dog he was handling, followed Mr. Barber and Mr. Pettingill on their walk back to the office, recording them while doing so, before returning to the group. DSMF ¶ 80; PRDSMF ¶ 80. No one stopped Mr. Gould from following Mr. Barber and Mr. Pettingill. DSMF ¶ 81; PRDSMF ¶ 81. Ms. Gardner witnessed Mr. Gould walk away from the group and follow Mr. Barber and Mr. Pettingill. DSMF ¶ 82; PRDSMF ¶ 82. The rest of the group waited for the police to arrive. DSMF ¶ 83; PRDSMF ¶ 83.

As the group waited for the police, Ms. Ames felt as if the Mall security guard "loomed over [her] from a couple of feet away and watched her every move," making her feel scared and as if the group was not free to leave.[50]  PSAMF ¶ 114; DRPSAMF ¶ 115. Ms. Landry did not feel free to leave the Maine Mall while the Plaintiffs waited for the police to arrive, and worried that if she tried to leave, the guard, who she

believed were watching the group's movements, would stop her. [51] PSAMF ¶ 120; DRPSAMF ¶ 121.

**\*17**  After the initial confrontation with the security guard, and while waiting for the police to arrive, Ms. Beaudoin stood up and exited the Mall with the dog she was handling after receiving permission from the security guard; the guard initially told Ms. Beaudoin that she could not go outside but allowed her to exit, so long as she returned, when she explained that Ghost would have an accident if she was not permitted to leave. [52] DSMF ¶ 84; PRDSMF ¶ 84; PSAMF ¶ 116; DRPSAMF ¶ 117. Specifically, the security guard told Ms. Beaudoin, "You'd better come back in." PSAMF ¶ 116; DRPSAMF ¶ 117. Ms. Beaudoin returned to the group through the same exit approximately thirteen minutes later. DSMF ¶ 85; PRDSMF ¶ 85. At this point, Abigail sat with Ms. Beaudoin, who was upset and anxious, to give her support. [53] PSAMF ¶¶ 115-116; DRPSAMF ¶¶ 116-117. Veronica told Ms. Gardner she needed to leave, and then exited the Maine Mall by way of the unblocked, nearby exit without being stopped by security. DSMF ¶ 86-87; PRDSMF ¶¶ 86-87. Veronica later apologized for her "inability to stand in solidarity" with the group. DSMF ¶ 88; PRDSMF ¶ 88.

At no point during the period the Plaintiffs waited for the police to arrive did any Maine Mall representative ask the only two permitted questions under Maine and federal law: (1) is the animal necessary because of a disability? and (2) what task or service has the animal been trained to perform? [54] PSAMF ¶ 153; DRPSAMF ¶ 153.

### 8. Arrival of South Portland Police and Plaintiffs' Exit

Soon after, South Portland police arrived and told Ms. Gardner that the group had to leave and, "if we failed to do so, we were going to be trespassed .." [55] DSMF ¶ 89; PRDSMF ¶ 89; PSAMF ¶ 151; DRPSAMF ¶ 151.

**\*18**  In front of police and Maine Mall management, while on the phone, Ms. Gardner said that the Mall is "asking us to leave at this point because it[']s private property and they don't allow service animals in training, but Maine State Law 13-12 is that service dogs in training with their trainer are allowed anywhere the public is allowed." DSMF ¶ 90; PRDSMF ¶ 90. In MWD's board member group chat, in a text message recounting the event, Ms. Gardner wrote, "[Mall security] came down and I tried to politely explain

that service animals in training are protected by [M]aine state law (apparently there are only four states now that don't acknowledge trainees) ...[.] Under the ADA, individuals can owner [sic] train and work their dogs." DSMF ¶ 91; PRDSMF ¶ 91 (all alterations made by Defendants).

The Plaintiffs waited for approximately fifty-two minutes from the initial confrontation with the security guard to when they left their place on the wall and headed for the mall's exit. DSMF ¶ 92; PRDSMF ¶ 92; PSAMF ¶ 150; DRPSAMF ¶ 150. The group was escorted out of the Maine Mall by a security guard. [56] DSMF ¶ 93; PRDSMF ¶ 93; PSAMF ¶ 152; DRPSAMF ¶ 152.

On their way towards the exit, one of the dogs defecated on the floor. DSMF ¶ 94; PRDSMF ¶ 94.

### J. Developments After May 7, 2022

In the days following May 7, 2022, Mr. Gorris reached out to MWD via email and voicemail to discuss setting up a training at the Mall; MWD did not respond. [57] DSMF ¶ 95; PRDSMF ¶ 95; PSAMF ¶ 154; DRPSAMF ¶ 154.

Ms. Gardner and Ms. Ames have been back to the Maine Mall with service dogs in training since May 7, 2022, and have not been asked to leave by security. DSMF ¶ 96; PRDSMF ¶ 96.

The Plaintiffs filed their complaint with the Maine Human Rights Commission (MHRC) alleging disability discrimination and MHRA retaliation on August 19, 2022, and the MHRC issued right to sue letters on March 31, 2023. PSAMF ¶ 129; DRPSAMF ¶ 130.

## III. THE PARTIES' POSITIONS

### A. The Defendants' Motion for Summary Judgment

Defendants move the Court to grant summary judgment on each of the four claims advanced by the Plaintiffs in their complaint. *Defs.' Mot.* at 1-2.

### 1. MHRA and ADA Claims

**\*19**  Defendants assert their entitlement to summary judgment on Plaintiffs' claims that they were discriminated against on account of their disabilities when the Defendants failed to provide a public accommodation in violation of the

MHRA and ADA. *Id.* at 6-7 (citing 📁42 U.S.C. § 12112; 📁5 M.R.S. § 4591). Defendants acknowledge the ADA prohibits individual discrimination on the basis of disability "in the full and equal enjoyment of the goods ... of any place of public accommodation" and the MHRA similarly provides that it is a civil right "for every individual to have equal access to places of public accommodation without discrimination because of ... physical or mental disability." *Id.* at 7 (quoting 42 U.S.C. § 12182(a); 📁5 M.R.S. § 4591). They also note that the MHRA provides that it is unlawful "[f]or any public accommodation or any person who is the owner, lessor, lessee, proprietor, operator, manager, superintendent, agent, or employee of any place of public accommodation to refuse to permit the use of a service animal or otherwise discriminate against an individual with a physical or mental disability who uses a service animal at the public accommodation." *Id.* (quoting 📁5 M.R.S. § 4592(8)). Defendants concede that the Maine Mall is a place of public accommodation, as defined by state and federal law. DSMF ¶ 1.

However, Defendants contend the Plaintiffs' ADA and MHRA claims fail for three reasons: (1) the dogs were not "service animals"; (2) Plaintiffs failed to establish a prima facie case of discrimination based on disability; and (3) Plaintiffs lack standing to bring claims pursuant to the ADA and MHRA. *Id.*

### a. Service Animal Classification

Defendants report that it is Plaintiffs' burden to establish their dogs qualify as "service animals" under the ADA and MHRA. *Id.* at 8 (citing 📁*Riley v. Bd. of Comm'rs*, No. 4:14-cv-063-JD, 2017 WL 4181143 at *5, 2017 U.S. Dist. LEXIS 153737 at *11 (N.D. Ind. Sept. 21, 2017) (citation amended)). Both statutes define a "service animal" as "any dog that is *individually trained* to do work or perform tasks for the benefit of an individual with a disability ... [.] [t]he work or tasks performed by a service animal must be *directly related to the individual's disability*." *Id.* (quoting 28 C.F.R. § 36.104; 📁5 M.R.S. § 4553(9-E)(B)) (emphasis added by Defendants). Defendants contend these laws "only protect the right to take service animals—as opposed to, e.g., untrained or emotional support animals—into public facilities," and a service animal in training is not afforded the same protections as a fully trained service

animal. *Id.* (first quoting and then citing 📁*Riley*, 2017 WL 4181143, at *5, 2017 U.S. Dist. LEXIS 153737, at *12). Defendants say this distinction is supported by Department of Justice policy clarifying the scope of the ADA. *Id.* (quoting U.S. Dep't of Justice, Civil Rights Div.: Frequently Asked Questions About Service Animals and the ADA, https://www.ada.gov/regs2010/service_animal_qa.html) (last updated Feb. 28, 2020) ("[u]nder the ADA, the dog must already be trained before it can be taken into public places")). Defendants proceed to cite cases from other federal district courts and the Tenth Circuit Court of Appeals granting and affirming summary judgment, respectively, where the implicated service animal was still in training. *Id.* at 8-9 (citing 📁*Riley*, 2017 WL 4181143, at *6–7, 2017 U.S. Dist. LEXIS 153737, at *14; 📁*Davis v. Ma*, 848 F. Supp. 2d 1105, 1116 (C.D. Cal. 2012); *Lewis v. Burger King*, 398 Fed. Appx. 323, 325 (10th Cir. 2010)).

Turning to the case at hand, Defendants argue "the record convincingly establishes that MWD's dogs were still 'in training' on the day of the incident," pointing to the admitted facts, among others, that the MWD dogs present at the May 7, 2022 training wore vests identifying them as "service dogs in training" or "in training," the training was for "novice" dogs, one of the dogs present at the training defecated on the Mall floor, and Ms. Gardner argued on the day in question that service dogs in training were allowed in places of public accommodation. *Id.* at 9 (citing DSMF ¶¶ 39, 32-34, 94, 90).

Defendants alternatively assert that even if Plaintiffs can establish these dogs had sufficient training to be classified as service animals within the meaning of the ADA and MHRA, "all the tasks claimed to have been, or could have been, provided were emotional," and emotional support animals are not protected under the federal and state statutes. *Id.* at 9-10 (citing 📁5 M.R.S. § 4553(9-E)(B); 28 C.F.R. § 35.104) (then collecting cases). They additionally aver that when Mall security confronted the Plaintiffs, the dogs only provided "emotional support and comfort related tasks." *Id.* at 10.

**\*20** Defendants also contest Plaintiffs' ADA and MHRA claims because "neither the volunteers nor Gardner owned the dogs—the non-profit did." *Defs.' Mot.* at 10. Defendants insist that "[t]here is a possessory element when qualifying a service animal; an individual is only allowed to bring into a public place of accommodation a service animal which *belongs* to him." *Id.* (citing *Grill v. Park*, No: 6:18-cv-1159-Orl-22KRS, 2018 WL 11478550, at *4, 2018

U.S. Dist. LEXIS 249358, at *11-12 (M.D. Fla. Oct. 29, 2018) (holding that when the plaintiff brought three service animals—one plaintiff's actual service dog, another belonging to plaintiff's friend, and a third in-training—into a place of public accommodation, the ADA did not require the defendant to permit entry to the two dogs not belonging to plaintiff) (citation corrected) (emphasis added by Defendants); 28 C.F.R. § 36.302(c)(7)). Relying on *Grill*, Defendants emphasize that "[w]hile an individual is permitted to have more than one service dog for herself, a service animal may not have multiple owners" because "service animals are not akin to support devices ... and cannot be swapped among those with disabilities." *Id.* at 10-11 (citing *Grill*, 2018 WL 11478550, at *4, 2018 U.S. Dist. LEXIS 249358, at *11-12; *Lewis*, 398 Fed. Appx. at 325) ("[u]nlike wheelchairs, the dogs are not interchangeable parts of [their] ADA claim").

Returning to the instant case, the Defendants apply these holdings to Mr. Gardner and Ms. Ames by pointing out that both owned a service animal not present at the May 7, 2022 training. *Id.* at 12 (citing DSMF ¶¶ 5, 20-21). They additionally state that all remaining Plaintiffs did not have a service dog which belonged to them, and thus do not have a viable claim under the ADA and MHRA. *Id.* (citing DSMF ¶¶ 22, 24, 25). Defendants contend this applies equally to Mr. Gould; while he was living with Lady Eleanor on May 7, 2022, she was still owned by MWD. *Id.* On this point, the Defendants emphasize that Ms. Gardner "stated that dogs were not assigned volunteers based on their disability, some of whom have none, but based on the experience of the handler." *Id.* (citing DSMF ¶ 41).

### b. Prima Facie Case of Discrimination

To establish a prima facie case of discrimination on the basis of disability pursuant to Title III of the ADA, Defendants report that a plaintiff must establish: (1) that the plaintiff is disabled within the meaning of the ADA; (2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) that the defendant took adverse action against the plaintiff that was based on the plaintiff's disability; and (4) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation. *Id.* at 12-13 (citing *Cutting v. Down E. Orthopedic Assocs., P.A.*, 278 F. Supp. 3d 485, 496 (D. Me. 2017)) (in turn quoting *Amir v. St. Louis Univ.*,

184 F.3d 1017, 1027 (8th Cir. 1999) (amended to provide pin citation)). Defendants note that, except for the availability of damages, "[i]t is settled law that the MHRA should be construed and applied along the same contours as the ADA." *Id.* at 13 (quoting *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 312 (1st Cir. 2003)).

Defendants focus on the third element to argue, first, that they did not take adverse action against Ms. Gardner, Ms. Ames, and Ms. Dwyer on the basis of a disability because these three Plaintiffs were not handling dogs at the time of the incident. *Id.* Defendants add, "[t]he dogs were also owned by MWD, and not any of the other Plaintiffs," *id.* (citing DSMF ¶ 31), and "[a]s such, these Plaintiffs were not, and could not be, denied a public accommodation because they had no service animal to be denied." *Id.*

Second, Defendants contest that the Plaintiffs were denied a public accommodation on the basis of their disabilities, emphasizing that Defendants "told Plaintiffs to leave," not because they are disabled, but in response to a report that there were "several dogs running around freely in their stores." *Id.* (citing DSMF ¶¶ 45, 50, 61). Upon learning that these were service animals in training, Defendants note that their representatives told the Plaintiffs that they do not allow service dogs in training in the Mall. *Id.* (citing DSMF ¶ 67). They also argue that Plaintiffs have failed to establish the third element because "Plaintiffs with disabilities and Plaintiffs without disabilities were treated similarly—both being told to leave and for the same reason." *Id.* Defendants insist that "[t]here is no competent evidence here that contradicts the fact that Plaintiffs were told to leave because they had an animal 'in training' and for no other reason." *Id.*

### c. Standing

**\*21** For a party to invoke federal jurisdiction, Defendants state they must establish: (1) an injury that is concrete and particularized, and actual or imminent; (2) causation; and (3) redressability. *Id.* at 14 (citing *Cutting*, 278 F. Supp. 3d at 492 (in turn citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992))). Plaintiffs emphasize that a particularized injury "must affect the plaintiff in a personal and individual way." *Id.* (quoting *Lujan*, 504 U.S. at 606, 112 S.Ct. 2130).

### i. Plaintiff Mission Working Dogs

Defendants argue MWD, a non-profit organization, lacks standing to sue pursuant to the ADA or MHRA because those statutes "provide[ ] a remedy *only to an individual* 'who is being subjected to discrimination on the basis of a disability.' " *Id.* (quoting *Shuper v. Pine Tree Legal Assistance*, No. 2:14-cv-00478-GZS, 2014 WL 7334073 at *3, 2014 U.S. Dist. LEXIS 175276 at *6 (D. Me. Dec. 19, 2014)) (citation corrected) (emphasis added by Defendants).

They additionally contend that MWD cannot claim organizational standing for the ADA, MHRA, and false imprisonment claims, as they are all "of the nature" that requires the participation of individual members. *Id.* at 14 n.1 (citing 📄 *Parent/Pro. Advocacy League v. City of Springfield*, 934 F.3d 13, 35 (1st Cir. 2019) ("stating that an 'organization lacks standing to assert claims of injunctive relief on behalf of its [constituents] where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof' ") (in turn quoting 📄 *Warth v. Seldin*, 422 U.S. 490, 515-16, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975))).

### ii. Plaintiffs Andre Beaudoin, Colleen Landry, and Melanie Sparks

Next, Defendants argue Mr. Beaudoin, Ms. Landry, and Ms. Sparks lack standing to sue pursuant to the ADA and MHRA claims because "they had no legally protected interest under the ADA and MHRA to be violated as they are not disabled." *Id.* at 15 (citing DSMF ¶¶ 7, 12, 28).

### iii. Redressability as to All Plaintiffs

Noting that the only redress available for a Title III ADA claim is injunctive relief, Defendants argue all Plaintiffs have failed to establish their standing pursuant to the ADA because the Court cannot provide redress. *Id.* at 15 (citing 📄 *Cutting*, 278 F. Supp. 3d at 492). "[I]n the ADA Title III context, the standing inquiry focuses more 'upon whether the barrier remains in place' than 'upon how many attempts a plaintiff has made to overcome a discriminatory barrier," they say. *Id.* (quoting *Cutting v. Down E. Orthopedic Assocs., P.A.*,

No. 1:16-cv-00582-JCN, 2019 WL 1960329 at *5, 2019 U.S. Dist. LEXIS 74086 at *15 (D. Me. May 2, 2019) (citation amended)).

Turning to the instant case, they argue that the Plaintiffs' argument that injunctive relief is necessary to prevent irreparable, future harm is inapposite because "Gardner and Ames have since returned to the Mall with service animals in training and had not been asked to leave." *Id.* (citing DSMF ¶ 96). In addition, they point out that the Maine Mall contacted MWD via email and voicemail in the days after May 7, 2022 to discuss setting up a training session. *Id.* (citing DSMF ¶ 95). They quote this Court as holding in a prior case that "an injunction is intended to forestall future violations, not to punish past ones. Accordingly, plaintiffs in Title III cases are generally required to show 'some ongoing harm (or, at least, a colorable threat of future harm).' " *Id.* (quoting 📄 *Cutting*, 278 F. Supp. 3d at 497). Defendants conclude that the Plaintiffs have failed to meet this burden here.

### d. Maine's Model White Cane Law and the MHRA

**\*22**  Defendants next take issue with what they characterize as Plaintiffs attempt to conflate the MHRA and Maine's Model White Cane Law. *Id.* Defendants argue that a violation of Maine's Model White Cane Law, which affords disability status and special rights and privileges to those who are "blind, visually impaired, or otherwise physically or mentally disabled," does not allow for the filing of an MHRA claim. *Id.* at 15-16. They say that Maine's Model White Cane Law does not include a private right of action and "certainly does not create a path by which to generate a cause of action under the MHRA." *Id.* at 16.

Furthermore, Defendants contend that Plaintiffs do not qualify as "specially trained service dog trainer[s]," proffering both that a "trainer" is an individual, which MWD is not, and that all Plaintiffs besides MWD and Ms. Gardner are volunteers and thus not "*specially trained* service dog trainers." *Id.* (emphasis in original) (citing DSMF ¶ 4). "All volunteers besides Ames—who gained general experience by training her own service animal with the help of a service dog trainer—had no specialized training experience other than through volunteering with MWD." *Id.* (citing DSMF ¶¶ 9, 11, 13, 16, 18, 20, 23, 27, 29). They also contend that Ms. Gardner was not handling a dog at the time of the incident, and "there is no evidence that this statute provides an umbrella of

protection to every individual working with the trainer." *Id.* (citing DSMF ¶ 6).

## 2. False Imprisonment Claim

Defendants define false imprisonment as "the unlawful restraint of an individual's personal freedom," and submit that to establish a false imprisonment claim, Plaintiffs must show: (1) Defendants acted intending to confine Plaintiffs within boundaries fixed by the actor; (2) Defendants' act directly or indirectly resulted in such a confinement of Plaintiffs; and (3) Plaintiffs were conscious of the confinement or harmed by it. *Id.* (quoting and then citing Restatement (Second) of Torts § 35).

### a. Standing as to Mission Working Dogs

Defendants argue that, as a non-profit, MWD lacks standing to claim false imprisonment because it is not an individual and, by definition, only an individual can be falsely imprisoned. *Id.*

### b. Prima Facie Case with Respect to the Individual Plaintiffs

At bottom, Defendants argue the individual Plaintiffs have failed to establish a prima facie case of false imprisonment because they cannot demonstrate that they were confined, given that they remained in the Maine Mall due to their "refus[al] to leave during the ejection process." *Id.* at 17. Thus, the Defendants' acts did not result in the Plaintiffs' confinement. *Id.* (citing *O'Neil v. DaimlerChrysler Corp.*, 538 F. Supp. 2d 304 (D. Mass. 2008); *McCann v. Wal-Mart Stores, Inc.*, 210 F.3d 51, 53 (1st Cir. 2000)). Distinguishing *McCann*, wherein the First Circuit determined reasonable people would believe they would be physically restrained if they attempted to leave when the defendant's employees directed the plaintiffs to come with them back inside the store, referenced the police, stood guard over the plaintiffs, and did not permit one plaintiff to leave to go to the bathroom, Defendants point out there, here, "Plaintiffs were not ushered back inside the Mall[;] instead they were repeatedly requested to leave." *Id.* (citing *McCann*, 210 F. 3d at 54; DSMF ¶¶ 50, 61, 67). Defendants add that it was Ms. Gardner, not the Mall security guard, who directed Plaintiffs to wait for the police's arrival. *Id.* (citing DSMF ¶¶ 59, 69, 70). "Moreover,

the record is clear in showing that Plaintiffs did not believe that they would be restrained physically if they sought to leave as some Plaintiffs had in fact left the group at different periods without being physically restrained." *Id.* (citing DSMF ¶¶ 80-82, 84-88). Instead, Defendants contend, Plaintiffs stayed in the Mall voluntarily, taking a "stand in solidarity," "holding [their] ground," and "educating the public." *Id.* (quoting DSMF ¶¶ 69, 70, 88). They additionally point out that Mr. Gould was permitted to follow Mall security personnel and management further into the Mall with his camera, *id.* at 18 (citing DSMF ¶¶ 80-82); Mall security did not stop Veronica from leaving from a nearby exit, *id.* (citing DSMF ¶ 87), and Ms. Beaudoin was allowed to leave the Mall with the dog she was handling and return some twelve minutes later, *id.* (citing DSMF ¶¶ 84-85). Throughout the encounter, Defendants say, the security guard was not stationed by or blocking the nearby exit. *Id.* (citing DSMF ¶ 87). The facts of this case are similar to those in *Crossett v. Campbell*, 122 La. 659, 48 So. 141 (La. 1908), Defendants say, in which the Louisiana Supreme Court determined there had been no false imprisonment. *Id.* at 18-19.

## 3. Retaliation Claim

**\*23** To establish a claim of retaliation pursuant to the MHRA, Defendants say, a plaintiff must show they engaged in a protected activity and were discriminated against for engaging in that activity. *Id.* at 19. They state that the MHRA also provides that it "is unlawful for a person to coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of the rights granted or protected by this Act or because that individual has exercised or enjoyed, or has aided or encouraged another individual in the exercise or enjoyment of, those rights." *Id.* (quoting 5 M.R.S. § 4633). Here, Defendants say, Plaintiffs' claim arises out of the alleged violation of their public accommodation rights and "there was no further interactions or alleged retaliatory, intimidation, or interference[ ] of their rights after the May 7, 2022 incident." *Id.* at 19-20. Thus, Defendants say, this claim fails. *Id.* at 20.

## 4. MHRA Civil Penal Damages

Defendants argue Plaintiffs' claim for civil penal damages pursuant to the MHRA is capped at $20,000, not $20,000 per plaintiff, pursuant to 5 M.R.S. § 4613. *Id.*

**B. The Plaintiffs' Opposition**

Plaintiffs urge the Court to reject the motion for summary judgment because a reasonable factfinder could determine the Plaintiffs experienced public accommodation discrimination in violation of the ADA and MHRA, that the Plaintiffs were falsely imprisoned by the Defendants agents, and that Defendants engaged in retaliation. *Pls.' Opp'n* at 1-23.

### 1. MHRA and ADA Claims

#### a. Standing

##### i. Plaintiff Mission Working Dogs

Plaintiffs contend MWD has standing both because it suffered an injury in its own right and because it can assert organizational or associational standing. *Id.* at 10 (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199, 143 S.Ct. 2141, 216 L.Ed.2d 857 (2023) ("In cases like these, where the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members' ") (internal citation omitted)). To establish organizational standing, Plaintiffs say, an organization must demonstrate: "(a) that its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 10-11 (quoting *Students for Fair Admissions, Inc.*, 600 U.S. at 199, 143 S.Ct. 2141).

Plaintiffs tell the Court that it previously concluded that an organization which associates with individuals with disabilities has standing to challenge a municipal regulation alleged to have a discriminatory effect based on a disability under Title II of the ADA, and insist "[t]he same reasoning applies to the present cases that arises under Title III and the MHRA, as the statutes are materially similar in this respect." *Id.* at 11 & n. 5, 6 (citing *Metro Treatment of Me., LP v. City of Bangor*, No. 1:16-cv-00433-JAW, 2016 WL 6768929 at *7, 2016 U.S. Dist. LEXIS 157619 at *20 (D. Me. Nov. 15, 2016) ("The Court agrees that Penobscot Metro has standing to bring an ADA claim on its own

behalf under the unique language of Title II")). On this point, the Plaintiffs note that both Title II and Title III of the ADA provide relief, respectively, to "any person alleging discrimination" and "any person who is being subjected to discrimination on the basis of disability," and the MHRA similarly provides that complaints filed under the Act may be brought by "any other person." *Id.* at 11 n. 6 (quoting 42 U.S.C. § 12133; 42 U.S.C. § 12188; 5 M.R.S. § 4613(2)). "Person," in turn, is defined in the MHRA as "one or more individuals, partnerships, associations, organizations, corporations, municipal corporations, [or] legal representatives." *Id.* (quoting 5 M.R.S. § 4553(7)).

**\*24** Turning to the present case, Plaintiffs argue MWD has standing either in its own right or on behalf of its members. *Id.* at 11. MWD has organizational standing because its mission of training service animals for disabled individuals, including support in accessing public spaces, is germane to the present suit, and individual Plaintiffs' participation would not be required for MWD to pursue relief against the Defendants. *Id.* at 11-12. Other federal district courts have determined that non-profit advocacy and service organizations have standing where a private entity's policies or actions violate disability laws, Plaintiffs say. *Id.* at 12 (collecting cases).

#### ii. Plaintiffs Andre Beaudoin, Colleen Landry, and Melanie Sparks

Turning to the Defendants' contention that Mr. Beaudoin, Ms. Landry, and Ms. Sparks lack standing under the MHRA and ADA because they are not disabled individuals, Plaintiffs counter that both the state and federal statute define unlawful public accommodation discrimination to include those who are excluded or denied access "because of the known protected class status of an individual with whom the individual or entity is known to have a relationship or association." *Id.* at 12-13 (quoting 5 M.R.S. § 4592(6)). The MHRA similarly defines "aggrieved person" to include "any person who claims to have been subject to unlawful discrimination on the basis of ... discrimination based on the person's known relationship or association with a member of a protected class." *Id.* at 13 (quoting 5 M.R.S. § 4553(1-D)). The ADA includes the same extension, Plaintiffs insist. *Id.* (citing 42 U.S.C. § 12182(b)(1)(E) (it is "discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations,

or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association"); 28 C.F.R. § 36.205).

For a disabled person's companion to have associational standing, Plaintiffs acknowledge they must still show that the relief sought —here, injunctive relief and civil penal damages —would directly benefit them. *Id.* (citing 🚩 *Lorenzo Font v. Francisco*, 260 F. Supp. 2d 394, 400-01 (D.P.R. 2003)). That is met here, they say, because the non-disabled Plaintiffs were at the Maine Mall with Ms. Gardner, "a plainly disabled individual as she was wearing shorts at the time that exposed her prosthetics, advocating for disabled persons," and all Plaintiffs, not only those with disabilities, were detained in violation of the Mall's policy. *Id.* at 13-14.

### iii. Redressability

Addressing the Defendants' arguments that Plaintiffs have not established their alleged injury is redressable through judicial intervention, Plaintiffs respond, first, that "[t]heir decision not to put themselves back in harm[ ]'[s] way does not deprive them of standing; there is no requirement that individuals repeatedly subject themselves to mistreatment." *Id.* at 14 (citing 🚩 *Dudley*, 333 F.3d at 305 ("We do not believe that establishing a private right of action under Title III requires a plaintiff to perform such heroic measures"); *Cutting*, 2019 WL 1960329, at *5, 2019 U.S. Dist. LEXIS 74086, at *15 ("A plaintiff's abstention from desired opportunities based on knowledge of potentially harmful conduct from others can sometimes be sufficient to establish standing for prospective relief"). They note that a defendant's voluntary cessation of challenged conduct does not deprive a plaintiff of standing when "nothing precludes that defendant from returning to its presuit ways, in the absence of a court order." *Id.* at 15 (quoting *Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1302 (S.D. Fla. 2013)). Here, they say, the Defendants' apology to Plaintiffs after the fact and "single email" sent to employees in May 2022, absent more, do not meet the "heavy burden of demonstrating that [their] cessation of the challenged conduct renders the controversy moot." *Id.* (quoting *Carnival Corp.*, 987 F. Supp. 2d at 1302)).

**\*25** Second, Plaintiffs say, they seek not only injunctive relief under the MHRA and ADA, but also civil penal damages pursuant to the MHRA, which do not require a threat of future harm. *Id.*

### b. Prima Facie Case of Discrimination

Plaintiffs proffer they have established a prima facie case of discrimination.

### i. Service Animal

First, Plaintiffs say the MHRA and ADA define "service animal" as:

> a dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual or other mental disability .... The work or tasks performed by a service animal must be directly related to the individual's disability. Examples of such work or tasks include, but are not limited to, assisting an individual who is totally or partially blind with navigation and other tasks, alerting an individual who is deaf or hard of hearing to the presence of people or sounds, providing nonviolent protection or rescue work, pulling a wheelchair, assisting an individual during a seizure, alerting an individual to the presence of allergens, retrieving items such as medicine or a telephone, **providing physical support and assistance with balance and stability to an individual with a mobility disability and helping a person with a psychiatric or neurological disability by preventing or interrupting impulsive or destructive behaviors.**

*Id.* at 16-17 (quoting 🚩 5 M.R.S. § 4553(9-E) (emphasis added by Plaintiffs); 28 C.F.R. § 36.104).

Plaintiffs aver that there is no state or federal standard that must be met before a dog qualifies as a service animal, nor any requirement that they be trained in a specific manner or by a professional trainer. *Id.* at 17 (citing *Miller v. Ladd*, No. CV 08-05595 NJV, 2010 WL 2867808 at *4, 2010 U.S. Dist. LEXIS 73050 at *12-13 (N.D. Cal. July 20, 2010)) ("Courts that have considered the training requirement for service animals recognize that federal regulations do not set forth any standards or requirements specifying the amount or type of training that an animal must receive to qualify as a service animal, nor the type or amount of work a service animal must provide for the disabled person. The relevant question for the court is whether the animal helps the disabled person perform tasks to ameliorate the ADA disability") (citation amended); *C.L. v. Del Amo Hosp., Inc.*, 992 F.3d 901, 910-11 (9th Cir. 2021) ("The [ADA] regulations do not specify by whom the dog must be trained").

Turning to the instant case, Plaintiffs insist that, while the dogs' service training classification is a disputed material fact, the record establishes MWD's dogs present at the May 7, 2022 training attained legal status as service animals even though they had not yet completed MWD's "exceedingly high certification requirements." *Id.* These dogs were specifically trained to, and did, perform specific tasks that ameliorated the effects of both physical and mental disabilities of those individuals with whom they were paired while at the Maine Mall, Plaintiffs say. *Id.* at 17-18. These were not "service animals in training" or "emotional support animals," as defined by the ADA. *Id.* at 18 (citing *C.L.*, 992 F.3d at 911).

**\*26** Plaintiffs also reject Defendants' contention that the MHRA and ADA claims must fail because the Plaintiffs have not established their ownership over the service animals with whom they were paired on May 7, 2022. *Id.* at 18. "[T]here is no statutory requirement under the MHRA or the ADA that a disabled individual prove an exclusive ownership interest in a service dog in order for them to have the right to access public spaces with the support of that service dog," they say, urging to Court to "not create such a requirement through judicial interpretation [which] would contravene the plain language ... and legislative purpose of both the ADA and the MHRA," which aimed to assure "equality of opportunity, full participation, independent living, and economic self-sufficiency." *Id.* (first citing 42 U.S.C. § 12191, then quoting

42 U.S.C. § 12101). Turning to this plain language, Plaintiffs report that the ADA provides that public accommodations shall "permit the use of *a* service animal by *an* individual with a disability," *id.* at 18-19 (quoting 28 C.F.R. § 36.302(c) (emphasis added by Plaintiffs)), and the ADA adopts the word "handler," not "owner." *Id.* at 19 (citing 28 C.F.R. § 3602 ("A service animal shall be under the control of its handler")).

The MHRA uses the same language, they say. *Id.* (citing 🚩 5 M.R.S. § 4592(8) (permitting an individual to use "*a* service animal at the public accommodation") (emphasis added by Plaintiffs); Public Accommodation Regulations of the Maine Human Rights Commission, Ch. 7, 7.04(E) (referring to an individual with a service animal as a "handler")). Conceding the statutes at times use the word "their" in relation to the service animals, Plaintiffs say that while this adjective "has a possessive meaning, it does not mean 'owner.' " *Id.* The cases Defendants cite to the contrary, Plaintiffs say, are dicta, come from courts outside the First Circuit, and do not directly address the issue of "ownership" for which Defendants use them. *Id.* at 19-20 (collecting cases).

Based on the foregoing, Plaintiffs urge the Court to dismiss the motion for summary judgment as to their ADA and MHRA claims.

### 2. False Imprisonment Claim

#### a. Plaintiff Mission Working Dogs

As an initial matter, Plaintiffs respond to Defendants' contention that the MWD, an entity, cannot bring a false imprisonment claim on its own behalf; Defendants misread Plaintiffs' complaint, they say, because the complaint only brings this count on behalf of the individual Plaintiffs. *Id.* at 11 n. 5, 20 n.10.

#### b. Prima Facie Case with Respect
#### to the Individual Plaintiffs

Turning to the Defendants' opposition to the false imprisonment claim brought by the individual Plaintiffs, Plaintiffs aver that, considering the facts in the light most favorable to them as the non-moving parties, they have established a prima facie case and disputes of material fact preclude granting summary judgment on this claim. *Id.* at 21. Plaintiffs contend the relevant facts, as follows, evidence their

claim: first, they were ordered to leave the Maine Mall based on an incorrect and illegal interpretation of the establishment's policy regarding service animals. *Id.* When they asserted their legal right to remain, pointing to the Mall's own policy, Defendants' agents ordered them to remain where they were in the Mall while the South Portland police were called "for them to be trespassed and arrested." *Id.* For almost an hour, Plaintiffs say, they were guarded by a Mall security officer and confined to a hallway where the guard instructed the one person he permitted to take a dog outside to use the bathroom that she "better come right back." *Id.* at 21-22. Based on these facts, Plaintiffs say, they "reasonably understood that at that point they were not free to leave even if one member of their group was able to quickly escape." *Id.* at 22. The Plaintiffs maintain that the First Circuit does not require Plaintiffs to have "test[ed] the bounds of their confinement" in order to establish a prima facie case of false imprisonment. *Id.*

### 3. Retaliation Claim

To establish a claim of retaliation pursuant to 5 M.R.S. § 4633, Plaintiffs say, the moving parties must show that (1) they engaged in protected conduct; (2) they thereafter suffered an adverse reaction; and (3) there is a causal link between the protected activity and the adverse action. *Id.* (citing *Doyle v. Dep't of Hum. Servs.*, 2003 ME 61, ¶ 20, 824 A.2d 48) (citation amended). "[P]rotected activity" is broadly defined as conduct by the plaintiff that is in opposition to an unlawful employment practice of the defendant, Plaintiffs aver. *Id.* (citing *Thompson v. MaineHealth*, 656 F. Supp. 3d 251, 257-58 (D. Me. 2023)). They clarify that an MHRA retaliation claim does not require there to have in fact been an underlying unlawful activity; a reasonable person's perception of such activity suffices. *Id.* (citing *Porietis v. Tradesmen Int'l, LLC*, 227 F. Supp. 3d 126, 137-38 (D. Me. 2017)).

**\*27** Plaintiffs contend the Defendants incorrectly frame the retaliation claim advanced in the complaint, and argue that they have established a prima facie case that they engaged in protected conduct in several ways: (1) accessing the Maine Mall with service animals; (2) several of the named Plaintiffs (Ms. Gardner, Mr. Gould, and Ms. Dwyer) asserted their right to access the Mall on the same terms and conditions as non-disabled individuals to the Defendants' representatives, vocally opposing their detention and ejection; (3) disabled Plaintiffs exercised their right to be at the Maine Mall with service animals; and (4) all of the individual Plaintiffs aided and encouraged the other Plaintiffs in their assertion of rights

and opposition to unlawful actions. *Id.* at 23. As a result of these actions, Plaintiffs say they were detained and then ejected from the Mall under threat of criminal action—both actions they define as adverse. *Id.* Further, they say that "Defendants' retaliatory motive is evidenced by their agents' refusal to follow the Mall's own written policy when it was shown to them or to look up the laws that were cited to them by Ms. Gardner as protecting the Plaintiffs." *Id.* Plaintiffs characterize the Defendants' actions as "intentional and malicious actions over the course of more than an hour to penalize a group of marginalized individuals who dared assert their rights and speak out in the face of discriminatory practices." *Id.* at 23-24.

### 4. MHRA Civil Penal Damages

Plaintiffs dispute the Defendants' characterization that their civil penal damages pursuant to the MHRA are capped at $20,000, insisting this amount is awardable to each Plaintiff. *Id.* at 24. In support, they reason that civil penal damages are not remedial; they are punitive, with a goal of deterrence. *Id.* (citing *Doran v. Univ. of Me. at Farmington*, No. CV-83-134, 1986 WL 192521 at \*1, 1986 Me. Super. LEXIS 112 at \*3-4 (Me. Super. Ct. May 12, 1986)) ("civil penal damages are what the statute suggests, an award to penalize wrongdoing") (collecting cases). Plaintiffs' recovery is not limited merely because they elected to consolidate their claims together for the sake of judicial efficiency, they argue, and to hold otherwise would "elevate form over function" and fly in the face of the spirit of the MHRA, which is to remedy and deter unlawful discrimination. *Id.* at 25.

Based on the foregoing, Plaintiffs move the Court to dismiss the motion for summary judgment.

### C. The Defendants' Reply

At bottom, Defendants allege that the Plaintiffs have not met their burden to demonstrate "through submissions of evidentiary quality, that a 'trial worthy issue' persists" on any of their claims, such that the Court should grant summary judgment. *Defs.' Reply* at 1 (quoting *Sanchez-Rodriguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 9 (1st Cir. 2012)).

### 1. The Factual Record

As an initial matter, Defendants argue that the Plaintiffs, in their response to the Defendants' statement of material facts (PRDSMF) and their additional material facts (PSAMF), submit Ms. Gardner's "own subjective beliefs and unsupported factual assertions," cited only by Ms. Gardner's own affidavit, "in an effort to create issues of fact." *Id.* at 2 (citing PSAMF ¶¶ 104, 106, 130, 131, 145, 149). They also contend the Plaintiffs make "numerous arguments in their facts, which are not supported by the record," and manufacture issue with the Defendants' factual statements. *Id.* Defendants argue that the material facts essential to this case are undisputed and uncontradicted. *Id.* at 2-4 (citing DSMF ¶¶ 32, 33, 38-43, 58-60, 62, 63, 66, 69-72, 74, 75, 77-82, 86-92, 94, 96).

## 2. MHRA and ADA Claims

### a. Standing

#### i. Plaintiff Mission Working Dogs

Defendants reiterate their argument that MWD cannot assert organizational standing without showing that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 4 (quoting *Pls.' Opp'n* at 11). First, Defendants say that Plaintiffs rely on the testimony of various volunteers, and their claims for relief are all "of the nature" that requires the participation of individual members. *Id.* (quoting 📁 *Parent/ Professional Advocacy League*, 934 F.3d at 34). Defendants further aver that the organization's participation in this suit is "improper" because "the individual [Plaintiffs] are already parties to the case." *Id.*

#### ii. Redressability as to All Plaintiffs

Defendants reassert that Plaintiffs lack the capacity for redress under the ADA because "an injunction would prove futile, as there exists no irreparable, future harm." *Id.* Plaintiffs' attempt to "weave a web of wrongdoing" by submitting facts indicating otherwise "is nothing more than a trojan horse in the face of summary judgment," Defendants claim. *Id.* at 5.

### b. Prima Face Case of Discrimination

#### i. Service Animal Classification

**\*28** Defendants continue to insist the Plaintiffs have not established the dogs present at the May 7, 2022 training were "service animals" rather than "service animals in training." *Id.* In response to the Plaintiffs' argument that Defendants cited caselaw outside the First Circuit to address the question of ownership, Defendants respond that the caselaw surrounding this issue is "scant" and that Plaintiffs provided no additional citations of their own. *Id.* Defendants further insist their citations support their interpretation of the ADA. The U.S. District Court for the Central District of California in 📁 *Davis v. Ma*, 848 F. Supp. 2d 1105, they say, noted that "[t]he ADA does not create unlimited license for disabled customers to enter facilities of public accommodation with their pets. The federal regulations limit protected entry to trained service animals that help ameliorate their *owner*'s qualifying disability." *Id.* at 5-6 (quoting 📁 *Davis*, 848 F. Supp. 2d at 1116 (C.D. Cal. 2012)) (emphasis added by Defendants). In *Grill*, they continue, the District of Florida agreed with 📁 *Davis*'s interpretation of the ADA, holding that:

> If Congress or the DOJ intended for the ADA to allow service animal trainers to train animals in places of public accommodation, they could have drafted a provision stating so as [other states have] done .... the ADA allows disabled individuals to bring *their* service animals into places of public accommodation. The ADA regulations define service animal as a "dog that is *individually trained* to do work or perform tasks for the benefit of an individual with a disability."

*Id.* at 6 (quoting *Grill*, 2018 WL 11478550, at \*5, 2018 U.S. Dist. LEXIS 249358, at \*13 (in turn quoting 28 C.F.R. § 36.104)) (emphasis added by Defendants).

Defendants insist that the service animals present at the training "were neither individually trained nor were they the volunteers' service animals." *Id.* They further aver that "the record demonstrates that the volunteers were paired with the dogs based on their volunteer experience, and not because of their disability." *Id.* (citing DSMF ¶ 41). Defendants add that Mr. Beaudoin, Ms. Landry, and Ms. Sparks "are not even

disabled," and Ms. Gardner and Ms. Dwyer were not handling dogs on May 7, 2022 to ameliorate any disability. *Id.* at 6-7.

Further, Defendants again argue that the record does not establish the dogs had already attained legal status as service animals; "[t]he record is clear that these were dogs in training by any standard," and thus do not qualify for protection under the ADA. *Id.* at 7-8. Defendants specifically resume their argument that the record, including the JCPenney security footage, does not show the animals performing "deep pressure therapy" on the day in question. *Id.* at 8 (citing PSAMF ¶¶ 113, 115). "Instead, the video shows volunteers who are smiling, talking, and petting [MWD]'s arbitrarily assigned puppies." *Id.*

### ii. Adverse Action by Reason of Disability

Defendants reiterate that "Plaintiffs have failed to show that the ejection from the Mall 'was by reason of [their] disabilit[ies].' " *Id.* at 8 (alterations made by Court). They contend that the Mall's employees did not exclude or otherwise discriminate against Plaintiffs on the basis of disability; rather, the Mall ejected the group because the dogs were service animals in training. *Id.* Defendants argue further that even if Plaintiffs could establish that MWD's dogs were fully trained service animals able to ameliorate an individual's particularized disability, "the Mall had no reason to believe or know that the dogs were anything other than *in training*, as indicated by vests that read 'in training' or 'service animals in training.' " *Id.* at 8-9. Ms. Gardner did not attempt to persuade the security guard otherwise on May 7, 2022, Defendants say. *Id.* at 8 (citing DSMF ¶¶ 90, 91).

### 3. False Imprisonment Claim

Defendants again reject Plaintiffs' assertion that established facts support their claim that they were falsely imprisoned. *Id.* at 9. "The record is clear," Defendants say: "Ms. Gardner instructed the group to sit against the wall while she spoke with [ ] security, various Mall personnel told the group to leave the Mall and Plaintiffs refused to do so, the security guard was not blocking the nearby exit, Mr. Gould walked deeper into the Mall without being stopped, one volunteer left without being stopped, and several of the volunteers sent text messages demonstrating the choice to 'stand in solidarity' to 'educate the public.' " *Id.* at 9-10.

### 4. Retaliation Claim

**\*29**  Defendants proffer that Plaintiffs "confuse and combine" their claims for public accommodation and retaliation, implying that every public accommodation claim would lead to a retaliation claim. *Id.* at 10. This is incorrect, Defendants say: "[t]here is no viable retaliation claim under the MHRA for public accommodation [and] [r]etaliation claims apply to employment, not public accommodation." *Id.* In the alternative, Defendants say, Plaintiffs cannot establish they engaged in any protected conduct so as to have a viable claim for retaliation pursuant to the MHRA. *Id.*

### 5. Civil Penal Damages

Defendants maintain that section 4613(2)(B)(7) of the MHRA caps the total award of civil penal damages at $20,000. *Id.* (quoting 5 M.R.S. § 4613(2)(B)(7) ("an order to pay to the victim, the commission, or both, civil penal damages not in excess of $20,000 in the case of the first order under this Act against the respondent")). "Absurd results" would transpire if Plaintiffs were permitted to "circumvent" this cap by "target[ing] a non-accessible facility" as a group and "file a massive claim." *Id.* Defendants maintain that the purpose of the MHRA is to remedy public accommodation issues, not enrich those who bring claims. *Id.*

Defendants conclude by urging the Court to grant their motion for summary judgment as to all counts in Plaintiffs' complaint. *Id.* at 11.

### IV. LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.' " 🚩 *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to ...

establish the presence of a trialworthy issue.' " *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide " 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), disregarding "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## V. DISCUSSION

### A. MHRA and ADA Claims

In enacting the ADA, Congress provided a broad mandate to eliminate disability discrimination nationwide. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). In doing so, Congress expressly found that "[d]iscrimination against individuals with disabilities persists in such critical areas as ... public accommodations" among others. 42 U.S.C. § 12101(a)(3). Title III of the Act forbids discrimination against disabled individuals in public accommodations, including a "bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment." *Id.* §§ 12181(7)(E), 12182. "It sends a bluntly worded message to those establishments that fall within its purview: you may not discriminate against an individual in the full and equal access to goods and services on the basis of a disability." *Dudley*, 333 F.3d at 303.

**\*30** Section 12182(a) of the ADA defines discrimination to include "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(a). Like Title III, the MHRA is designed to ensure equal access to public accommodations. *See* 5 M.R.S. §§ 4552, 4591, 4592. Ordinarily, "the MHRA should be construed and applied along the same contours as the ADA." *Dudley*, 333 F.3d at 312. Following this well-established precedent, the Court largely treats the MHRA and ADA claims together. [58]

In *Dudley*, the First Circuit cited *Amir v. St. Louis University*, 184 F.3d 1017 (8th Cir. 1999) for its recitation of what a plaintiff must show in a Title III case. *Dudley*, 333 F.3d at 307. In *Amir*, the plaintiff alleged that a university discriminated against him on the basis of his obsessive-compulsive disorder when it assigned him a failing grade in a psychiatry clinic and expelled him after he filed a grievance. The *Amir* Court expounded, "[a] person alleging discrimination under Title III must show (1) that he is disabled within the meaning of the ADA, (2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation, (3) that the defendant took adverse action against the plaintiff that was based upon the plaintiff's disability, and (4) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation." 184 F.3d at 1027 (citing 42 U.S.C. § 12182(a) and (b)(2)(A)(ii)).

Defendants argue that summary judgment is warranted on the Plaintiffs' Title III and MHRA claims because (1) Plaintiffs lack prudential standing to seek relief pursuant to the ADA; (2) the factual record does not support that Plaintiffs experienced an adverse action on account of disability; and (3) it exceeds the requirement of a reasonable accommodation for the Maine Mall to allow entry to service animals in training.

It is undisputed that the Maine Mall is a place of public accommodation as defined by 42 U.S.C. § 12181(7)(E) and 5 M.R.S. § 4592. DSMF ¶ 1; PRDSMF ¶ 1; PSAMF ¶¶ 125-126, 128; DRPSAMF ¶¶ 126-127, 129.

### 1. Standing

As an application of the United States Constitution's limitation of the Article III courts' jurisdiction to "Cases" and "Controversies," U.S. CONST. art. III, § 2, cl. 2, the United States Supreme Court has developed the doctrine of constitutional standing. In Lujan v. Defenders of Wildlife, the Supreme Court elucidated the three elements of the "irreducible constitutional minimum of standing" that a party invoking federal jurisdiction must establish: (1) an injury in fact that is concrete and particularized, and actual or imminent; (2) a causal connection between the injury and conduct complained of; and (3) a likelihood that the court could redress the injury with a favorable decision. 504 U.S. at 560-61, 112 S.Ct. 2130.

Defendants do not appear to contest that Plaintiffs have Article III standing to bring their claims pursuant to the ADA and MHRA. Rather, they challenge standing on prudential grounds and assert that (1) all Plaintiffs have failed to establish that the injunctive relief afforded by the ADA will redress their past injury; (2) MWD, as a non-profit organization, lacks standing to seek relief pursuant to the ADA and MHRA; and (3) the three non-disabled Plaintiffs do not have a cause of action under the federal or state statute.

### a. Injunctive Relief under Title III

**\*31** "[M]oney damages are not an option for private parties suing under Title III of the ADA." Goodwin v. C.N.J., Inc., 436 F.3d 44, 50 (1st Cir. 2006). Title III provides that both private litigants and the Attorney General may seek injunctive relief. 42 U.S.C. § 12188(a)-(b); 42 U.S.C. § 2000a-3; see Goodwin, 436 F.3d at 50. However, only the latter can seek such relief solely on the basis of past harm. Id. "Title III is not intended to provide redress [to individuals] for past discrimination that is unlikely to recur ...," Dudley, 333 F. 3d at 304, and an injunction is intended to forestall future violations, not to punish past ones. Accordingly, plaintiffs in Title III cases are generally required to show "some ongoing harm (or, at least, a colorable threat of future harm)." Id. (citing 42 U.S.C. § 2000a–3(a) (permitting a civil action for injunctive relief whenever "there are reasonable grounds to believe that any person is about to engage in any [prohibited]

act or practice") (emphasis in original)); see Fiedler v. Ocean Props., Ltd., 683 F.Supp.2d 57, 73 (D.Me. 2010) (same). This corresponds with the axiomatic need, in the context of injunctive relief more generally, for a plaintiff to show that an injunction is necessary to prevent irreparable harm. See Nat'l Tank Truck Carriers, Inc. v. Burke, 608 F.2d 819, 824 (1st Cir. 1979).

As the First Circuit noted, the standard for Title III plaintiffs to show a real and immediate threat of future harm "has been adapted from" the constitutional standing injury-in-fact inquiry. Dudley, 333 F.3d at 305-06. An injury in fact is the invasion of a legally protected interest which is neither conjectural nor hypothetical. Lujan, 504 U.S. at 560, 112 S.Ct. 2130. Such invasion must affect the plaintiff in a personal and individual way. Id. The plaintiff must show that he or she "sustained or is immediately in danger of sustaining some direct injury as the result of the challenged ... conduct and [that] the injury or threat of injury [is] both real and immediate ...." City of Los Angeles v. Lyons, 461 U.S. 95, 102-03, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). "[A] plaintiff seeking injunctive relief premised upon an alleged past wrong must demonstrate a 'real and immediate threat' of repeated future harm to satisfy the injury in fact prong of the standing test." Aikins v. St. Helena Hosp., 843 F. Supp. 1329, 1333 (N.D. Cal. 1994) (quoting Lyons, 461 U.S. at 111, 103 S.Ct. 1660).

In the instant case, Defendants argue that all Plaintiffs lack standing pursuant to Title III because they have failed to show injunctive relief will redress "some ongoing harm (or, at least, a colorable threat of future harm)." Defs.' Mot. at 15 (quoting Cutting, 278 F. Supp. 3d at 497). They contend Plaintiffs' argument that injunctive relief is necessary to prevent irreparable, future harm is inapposite because, subsequent to the incident on May 7, 2022, "Gardner and Ames have ... returned to the Mall with service animals in training and ha[ve] not been asked to leave." Id. (citing DSMF ¶ 96). In addition, they point out that the Maine Mall contacted MWD via email and voicemail in the days after May 7, 2022 to discuss setting up a training session, and did not receive a response. Id. (citing DSMF ¶ 95).

Plaintiffs counter that "[t]heir decision not to put themselves back in harm[ ]'[s] way does not deprive them of standing,"

as "there is no requirement that individuals repeatedly subject themselves to mistreatment." *Pls.' Opp'n* at 14 (citing 🚩 *Dudley*, 333 F.3d at 305 ("We do not believe that establishing a private right of action under Title III requires a plaintiff to perform such heroic measures"); *Cutting*, 2019 WL 1960329, at *5, 2019 U.S. Dist. LEXIS 74086, at *15 ("A plaintiff's abstention from desired opportunities based on knowledge of potentially harmful conduct from others can sometimes be sufficient to establish standing for prospective relief"). Plaintiffs note further that a defendant's voluntary cessation of challenged conduct does not deprive a plaintiff of standing when "nothing precludes that defendant from returning to its presuit ways, in the absence of a court order." *Id.* at 15 (quoting *Carnival Corp.*, 987 F. Supp. 2d at 1302). Plaintiffs aver that "Defendants have done nothing to ensure something like this never happens against except that Mr. Gorris sent a single email in May of 2022 reminding its employees and Security personnel that both service animals and service animals in training are allowed in the Maine Mall under State law and the Mall's policy." *Id.* at 9. Plaintiffs' say this remedial conduct, absent more, does not meet the "heavy burden of demonstrating that [Defendants'] cessation of the challenged conduct renders the controversy moot." *Id.* at 15 (quoting *Carnival Corp.*, 987 F. Supp. 2d at 1302)) (alteration made by Court).

**\*32** Plaintiffs are correct that to demonstrate a likelihood of future harm pursuant to Title III, a person with a disability need not "engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 🚩 42 U.S.C. § 12188(a)(1). "[T]he existence of private right of action under 🚩 section 12188(a)(1) does not depend upon how many attempts a plaintiff has made to overcome a discriminatory barrier, but, rather, upon whether the barrier remains in place." 🚩 *Dudley*, 333 F.3d at 305. Here, Plaintiffs challenge the Defendants' corrective action as insufficient to ameliorate the risk of future harm.

In addition, while courts have determined a disabled individual has suffered an injury pursuant to Title III once he has "become aware of discriminatory conditions existing at a public accommodation ... and is thereby deterred from visiting or patronizing that accommodation," 🚩 *Dudley*, 333 F.3d at 305 (quoting 🚩 *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1136 (9th Cir. 2002)), here, two Plaintiffs returned to the Maine Mall after May 7, 2022 and were not asked to

leave. DSMF ¶ 96; PRDSMF ¶ 96. Plaintiffs stress that "only two" of the individual Plaintiffs have since returned, and they only visited the Mall's food court, *Pls.' Opp'n* at 9; Defendants insist that this indicates no threat of future harm exists and injunctive relief is thus unwarranted as to any Plaintiff. *Defs.' Reply.* at 4.

Although this is a close call, the Court concludes Plaintiffs have sufficiently pleaded a colorable threat of future harm and thus demonstrated the possibility of redress pursuant to Title III. "[I]t is elementary that at summary judgment a court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the same." 🚩 *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 40 (1st Cir. 2009). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment should not be granted. 🚩 *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 241 (1st Cir. 2006).

Here, the factual record supports that only two of the ten individual Plaintiffs in this suit have returned to the Maine Mall after May 7, 2022. What distinguishes the events of May 7, 2022 from these subsequent visits seems obvious. The Mall does not find it objectionable when a few disabled people appear with their service animals. But by its actions on May 7, 2022, the Mall draws the line when ten disabled persons enter its premises en masse and use it to train service animals. The Mall's response to this lawsuit has given no assurance that if as many as ten disabled people came to the Mall in the future and used it to train their multiple service animals, the Mall would not again instruct them to leave and call the police to oust them on pain of criminal charges for trespassing.

Furthermore, based on this record and the absence of sufficient corrective action by the Mall, the Court reasonably infers that the remainder have not returned because they fear the violations are ongoing and it would be futile to again seek, and potentially be denied, access because the Defendants have not taken sufficient action to make it unlikely their injury would not recur. *See Pls.' Opp'n* at 9 ("Defendants have done nothing to ensure something like this never happens against except that Mr. Gorris sent a single email in May of 2022 reminding its employees and Security personnel that both service animals and service animals in training are allowed in the Maine Mall under State law and the Mall's policy").

**\*33** The District of Puerto Rico recently concluded there was no credible threat of future harm where, after an allegedly discriminatory incident, "signs were posted at the entrance of all [public accommodation] localities, stating that service animals specifically trained to help disabled persons are allowed on the premises," and "that same month, a memorandum was issued to all employees detailing management's policy with respect to the ADA compliance as to service animals, instructing personnel on the ADA requirements and the way employees should address visitors who are accompanied by service animals." *Roman v. Hatillo Cash & Carry*, 2019 WL 8759095, at \*5, 2019 U.S. Dist. LEXIS 230960, at \*11-12 (D.P.R. June 24, 2019). In addition, the public accommodation "required all employees to sign an acknowledgement receipt of said memorandum, which was then placed on each employee file, and the memorandum is provided to any new employee, who likewise is required to sign." *Id.* at \*5, 2019 U.S. Dist. LEXIS 230960, at \*12. The entity also gave all employees training regarding patrons with service animals. *Id.* at \*5, 2019 U.S. Dist. LEXIS 230960, at \*14. The record in this case does not show the nearly the same degree of remedial measures undertaken by the Defendants. *See Pls.' Opp'n* at 9.

The Court's conclusion that Plaintiffs have pleaded enough at this stage is consistent with the Supreme Court's instruction for courts to take a broad view of standing in civil rights cases, especially were, as under the ADA, "complaints by private persons are the primary method of obtaining compliance with the Act." *Fiedler*, 683 F.Supp.2d at 65 (quoting *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)). It is also consistent with Congress' intent for the ADA to provide broad protections for individuals with disabilities. *Dudley*, 333 F.3d at 307 ("Limiting Title III relief to instances in which a future violation appears certain to occur would create a standard far more demanding than that contemplated by the congressional objectives that influenced the ADA").

The Court proceeds to consider Defendants' challenge to the prudential standing of MWD and the three non-disabled Plaintiffs.

### b. Plaintiff Mission Working Dogs

In essence, Defendants argue that MWD, a non-profit organization, cannot obtain redress pursuant to the MHRA

and ADA because the statutes "provide[ ] a remedy *only* to *an individual* 'who is being subjected to discrimination on the basis of a disability.' " *Defs.' Mot.* at 13 (quoting *Shuper*, 2014 WL 7334073, at \*3, 2014 U.S. Dist. LEXIS 175276, at \*6) (emphasis added by Defendants). They additionally contend that MWD lacks organizational standing because the ADA and MHRA claims are all "of the nature" that requires the participation of individual members. *Id.* at 14 n.1 (citing *Parent/Professional Advocacy League*, 934 F.3d at 35 ("stating that an 'organization lacks standing to assert claims of injunctive relief on behalf of its [constituents] where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof' ")). Plaintiffs counter that MWD has both individual and organizational standing and direct the Court to its recent holding that an organization that associates with disabled individuals has standing to challenge a municipal regulation pursuant to Title II of the ADA. *Pls.' Opp'n* at 10-11 (citing *Metro Treatment of Me., LP*, 2016 WL 6768929, at \*7, 2016 U.S. Dist. LEXIS 157619, at \*20).

The Court in *Metro Treatment of Me., LP* concluded that an organization had standing to bring an ADA claim on its own behalf "under the unique language of Title II." *Metro Treatment of Me., LP*, 2016 WL 6768929, at \*7, 2016 U.S. Dist. LEXIS 157619, at \*20. Plaintiffs acknowledge they bring suit pursuant to a different provision of the ADA, but proffer "[t]he same reasoning applies to the present case ... as the statutes are materially similar in this respect." *Pls.' Opp'n* at 11. They compare the plain language of Title II, which provides relief to "*any person* alleging discrimination on the basis of disability," *id.* at 11 n. 6 (quoting 42 U.S.C. § 12133) (emphasis added by Plaintiffs), with Title III, which similarly extends to "*any person* who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title," *id.* (quoting 42 U.S.C. § 12188) (emphasis added by Plaintiffs). They also point out that the MHRA broadly defines "person" as "one or more individuals, partnerships, associations, organizations, corporations, municipal corporations, [or] legal representatives") (quoting 5 M.R.S. § 4553(7)). *Id.*

**\*34** The Court agrees with Plaintiffs that an organization, such as MWD, can seek relief on its own behalf pursuant to the ADA and MHRA. The statutes define "person" broadly to encompass not only natural persons, but "associations"

and "organizations," 5 M.R.S. § 4553(7), thus appearing to expressly contemplate standing for a nonprofit entity like MWD.

In addition, Title III of the ADA goes further than Title II in defining discrimination to include conduct directed at an entity based on its relationship or association with disabled persons. *See* 42 U.S.C. § 12182(b)(1)(E) ("It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association");

*Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997). MWD's undisputed mission is to support the community by training service dogs for individuals with mental and physical disabilities, PSAMF ¶ 99; DRPSAMF ¶ 99, such that the Court readily concludes it is an "entity ... known to have a relationship or association" with disabled individuals. 42 U.S.C. § 12182(b)(1)(E).

The next question is whether MWD's Title III standing authorizes it to seek injunctive relief. The issue is complicated by the conclusion that in pursuing a Title III claim, a service animal training organization is not merely suing on behalf of its volunteers, but also on its own behalf.

*MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335 (6th Cir. 2002) ("Plaintiff is not an association suing solely on behalf of its members. Instead, it is an entity suing primarily on its own behalf, because of injury it suffered as a result of its association with individuals with disabilities"). While Defendants contend all Plaintiffs lack standing to pursue injunctive relief for a past violation, an issue resolved above, they do not specifically allege MWD lacks standing to pursue injunctive relief due to its organizational status. Therefore, the Court assumes MWD's status as an organization does not prevent it from obtaining injunctive relief on behalf of its volunteers. *Accord*

*Gniewkowski v. Lettuce Entertain You Enters.*, 251 F. Supp. 3d 908, 914 (W.D. Pa. 2017) (concluding that a non-profit organization providing advocacy services for blind individuals had standing where the organization sought an injunction to remedy allegation that a bank's website was not accessible to blind individuals and violated the ADA); *see also Me. Human Rights Comm'n v. Sunbury Primary Care, P.A.*, 770 F. Supp. 2d 370, 399-400 (D. Me. 2011) (concluding a government agency had standing to seek injunctive relief on behalf of those it was statutorily authorized to represent

even though the agency itself did not suffer an injury). This is consistent with the Supreme Court's directive for lower courts to take a broad view of standing in civil rights cases, including those addressing the ADA. *Trafficante*, 409 U.S. at 209, 93 S.Ct. 364.

In sum, the Court concludes MWD has standing to seek injunctive relief pursuant to Title III of the ADA and the MHRA.

### c. Plaintiffs Andre Beaudoin, Colleen Landry, and Melanie Sparks

A similar question arises with regards to Mr. Beaudoin, Ms. Landry, and Ms. Sparks, three individual Plaintiffs in this suit who are not disabled. To have an actionable claim under Title III, a plaintiff must establish, among other things, that "he is disabled within the meaning of the ADA." *Amir*, 184 F.3d at 1027 (citing 42 U.S.C. § 12182(a) and (b)(2)(A)(ii)). Defendants argue Mr. Beaudoin, Ms. Landry, and Ms. Sparks lack standing pursuant to the ADA and MHRA because "they had no legally protected interest under the ADA and MHRA to be violated as they are not disabled." *Defs.' Mot.* at 15 (citing DSMF ¶¶ 7, 12, 28). Plaintiffs contend these three individuals have standing because unlawful public accommodation discrimination in violation of Title III and the MHRA includes those who are excluded or denied access "because of the known protected class status of an individual with whom the individual or entity is known to have a relationship or association." *Pls.' Opp'n* at 12-13 (quoting 5 M.R.S. § 4592(6)) (later citing 42 U.S.C. § 12182(b)(1) (E) for the same proposition).

**\*35** Plaintiffs are correct that Title III plainly permits associational standing. *See* 42 U.S.C. § 12182(b)(1)(E). Further, the factual record supports that on May 7, 2022, Mr. Beaudoin, Ms. Landry, and Ms. Sparks volunteered at a service animal training session, DSMF ¶ 4; PRDSMF ¶ 4, held by an organization that specifically serves that purpose, DSMF ¶ 32; PRDSMF ¶ 32. At the May 7, 2022 training, Mr. Beaudoin, Ms. Landry, and Ms. Sparks handled dogs wearing vests identifying them as service animals in training, DSMF ¶ 39; PRDSMF ¶ 39, and volunteered alongside plainly disabled individuals, including Ms. Gardner, who is a double below-the-knee amputee and was wearing shorts exposing her prosthetics on the day in question. PSAMF ¶ 109; DRPSAMF ¶ 109. Based on this record, it is readily apparent that the three

non-disabled Plaintiffs were "known to have a relationship or association" with individuals with a "known disability" on May 7, 2022. 42 U.S.C. § 12182(b)(1)(E). Thus, the Court concludes that Mr. Beaudoin, Ms. Landry, and Ms. Sparks have standing to seek redress pursuant to Title III, despite the uncontested fact that none are disabled within the meaning of the ADA.

Having determined all Plaintiffs have prudential standing, the Court considers the Defendants' arguments that summary judgment is appropriate because Plaintiffs do not have a viable Title III and MHRA claim.

### 2. Viability of Title III ADA and MHRA Claims

As noted, "[a] person alleging discrimination under Title III must show (1) that he is disabled within the meaning of the ADA, (2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation, (3) that the defendant took adverse action against the plaintiff that was based upon the plaintiff's disability, and (4) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation." 🔖 *Amir*, 184 F.3d at 1027 (citing 42 U.S.C. § 12182(a) and (b)(2)(A)(ii)). Defendants allege they are entitled to summary judgment on the ADA and MHRA claims in the complaint because the record does not support the third and fourth prongs of the Plaintiffs' prima facie case.

#### a. Adverse Action on Account of Disability

Under Title III, a public accommodation is liable for disability discrimination if it excludes someone "on the basis of disability." 42 U.S.C. § 12182(a). This language requires a causal connection between a plaintiff's disability and the defendant's discriminatory action. It also necessarily requires an adverse action against the plaintiff. Here, Defendants contend the Maine Mall did not take adverse action against Ms. Gardner, Ms. Ames, and Ms. Dwyer because none handled a service animal at the time of the incident and, "[a]s such, these Plaintiffs were not, and could not be, denied a public accommodation because they had no service animal to be denied." *Defs.' Mot.* at 13. Defendants also posit that any adverse action was not on account of disability because (1) the Maine Mall's employees instructed Plaintiffs to leave not on

account of their disability but in response to a call that there were "several dogs running around freely in their stores," *id.* (citing DSMF ¶¶ 45, 50, 61), and (2) "Plaintiffs with disabilities and Plaintiffs without disabilities were treated similarly—both being told to leave and for the same reason," and thus allegations of adverse action were not taken on account of disability. *Id.*

On Defendants' adverse action argument, the Court concludes all Plaintiffs, including Ms. Gardner, Ms. Ames, and Ms. Dwyer, experienced an adverse action when the Defendants' representatives asked the group to leave the Maine Mall on May 7, 2022.[59] DSMF ¶ 50; PRDSMF ¶ 50 PSAMF ¶ 137; DRPSAMF ¶ 137; DSMF ¶ 61; PRDSMF ¶ 61; PSAMF ¶ 140; DRPSAMF ¶ 140; PSAMF ¶ 143; DRPSAMF ¶ 143. On this threshold question of whether an adverse action occurred, the Court sees no reason why these individuals should be required to have been handling a service animal when Defendants' representatives asked them to leave a place of public accommodation. Although the Defendants' request was directed at the entire group, the Court notes that three such requests were specifically communicated to Ms. Dwyer and Ms. Gardner. *Id.*

**\*36** The next question is whether Defendants' adverse action was predicated on disability. Although a closer call, the Court concludes that Plaintiffs have presented sufficient evidence from which a reasonable jury could conclude that Defendants' adverse action was on account of disability for purposes of ruling on this summary judgment motion. Defendants oppose this conclusion in part based on their mistaken belief that the connection between a report of two service animals running loose in a store, and Defendants' subsequent request that the group of disabled and non-disabled individuals handling these service animals leave the Maine Mall, is too attenuated to constitute causation. The Court disagrees. First, the two dogs purportedly running loose in Bath & Body Works wore vests identifying them as "service dog in training" or "in training." DSMF ¶ 39; PRDSMF ¶ 39. It is common knowledge that service animals are used by individuals with disabilities; indeed, this is the primary purpose for which they are trained. The record further supports that Defendants' representatives knew these were service animals. DSMF ¶ 64; PRDSMF ¶ 64 (stating that Mr. Barber called operations manager Mr. Pettingill and informed him "there were ten service dogs in a group, that they had received a complaint that the dogs had been set free in some of the stores and were just running around and asked me what I wanted to do with that").

Second, the temporal proximity between the phone call that service animals in training were loose in a store, and the request that MWD leave the Mall, is instructive; the record indicates the group entered the Maine Mall around 10:00 a.m. and suggests they were first asked to leave soon after Mall Security received a phone call from a Bath & Body Works employee. DSMF ¶ 43; PRDSMF ¶ 43; DSMF ¶ 47; PRDSMF ¶ 47. Although the record does not indicate at what time Mall Security received a call from the Bath & Body Works employee or at what time Mall Security first interacted with Plaintiffs, the novice training session was scheduled for only an hour and a half, from 10:00 a.m. to 11:30 a.m., DSMF ¶ 32; PRDSMF ¶ 32, thus imposing a relatively short outer limit on the period that may have passed between these two events. *Compare* DSMF ¶ 45 ("At some point during the training, but prior to any interaction by Mall security, Mall security received a phone call from employees at [Bath & Body Works] that there were several dogs running around freely in their store") *with* DSMF ¶¶ 46-47 *and* PRDSMF ¶¶ 46-47 (describing how, at some point during the training while the group was inside JCPenney, the dog assigned to Ms. Beattie was not cooperating and needed a break; when Ms. Beattie and Ms. Dwyer exited JCPenney, they walked down the hallway and were confronted by a Mall security guard).

The Court is equally unpersuaded by Defendants' final contention that the Plaintiffs were not asked to leave "on the basis of disability" because both disabled and non-disabled individuals were told to follow this instruction. As noted above, Title III defines disability discrimination to include associational discrimination. 42 U.S.C. § 12182(b)(1)(E) ("It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association"). For the same reasons the Court determined the three non-disabled Plaintiffs have standing to seek relief pursuant to Title III, the Court also concludes the non-disabled Plaintiffs' open and obvious association with identified service animals in training, as well as with individuals with plainly apparent disabilities, is sufficient to conclude that the request they leave was on account of disability.

At trial, Defendants could conceivably establish facts allowing a jury to determine that their representatives asked Plaintiffs to leave because animals running freely in a store

is a public safety hazard, particularly on a busy Saturday morning. However, a court's obligation on a motion for summary judgment is to "view[ ] the facts and draw[ ] all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd.*, 632 F.3d at 35. Here, the Court concludes a jury could reasonably find Plaintiffs experienced an adverse action on account of disability when Defendants asked Plaintiffs to leave a place of public accommodation minutes after receiving a phone call that two service animals were running around a store.

### b. Reasonable Modification

**\*37** Discrimination in violation of Title III of the ADA includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii). To succeed on such a claim, "the plaintiff must show that the defendant has a discriminatory policy or practice in effect; that he (the plaintiff) requested a reasonable modification of that policy which, if granted, would have afforded him access to the desired goods[, services, facilities, privileges, advantages, or accommodations]; that the requested modification—or a modification like it—was necessary to afford that access; and that the defendant nevertheless refused to modify the policy or practice." *Dudley*, 333 F.3d at 307.

Federal regulations generally require Title III public accommodations to "modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 35.302(c)(1). There are, however, exceptions to the reasonable modification rule; per 28 C.F.R. § 35.302(c)(2), "Exceptions," "[a] public accommodation may ask an individual with a disability to remove a service animal from the premises if: (i) [t]he animal is out of control and the animal's handler does not take effective action to control it; or (ii) [t]he animal is not housebroken." 28 C.F.R. § 35.302(c)(2). "The plaintiff bears the burden of establishing that the desired accommodation is reasonable and necessary, while the defendant bears the burden of showing that it would fundamentally alter the nature of the program." *Matheis v.*

*CSL Plasma, Inc.*, 936 F.3d 171, 178 (3d Cir. 2019) (citing *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 124 (3d Cir. 2018)).

Here, the parties' disagreement centers on the Plaintiffs' first required showing: that the Defendants' practice of asking Plaintiffs and their dogs to leave the Maine Mall on May 7, 2022 was discriminatory. It is not disputed that Plaintiffs requested they be allow to stay in the Maine Mall with their service animals in training, and thus satisfied the requirement in 42 U.S.C. § 12182(b) (2)(A)(ii) of "request[ing] a reasonable and necessary modification, thereby informing the operator of a public accommodation about the disability." 🔖 *Dudley*, 333 F.3d at 307; *see also Laboy-Febo v. Arcos Dorados P.R., LLC*, No. 21-1245 (GMM), 2024 WL 1443949 at *7, 2024 U.S. Dist. LEXIS 65219 at *16 (D.P.R. Mar. 31, 2024) ("The Court underscores that the element of <u>requesting accommodations</u> to an allegedly discriminatory policy, practice, or procedure is crucial, if not an outright prerequisite") (emphasis in original)). In this case, Defendants instead challenge whether (1) they were legally required to accommodate service animals in training, (2) these service animals were equivalent to emotional support animals, and thus not protected by the statutes; and (3) an individual is entitled to enter a place of public accommodation with an animal they handle but do not own. Plaintiffs resist all three contentions and argue their request was reasonable and that the Maine Mall's practice did not fall within a recognized exception and thus is in violation of the ADA's rules regarding service animals.

### i. Plaintiffs' Requested Modification

#### aa. Service Animals in Training

First, Defendants assert the Plaintiffs' modification request was unreasonable within the meaning of the ADA because the service animals present on May 7, 2022 were still in training. Conceding the MHRA requires public accommodations to permit entry to service animals in training, DRPSAMF ¶ 124A, Defendants argue the ADA's protective scope only extends to service animals, and not service animals in training, and point to 28 C.F.R. § 36.104, which defines "service animal" as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. § 36.104.

The statute further states that such tasks include "providing physical support and assistance with balance and stability to an individual with a mobility disability and helping a person with a psychiatric or neurological disability by preventing or interrupting impulsive or destructive behavior." *Id.* Defendants insist this statutory language indicates the ADA's requirement that service animals have completed their training in order to be protected pursuant to the federal statute.

**\*38** The question becomes whether the Plaintiffs' request that the Maine Mall employees permit the presence of service dogs in training was reasonable under the ADA. While the ADA and MHRA are, in many respects, analogous provisions and courts review them as such, Defendants are correct that the MHRA explicitly mandates protections for service animals in training while Title III is less clear, defining "service animal" as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. § 36.104. Defendants insist MWD's animals present on May 7, 2022 do not meet this statutory definition because, by virtue of attending a training session, they were still in the process of being trained. Plaintiffs contend that the animals present at the Maine Mall had already received some training, that the ADA contains no official certification standard and, further, that such a requirement would be illusory as there is no universal federal standard to be a service animal. *See Del Amo Hosp., Inc.*, 992 F.3d at 912 ("The district court's ruling that Aspen was not a service animal in part because she could not be certified under ADI standards is contrary to multiple aspects of the ... regulations .... As other courts have noted, a dog can be trained to aid a person with a disability without formal schooling"); 🔖 *Bronk v. Ineichen*, 54 F.3d 425, 430-31 (7th Cir. 1995) (holding that the district court erred as a matter of law by providing a jury instruction from which the "jury could logically infer ... that without school training, a dog cannot be a reasonable accommodation," where a reasonable accommodation is defined by statute as 'facilitat[ing] a [person with a disability's] ability to function ... The federal statute does not say any of these things, and there is no basis for imputing them into a text that is silent on the subject"); 🔖 *Green v. Housing Auth.*, 994 F. Supp. 1253, 1256 (D. Or. 1998) ("The only requirements to be classified as a service animal under federal regulations are that the animal be (1) individually trained, and (2) work for the benefit of a disabled individual. There is no requirement as to the amount of training a service animal must provide for the benefit of

the disabled person"); *Rose v. Springfield-Greene Cnty. Health Dep't*, 668 F. Supp. 2d 1206, 1214-15 (W.D. Mo. 2009) ("There are no requirements as to the amount or type of training that a service animal must undergo, nor the type of work or assistance that a service animal must provide, but the animal be trained to perform tasks or do work for the benefit of a [person with a disability]"); *Riley v. Bd. of Comm'rs*, 2017 WL 4181143, at *5, 2017 U.S. Dist. LEXIS 153737, at *5 (same); *Cordoves v. Miami-Dade County*, 92 F. Supp. 3d 1221, 1230 (S.D. Fla. 2015) (same).

"To flesh out the details of [Title III's] general rule, Congress charged the Attorney General with the task of promulgating regulations clarifying how public accommodations must meet those statutory obligations." *United States v. AMC Ent., Inc.*, 549 F.3d 760, 763 (9th Cir. 2008). "DOJ regulations and commentary make clear that individuals may self-train animals without obtaining formal certification." *Del Amo Hosp. Inc.*, 992 F.3d at 911. The Ninth Circuit, examining the rulemaking, observed that the DOJ "considered but specifically rejected a recommendation submitted by multiple commenters to adopt 'formal training requirements for service animals.' " *Id.* at 912 (citing Final Rule, 75 Fed. Reg. at 56272) (rejecting this approach and concluding that DOJ "will not impose any type of formal training requirements or certification process"). The DOJ justified this decision by noting that a certification requirement would increase the cost of acquiring a service animal, which could have the effect of limiting access, and that suggested training standards were too "lengthy" and "detailed." *Id.* (citing Final Rule, 75 Fed. Reg. at 56272). The Ninth Circuit, considering these regulations, concluded "[i]t is enough if a service dog had been trained to perform specific tasks that will consistently aid a person with a disability by making them more able to perform necessary tasks and enjoy activities of daily living." *Id.*

Absent clear guidance from the First Circuit on the challenging question of whether the ADA protects service animals in training, the Court concludes the guidance from the Ninth and Seventh Circuits, and fellow district courts, is well-reasoned, persuasive, and aligns with Congress' broad mandate that the ADA eliminate disability discrimination nationwide, and will not deviate from this precedent. *PGA Tour, Inc.*, 532 U.S. at 674-75, 121 S.Ct. 1879.

It is undeniably the case that the service animals present on May 7, 2022 were in training. MWD's dogs, and all individual Plaintiffs, accessed the Maine Mall on May 7,

2022 for the explicit purpose of preparing Moxie, Abigail Adams, Gator Girl, Lady Hope, Andre Rush, Sherman Tank, Urban Ghost, Lady Eleanor, and Biscuit to be "individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. § 36.104; PSAMF ¶ 105; DRPSAMF ¶ 105. These dogs were, more specifically, attending a "novice" service dog training with the specific goal of acclimating them to the general public so they could go through different elements of public settings and thus practice tasks that are required for accessing public spaces. DSMF ¶ 32; PRDSMF ¶ 32; DSMF ¶ 37; PRDSMF ¶ 37. Public access training is part of MWD's exacting training standards for service dogs: in order to graduate as an MWD service dog, an animal must have at least 120 hours of training, master more than sixty commands, pass a fourteen-part public access test, pass a skills test, and pass a restaurant test. PSAMF ¶ 100; DRPSAMF ¶ 100. MWD's training typically starts when the dogs are three days old, and by six or seven months of age, most dogs in MWD's training program have mastered at least four or five tasks. *Id.* MWD's dogs present on May 7, 2022 had already received individual training to assist individuals with disabilities, and were continuing to receive such training on the day in question. They were, in short, service animals in training.

**\*39** Consistent with precedent and Congress' broad directive in promulgating the ADA, the Court concludes that the fact that MWD's dogs present at the Maine Mall on May 7, 2022 were in training does not stand in the way of the Court deeming them "service animals" under the ADA and the MHRA.

### bb. Emotional Support

Defendants also challenge Plaintiffs' request on the grounds that the MWD service animals present at the training provided only emotional support, and thus do not fall within the definition of "service animal." As noted, 28 C.F.R. § 36.104 defines a "service animal" as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability," and further states that such tasks include "providing physical support and assistance with balance and stability to an individual with a mobility disability and helping a person

with a psychiatric or neurological disability by preventing or interrupting impulsive or destructive behavior." *Id.*

The Court does not accept the Defendants' argument that MWD's service animals in training were merely emotional support animals. Put differently, based on the summary judgment record, there is a genuine issue of material fact as to whether the animals were emotional support or service animals in training sufficient to preclude summary judgment in favor of the Defendants.

In making this determination, the Court agrees with its fellow district court in the Northern District of California that "[t]he relevant question for the court is whether the animal helps the disabled person perform tasks to ameliorate the ADA disability." *Miller*, 2010 WL 2867808, at *4, 2010 U.S. Dist. LEXIS 73050, at *12-13. As an initial matter, the record supports that MWD's dogs on the day in question were paired with and handled by individuals with ADA disabilities including TBIs, PTSD, epilepsy, a spinal cord injury, amputations, cyclical vomiting syndrome, anxiety, Ehlers-Danlos syndrome, POTS, anxiety, chronic depression, and autism. PSAMF ¶ 108; DRPSAMF ¶ 108; PSAMF ¶ 111; DRPSAMF ¶ 111; PSAMF ¶ 115; DRPSAMF ¶ 116; PSAMF ¶ 117; DRPSAMF ¶ 118; PSAMF ¶ 121; DRPSAMF ¶ 122; PSAMF ¶ 122; DRPSAMF ¶ 123. From the Court's perspective, the record also supports that on the day in question, the MWD dogs performed tasks, among others, to "help[ ] a person with a psychiatric or neurological disability by preventing or interrupting impulsive or destructive behavior." 28 C.F.R. § 36.104. The record also establishes that MWD's service dogs present at the Mall were in the process of being trained in a task called "deep pressure therapy," a scientifically backed task whereby a dog is trained to press on certain pressure points in order to release positive hormones in their individual. PSAMF ¶ 104; DRPSAMF ¶ 104. Similarly, these dogs were being trained to provide mobility assistance and/or PTSD service and had already mastered some of these initial skills. PSAMF ¶ 106; DRPSAMF ¶ 106. All these animals thus "help[ed] the disabled person perform tasks to ameliorate [an] ADA disability" on May 7, 2022. *See Miller*, 2010 WL 2867808, at *4, 2010 U.S. Dist. LEXIS 73050, at *12-13.

Abigail does not sway the Court's conclusion that a genuine issue of material fact remains. Although Abigail was present at the May 7, 2022 training and later failed out of MWD's training program, and thus was not ultimately certified as a service animal by MWD's high standards, as of May

7, 2022, she had mastered several disability-related tasks, including one for mobility support as well as for emotional support. DSMF ¶ 36; PRDSMF ¶ 36. The record additionally establishes that Abigail sat with Ms. Beaudoin, a disabled individual diagnosed with memory challenges from a TBI, anxiety, and chronic depression, to provide support for her anxiety while the group waited the police's arrival. PSAMF ¶¶ 115-116; DRPSAMF ¶¶ 116-117. The Court could thus conclude that Abigail "help[ed] [a] disabled person perform tasks to ameliorate [an] ADA disability," *Miller*, 2010 WL 2867808, at *4, 2010 U.S. Dist. LEXIS 73050, at *12-13, and that she was a service animal within the meaning of the ADA and MHRA on May 7, 2022. The U.S. District Court for the District of Puerto Rico recently came to the same conclusion regarding a dog "trained to carry out tasks directly related to [her handler's mental conditions]," of severe anxiety disorder and panic disorder. *Laboy-Febo*, 2024 WL 1443949, at *9, 2024 U.S. Dist. LEXIS 65219, at *20-21. In that case, the service animal's training included "detect[ing] the Plaintiff's panic attacks, get[ting] close to and distract[ing] her to help her out of the panic attack[s] quicker," and thus "provide[ ] indispensable emotional support." *Laboy-Febo*, 2024 WL 1443949, at *9, 2024 U.S. Dist. LEXIS 65219, at *21. Here, Abigail was trained to serve the same purposes and the record reflects she indeed provided these services to her handler during the incident underlying this dispute; the Court thus concludes she, like MWD's other service dogs present on May 7, 2022, could satisfy the regulatory definition of service animal. Based on the foregoing, Plaintiffs have shown that a genuine dispute of material fact remains as to whether the dogs present on May 7, 2022 were service animals within the meaning of the ADA and MHRA.

**\*40** In short, the Court does not credit the Defendants' argument that Plaintiffs' modification request was unreasonable because they asked Defendants' representatives to modify their practice so as to permit entry to emotional support animals. Plaintiffs asked the Maine Mall employees to allow continued access to their service animals, clearly a reasonable request under the ADA and MHRA, and, in addition, one consistent with the Maine Mall's official policy.

### cc. Ownership

Finally, Defendants argue Plaintiffs' modification request was unreasonable because the majority of individual Plaintiffs did not own the service animals they handled at the May 7, 2022 training. This argument is unavailing. Plaintiffs are

correct that the law does not require individuals to own a service animal in order to access a public accommodation; the regulation instead employs the language "handler." 28 C.F.R. § 36.302(c)(4) ("Animal under handler's control. A service animal shall be under the control of its handler. A service animal shall have a harness, leash, or other tether, unless either the handler is unable because of a disability to use a harness, leash, or other tether, or the use of a harness, leash, or other tether would interfere with the service animal's safe, effective performance of work or tasks, in which case the service animal must be otherwise under the handler's control (e.g., voice control, signals, or other effective means"). It is not disputed that Moxie, Abigail, Gator Girl, Lady Hope, Andre Rush, Sherman Tank, Urban Ghost, Lady Eleanor, and Biscuit were each paired with individual volunteers and handled at the Maine Mall on May 7, 2022. DSMF ¶ 8; PRDSMF ¶ 8; DSMF ¶ 10; PRDSMF ¶ 10; DSMF ¶ 14; PRDSMF ¶ 14; DSMF ¶¶ 15, 17; PRDSMF ¶¶ 15, 17; DSMF ¶ 19; PRDSMF ¶ 19; PSAMF ¶ 113; DRPSAMF ¶ 113; DSMF ¶ 22; PRDSMF ¶ 22; DSMF ¶ 26; PRDSMF ¶ 26; DSMF ¶¶ 29-30; PRDSMF ¶¶ 29-30.

Taking all reasonable inferences in favor of the non-moving party, the Court concludes that Plaintiffs have met their burden at this stage to establish that their request that Defendants' representatives modify their practice was reasonable.

The Court proceeds to consider whether the Defendants' denial of Plaintiffs' request falls within an exception recognized by the ADA.

### ii. Exceptions

Although "[g]enerally a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability," 28 C.F.R. § 36.302(c)(1), this directive is not without limits. "[A] public accommodation may ask a disabled individual to remove a service animal when (1) 'the animal is out of control and the animal's handler does not take effective action to control it' or (2) 'the animal is not housebroken.' " *Ortiz v. Caparra Ctr. Assocs., LLC*, 261 F. Supp. 3d 240, 247 (D.P.R. March 21, 2016) (quoting 28 C.F.R. § 36.302(c)(2)(i)-(ii)). Defendants submit that both exceptions apply in this case because Mall Security received a report from an employee that there were two dogs off leash in Bath & Body Works that were being allowed to "run around in the store," DSMF ¶ 45; PRDSMF ¶

45; PSAMF ¶¶ 133-134; DRPSAMF ¶¶ 133-134, and that one of the dogs defecated on the floor as the Plaintiffs proceeded towards the Mall's exit after the South Portland police arrived. DSMF ¶ 94; PRDSMF ¶ 94. As an initial matter, the Court concludes the second exception is unavailable, as the record plainly establishes that Defendants asked Plaintiffs to leave long before an animal defecated on the floor of the Mall; thus, this cannot have influenced the Defendants' decision to deny the Plaintiffs' reasonable modification request.

**\*41** Turning to the Defendants' first argument, the ADA regulations do not define what it means for a service animal to be "out of control." However, the regulations dictate that an animal is "under the handler's control" if it "ha[s] a harness, leash, or other tether, unless either the handle is unable because of a disability to use a harness, leash, or other tether, or the use of a harness, leash, or other tether would interfere with the service animal's safe, effective, performance of work or tasks, in which case the service animal must be otherwise under the handler's control (*e.g.*, voice control, signals, or other effective means)." 28 C.F.R. § 36.302(c)(4). ADA regulations do not further define the word "handler," and, as other district courts have recognized, "case[ ]law sheds little insight." *Ahlschlager v. Imhof*, No. 24-CV-8267 (OEM) (JMW), 2024 WL 5168732 at \*5, 2024 U.S. Dist. LEXIS 229970 at \*14 (E.D.N.Y. Dec. 19, 2024)

(citing 🔖 *Alboniga v. Sch. Bd. of Broward Cnty. Fla.*, 87 F. Supp. 3d 1319, 1342 (S.D. Fla. 2015) ("Unfortunately, there is very little in the way of case-law guidance as to what constitutes a 'handler' with 'control' over a service animal for purposes of these regulations")). In 🔖 *Alboniga*, the Southern District of Florida concluded that the regulations " 'specifically prohibit[s] the practice of leaving a service animal unattended[ ]' which implies that an animal being out of control 'is its being unattended.' " *Ahlschlager*, 2024 WL 5168732, at \*5, 2024 U.S. Dist. LEXIS 229970, at \*14

(quoting 🔖 *Alboniga*, 87 F. Supp. 3d at 1342 ("[N]ormally, tethering a service animal to the wheelchair of a disabled person constitutes 'control' over the animal by the disabled person")).

In the absence of well-established precedent, the Eastern District of New York closely considered the relevant Department of Justice regulations. *Ahlschlager*, 2024 WL 5168732, at \*6, 2024 U.S. Dist. LEXIS 229970, at \*16-17. That court observed that the regulation's Appendix states that "misbehavior in response to provocation is not always unreasonable. In circumstances where a service animal

misbehaves or responds reasonable to a provocation or injury, the public entity must give the handler a reasonable opportunity to gain control of the animal." *Id.* (quoting 28 C.F.R. § Pt. 35, App. A). The Eastern District of New York deduced that "[t]he Appendix contemplates that a dog's behavior, even a well-trained service dog, is not always predictable and consistent with the regulatory language, [and] provides that a public entity must give the handler a reasonable opportunity to get the animal under control." *Id.* at *6, 2024 U.S. Dist. LEXIS 229970, at *17.

The Court determines this reading of the regulation persuasive and in line with the congressional mandate that the ADA broadly protect the right of disabled individuals to access public accommodations. Here, based on the factual record presented, the Court is unable to conclude whether the MWD service dogs in the Bath & Body Works were "out of control" within the meaning of the ADA. The factual record only provides that two animals were off leash. DSMF ¶ 45; PRDSMF ¶ 45; PSAMF ¶¶ 133-134; DRPSAMF ¶¶ 133-134. The record does not indicate for how long the two dogs were off leash, or whether they were off leash and still within the control of their handlers (through, for example, voice control).

In addition, for this exception to apply, the animal must be "out of control *and the animal's handler does not take effective action to control it.*" 28 C.F.R. § 36.302(c)(2)(i)-(ii)) (emphasis added by Court). In the event these two animals did become "out of control," the record does not indicate whether or not the two animals' respective handlers took or alternatively failed to take effective action to "control" their animals. The record establishes that, at another moment in the training, while the group was inside JCPenney, the dog assigned to Ms. Beattie was not cooperating and needed a break; Ms. Beattie and Ms. Dwyer then exited JCPenney and walked down the hallway. DSMF ¶¶ 46-47; PRDSMF ¶¶ 46-47. Although not conclusive, this suggests the reasonable inference that MWD volunteers took steps to maintain control of their animals when needed. *See* 28 C.F.R. § 36.302(c)(2)(i)-(ii)).

Further, the record does establish that no employee at the Maine Mall told or suggested to Ms. Gardner that there had been a complaint made by an employee of Bath & Body Works, PSAMF ¶ 135; DRPSAMF ¶ 135, and thus it is clear the public entity did not give the handler a "reasonable opportunity to get the animal under control." *Ahlschlager*, 2024 WL 5168732, at *6, 2024 U.S. Dist. LEXIS 229970, at *17.

**\*42** Both on these disputed material facts, and on the undisputed fact that Plaintiffs were not given a reasonable opportunity to get their animals under control before being asked to leave, the Court rejects the Defendants' request to grant summary judgment on the ADA and MHRA claims.

**B. False Imprisonment Claim**

Individual Plaintiffs bring a claim of false imprisonment against Defendants, arguing a Mall security guard unlawfully confined them while they waited for the arrival of the South Portland police. [60] *Pls.' Opp'n* at 21-22. Defendants contend the individual Plaintiffs have failed to establish a prima facie case of false imprisonment because they remained in the Maine Mall voluntarily by refusing the Mall's representatives requests that Plaintiffs leave the premises. *Defs.' Mot.* at 17. They further state that it was Ms. Gardner, and not the Mall's representatives, who directed Plaintiffs to wait for the police's arrival, *id.* (citing DSMF ¶¶ 59, 69, 70), and "the record is clear in showing that Plaintiffs did not believe that they would be restrained physically if they sought to leave as some Plaintiffs had in fact left the group at different periods without being physically restrained." *Id.* (citing DSMF ¶¶ 80-82, 84-88).

Under Maine law, a claim of false imprisonment may be brought when an actor, without authority, "(1) intends to, and does in fact, confine another[,] (2) within boundaries fixed by the actor, and (3) the victim is conscious of the confinement or is harmed by it." *Smith v. Heritage Salmon, Inc.*, 180 F. Supp. 2d 208, 220 (D. Me. 2002). "While confinement can be imposed by physical barriers or physical force, much less will do—although how much less becomes cloudy at the margins. It is generally settled that mere threats of physical force will suffice ... and it is also settled—although there is no Maine case on point—that the threats may be implicit as well as explicit, and that confinement can also be based on a false assertion of legal authority to confine. Indeed, the *Restatement* provides that confinement may occur by other unspecified means of 'duress.' " *McCann*, 210 F.3d at 53 (citing Restatement (Second) of Torts §§ 40, 40A, 41 (Am. Law Inst. 1965)) (citation amended).

As an initial matter, in response to Defendants' argument that they are entitled to summary judgment because their representatives initially asked the individual Plaintiffs to leave, Plaintiffs clarify their position that they were falsely imprisoned after the South Portland police had been

called. *Pls.' Opp'n* at 21-22. Plaintiffs are correct that the Defendants' earlier instruction that they should leave does not resolve the question of whether they were subsequently falsely imprisoned. *See Forgie-Buccioni v. Hannaford Bros., Inc.*, 413 F.3d 175, 181 (1st Cir. 2005) ("Although Plaintiff testified he voluntarily returned to the store, he later explained that he did not feel free to leave the store any time thereafter"). Defendants are, however, correct that the record reflects it was Ms. Gardner, not Defendants' representatives, who instructed the group to find a spot to sit and wait while she spoke with security. DSMF ¶ 59; PRDSMF ¶ 59; PSAMF ¶¶ 119, 149; DRPSAMF ¶¶ 120, 149.

 **\*43**  The record additionally provides that Mr. Pettingill specifically threatened Ms. Gardner that she and the MWD group would be arrested for trespassing upon the arrival of law enforcement. PSAMF ¶ 147; DRPSAMF ¶ 147. However, after this communication, Mr. Barber told Ms. Gardner that the group should leave the Maine Mall. DSMF ¶ 67; PRDSMF ¶ 67; PSAMF ¶ 141; DRPSAMF ¶ 141. Ms. Gardner responded that service animals in training are protected by Maine state law, DSMF ¶ 68; PRDSMF ¶ 68, and that the group was legally allowed to be in the Maine Mall on the same terms as the general public; the Mall's representatives again ordered the group to leave. PSAMF ¶ 143; DRPSAMF ¶ 143. Both Mall personnel and Ms. Gardner then called the South Portland police. DSMF ¶¶ 74-75; PRDSMF ¶¶ 74-75.

The record supports that as the parties waited for the police to arrive, Mr. Pettingill ordered a Mall security guard to keep his eyes on the Plaintiffs and not let them leave, and Mr. Barber told Mall security to not allow the group to come any further into the mall. DSMF ¶ 76; PRDSMF ¶ 76; PSAMF ¶ 147; DRPSAMF ¶ 147. As already addressed, the Mall security guard was not blocking the group's pathway to the nearby exit. DSMF ¶¶ 77-78; PRDSMF ¶¶ 77-78. Mr. Gould told the security guard that they did not have a legal right to detain anyone, and the guard responded that they "do it all the time," which Mr. Gould interpreted to mean they detained people regularly. PSAMF ¶ 148; DRPSAMF ¶ 148.

By the Court's reading, the factual record presented is unclear as to whether Plaintiffs remained in the Mall voluntarily or because they reasonably did not feel free to leave. The record indicates both that some Plaintiffs stayed to "hold[ ] [their] ground," and "educat[e] the public," DSMF ¶¶ 69-70; PRDSMF ¶¶ 69-70, while others "f[elt] scared and as if the group was not free to leave," and worried that if they did

try to leave, the guard would stop them. PSAMF ¶¶ 114, 120; DRPSAMF ¶¶ 115, 121. The record also indicates that Ms. Beaudoin was first told she could not leave so that the service animal she was handling could use the bathroom and even when she was subsequently given permission to leave temporarily, the guard told Ms. Beaudoin "you'd better come back in." DSMF ¶ 84; PRDSMF ¶ 84; PSAMF ¶ 116; DRPSAMF ¶ 117. When she returned, Ms. Beaudoin was upset and anxious, and Abigail sat with her to provide support. PSAMF ¶¶ 115-116; DRPSAMF ¶¶ 116-117. As noted, Mr. Pettingill specifically threatened Ms. Gardner that she and the MWD group would be arrested for trespassing upon the arrival of law enforcement. PSAMF ¶ 147; DRPSAMF ¶ 147. A reasonable person could interpret this statement to mean that they needed to wait for the arrival of the police and if they did not, they might be evading an arrest warrant.

Viewing conflicting evidence in the light most favorable to the non-movants, the Court concludes a reasonable jury could find the Defendants unlawfully restrained or confined the individual Plaintiffs. The First Circuit held that "[w]hile 'confinement' can be imposed by physical barriers or physical force, much less will do—although how much less becomes cloudy at the margins." *McCann*, 210 F.3d at 53 (citing Restatement (Second) of Torts §§ 40, 40A, 41). In *McCann*, the First Circuit noted that "[t]he evidence, taken favorably to the [plaintiffs], showed that Wal-Mart employees stopped the [plaintiffs] as they were seeking to exit the store, said that the children were not allowed in the store, told the [plaintiffs] that they had to come with the Wal-Mart employees and that Wal-Mart was calling the police, and then stood guard over the [plaintiffs] while waiting for a security guard to arrive." *Id.* at 54. The *McCann* Court concluded that a reasonable jury could find that Wal-Mart's employees intended to "confine" the plaintiffs "within boundaries fixed by" the retailer, that the employees' acts did result in such confinement, and that the plaintiffs were conscious of the confinement. *Id.* The Court of Appeals underlined that "[t]he direction to the [plaintiffs], the reference to the police, and the continued presence of the Wal-Mart employees (who at one point told [an individual plaintiff] that he could not leave to go to the bathroom) were enough to induce reasonable people to believe either that they would be restrained physically if they sought to leave, or that the store was claiming lawful authority to confine them until the police arrived, or both." *Id.*

 **\*44**  Defendants attempt to differentiate *McCann* from the instant case, noting, among other factors, that at no point in *McCann* did the defendants inform the plaintiffs that they

could leave. *Id.* at 53. While this is a distinguishing feature, Plaintiffs assert they were falsely imprisoned after the South Portland police had been called, and the record supports that they were not instructed to leave or told they were free to leave after this point. In *Forgie-Buccioni*, the First Circuit held that a reasonable jury could conclude a grocery store's employees falsely imprisoned the plaintiff, a customer suspected of shoplifting, when two employees escorted him back into the store with a hand on his arm, an employee sat with the plaintiff "the entire time" and then "personally escorted him and stood outside the restroom door," and the plaintiff began to feel "shaky and nervous and lightheaded" during his thirty-to-forty-minute detention. *Forgie-Buccioni*, 413 F.3d at 181-82. The detention in *Forgie-Buccioni* is similar to the present case, where a Mall security was directed to stay with the group and the record demonstrates the emotional effects of the Mall security's directives on the Plaintiffs. Although neither *McCann* nor *Forgie-Buccioni* is a perfect analogy, *McCann* in particular contains strikingly similar facts to those of this case.

Viewing the facts and drawing all reasonable inferences in favor of the Plaintiffs as the non-moving party, the Court concludes a reasonable jury could find that Defendants' representatives intended to confine the individual Plaintiffs within fixed boundaries, that these actions did result in such confinement, and that Plaintiffs were conscious of the confinement. *See Ophthalmic Surgeons, Ltd.*, 632 F.3d at 35. The Court declines to grant summary judgment on the Plaintiffs' claim of false imprisonment.

**C. MHRA Retaliation Claim**

The MHRA prohibits retaliation "against any individual because that individual has opposed any act or practice that is unlawful under this Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act." 5 M.R.S. § 4633(1). Plaintiffs claim they established a prima facie case of retaliation by showing (1) they engaged in protected conduct; (2) they thereafter suffered an adverse reaction; and (3) there is a causal link between the protected activity and the adverse action. *Pls.' Opp'n* at 22 (citing *Doyle*, 2003 ME 61, ¶ 20, 824 A.2d 48) (citation amended). Defendants argue they are entitled to summary judgment on this count because Plaintiffs "confuse and combine" their claims for public accommodation and retaliation and because "[r]etaliation claims apply to employment, not public accommodation." *Defs.' Reply* at 10. Defendants argue in the alternative that Plaintiffs do not have a viable claim for retaliation pursuant

to the MHRA because they have not engaged in any protected conduct. *Id.*

5 M.R.S. § 4633(1) says, in relevant part, that "[a] person may not discriminate against any individual because that individual has opposed any act or practice that is unlawful under this Act." *Id.* 5 M.R.S. § 4553(7) defines "person" broadly as meaning "one or more individuals, partnerships, associations, organizations, corporations, municipal corporations, legal representatives, trustees, trustees in bankruptcy, receivers and other legal representatives, labor organizations, mutual companies, joint-stock companies and unincorporated organizations and includes the State and all agencies thereof." *Id.* The statute, in short, does not say that retaliation is only available in the employment context; to the contrary, it states a retaliation claim can be brought against "[any] person," a broad definition which encompasses both Defendants. 5 M.R.S. § 4633(1). The Court also notes that 5 M.R.S. § 4633 appears in the "miscellaneous" section of the MHRA, not the employment discrimination title. *See Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 66 (1st Cir. 2019) (distinguishing 5 M.R.S. § 4633 from the employment discrimination section of the MHRA, 5 M.R.S. § 4572).

Defendants cite no caselaw in support of their proposition that a retaliation claim pursuant to 5 M.R.S. § 4633 can only be brought against employers. *Defs.' Reply* at 10. Plaintiffs, for their part, support their argument that they have established a prima facie case of retaliation against Defendants by citing caselaw from the employment context, despite no employment relationship with Defendants. *Pls.' Opp'n* at 22 (citing *Doyle*, 2003 ME 61, ¶ 20, 824 A.2d 48; *Thompson*, 656 F. Supp. 3d at 257-58; *Porietis*, 227 F. Supp. 3d at 137-38). These cases hold that "[t]o establish a prima facie claim of retaliation, the employee must show that she engaged in statutory protected activity; her employer made an employment decision that adversely affected her; and that 'there was a causal link between the protected activity and the adverse employment action.' " *See, e.g., Doyle*, 2003 ME 61, ¶ 20, 824 A.2d 48.

**\*45** The Court searched for caselaw applying or discussing the MHRA's retaliation provision outside the employment context but could not locate any. The caselaw the Court reviewed suggests that 5 M.R.S. § 4633 is only available in the employment context. *See, e.g., Taghavidinani v. Riverview Psychiatric Ctr.*, No. 1:16-cv-00208-JDL, 2018 WL 1156287

at *6, 2018 U.S. Dist. LEXIS 35403 at *10 (D. Me. March 5, 2018) ("To establish a prima facie case of retaliation in violation of the MHRA, an employee must demonstrate that he engaged in a statutorily protected activity, that [the employer] made an employment decision that adversely affected him, and that there was a causal link between the two"); *Briggs v. City of Portland*, No. 2:16-cv-00374-JDL, 2017 U.S. Dist. LEXIS 68008, at *34 (same); *Ferrante v. MAS Med. Staffing*, 2:13-cv-00211-JAW, 2015 WL 1401023, at *24, 2015 U.S. Dist. LEXIS 38399, at *123-24 (D. Me. March 25, 2015) (same).

In *Roy v. Correct Care Solutions, LLC*, 914 F.3d 52 (1st Cir. 2019), the First Circuit held that the "key distinction between § 4633 and § 4572, the MHRA provision that prohibits unlawful employment discrimination," is that § 4572 "addresses discriminatory conduct by an employer, or employees or agents of the employer, that occurs within the scope of a traditional employment relationship," while § 4633 "targets actions by third parties (not the employer, its employees, or agents) that hinder employees' MHRA-protected rights to work free from discrimination." *Roy*, 914 F.3d at 66 (citing *Me. Human Rights Comm'n v. Saddleback, Inc.*, No. CV-06-219, 2008 WL 6875449, 2008 Me. Super. LEXIS 198 (Me. Super. Ct. Oct. 31, 2008)). Thus, while an employer-employee relationship was not required, the First Circuit nonetheless considered 5 M.R.S. § 4633 to protect an employee's workplace rights from third-party interference.

The Court concludes Defendants are entitled to summary judgment on Plaintiffs' claim of retaliation pursuant to the MHRA. This is not an employment dispute, Defendants are not Plaintiffs' employers or third-parties associated with Plaintiffs' respective employers, and Plaintiffs do not allege they experienced retaliation for protected action in the course of their employment. Consistent with precedent, particularly the First Circuit's determination that 5 M.R.S. § 4633 "targets actions by third parties (not the employer, its employees, or agents) that hinder employees' MHRA-protected rights to work free from discrimination," *Roy*, 914 F.3d at 66, the Court concludes Plaintiffs do not have an avenue to relief against Defendants on their claim for MHRA retaliation.

### D. The Statutory Cap of Civil Penal Damages under the MHRA

Finally, Defendants ask the Court to rule on the amount of civil penal damages available under 5 M.R.S. § 4613.[61] Defendants argue Plaintiffs' claim for civil penal damages is capped at a total amount of $20,000, *Defs.' Mot.* at 20; *Defs.' Reply* at 10, while Plaintiffs insist each Plaintiff is entitled to seek $20,000. *Pls.' Opp'n* at 24.

5 M.R.S. § 4613(2) says, in relevant part:

> B. If the court finds that unlawful discrimination occurred, other than employment discrimination in the case of a respondent who has more than 14 employees .... [t]he remedies may include, but are not limited to:
>
> ....
>
> (7) An order to pay to the victim of unlawful discrimination ... civil penal damages not in excess of $20,000 in the case of the first order under this Act against the respondent, not in excess of $50,000 in the case of a 2nd order against the respondent arising under the same subchapter of this Act and not in excess of $100,000 in the case of a 3rd or subsequent order against the respondent arising under the same subchapter of this Act, except that the total amount of civil penal damages awarded in any action under this Act may not exceed the limits contained in this subparagraph.

**\*46** 5 M.R.S. § 4613(2)(B)(7).

The Court concludes, based on the plain language of the statute, that the MHRA caps civil penal damages "to the victim." *Id.* Section 4613(2)(B)(7) states that a victim can recover a maximum of $20,000 in punitive damages for a respondent's first violation, a maximum of $50,000 for a respondent's second violation, and a maximum of $100,000 for any further violations. *Id.* Here, this means that the statutory cap on damages is, as the Plaintiffs say, per each individual plaintiff.

The Court's reading of the statute is internally consistent with Section 4613(2)(B)(8)(e), which caps compensatory and punitive damages in intentional employment discrimination cases "for each complaining party" based on the employer's number of employees. *See* 5 M.R.S. § 4613(2)(B)(8)(e)(i)-(iv). Thus, in the employment discrimination context, each plaintiff's statutory damages is capped at $100,000 when the respondent has more than fourteen and fewer than 101 employees. 5 M.R.S. § 4613(2)(B)(8)(e)(i).

This interpretation also reflects the purpose of punitive damages. Defendants reason the relevant cap cannot be per plaintiff, because "[t]he point of the MHRA ... is to remedy public accommodation issues, not enrich those who bring claims." *Defs.' Reply* at 10. Plaintiffs insist "civil penal damages are not remedial in nature; they are punitive with a goal of deterrence" and this purpose will be better served through a statutory damages cap that is per plaintiff. *Pls.' Opp'n* at 24 (collecting cases). Plaintiffs are correct that "[p]unitive damages are directed at deterring and punishing *defendants*; they are not designed to compensate plaintiffs for losses." *Sanchez v. P.R. Oil Co.*, 37 F.3d 712, 725 (1st Cir. 1994) (emphasis in original) (collecting cases). "As such," the First Circuit continued, "the considerations that operate to bar multiple recoveries are conceptually and legally inapplicable to punitive damages," although "potential punitive liability may be limited by legislative intent or due process." *Id.* (collecting cases). On this point, the Supreme Court has held due process "prohibits the imposition of grossly excessive or arbitrary punishments," and "does not permit a State to classify arbitrariness as a virtue [because] the point of due process—of the law in general—is to allow citizens to order their behavior." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416-17, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (first quoting *Cooper Indus. v. Leatherman*

*Tool Grp., Inc.*, 532 U.S. 424, 433, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001)) (then quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 59, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (O'Connor, J., diss.)). Here, 5 M.R.S. § 4613(2)(B)(7) limits the maximum amount of punitive damages and is consistent with 5 M.R.S. § 4613(2)(B)(8), thus avoiding arbitrary punishment and providing litigants with clear notice.

In sum, the Court agrees with the Plaintiffs that 5 M.R.S § 4613(2)(B)(7) sets the maximum punitive damages at $20,000 per plaintiff for a respondent's first time offense.

### VI. CONCLUSION

The Court GRANTS in part and DISMISSES in part Defendants' Motion for Summary Judgment (ECF No. 34). The Court grants summary judgment on the retaliation claim (Count IV) and denies summary judgment on the claims Plaintiffs bring pursuant to the ADA (Count I), MHRA (Count II), and false imprisonment (Count III). [62]

**\*47**  SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2025 WL 744048

---

### Footnotes

1   Plaintiffs' complaint describes the false imprisonment and retaliation claims as separate causes of action but labels both as Count III. *Compl.* (ECF No. 1) at 15. The Court assumes this was a typographical error and refers to the retaliation claim as the complaint's Count IV.

2   The Plaintiffs included both their response to the Defendants' Statement of Material Facts (PRDSMF) and their statement of additional facts (PSAMF) in the same filing, which is proper. The Court uses PRDSMF to refer to paragraphs 1-96 in ECF No. 41, and PSAMF to refer to paragraphs 97-154 within the same.

3   DSMF ¶ 1 says: "Defendant Maine Mall ... is a private entity that owns a place of public accommodation as defined under 42 U.S.C. § 12181(7)(E) and 5 M.R.S. §[ ]4592." DSMF ¶ 1. The PRDSMF concedes "that Defendants own and operate the Maine Mall, which [is] a place of public accommodation as defined by both State and Federal law." PRDSMF ¶ 1.

    However, the Plaintiffs further qualify DSMF ¶ 1: "There is no Defendant in this case that bears the name 'Maine Mall.' There are two Defendants in this case: Brookfield Properties, Retail, Inc., which is the corporate entity that owns the real property that houses the 'Maine Mall' and GGP-Maine Mall, LLC, which is a property management company that operates the 'Maine Mall.' " *Id.*

The confusion over what should be an undisputed fact continues. PSAMF ¶ 125 says "Brookfield Properties Retail, Inc. (BPR) is the Maine Mall's property management company." *Id.* PSAMF ¶ 126 says "GGP-Maine Mall, LLC is the corporate entity that owns the real property in which the Maine Mall ... operates." *Id.* The Defendants admit both facts. DRPSAMF ¶¶ 126, 127.

The record confirms the identity of the two Defendants in this case: Brookfield Properties Retail, Inc. and GGP-Maine Mall, LLC; Maine Mall is not a Defendant. However, the Court is now faced with facts in one filing asserting that BPR manages the Maine Mall and GGP owns the Maine Mall, and facts in another filing asserting the opposite control structure.

To resolve the contradiction for purposes of the motion for summary judgment, the Court looked to the Defendant's answer to the complaint, which the Plaintiffs cite in support of their factual assertions regarding the Defendants' respective roles at the Maine Mall. PSAMF ¶¶ 125, 126. The Defendants' answer supports the Plaintiffs' statement that BPR operates the Maine Mall and GGP owns the real property known as the Maine Mall. *Answer* ¶¶ 11, 12. The Court takes the Defendants at their word that they know their own identities and functions and recounts these facts as stated by PSAMF ¶¶ 125, 126 and supported by the Defendants' answer. "Ordinarily, statements in a complaint are not part of the summary judgment record." *Doherty v. Donahoe*, 985 F.Supp.2d 190, 195 (D. Mass. 2013) (citing *Sheinkopf v. Stone*, 927 F.2d 1259, 1262-63 (1st Cir. 1991)). Here, however, the Court refers to the Defendant's answer only to ensure that crucial background —such as who the Defendants are—is provided. If the Court is wrong that the roles of the Defendants is reversed, the parties are free to correct the record.

4  DRPSAMF ¶ 99 seeks to qualify this statement, noting at her deposition Ms. Gardner testified MWD's mission was to train service dogs for "those in need," and not simply for anyone with a mental or physical disability. *Id.* (citing DSMF, Attach. 1, *Christina Gardner Dep. Tr.* at 16:3-12 (*Gardner Dep. Tr.*)). Ms. Gardner's deposition transcript does use the language "those in need," but it is clear from the context of her statement that she is referring to those in need of service animals—in other words, individuals with a mental or physical disability. The Court deems the statement as proffered by PSAMF ¶ 99 admitted.

5  PSAMF ¶ 97 says, in disputed part, that Ms. Gardner "has no official service dog training credential, but there isn't one in the United States." *Id.* (citing *Gardner Dep. Tr.* at 13:9-22, 40:14-41:14). Defendants qualify that Ms. Gardner testified that while there is no accreditation, "different Universities offer service dog training degrees." DRPSAMF ¶ 97 (citing *Gardner Dep. Tr.* at 41:9-41:7). Ms. Gardner's deposition transcript reflects both statements and the Court amends PSAMF ¶ 97 slightly to reflect the Defendants' qualification.

6  As an initial note, on citations, both PSAMF and DRPSAMF revert to ¶ 123 after, respectively, PSAMF ¶ 129 and DRPSAMF ¶ 130. This means that PSAMF includes two different statements of fact each labeled paragraphs 123-129 and DRPSAMF includes two different statements of fact each labeled paragraphs 124-130. To avoid confusion, the Court differentiates the second appearance of these duplicate citations with an A (for example, PSAMF ¶ 124A and DRPSAMF ¶ 124A).

Turning to the substance of this factual statement, PSAMF ¶ 124A says the Maine Mall's policy regarding service dogs and service dogs in training is consistent with federal and state law; DRPSAMF ¶ 124A qualifies that the mall's policy is only consistent with Maine state law because "service animals in training are not protected under Federal law." DRPSAMF ¶ 124A. At the summary judgment stage, the Court accepts facts but disregards "[c]onclusory allegations." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).The Court thus amends this fact to remove the legal conclusion that the Maine Mall's policy to permit service dogs in training is in accordance with either state or federal law.

7    In disputed part, PSAMF ¶ 127A says that Maine Mall employees received no "general training about the ADA." *Id.* (citing *Craig Gorris Dep. Tr.* at 12:1-18, 15:11-19:8 (ECF No. 44) (*Gorris Dep. Tr.*)). The Defendants contend that Mr. Gorris's testimony reflects that he and employes have annual discrimination training. DRPSAMF ¶ 127A (citing *Gorris Dep. Tr.* at 15:16-24). Defendants are correct that Mr. Gorris testified Maine Mall employees have "annual training that we are required to take about in general ... discrimination, which ... would include the ADA, but it's not ... really specific about the ADA." *Gorris Dep. Tr.* at 15:18-21. The Court amended PSAMF ¶ 127A slightly to reflect this general training on discrimination which includes the ADA.

8    DRPSAMF ¶ 123A seeks to qualify this statement, asserting it is not supported by the record. The Court reviewed the deposition transcripts cited in support by Plaintiffs, *Gorris Dep. Tr.* at 22:2-23:18, 37:20-38:5 and DSMF, Attach. 17, *Bruce Barber Dep. Tr.* at 17:21-24 (*Barber Dep. Tr.*). Mr. Gorris states that, pursuant to the ADA, only two questions may be asked of individuals at the Mall with a dog. He does not, however, list the two questions, nor does Mr. Barber in his deposition. Plaintiffs are, however, clearly correct that these are the two questions which the ADA permits, as addressed in the legal discussion section below, and the Court, to make all reasonable inferences in their favor, accepts PSAMF ¶ 123A with the slight modification that these questions are pursuant to the ADA.

9    PSAMF ¶ 130 begins by asserting that before May 7, 2022, Ms. Gardner "experienced multiple instances of being discriminated against at the Maine Mall because she had a service dog." *Id.* (citing Gardner Aff. ¶ 6). PSAMF ¶ 130 proceeds to describe one such prior experience, which the rest of this paragraph recounts above the line. DRPSAMF ¶ 130A admits that Ms. Gardner's affidavit supports these statements but denies the conclusory statement that there were multiple instances of discrimination at Ms. Gardner. *Id.* The Court removed the conclusory statement that Ms. Gardner experienced discrimination before May 7, 2022 at the Maine Mall, but included the rest of the Plaintiffs' statement at PSAMF ¶ 130, given that, as Defendants acknowledge, it is supported by the record. 📄 *Mancini*, 909 F.3d at 38 (quoting 📄 *Ahern*, 629 F.3d at 54). The Defendants additionally qualify that Ms. Gardner did not report this incident; however, this qualification is outside the scope of PSAMF ¶ 130.

10   The Defendants seek to qualify PSAMF ¶ 131 on the same grounds as PSAMF ¶ 130, asserting while Ms. Gardner made these statements in her affidavit, Defendants deny the conclusory statement that there were multiple instances of discrimination against her, or that she notified anyone of any such incidents. DRPSAMF ¶ 131. First, PSAMF ¶ 131 neither asserts this was an instance of discrimination nor that Ms. Gardner reported this incident, and the Defendants' qualification is thus outside the scope. Second, as with PSAMF ¶ 130, Defendants acknowledge the Plaintiffs' statement is supported by the record. The Court recounts this statement as indicated by the Plaintiffs.

11   DRPSAMF ¶ 101 seeks to qualify this statement "[MWD] provides mobility assistance service dogs to individuals who have been referred by their doctor and have sufficient medical records to have a significant mobility impairment. Furthermore, [MWD] provides PTSD service dogs to individuals who have been diagnosed with PTSD and in treatment for a year." *Id.* (citing *Gardner Dep. Tr.* at 25:22-26:20). The Court reviewed the portion of Ms. Gardner's deposition transcript cited by both parties and concludes PSAMF ¶ 101 is supported by the deposition and is additionally not controverted by DRPSAMF ¶ 101.

12   DRPSAMF ¶ 100 seeks to qualify this statement and claims the training logs show that MWD dogs present at the Maine Mall on May 7, 2022 were five or seven months old and yet "had just begun their training." *Id.* "Furthermore, the training logs show that some of the tasks being trained were basic obedience training, such as 'sit' and 'potty,' further evidenced by one of the dogs defecating on the Mall floor having been taken out not two hours prior." *Id.* (citing DSMF, Attach. 27, *Center Ct. NW* at 1:00-3:00). The Court does not accept the Defendants' qualification as outside the scope of PSAMF ¶ 100. PSAMF ¶ 100 makes the general statement that "by six or seven months of age, most dogs in MWD's training program have mastered at least for our

five tasks"; the statement does not seek to comment on the level of skill of the specific dogs present at the May 7, 2022 training. In addition, the Court addresses the MWD dog's defecation referenced by Defendants in its discussion of DSMF ¶ 94 and PRDSMF ¶ 94 below.

13    DSMF ¶ 37 says the training goal on May 7, 2022 was "to acclimate the dogs to the general public." DSMF ¶ 37 (citing *Gardner Dep. Tr.* at 68:15-69:1). The Plaintiffs qualify this statement, admitting they accessed the Maine Mall on May 7, 2022 with service dogs from MWD to "go through different elements of public settings" so the service dogs can practice tasks that are required for accessing public spaces. PRDSMF ¶ 37 (citing *Gardner Dep. Tr.* at 68:15-70:22). The clarifying detail provided by the Plaintiffs is consistent with Ms. Gardner's deposition, and the Court recounts this fact in the light most favorable to the non-moving party.

14    The Plaintiffs deny and qualify DSMF ¶ 34, which says "[t]he term 'novice' meant a lack of skill or nine months or younger, and in relation to the dogs." DSMF ¶ 34 (citing *Gardner Dep. Tr.* at 58:10-59:23). PRDSMF ¶ 34 contends that "[t]he 'novice' categorization was based on age, not skill level. Older dogs were only put in this group if they were 'owner-trained' and not animals that were owned by MWD." PRDSMF ¶ 34 (citing *Gardner Dep. Tr.* at 58:6-59:3).

At her deposition, Ms. Gardner was asked about the all-novice training scheduled to take place from 10:00 to 11:30 a.m. on May 7, 2022. *Gardner Dep. Tr.* at 58:6-10. She responded "[t]hey were basically separated by age, not necessarily skill level. So anybody under nine months isn't usually considered in the novice group. International standard is that they can't graduate until they're at least a year[ ]old. So it's just by age. Like, for example, Tundra only finally just graduated. He was older. He was in the advanced group at this point; but skill level, he was not." *Id.* at 58:11-19. She adds that older dogs might be in the novice group "if they were owner-trained and newer to us meaning they haven't got the skills." *Id.* at 58:25-59:3. The Court agrees with the Plaintiffs that Ms. Gardner's deposition transcript supports PRDSMF ¶ 34 and recounts this fact as stated by the Plaintiffs.

15    Defendants admit these were the dogs present on May 7, 2022, but deny that the dogs present were service animals. DRPSAMF ¶ 105. In support, Defendants cite these dogs' training logs, attached by the Defendants to their reply, and DSMF ¶¶ 32, 33, 39, 90, 91, 94. The training logs and portions of the DSMF cited by the Defendants indicate these animals were service dogs in training and the Court amended PSAMF ¶ 105 slightly to reflect the service dogs were present at the Maine Mall on the day in question for the purpose of being trained.

16    DSMF ¶ 31 says "[o]n May 7, 2022, all dogs present at the Mall, except for Veronica and her dog Biscuit, were owned by MWD." DSMF ¶ 31. The Plaintiffs admit this statement except as it relates to Eleanor, who they classify as "Plaintiff Gould's service animal." PRDSMF ¶ 31. The Court addressed and responded to this contention above, and now modifies DSMF ¶ 34 slightly to indicate that Eleanor was in the process of transitioning from MWD's ownership to Mr. Gould.

17    PSAMF ¶ 104 says, in relevant part, "MWD's service dogs at the Mall were all trained [in] a task called 'deep pressure therapy.' " *Id.* Defendants deny this statement, claiming instead that the dogs were in the process of being trained to perform deep pressure therapy on May 7, 2022. DRPSAMF ¶ 104. The Defendants are correct that the service dogs present at the training were in the process of learning to perform deep pressure therapy and rewords PSAMF ¶ 104 slightly to reflect this fact.

18    PSAMF ¶ 106 emphasizes that the service animals present at the May 7, 2022 training had already mastered skills to support mobility assistance and/or PTSD service; DRPSAMF ¶ 106 instead underlines that these service animals were in training and thus had not fully mastered the training needed to perform mobility

assistance and/or PTSD service. For purposes of this motion, this is a purely semantic difference. Viewed in the light most favorable to the non-movants, the Court states this fact as recounted by the Plaintiffs.

19    DSMF ¶ 35 says "[n]ot all MWD's dogs in training become service animals." DSMF ¶ 35 (citing Gardner Dep. Tr. at 17:1-19:5). The Plaintiffs qualify this statement, saying:

> Not all of the dogs that MWD trains graduate its service animal program to receive certificates stating that they have met MWD's standards to graduate their program; some are more suited to be therapy or facility dogs. MWD is an internationally accredited organization [and] MWD's rigorous and high standards for receipt of a MWD certificate exceed that of State and Federal Law. Thus, the statement is denied to the extent that it implies or otherwise contends that the dogs at the Maine Mall on May 7, 2022 were not qualified as service animals because they had not yet received their certificates from MWD. They were, and none of the Defendants' agents asked whether or not they were before detaining and ejecting the Plaintiffs.

PRDSMF ¶ 35. PRDSMF ¶ 35 does not contradict DSMF ¶ 35 and the Court recounts this fact as asserted by the Defendants.

20    DSMF ¶ 36 claims that "[o]ne of the dogs present on May 7, 2022, Abigail, failed out of training and was not certified as a service animal by MWD and is not a service animal, and now lives with Tina and Andy Beaudoin." DSMF ¶ 36 (citing *Gardner Dep. Tr.* at 62:23-63:6). The Plaintiffs qualify and deny this statement. They contend, "[i]t is admitted that Lady Abigail did not complete MWD's rigorous service animal training program (*Gardner Depo.* [at] 62:23-63:6), but as of May 7, 2022, Abigail had already mastered several disability-related tasks, including one for mobility support, as well as one for emotional support[ ] (*Beaudoin, T. Depo.* at [at] 63:21-65:5). Thus, this fact is denied insofar as it states that Abigail was not a service animal at all times relevant to this matter." PRDSMF ¶ 36. Ms. Gardner's deposition transcript confirms that "Abigail failed out of training" because, although "[s]he's a great dog[,] [s]he just failed to meet my standards." *Gardner Dep. Tr.* at 63:2-6. Ms. Beaudoin's deposition states that in May of 2022, Abigail had been trained to "sit, stay, leave it, stepping up stairs. She ... had skills of support where she would go in the middle, you tell her middle, and she would go between your legs and sit, and she would push her body into your legs, so she had that down; she still does .... [s]he really had a lot of skills. It was just that she was nervous." DSMF, Attach. 3, *Trina Beaudoin Dep. Tr.* at 63:21-64:7 (*T. Beaudoin Dep. Tr.*).

Both Ms. Gardner's and Ms. Beaudoin's depositions state that Abigail did not graduate from MWD training, but do not confirm whether Abigail would nevertheless be considered a service dog, given that MWD's graduation requirements place a higher bar for certification than federal and state law. The Court acknowledges the undisputed fact that Abigail did not graduate from MWD but, to present the disputed matter in the light most favorable to the Plaintiffs as non-movants, adds that Abigail had mastered several specific disability-related tasks on the day in question.

This controversy begs the question of whether the legal definition of a service dog is more expansive than the MWD's requirements for service dog designation, a legal question the Court addresses in its discussion below.

21    DSMF ¶ 41 asserts: "[v]olunteers were then assigned dogs based on the experience of the volunteer." The Plaintiffs qualify this statement on the ground that it does not apply to Mr. Gould, who they say arrived at the Maine Mall accompanied by his service dog Eleanor, and Veronica, who brought her service dog, Biscuit, to the May 7, 2022 training. PRDSMF ¶ 41. Consistent with its obligation to recount the factual record in the light most favorable to the non-moving party, the Court has slightly modified DSMF ¶ 41 to reflect these two details.

22    DSMF ¶ 4 says "[a]ll Plaintiffs besides Gardner and MWD were volunteers on May 7." *Id.* (citing *Gardner Dep. Tr.* at 16:13-17:10; 57:16-58:9). PRDSMF ¶ 4 seeks to qualify the Defendants' statement, averring "[t]he

record citations cited by Defendants do not support the Statement for which they are cited." PRDSMF ¶ 4. The Court reviewed Ms. Gardner's transcript and agrees it stands for the proposition the Defendants assert. At 16:13-23, Ms. Gardner's deposition transcript states that MWD has one paid employee (an administrative assistant) and fifty-three volunteers; from this, it stands to reason that all Plaintiffs appeared at the May 7, 2022 training not as employees, but in a volunteer capacity. *Gardner Dep. Tr.* at 16:13-23. Later in her deposition testimony, Ms. Gardner responded in the affirmative that the May 7, 2022 training "included both people who would be assigned dogs when they arrived as volunteer, but also people who bring their own dog as part of the training." *Id.* at 57:16-21.

23      In relevant part, the Defendants qualify PSAMF ¶ 107 by admitting that volunteers receive on-boarding training, and the Plaintiffs note, but adding that they are "always supervised by Ms. Gardner or another member of the leadership team." DRPSAMF ¶ 107 (citing, e.g., *Gardner Dep. Tr.* at 41:22-42:8). The Defendants also contend that various Plaintiffs' training was limited to their volunteering with MWD. *Id.* The Court amends PSAMF ¶ 107 to reflect the Defendants' proper qualification, supported by Ms. Gardner's transcript, that she was present and supervised MWD trainings. The Court does not amend the statement to reflect the Plaintiffs' prior volunteer experience as the Court addresses this issue elsewhere in the factual record.

24      DSMF ¶ 6 says: "Gardner was not handling a dog during the training at the Mall on May 7, 2022." DSMF ¶ 6 (citing *Gardner Dep. Tr.* at 75:5-75:20). The Plaintiffs qualify this statement, asserting "Plaintiff Gardner testified that she did not bring her own service animal, Douglas, with her to the Maine Mall on the date in question, but she had all of MWD's service dogs available to her for support at the Maine Mall because they were trained to assist her with tasks for which she requires assistance based on her disabilities and that she may have had one or several of MWD's service dogs while at the Maine Mall." PRDSMF ¶ 6.

The Court reviewed Ms. Gardner's deposition transcript and agrees with Ms. Gardner's interpretation. When asked at the deposition if she recalled whether she had a dog of her own present at the May 7 training, Ms. Gardner responded, "I did not, but I had the other seven or whatever [dogs]," *Gardner Dep. Tr.* at 75:17-20, adding, "If I had needed anything assistance-wise, these dogs could have done it for me in that case," *id.* at 75:23-25. She further explained during her deposition that "it's best as an observer to not have [her own dog with her] so [she] can properly teach; devote my attention to everyone else." *Id.* at 75:14-16. As the Court is required to view disputed matters in the light most favorable to the Plaintiffs as nonmovant, the Court accepts Ms. Gardner's version.

The parties raise a similar dispute in PSAMF ¶ 132 and DRPSAMF ¶ 132, and the Court determines it resolved.

25      DSMF ¶ 16 says: "Prior to May 7, 2022, Dwyer's service animal training experience was limited to her volunteering with MWD." DSMF ¶ 16 (citing *id.*, Attach. 6, *Angelica Dwyer Dep. Tr.* at 10:23-11:22 (*Dwyer Dep. Tr.*)). The Plaintiffs assert that "[t]he record citation cited by Defendants does not support the Statement for which it is cited." PRSMF ¶ 16. The Court reviewed Ms. Dwyer's deposition transcript and agrees with the Plaintiffs that it does not support the Defendants' statement that Ms. Dwyer's prior service animal training experience was limited to her volunteering with MWD. *See Dwyer Dep. Tr.* at 10:23-11:22. While this portion of the transcript confirms Ms. Dwyer had volunteered with MWD before the May 7, 2022 training at the Maine Mall, it does not say that this was Ms. Dwyer's *only* experience with service animal training. The Court amends DSMF ¶ 16 slightly to reflect only that Ms. Dwyer had prior experience volunteering with MWD before May 7, 2022.

26      DSMF ¶ 19 says Ms. Ames "was not assigned a MWD dog to handle on May 7, 2022." DSMF ¶ 19 (citing *id.*, Attach. 8, *Anastacia Ames Dep. Tr.* at 36:3-37:7 (*Ames Dep. Tr.*)). The Plaintiffs qualify that Ms. Ames "was not initially assigned one of MWD's service dogs when the group entered the Maine Mall (Ames Depo. [at]

36:3-37:7), but she was accompanied by MWD's service dog, 'Tank,' during the period after the individual Plaintiffs were detained by Defendants[ ] (Ames Depo. [at] 40:7-41:8)." PRSMF ¶ 19. Ms. Ames's transcript supports the Plaintiffs' more detailed account and, as the Court is required to view disputed matters in the light most favorable to the Plaintiffs as non-movants, accepts their version of events.

The parties raise the same dispute in PSAMF ¶ 113 and DRPSAMF ¶ 113. Having already resolved the dispute, the Court does not restate their positions here.

27  PRDSFM ¶ 21 qualifies the Defendants' statement that "Ames did not have her own service animal with her at the Mall," DSMF ¶ 21, adding that "Plaintiff Ames testified that she did not bring her own service animal, Kia, with her to the Maine Mall on the date in question, but Tank acted as her service animal on May 7, 2022, as he was trained to assist her with tasks for which she requires assistance based on her disabilities and performed those services while the Plaintiffs were being detained by the Defendants." PRSMF ¶ 21. Having acknowledged the Plaintiffs' qualification that Tank provided periodic support to Ms. Ames on May 7, 2022, the Court states this fact as recounted by the Defendants.

28  DSMF ¶ 22 says that Mr. Gould "was assigned a MWD dog ('Eleanor') to handle on May 7, 2022, and Eleanor was in the process of being trained to pair specifically with Gould." DSMF ¶ 22. The Plaintiffs admit this statement, but add that, "at the time of the incident, Eleanor was already a trained service animal who was proficient with several tasks that directly related to [Mr. Gould's] disabilities, which include PTSD and lateral and bilateral knee instability. Thus, this fact is denied to the extent it contends that Lady Eleanor was not a service animal as defined by State and Federal law on May 7, 2022." PRDSMF ¶ 22. The Court does not read DSMF ¶ 22 to say that Eleanor was not a trained service animal as of May 7, 2022; however, it includes the Plaintiffs' qualification to clarify this fact and to view the disputed matter in the light most favorable to the non-movants.

29  DSMF ¶ 24 says "[o]n May 7, 2022, Eleanor did not have specific task training for Gould." DSMF ¶ 24 (citing *id.*, Attach. 9, *Joshua Gould Dep. Tr.* at 15:1-12 (*Gould Dep. Tr.*)). The Plaintiffs deny this statement, directing the Court to their response to DSMF ¶ 22.

The Court reviewed Mr. Gould's deposition transcript. Mr. Gould was asked: "So as of May 7th, 2022, Eleanor had undergone some of the training to be certified .... she had had some of the training; but she hadn't been fully trained yet as a service animal. Is that accurate?" *Gould Dep. Tr.* at 14:19-25. Mr. Gould responded, "Yes. She had her obedience training and task training; but she hadn't had specific task training for her person, me. So once they're paired with a person, that's when they work on that person's individual task .... She was proficient in three out of the four tasks I need her, now and still, she was proficient in three of them as of that date." *Id.* at 15:1-5; 15:10-12. The Court amended DSMF ¶ 24 to reflect that Eleanor was in the process of completing specific task training to be paired with Mr. Gould, as his deposition transcript states.

The parties engage in the same dispute in PSAMF ¶ 124 and DRPSAMF ¶ 125, and the Court determines it resolved.

30  DSMF ¶ 25 says that "[o]n May 7, 2022, Eleanor was owned by MWD." DSMF ¶ 25 (citing *Gardner Dep. Tr.* at 74:12-15). As qualification, the Plaintiffs say, "[o]n May 7, 2022, Eleanor was already living with Plaintiff Gould as his service animal, although her ownership papers had not been formally transferred. The record citation indicates that Plaintiff Gardner already considered Eleanor to be Plaintiff[ ] Gould's dog at that time from a practical perspective." PRDSMF ¶ 25.

In response to an inquiry at her deposition as to whether "there [were] any dogs that were not ... Mission dogs" present at the May 7, 2022 training, Ms. Gardner said, "I guess it would depend how you classify [Mr. Gould] at that point with Eleanor, because she was living with him already, but still owned by us." *Gardner Dep.*

*Tr.* at 74:12-15. The Court does not agree with the Plaintiffs that this deposition statement establishes Ms. Gardner "considered Eleanor to be Plaintiff[ ] Gould's dog at that time from a practical perspective." Instead, the statement confirms the Defendants' statement that Eleanor was owned by MWD on May 7, 2022. DSMF ¶ 25. To view the disputed matter in the light most favorable to the Plaintiffs, however, the Court adds the Plaintiffs' qualification that Eleanor was already living with Mr. Gould on the day in question.

31  The Defendants say "[p]rior to May 7, 2022, Brilliant's service animal training experience was limited to her volunteering with MWD." DSMF ¶ 27 (citing *id.*, Attach. 10, *Theresa Brilliant Dep. Tr.* at 19:24-24:4 (*Brilliant Dep. Tr.*)). PRSMF ¶ 27 contends Brilliant's deposition transcript does not support this statement. PRSMF ¶ 27. In response to a question at her deposition about her prior experience training service animals, Ms. Brilliant said, "Well, it's ... self-taught .... I have a very big faith in God, and I feel that that is my gift." *Brilliant Dep. Tr.* at 19:20-20:3. The Court modified DSMF ¶ 27 to reflect that, prior to May 7, 2022, Ms. Brilliant had self-taught service animal experience.

32  DSMF ¶ 45 alleges: "At some point during the training, but prior to any interaction by Mall security, Mall security received a complaint from employees at Bed, Bath, and Beyond that there were several dogs running around freely in their store." DSMF ¶ 45 (citing *Barber Dep. Tr.* at 60:12-62:17). The Plaintiffs deny this statement, contending "Mr. Barber testified that Maine Mall's security dispatch received a call complaining about **two** dogs being off leash in **Bath and Body Works** that were being allowed to 'run around the store.' " PRDSMF ¶ 45 (emphasis in original). The Court reviewed Mr. Barber's deposition transcript and agrees it reflects the Plaintiffs' version of events, and amends DSMF ¶ 45 accordingly.

The parties raise a similar dispute in PSAMF ¶¶ 133-134 and DRPSAMF ¶¶ 133-134; the Court reviewed these statements of fact, and the sources the parties cite in support of each, and concludes them resolved based on DSMF ¶ 45 and PRDSMF ¶ 45.

33  DSMF ¶ 49 states: "Dwyer told the Mall security guard that the dog was in training." DSMF ¶ 49 (citing Dwyer Dep. Tr. at 30:3-6). PRDSMF ¶ 49 counters that "Ms. Dwyer told the Mall's security guard that Tank *was* a service animal, that he was in training, and that service dogs had a right to be at the Mall whether they were training or not." PRDSMF ¶ 49 (emphasis in original). At her deposition, Ms. Dwyer said she told the Mall security guard, when asked if Sherman Tank was a service animal, "yes, he's in training." *Dwyer Dep. Tr.* at 30:3-6. The Court slightly amended DSMF ¶ 49 to reflect that Ms. Dwyer in fact told the security guard that Tank was a service animal who was in training. The Court rejects the Plaintiffs' additional qualification as being outside the scope of the fact asserted. This resolves the same dispute raised by PSAMF ¶ 136 and DRPSAMF ¶ 136.

34  The Plaintiffs qualify and deny DSMF ¶ 50 on the ground that "[t]he Mall's security guard told Ms. Dwyer and Ms. Beattie that *they* were not allowed to be at the Maine Mall and asked them to leave after she said that Tank was a service dog and asserted her right to be at the Maine Mall with Ms. Beattie." PRDSMF ¶ 50 (emphasis in original). The Court does not accept this denial. First, the Court does not read PRDSMF ¶ 50 as disputing DSMF ¶ 50; on the contrary, the Court sees no difference between DSMF ¶ 50 and PRDSMF ¶ 50, insofar as it recounts what the Mall security guard told Ms. Beattie and Ms. Dwyer. Second, the Plaintiffs' qualifications are outside the scope of the fact asserted and, additionally, addressed in DSMF ¶ 49. This resolves the dispute raised by PSAMF ¶ 137 and DRPSAMF ¶ 137.

35  The Plaintiffs qualify DSMF ¶ 54, adding that, while on the phone with Ms. Gardner, Ms. Dwyer additionally told Ms. Gardner that the Mall's security guard touched her body without permission. PRDSMF ¶ 54 (citing *Dwyer Dep. Tr.* at 33:10-35:4; *Gardner Dep. Tr.* at 78:2-78:6). To make all reasonable inferences in favor of the non-moving party, the Court amends DSMF ¶ 54 to reflect the additional detail raised by Plaintiffs, as

supported by the deposition transcripts of Ms. Dwyer and Ms. Gardner. The Court also notes the Defendants admit this statement in DRPSAMF ¶ 138, discussed above.

36   The Plaintiffs admit DSMF ¶ 59, but in PRDSAMF ¶ 119 claim "Ms. Beattie was told to sit down with the group of Plaintiff[s] during the exchange with the Defendants' employees and agents by the Security Guard." PSAMF ¶ 119. The Defendants deny this statement, asserting it was Ms. Gardner, not security, who initially told the group to find a spot to sit down and wait. DRPSAMF ¶ 120. The Court accepts the Defendants' denial and includes DSMF ¶ 59, which the Plaintiffs admitted. PRDSAMF ¶ 59. This also resolves the same dispute raised in PSAMF ¶ 149 and DRPSAMF ¶ 149.

37   DSMF ¶ 61 says: "[t]he Mall security guard told Gardner that service dogs in training were not allowed inside the Mall and that they needed to leave." DSMF ¶ 61 (citing *Gould Dep. Tr.* at 27:4-15). The Plaintiffs qualify and deny this statement, averring Mr. Gould in fact stated that the entire group was not allowed in the Mall and needed to leave. PRDSMF ¶ 61 (citing *Gardner Dep. Tr.* at 79:15-80:21). The Plaintiffs further say, "[i]n addition, the security guard started his interaction with Gardner by asking for the 'certification papers' for the service dogs, which Gardner told him was illegal and she told him that they had a legal right to be at the Maine Mall under the ADA 'with our service dogs.' " *Id.* The Plaintiffs are correct that Mr. Gould's deposition transcript reflects their version of events; the Court amended DSMF ¶ 61 to reflect that the Mall security officer told Mr. Gould that the service animals, as well as the training group members themselves, needed to leave the Maine Mall. To view the fact in the light most favorable to the non-moving party, the Court also includes the Plaintiffs' addition regarding the certification papers, as it is supported by Ms. Gardner's deposition transcript. In addition, this resolves the dispute raised in PSAMF ¶ 140 and DRPSAMF ¶ 149.

38   DSMF ¶ 64 asserts "Barber called operations manager Paul Pettingill ... and informed him of the situation." DSMF ¶ 64 (citing DSMF, Attach. 19, *Paul Pettingill Dep. Tr.* at 20:1-7 (*Pettingill Dep. Tr.*)). The Plaintiffs seek to qualify this statement: "It is admitted that Barber called Mr. Pettingill, but the fact does not accurately and completely relay what Barber said. Pettingill told him 'there were ten **service dogs** in a group, that they had received a complaint that the dogs had been set free in some of the 6 stores and were just running around and asked me what I wanted to do with that." PRDSMF ¶ 64 (citing *Pettingill Dep. Tr.* at 20:1-7) (emphasis added by Plaintiffs). Mr. Pettingill's deposition, at the section cited by both parties, reflects the Plaintiffs' qualified statement of fact and the Court accepts PRDSMF ¶ 64.

39   DSMF ¶ 73 says "Pettingill told Gardner that she was trespassing and that they would wait for the police to arrive." DSMF ¶ 73 (citing *Pettingill Dep. Tr.* at 23:7-16). PRDSMF ¶ 73 claims Mr. Pettingill in fact told Ms. Gardner that the group, and not just Ms. Gardner, was trespassing and "ordered a security guard to keep his eyes on the group and not let them leave." PRDSMF ¶ 73 (citing *Gardner Dep. Tr.* at 85:13-88:22, 146:16-25; *Pettingill Dep. Tr.* at 23:12-16).

When asked at his deposition whether he told Ms. Gardner that she alone, or the entire group, was trespassing, Mr. Pettingill said, "I don't think I was specific." *Pettingill Dep. Tr.* at 23:17-20. However, when asked soon after "[w]as the group free to leave at the point where you were waiting for the South Portland police?," Mr. Pettingill said, "They were asked to leave, yes. I was hoping they would leave." *Id.* at 24:3-6. First, the Court amends DSMF ¶ 73 to reflect that Mr. Pettingill told Ms. Gardner that the group was trespassing.

The second point of contention between the parties is whether the group was instructed to wait for the police or told they were not allowed to leave. *Compare* DSMF ¶ 73 *with* PRDSMF ¶ 73. This dispute is more directly raised by DSMF ¶ 76 and PRDSMF ¶ 76 and the Court addresses it below.

40   PSAMF ¶ 128A says "Mr. Gorris was not at the Maine Mall when the incident involving Plaintiffs occurred, but Bruce Barber ... claims that Mr. Gorris said the Mall's policy was not to allow service animals in training, only those that were 'fully trained.' That was not true; Mr. Gorris did not provide that information and that was

not the Mall's policy." *Id.* Defendants qualify this statement slightly to clarify that Mr. Barber was informed of Mr. Gorris's position by way of Mr. Pettingill, who was present on site with Mr. Barber. DRPSAMF ¶ 128A. They clarify that Mr. Barber was standing near Mr. Pettingill and overheard parts of his conversation with Mr. Gorris. *Id.* The Court amends PSAMF ¶ 128A to clarify these points.

41      PSAMF ¶ 129A says, in disputed part, that "Ms. Vaughan supported ejecting the Plaintiffs from the Maine Mall." *Id.* (citing *Pettingill Dep. Tr.* at 9:6-10:20, 27:14-30:6). DRPSAMF ¶ 129A counters that Ms. Vaughan, upon learning from Mr. Pettingill about the incident over the phone, "agreed that ten dogs in training on a busy Saturday was inappropriate and that the Mall would accommodate service animals in training in MWD let them know ahead of time." *Id.* (citing *Pettingill Dep. Tr.* at 29:20-30:6). The Court reviewed Mr. Pettingill's deposition transcript at the lines cited by both parties and agree it, word for word, supports the Defendants' version of events.

42      The Defendants assert a qualification of this statement, but the Court cannot identify any disagreement between the parties and thus accepts PSAMF ¶ 142. *Compare* PSAMF ¶ 142, *with* DRPSAMF ¶ 142.

43      The Plaintiffs admit that "Barber ... told Gardner the Plaintiffs had to leave," PRDSMF ¶ 67, but qualify DSMF ¶ 67: "after Gardner said the Plaintiffs had a legal right to be there, Pettingill then told her group was now trespassing and ordered a security guard to keep his eyes on the group and not let them leave." PRDSMF ¶ 67. This qualification is outside the scope of DSMF ¶ 67. All DSMF ¶ 67 says is that Mr. Barber told Ms. Gardner the Plaintiffs had to leave, and PRDSMF ¶ 67 explicitly admits this statement's truth. PRDSMF ¶ 67. In addition, DSMF ¶ 73 says "Pettingill told Gardner that she was trespassing and that they would wait for the police to arrive" and thus addresses the Plaintiffs' qualification of DSMF ¶ 67. The parties raise the same dispute in PSAMF ¶ 141 and DRPSAMF ¶ 141, which is now resolved.

44      DSMF ¶ 68 says: "Gardner stated that service animals in training are protected by Maine state law." DSMF ¶ 68 (citing *Gardner Dep. Tr.* at 121:1-5; *Barber Dep. Tr.* at 40:13-41:2). Plaintiffs say: "It is admitted that Gardner told Defendants' agents numerous times during the incident that both service animals *and* service animals in training were allowed by Maine law and the ADA, as well as the Maine Mall's own policy." PRDSMF ¶ 68 (citing *Gardner Dep. Tr.* at 80:7-14, 118:16-121:5, 143:25-144:8) (emphasis in original). The Court reviewed the provisions of Ms. Gardner's deposition transcript and Mr. Barber's deposition transcript cited by the parties. While Ms. Gardner's transcript reflects that she told Mr. Barber that both service animals and service animals in training are protected by Maine law, Mr. Barber's transcript confirmed Ms. Gardner told him service animals in training were allowed in the Maine Mall under state law. However, Mr. Barber was asked the narrow question of whether the Plaintiff told him Maine law covered service animals in training; he was not asked whether she also told him state law protects service animals and the Court thus cannot conclude from his deposition transcript that Ms. Gardner did not make this point more fully as she claims. In line with its obligation to view the factual record in the light most favorable to the non-moving party, the Court amends DSMF ¶ 68 slightly to reflect that Ms. Gardner told Mr. Barber that Maine law protects both service animals and service animals in training.

45      The Court includes the Defendants' minor qualification of PSAMF ¶ 143 that Ms. Gardner cited Maine's White Cane Law, 17 M.R.S. § 1312, to the Mall representatives. DRPSAMF ¶ 143.

46      Defendants seek to qualify this statement on the ground that Ms. Gardner's inference as to the security guard's statement's meaning is unsupported. DRPSAMF ¶ 146. The Court amends PSAMF ¶ 146 slightly to reflect this interpretation of the statement was made by Ms. Gardner, and not stated by the guard explicitly.

47      DSMF ¶ 76 says "Barber told the Mall security guard to not allow the group to come any further into the mall until South Portland police arrived." DSMF ¶ 76 (citing *Barber Dep. Tr.* at 46:21-47:11). PRDSMF ¶ 76 denies this statement and contends "[a]fter Gardner said the Plaintiffs had a legal right to be there, Pettingill ordered

a security guard to keep his eyes on the group and not let them leave." PRDSMF ¶ 76 (citing *Gardner Dep. Tr.* at 85:13-88:22, 146:16-25; *Gould Dep. Tr.* at 32:8-33:5; *Pettingill Dep. Tr.* at 23:12-16). As an initial matter, the parties accurately reflect the contents of Mr. Barber's deposition and Ms. Gardner's deposition. Next, given that the Defendants' statement of fact and the Plaintiffs' statement of fact are not actually in opposition (DSMF ¶ 76 concerns a direction Mr. Barber gave to Mall security, while PRDSMF ¶ 76 discusses an order Mr. Pettingill gave to the same), and that both are supported by the record, the Court includes DSMF ¶ 76 and PRDSMF ¶ 76. This resolves the same dispute raised in PSAMF ¶ 147 and DRPSAMF ¶ 147.

48    DSMF ¶ 77 says "[t]he Mall security guard was positioned in between the group and the main foyer of the Mall," *id.* (citing *Barber Dep. Tr.* at 47:8-48:6), while the Plaintiffs say "[t]he Mall security officer who was ordered to guard the Plaintiffs so that they could not leave until the South Portland Police arrived walked back and forth into the hallway where the Plaintiffs were sitting and standing, as well as standing in the foyer of the mall." PRDSMF ¶ 77 (citing DSMF, Attach. 22, *JC Penney Int. Bus Stop Fixed Video*). The Court reviewed the JCPenney security footage, which does not include a security guard on screen, and thus does not support the inference that the security guard paced back and forth. Mr. Barber's deposition transcript, however, supports DSMF ¶ 77 and the Court recounts this fact as stated by the Defendants.

49    The Defendants deny that Mall security officers have the right to detain individuals, or that they do this regularly. DRPSAMF ¶ 148. The Court amended PSAMF ¶ 148 to reflect Mr. Gould's deposition transcript, cited by Plaintiffs in support, which clarifies this was Mr. Gould's interpretation of his conversation with Mall security. Gould Dep. Tr. at 32:8-33:8.

50    As an initial matter, the Defendants accidentally label their response to PSAMF ¶ 113 as DRPSAMF ¶ 114, and thus proceed to mislabel the paragraph number of the Plaintiffs' statements of additional material facts. Thus, DRPSAMF ¶ 115 addresses PSAMF ¶ 114.

      PSAMF ¶ 114 says that while the Plaintiffs waited for the South Portland police to arrive, the security guard "loomed over Ms. Ames from a couple of feet away and watched her every move, making her scared ...." *Id.* (citing *Ames Dep. Tr.* at 48:14-23, 62:1-8, 67:10-22). Defendants deny this statement, asserting "[s]ecurity footage shows no Maine Mall security guard, who wear yellow uniforms, was ever 'a couple feet away' [from Ms. Ames], watch[ing] her every move." DRPSAMF ¶ 115 (citing *JCPenney Int. Bus Stop Fixed Video*). The Defendants are correct that the JCPenney security footage does not include an individual the Court can identify as a security guard, but the Plaintiffs are correct that Ms. Ames's deposition transcript reflects that this is how she perceived the security guard's presence. To view the fact in the light most favorable to the Plaintiffs, the Court amends PSAMF ¶ 114 to reflect that it recounts Ms. Ames's perception.

51    PSAMF ¶ 120 said that Ms. Landry did not feel free to leave the mall while the Plaintiffs waited for the police because the guard "was standing over them watching them," and she felt as if she tried to leave, the guard would stop her. *Id.* (citing DSMF, Attach. 4, *Colleen Landry Dep. Tr.* at 36:6-37:9 (*Landry Dep. Tr.*)). The Defendants deny the statement insofar as it says that the Security Guard was standing over the group and watching them. DRPSAMF ¶ 121 (citing *JCPenney Int. Bus Stop Fixed Video*). As noted, the Court cannot determine the position of the security guard from the video cited by the Defendants. Ms. Landry's deposition transcript confirms the Plaintiffs' version of events and, as it is required to view disputed facts in the light most favorable to the non-movants, the Court recounts this fact as stated by the Plaintiffs.

52    DSMF ¶ 84 says "[a]fter the initial confrontation with the security guard, while waiting for the police to arrive, Trina stood up and exited the nearby exit with the dog she was handling without being stopped by security." *Id.* (citing *JCPenney Int. Bus Stop Fixed Video* at 17:00-32:00). The Plaintiffs admit that Ms. Beaudoin was allowed to exit the Maine Mall so that her service dog, Ghost, could go to the bathroom, but that was only after she received permission from the security guard, who the Plaintiffs report "initially told her that she could

not go outside ... and then allowed her when she said [Ghost] would have an accident. The security guard
told her she had to 'go out and come back in.' " PRDSMF ¶ 84 (citing *T. Beaudoin Dep. Tr.* at 41:1-20).

The parties dispute the same fact at PSAMF ¶ 116 and DRPSAMF ¶ 117. PSAMF ¶ 116 says, in relevant part,
"When the group was detained while the South Portland Police came, Ms. Beaudoin asked if she could take
Ghost outside to the bathroom, and the Defendants' Security Guard told her to go out through a specific exit
and 'You'd better come back in.' Ms. Beaudoin took Ghost outside to go to the bathroom." *Id.* The Defendants
admit this statement "except for the conclusory statement that the group was detained," which they deny.
DRPSAMF ¶ 117. The Court recounts PSAMF ¶ 116 with the slight qualification sought by DRPSAMF ¶ 117.

53    PSAMF ¶ 115 says, in relevant part, "[d]uring the Plaintiffs' detention by the Mall's Security Guards, Abigail
performed the task of deep pressure therapy to alleviate Ms. Beaudoin's anxiety." *Id.* (citing *T. Beaudoin
Dep. Tr.* at 64:13-65:5). DRPSAMF ¶ 116 seeks to qualify this statement, saying "Security Footage shows
no deep pressure therapy performed." *Id.* (citing *JCPenney Int. Bus Stop Fixed Video*). The Court is unable
to determine from the security footage whether it reflects that Abigail performed deep pressure therapy on
Ms. Beaudoin. However, Ms. Beaudoin's transcript states only that Abigail sat with her and gave her support;
it does not say Abigail provided deep pressure therapy and the Court amends the Plaintiffs' statement of
fact to reflect her testimony.

54    PSAMF ¶ 153 additionally says that these questions were not asked at any point "when Plaintiffs were illegally
discriminated against and detained." *Id.* The Defendants correctly reject this portion of the factual statement
as a conclusory statement not supported by the record.

55    PSAMF ¶ 151 additionally states the South Portland police, on the Defendants' instruction, threatened the
Plaintiffs with arrest and criminal charges if they did not leave the Mall. *Id.* (citing *Gardner Dep. Tr.* at 99:7-14).
Defendants contest this portion of the statement. DRPSAMF ¶ 151. The Court reviewed Ms. Gardner's
deposition transcript at the lines indicated by Plaintiffs and largely agrees with the Defendants that it does
not confirm that the police threatened the group with arrest and criminal charges; her testimony instead says
the "police ... request[ed] that we leave because the mall staff had requested that we leave or that we were
going to be trespassed; and then we were asked to leave and paraded out." *Gardner Dep. Tr.* at 99:7-14.
Even though the police comment that they would be "trespassed" could be interpreted as threatening arrest
and criminal charges if they did not leave the Mall, the Court construes PSAMF ¶ 151 as alleging what
South Portland Police said to Plaintiffs, not what the police may have implied by what they said. The Court,
therefore, amends PSAMF ¶ 151 to reflect only that the police indicated the group may be trespassing if
they did not leave.

56    DSMF ¶ 93 says the group was allowed to exit the mall through the same way they entered. *Id.* (citing *Gardner
Dep. Tr.* at 100:4-100:13). The Plaintiffs contend they were instead "allowed to walk through the Mall in order
to comply with the Defendants' order to leave ..., but they were escorted out by the Maine Mall security
guard." PRDSMF ¶ 93 (citing *Gould Dep. Tr.* at 38:23-39:2; DSMF, Attach. 12, *Melanie Sparks Dep. Tr.* at
28:6-10 (*Sparks Dep. Tr.*); *Center Ct. NW Video*). Mr. Gould's transcript says the group exited the Maine Mall
escorted by police officers, *Gould Dep. Tr.* at 38:23-39:2; Ms. Sparks says the group exited while escorted
by a Mall security guard, *Sparks Dep. Tr.* at 28:8-10. It is not clear from the Center Court NW Video who
escorted the Plaintiffs on their exit. Consistent with its obligation to view the facts in the light most favorable
to the Plaintiffs as the non-movants, the Court amends DSMF ¶ 93 to reflect the Plaintiffs' contention, supported
by Ms. Spark's deposition transcript, that a Mall security officer escorted the Plaintiffs out of the mall.

PSAMF ¶ 152 and DRPSAMF ¶ 152 raise a similar dispute, largely resolved above. However, PSAMF ¶ 152
additionally contends the Plaintiffs agreed to leave the Mall because they "fear[ed] further unlawful arrest." *Id.*
The Court agrees with the Defendants that the deposition transcripts of Ms. Gardner, Ms. Ames, Ms. Landry,

Ms. Sparks, and Mr. Gould, all cited by Plaintiffs, do not support this part of PSAMF ¶ 152 and amends the statement accordingly.

57   DSMF ¶ 95, admitted by Plaintiffs at PRDSMF ¶ 95, resolves the dispute raised in PSAMF ¶ 154 and DRPSAMF ¶ 154.

58   As discussed elsewhere in this order, the MHRA and ADA diverge in the relief they afford, and the Court addresses this distinction as regards the issue of Plaintiffs' standing.

59   Defendants insist their representatives asked Plaintiffs to leave the Maine Mall on May 7, 2022; Plaintiffs contend they were instead detained and forced to stay in the Mall as they awaited the police's arrival. The Court addresses the merits of the Plaintiffs' false imprisonment claim below; however, the factual record (viewed in the light most favorable to the non-movants) supports the conclusion that Plaintiffs, on several instances, were told to leave because they could not be present in the Mall with their service animals. DSMF ¶ 50; PRDSMF ¶ 50 PSAMF ¶ 137; DRPSAMF ¶ 137; DSMF ¶ 61; PRDSMF ¶ 61; PSAMF ¶ 140; DRPSAMF ¶ 140.

60   Defendants challenge MWD's standing to claim false imprisonment, *Defs.' Mot.* at 16; however, Plaintiffs clarify that the false imprisonment count is brought only on behalf of the individual Plaintiffs. *Pls.' Opp'n* at 11 n.5, 20 n.10. The Court thus considers this claim with regard to the individual Plaintiffs only.

61   It is not disputed that Defendants met their burden of raising the statutory cap on punitive damages as an affirmative defense in their answer. *See Answer to Compl.* at 10; *Tourangeau v. Nappi Distribs.*, No. 2:20-cv-00012-JAW, 2022 WL 2132303 at *——, 2022 U.S. Dist. LEXIS 105623 at *12-15 (D. Me. June 14, 2022).

62   As noted, Plaintiffs' complaint labels the false imprisonment and retaliation claims a separate Count III. *Compl.* at 15. The Court assumes this was a typographical error and refers to the retaliation claim as the complaint's Count IV.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.