**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| OUTMEMPHIS; JANE DOE #1;<br>JANE DOE #2; JANE DOE #3;<br>and JANE DOE #4,<br><br>　　Plaintiffs,<br><br>v.<br><br>BILL LEE, in his official capacity as<br>Governor of Tennessee; JONATHAN<br>SKRMETTI, in his official capacity as<br>Attorney General and Reporter of<br>Tennessee; DAVID RAUSCH, in his<br>official capacity as Director of the<br>Tennessee Bureau of Investigation;<br>and FRANK STRADA, in his official<br>capacity as Commissioner of the Tennessee<br>Department of Correction,<br><br>　　Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 2:23-cv-2670-SHL-cgc |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Before the Court is the Motion to Dismiss Plaintiff OUTMemphis and Individual

Plaintiffs Michelle Anderson and Jane Does 2–4's First Amended Complaint.  (ECF No. 66.)

The Motion to Dismiss was filed on February 15, 2024, by Defendants Bill Lee, in his official

capacity as Governor of Tennessee; Jonathan Skrmetti, in his official capacity as the Attorney

General and Reporter of Tennessee; David Rausch, in his official capacity as Director of the

Tennessee Bureau of Investigation ("TBI"); and Frank Strada, in his official capacity as

Commissioner of the Tennessee Department of Correction ("TDOC").  (Id.)  Plaintiffs responded

on March 14, 2024 (ECF No. 67), and Defendants replied on April 11, 2024 (ECF No. 88).  The

Court held a hearing on the Motion on January 30, 2025.  (ECF No. 156.)  Defendants have since

submitted three Notices of Supplemental Authority (ECF Nos. 99, 110, 117), which

OUTMemphis asserts do not influence the outcome of the Motion to Dismiss (ECF Nos. 100,

111, 123).  OUTMemphis has also filed Notices of Supplemental Authority (ECF Nos. 123, 141,

152, 157, 167), which Defendants have not addressed.

For the following reasons, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

It is **GRANTED** as to Counts II, III, and IX, and **DENIED** as to Count I.  Further, Governor Bill

Lee is dismissed as a defendant.[1]

### BACKGROUND[2]

This case is a constitutional challenge to the Tennessee statute classifying prostitution by

a person who knows they are infected with the Human Immunodeficiency Virus ("HIV") as

Aggravated Prostitution, a "violent sexual offense" that results in lifetime registry on the

Tennessee sex offender registry.  (ECF No. 62 ¶¶ 1–2, 76, 78.)

HIV attacks the human body's immune system.  (Id. ¶ 24.)  It "impairs the immune,

hemic, and lymphatic systems of the human body and substantially limits the major life activity

of, among other things, fighting life-threatening infections by impeding the normal operation of

and functioning of the body's immune system."  (Id. ¶ 30.)  In recent years, medical advances

have helped treat HIV and keep the disease from spreading.  (See id. ¶¶ 36–43.)  Even without

mitigation techniques, many sexual acts carry a "zero to very low risk" of transmitting HIV.  (Id.

¶ 52.)  But, if untreated, HIV will almost always lead to Acquired Immuno-Deficiency Syndrome

---

[1] Because OUTMemphis is the only remaining plaintiff, and Attorney General Skrmetti is the only remaining defendant, the Clerk is **DIRECTED** to modify the case caption to reflect these changes.  The style going forward shall be OUTMemphis v. Skrmetti.

[2] The following facts come from the Amended Complaint (ECF No. 62), unless otherwise noted, and are accepted as true in considering this Motion.

("AIDS"), a "life-threatening stage" of the virus.  (Id. ¶¶ 29, 32.)  Without treatment for HIV, those who develop AIDS typically have a life expectancy of one to three years.  (Id.)

HIV first came into public consciousness in the early 1980s, when it was initially described as "gay cancer" and "gay-related immune deficiency."  (Id. ¶¶ 64, 66.)  Fear and panic coincided with what ultimately became known as the HIV/AIDS epidemic.  (Id. ¶ 65.)  At the time, the virus was associated with marginalized groups, including men having sex with men, sex workers, and Black immigrants.  (Id. ¶ 66.)  Especially during the early years of the epidemic, concern about the spread of HIV ran rampant.  (See generally ECF No. 62.)  Public health officials, despite a lack of scientific evidence, believed that sex workers living with HIV would contribute to HIV's spread.  (Id. ¶ 70.)

Legislatures across the country began to respond.  States began to pass laws criminalizing HIV in 1986.  (Id. ¶ 73.)  Tennessee followed suit.

In April 1991, the Aggravated Prostitution bill was introduced in the Tennessee House and Senate.  (Id. ¶ 76.)  Elected officials justified their support for the bill based on "the growing problem of HIV" and a "problem down in Memphis."  (Id. ¶ 77 (quoting 97 Cong. Rec. H–66. (Tenn. Apr. 22, 1991) (statement of Rep. Tim Joyce, Member, Gen. Assembly)).)  The legislation was intended to address individuals who knew they had HIV and "knowingly" continued their sex work.  (Id. ¶ 76.)  The legislation passed the Tennessee Senate and House.  (Id. ¶ 78.)

The Aggravated Prostitution statute was ultimately codified on April 29, 1991.  (Id.) Under the statute:

> (a)    A person commits aggravated prostitution when, knowing that such person is infected with HIV, the person engages in sexual activity as a business or is an inmate in a house of prostitution or loiters in a public place for the purpose of being hired to engage in sexual activity.

(b)     For the purposes of this section, "HIV" means the human immunodeficiency virus or any other identified causative agent of acquired immunodeficiency syndrome.
(c)     Nothing in this section shall be construed to require that an infection with HIV has occurred in order for a person to have committed aggravated prostitution.
(d)     Aggravated prostitution is a Class C felony.

Tenn. Code Ann. § 39-13-516.

When Tennessee adopted a sex offender registry in 1995, "aggravated prostitution" became a registerable offense. (ECF No. 62 ¶ 78.) "Aggravated prostitution" was also re-classified as a "violent sexual offense," requiring lifetime registration on the registry. (Id. ¶¶ 2, 78.) Prostitution, meanwhile, is a "misdemeanor" in Tennessee, and those who engage in misdemeanor prostitution face limited jail time. Tenn. Code Ann. §§ 39-13-513; 40-35-111(e)(2). Patronizing prostitution is also a misdemeanor offense under Tennessee law. Id. § 39-13-514.

OUTMemphis alleges that, in 2020, Tennessee had 650 newly reported cases of HIV. (ECF No. 62 ¶ 320.) It also contends that other infectious diseases—such as COVID-19, chlamydia, influenza, Meningococcal disease, syphilis, tuberculosis, Hepatitis B, genital herpes, and human papillomavirus ("HPV")—are comparable to or more severe than HIV yet are not criminalized. (See, e.g., id. ¶¶ 318–19.)

According to OUTMemphis, a detailed analysis of Aggravated Prostitution convictions in Shelby County between 1993 and 2009 found that most arrests involved activity that posed no realistic threat to public health or safety. (Id. ¶ 217.) Seventy-four percent of all Shelby County arrests resulting in Aggravated Prostitution convictions were of Black cisgender women. (Id. ¶ 227.) Across the state, 57% of arrests resulting in Aggravated Prostitution convictions were of Black cisgender women. (Id.) Seven percent of Shelby County arrests, and 20% statewide, resulting in Aggravated Prostitution convictions involved white women. (Id. ¶ 227.) Research

4

has found that transgender Black women are targeted and disproportionately impacted by Aggravated Prostitution policing and prosecutions.  (Id. ¶ 230.)  According to OUTMemphis, maintenance, administration, and enforcement of the Aggravated Prostitution statute is "motivated by a desire to harm a politically unpopular and vulnerable group and rests on unfounded prejudice and antipathy toward members of that group."  (See, e.g., id. ¶¶ 376–77.)

And the alleged harm to this group is significant.  Because those convicted of Aggravated Prostitution are placed on the Tennessee sex offender registry, they "are effectively barred from many employment opportunities, housing options, and public spaces as well as family and community life."  (Id. ¶ 5.)  For example, because they are "forbidden from working, living, or even spending short amounts of time within 1,000 feet of a school, playground, park, or other area where children gather," the people that OUTMemphis serves face challenges finding work and housing "outside these vast and ever-changing registry 'Exclusion Zones.'"  (Id.)

Plaintiff OUTMemphis is a 501(c)(3) nonprofit based in Memphis, Tennessee, that serves lesbian, gay, bisexual, transgender, and queer (LGBTQ+) people in the Mid-South.  (ECF No. 62 ¶ 14.)  OUTMemphis's mission is "to empower, connect, educate, and advocate for the LGBTQ+ community of the Mid-South."  (Id.)  The organization's constituency includes individuals with Aggravated Prostitution convictions, individuals at risk of being convicted of Aggravated Prostitution, and those who had been put on the registry because of Aggravated Prostitution convictions.  (Id. ¶ 15.)  OUTMemphis's services include "HIV testing, education, navigation-to-care, and access to financial assistance, community meals, and support groups for people living with HIV."  (Id. ¶ 248.)  It has allegedly diverted resources to counseling those who have been convicted of Aggravated Prostitution or are at risk of being prosecuted.  (Id. ¶ 249.)  Individual Plaintiffs Anderson and Jane Does 2–4 have been convicted of Aggravated Prostitution at least

once.  (Id. ¶ 17.)  These plaintiffs filed an amended complaint challenging the Aggravated

Prostitution statute and the related sex offender registry requirement.  (See ECF No. 62.)  They

seek declaratory and injunctive relief.  (Id.)

Defendants seek to dismiss the Amended Complaint under Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6).  (ECF No. 66.)  Defendants argue that (1) all Plaintiffs lack

standing to bring these claims, (2) sovereign immunity bars all of Plaintiffs' claims, and (3)

Plaintiffs have failed to state any valid claims for which relief can be granted.  (ECF No. 66 at

PageID 569–71.)

On July 1, 2024, after the amended complaint was filed, amendments to Tennessee's sex

offender registry statutes went into effect.  2024 Tenn. Pub. Acts, ch. 545.  Under these

amendments:

- A person convicted of Aggravated Prostitution under Tennessee Code Annotated Section 39-13-516 could have their record convictions expunged under certain conditions[3];
- "Aggravated Prostitution" would no longer be considered to be a "sexual offense" or a "violent sexual offense" under Tennessee Code Annotated Section 40-39-202;
- A statute addressing those convicted of Aggravated Prostitution specifically, titled "Termination of the registration requirements based on the person's status as a victim," Tennessee Code Annotated Section 40-39-218, would be removed from the Tennessee code; and
- An offender convicted under the Aggravated Prostitution statute required to register under Tennessee Code Annotated Section 40-39-207 could "file a request for termination of registration requirements with TBI headquarters in Nashville," as long as the offense occurred before July 1, 2024.

2024 Tenn. Pub. Acts, ch. 545.  Nevertheless, the Aggravated Prostitution statute remains on the

books.

---

[3] A conviction record could be expunged if it was for "the offense of Aggravated Prostitution, under § 39-13-516" and neither involved "the use, attempted use, or threatened use of physical force" nor "the use or possession of a deadly weapon."  Tenn. Code Ann. § 40-32-105.

After these amendments, the Parties filed a Joint Notice of Partial Settlement and Stipulation of Partial Dismissal. (ECF No. 124.) In that stipulation, the Parties stated that they settled Counts IV, V, VI, VII, VIII, and X of Plaintiffs' Amended Complaint (id. at PageID 1322), and those six claims have since been dismissed (ECF No. 125). As a result, no claims against Defendants Strada and Rausch remain, and no claims by Individual Plaintiffs survive. OUTMemphis is currently the only plaintiff, and Governor Lee and Attorney General Skrmetti are the remaining defendants.

Four counts from the Amended Complaint remain. Plaintiff OUTMemphis's claims against Defendants Lee and Skrmetti assert that Tennessee's Aggravated Prostitution statute (Tenn. Code Ann. § 39-13-516) violates: (1) Title II of the Americans with Disabilities Act ("ADA") (Count I); (2) the Fourteenth Amendment Equal Protection Clause (Count II); (3) Fourteenth Amendment Substantive Due Process (Count III); and (4) Section 504 of the Rehabilitation Act of 1973 (Count IX). (ECF No. 62 at PageID 539–43, 549–50.)

The Motion to Dismiss as to those remaining charges is fully briefed and ripe for review.

## ANALYSIS

Defendants Lee and Skrmetti seek dismissal of the remaining counts under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 66.) When defendants move to dismiss based on Rules 12(b)(1) and 12(b)(6), courts "are bound to consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if [the] court lacks subject matter jurisdiction." Moir v. Greater Cleveland Reg'l Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990) (citing Bell v. Hood, 327 U.S. 678, 682 (1946); Wright & Miller, 5 Federal Practice and Procedure § 1350, at 548 (1969)). Thus, subject matter jurisdiction is first addressed below, followed by the question of whether OUTMemphis alleges viable claims and then the scope of the relief at issue.

7

## I.      Rule 12(b)(1) Subject Matter Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(1), a court cannot address a claim over which it lacks subject matter jurisdiction. A court lacks jurisdiction if a plaintiff has no standing to bring the case or if a defendant is immune from suit. Lyshe v. Levy, 854 F.3d 855, 857 (6th Cir. 2017); Russell v. Lundergan-Grimes, 784 F.3d 1037, 1046 (6th Cir. 2015).

The party invoking federal jurisdiction bears the burden of establishing standing. Ames v. LaRose, 86 F.4th 729, 732 (6th Cir. 2023) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). To do so, "a plaintiff must allege (1) an injury in fact (2) that's traceable to the defendant's conduct and (3) that the courts can redress." Gerber v. Herskovitz, 14 F.4th 500, 505 (6th Cir. 2021) (citing Lujan, 504 U.S. at 559–61). This analysis is not a measure of a case's merits. See id. (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) ("A merits defect deprives a court of subject matter jurisdiction only if the claim is utterly frivolous.")). When reviewing a motion to dismiss for lack of standing, a court "must accept the allegations set forth in the complaint as true" and make "all inferences in favor of the plaintiff." Hile v. Michigan, 86 F.4th 269, 273 (6th Cir. 2023) (quoting Mosley v. Kohl's Dep't Stores, Inc., 942 F.3d 752, 756 (6th Cir. 2019)) (internal quotation marks omitted).

Lee and Skrmetti contest subject matter jurisdiction based on three arguments: (1) OUTMemphis lacks standing to bring any claim; (2) any alleged injury cannot be traced to or redressed by Lee or Skrmetti; and (3) sovereign immunity bars all claims against Lee and Skrmetti. (ECF No. 66-1 at PageID 594–604.) As discussed below, first, the pleadings establish organizational standing for OUTMemphis at this stage. However, OUTMemphis does not have standing to bring the remaining claims against Lee because no injuries can be traced to or redressed by him. On the other hand, because the alleged injury can be traced to or redressed by

8

Skrmetti, and sovereign immunity does not bar claims against him, OUTMemphis has standing to bring these claims against him.

### A.      OUTMemphis's Standing to Bring Claims

Defendants Lee and Skrmetti contend that OUTMemphis's claims must be dismissed because the group does not have associational, third-party, or organizational standing.  (ECF No. 66 at PageID 570.)  In its response, OUTMemphis clarifies that it asserts only organizational standing "because it has suffered a palpable injury as a result of the defendants' actions."  (ECF No. 67 at PageID 662 (citing MX Grp., Inc. v. City of Covington, 293 F.3d 326, 332–33 (6th Cir. 2002) (internal quotation marks omitted)).)

The Supreme Court established the concept of organizational standing in Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982).  There, Havens Realty Corporation allegedly owned and operated an apartment complex that provided false information to Black potential renters about its apartment availability—a process known as "racial steering."  Id. at 366–68.  A nonprofit counseling service organization, Housing Opportunities Made Equal ("HOME"), alleged that Haven's actions "frustrated [its] counseling and referral services" designed to help individuals rent, resulting in "a consequent drain on resources."  Id. at 369.  The Court affirmed that "organizations are entitled to sue on their own behalf for injuries they have sustained."  Id. at 379 n.19 (citing Warth v. Seldin, 422 U.S. 490, 511 (1975)).  If Havens' racial steering practices had "impaired HOME's ability to provide counseling and referral services" as alleged, there was "no question that the organization [had] suffered injury in fact."  Havens, 455 U.S. at 379.

However, for organizations to have standing, they "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals."  Food & Drug Admin. v. Alliance for Hippocratic Med., 602 U.S. 367, 393–94 (2024) (citing Havens, 455 U.S. at 378–

9

79).  In Alliance, one of the plaintiffs was an organization that consisted of a group of anti-abortion doctors and associations who sued the FDA when the agency "relaxed its regulatory requirements" for mifepristone, a medication used to end pregnancy.  Alliance, 602 U.S. at 372–73.  The Alliance plaintiffs relied on Havens to argue that, in taking this regulatory action, the FDA (1) "'impaired' their 'ability to provide services and achieve their organizational missions,'" (2) "'caused' the [plaintiff] associations to conduct their own studies on mifepristone so that the associations can better inform their members and the public about [the drug's] risks," and (3) forced them to "'expend considerable time, energy, and resources' drafting citizen petitions to the FDA, as well as engaging in public advocacy and public education."  Id. at 394 (internal citation omitted).

The Supreme Court held that the Alliance plaintiffs did not have standing because "[a] plaintiff must show 'far more than simply a setback to the organization's abstract social interests'" (id. (quoting Havens, 455 U.S. at 379)), and that an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's actions" (id.).  Unlike the Havens plaintiff organization, which suffered a direct impairment to its core counseling and referral services because of the allegedly false information defendant provided, the Alliance plaintiffs suffered no injury to their core business activities because of the FDA's actions—the medical associations and doctors were merely spending money to advocate against the FDA and educate the public to further their social interests.  Alliance, 602 U.S. at 367, 395–96.

Here, both Parties rely on Havens and its progeny.  Lee and Skrmetti assert that Alliance explicitly "limited" the holding in Havens to cases "[w]here a government agency provides false information to employees of an organization that 'directly affect[s] and interfere[s] with [the

organization's] core business activities.'"  (ECF No. 110 at PageID 1141 (quoting Alliance, 602

U.S. at 395).)  OUTMemphis counters that Alliance involved "manufactured standing" and that

this matter resembles Havens, where there was "legitimate frustration of mission allegations,"

not Alliance, where there was no concrete injury.  (ECF No. 111 at PageID 1185–86.)

OUTMemphis's allegations are more like those in Havens than Alliance.  Lee and

Skrmetti are correct that OUTMemphis "does not allege an intent to commit aggravated

prostitution or a violation" of the Aggravated Prostitution statute or a "fear" of future

prosecution.  (ECF No. 66-1 at PageID 601.)  Instead, it alleges that the enforcement of the

statute harms several of its services and impairs its core organizational activities.  (ECF No. 62 at

PageID 515–18.)  OUTMemphis plainly alleges that several of its core services have been

impacted by the enforcement of the Aggravated Prostitution statute, including (1) HIV testing

services that the organization's clients have been deterred from using in fear that they will then

be prosecuted, given the statute's "knowing" element; (2) services that assist clients in securing

housing, food, utilities, and transportation because of restrictions imposed by the challenged law

that have forced resources to be diverted; and (3) other LGBTQ+ services that have been

impaired due to the diversion of resources.  (ECF No. 67 at PageID 663–64.)  Unlike the

Alliance plaintiffs, OUTMemphis does not seek to "spend its way into standing simply by

expending money to gather information and advocate against defendant's action[s]."  Compare

ECF No. 67 at PageID 663–64, with Alliance, 602 U.S. at 394.  Rather, OUTMemphis spends

money on its core business activities to serve its clients who are impacted by the challenged

statute.  (ECF No. 62 at PageID 514–18.)  Similar to Havens, where HOME's ability to provide

its clients with counselling and referral services was altered, 455 U.S. at 379, OUTMemphis

11

alleges that Defendants, by enforcing an unlawful statute, hurt the organization's "ability to provide services for LGBTQ+ Tennesseans." (ECF No. 67 at PageID 664.)

Viewed in the light most favorable to OUTMemphis, the organization has sufficiently pled that it has standing. See Lujan, 504 U.S. at 561 (finding that "general factual allegations of injury resulting from the defendant's conduct may suffice" when stating a claim).

### B.  Standing to Sue Lee and Skrmetti

Next, Defendants argue that OUTMemphis lacks standing to sue either Lee or Skrmetti in their official capacity because neither individual has the "authority to enforce the challenged statute[]," and, therefore, OUTMemphis's alleged injuries can neither be traced to nor redressed by either Defendant. (ECF No. 66-1 at PageID 604.) OUTMemphis counters that it has "plausibly alleged" that both Lee and Skrmetti have the power to enforce the Aggravated Prostitution statute. (ECF No. 67 at PageID 665.)

Standing's traceability component requires plaintiffs to prove that they can "trace" their alleged injury to a defendant's "allegedly unlawful conduct," rather than to the challenged law itself. Collins v. Yellen, 594 U.S. 220, 243 (2021) (internal citations omitted). Additionally, the "redressability" component of standing requires plaintiffs to show how the relief requested against each defendant "could redress" the alleged injuries themselves. Universal Life Church Monastery Storehouse v. Nabors, 35 F.4th 1021, 1031 (6th Cir. 2022). Traceability and redressability are often "flip sides of the same coin" because enjoining an action caused by defendants themselves will "typically redress" the injury in question. Alliance, 602 U.S. at 380–81 (quoting Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 288 (2008)) (citation modified). As discussed below, OUTMemphis has not shown that its injuries can be traced to or redressed by Lee. However, it has sufficiently alleged standing to sue Skrmetti.

### 1.    Governor Lee

Defendants assert that OUTMemphis does not have standing to sue Lee because he lacks authority to enforce the Aggravated Prostitution statute.  (ECF No. 66-1 at PageID 602–04.)  OUTMemphis argues that it has standing to sue Lee because he "has supreme executive power, must take care that applicable federal and state laws are faithfully executed, and is responsible for the administration of state departments that enforce these laws, including [TBI and TDOC]."  (ECF No. 67 at PageID 656.)  Yet, as discussed below, these responsibilities are insufficient to establish traceability or redressability.

To establish standing to sue the governor of a state, a plaintiff "must do more than allege that [a governor] may harm them, or that he theoretically possesses the power to do so."  Doe v. Lee, 102 F.4th 330, 335 (6th Cir. 2024) (citing Nabors, 35 F.4th at 1031).  Rather, plaintiffs must make "specific, plausible allegations about what the Governor has done, is doing, or might do to injure plaintiffs."  Nabors, 35 F.4th at 1031 (citing Lujan, 504 U.S. at 560); Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin., 13 F.4th 531, 543–44 (6th Cir. 2021)).  OUTMemphis did not explain in its Amended Complaint how Governor Lee can specifically enforce the law which would lead to the injury it alleges.  (See ECF No. 62 ¶ 18 (discussing Lee as a defendant).)  It also does not allege what a federal court could order the governor to do to provide relief.  (See generally id.)  Therefore, OUTMemphis has failed to meet the traceability and redressability standing requirements as to Lee.

OUTMemphis relies on general allegations regarding Lee's "take care" duty and his responsibility over the state departments that enforce the laws.  Although Lee possesses a general "take care" power to see that the laws of the state are enforced under Article III, Section 10, of the Tennessee Constitution, the Sixth Circuit recently held in Doe v. Lee that this power is

13

insufficient, by itself, to confer standing. 102 F.4th at 335–36. Of note, in <u>Lee</u>, the Governor's responsibility over the TBI specifically did not give him a role in the enforcement of individual criminal laws beyond his general "take care" duty. <u>Id.</u> at 336.

OUTMemphis cites to <u>Allied Artists Picture Corp. v. Rhodes</u>, 679 F.2d 656 (6th Cir. 1982), arguing that the <u>Lee</u> court's holding does not control here because the Sixth Circuit neither displaced nor addressed the earlier doctrine from <u>Allied Artists</u>, 679 F.2d at 665 n.5. (ECF No. 67 at PageID 653–57.) In <u>Allied Artists</u>, the Sixth Circuit considered whether the Governor of Ohio was sufficiently connected to the enforcement of a statute regulating film marketing in considering the question of the scope of Eleventh Amendment protection. 679 F.2d at 665 n.5. However, <u>Allied Artists</u> does not discuss traceability or redressability. Thus, OUTMemphis's reliance on <u>Allied Artists</u> is misplaced.

Because Governor Lee has no role in enforcing the statute at issue, OUTMemphis has no standing to sue him here. The motion to dismiss all remaining claims against Lee is **GRANTED** and Lee is **DISMISSED**.

### 2.    Attorney General Skrmetti

Next, Skrmetti argues that he lacks "the requisite enforcement authority" needed to establish standing. (ECF No. 66-1 at PageID 595.) OUTMemphis contends that it has standing to sue Skrmetti because he (1) has the "duty to 'defend the constitutionality and validity of all legislation of statewide applicability'" (ECF No. 67 at PageID 665 (quoting Tenn. Code Ann. § 8-6-109(9))) and (2) "plays a direct role in ensuring criminal laws are enforced" when a local district attorney "peremptorily and categorically refuses to prosecute all instances of a criminal offense without regard to facts or circumstances" (<u>id.</u> at PageID 657–58). As discussed below,

14

Skrmetti's responsibilities create a reasonable risk that he may take prosecutorial action under the challenged statute, thus establishing the traceability and redressability standing requirements.

To establish standing for a state's attorney general, plaintiffs must show, not that he "may defend the constitutionality of the statute," but that he "can and may take some enforcement action against them." Nabors, 35 F.4th at 1032 (internal citations omitted). Tennessee's attorney general does not have authority to initiate criminal prosecutions; rather, that power belongs to local district attorneys. Id. (internal citation omitted). But when a local district attorney "peremptorily and categorically refuses to prosecute all instances of a criminal offense without regard to facts or circumstances," Tennessee's law creates an enforcement mechanism that allows the attorney general to ensure the law is enforced. Tenn. Code Ann. § 8-7-106.

Indeed, this statutory provision is a relatively recent one, designed to address the particular situation where a local district attorney refuses to enforce a state law. The Tennessee Constitution contemplates this situation, stating that "[i]n all cases where the Attorney for any district fails or refuses to attend and prosecute according to law, the [Tennessee Supreme] Court shall have power to appoint an attorney pro tempore." Tenn. Const. art. VI, § 5. Based on this language, in 2021, the Tennessee General Assembly enacted Tennessee Code Annotated § 8-7-106 "to put into code a process . . . for the court and the attorney general's office to enact that Constitutional language [in Article VI, Section 5, of the Tennessee Constitution]." Senate Judiciary Committee, S.B. 9008, 2021 Sess. (Tenn. 2021), available at https://tnga.granicus.com/player/clip/25560 (emphasis added). The enforcement mechanism operates as follows: first, the Attorney General may petition the Tennessee Supreme Court for appointment of a district attorney general pro tempore; second, the Tennessee Supreme Court considers whether the local district attorney has indeed "refused to attend and prosecute

15

according to law"; and, if so, the Tennessee Supreme Court shall appoint some other attorney as district attorney general pro tempore in the district attorney general's place for the sole purpose of prosecuting persons accused of committing that offense.  See Tenn. Code Ann. § 8-7-106.

There is reason to believe that Skrmetti will follow this process and take action to enforce the Aggravated Prostitution statute.  As OUTMemphis notes, the Shelby County District Attorney General's office entered into an agreement with the United States to stop enforcing the statute at issue here.  (ECF No. 100 at PageID 995.)  But Skrmetti could reasonably respond by petitioning the Tennessee Supreme Court to appoint a district attorney pro tempore, constituting an enforcement action.  (See id.)

Skrmetti's rebuttal is not persuasive.  He correctly argues that "[a] duty to defend Tennessee's laws in litigation is different than a grant of authority to enforce those laws against the public."  (ECF No. 66-1 at PageID 596.)  He also contends that OUTMemphis's description of the enforcement mechanism on which it relies to establish standing is a "multi-step speculation [that] does not plausibly show the required enforcement 'choices . . . will be made.'" (ECF No. 88 at PageID 868 (citing R.K. ex rel. J.K. v. Lee, 53 F.4th 995, 999 (6th Cir. 2022)); cf. Nabors, 35 F.4th at 1031–32.)  Skrmetti relies on Nabors to support his "multi-step speculation" characterization of Tenn. Code Ann. § 8-7-106.  (Id.)  However, the Nabors court analyzed a different constitutional provision[4] when it determined that the Attorney General "never step[ped] in" and had not "issued a direct command to district attorneys general to prosecute."  Nabors, 35

---

[4] Nabors cited Article VI, Section 5, of the Tennessee Constitution.  Nabors, 35 F.4th at 1032.  Under this section, "[i]n all cases where the Attorney for any district fails or refuses to attend and prosecute according to law, the Court shall have power to appoint an Attorney pro tempore."  Tenn. Const. art. VI, § 5.

F.4th at 1032.  Nabors did not address the statute that codified a specific process for the Attorney

General to ensure the law is enforced.  The situation here is thus less speculative than in Nabors.

Moreover, standing can be found even if enforcement actions have yet to be taken.  See

Kiser v. Reitz, 765 F.3d 601, 607 (6th Cir. 2014) ("In a pre-enforcement challenge, whether the

plaintiff has standing to sue often turns upon whether he can demonstrate an 'injury in fact'

before the state has actually commenced an enforcement proceeding against him."); see also

Adult Video Ass'n v. U.S. Dep't of Just., 853 F. Supp. 263, 266 n.4 (W.D. Tenn. 1994), aff'd, 71

F.3d 563 (6th Cir. 1995) (citing Virginia v. Am. Booksellers Ass'n., 484 U.S. 383, 393 (1988)

("The assumption that a statute will be enforced in some capacity is typically a safe one.")).

Plaintiffs can establish a pre-enforcement review challenge by alleging "a credible threat" that

the statute will be enforced.  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 161 (2014) (citing

Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)); see also Christian

Healthcare Ctrs., Inc. v. Nessel, 117 F.4th 826, 843, 852–55 (6th Cir. 2024) (noting that a

"credible threat of enforcement" was sufficient to establish standing).

The legislative history of Tennessee Code Annotated § 8-7-106 provides insight.  When

enacting the statute, the legislature intended for the Attorney General to have enforcement power

where the local district attorneys refused to prosecute.  During the Senate floor discussion, the

bill's sponsor, State Senator John Stevens, explained that the statute "put[] in place a procedure

for the state attorney general to bring forward to the court to appoint an attorney pro temp to

prosecute those instances of law [where a local district attorney refuses to]."  Senate Floor

Discussion, S.B. 9008, 2021 Sess. (Tenn. 2021), available at

https://tnga.granicus.com/player/clip/25575?view_id=610&redirect=true.  Senator Stevens

emphasized the statute's purpose when he said, "[I]t matters that our laws are enforced."  Id.

17

Additionally, Stevens explained that the bill would provide discretion to the attorney general akin to what a district attorney exercises when determining whether to prosecute a case.  Id. Specifically, he stated that, when determining whether to petition the court, the attorney general must "function[] as a prosecutor in this step . . . on whether or not they think they can make the case to a court."  Id.

The enforcement mechanism created by the 2021 statute presents a "credible threat" that Skrmetti will take prosecutorial action.  Skrmetti's responsibilities are thus sufficient to establish traceability and redressability here.  OUTMemphis has a legitimate reason, based on the statute's design, to fear the attorney general's enforcement.

Therefore, OUTMemphis has standing to bring this claim against Defendant Skrmetti.

### C.    Sovereign Immunity

Defendant Skrmetti also argues that he is protected from suit by sovereign immunity, based on the Eleventh Amendment to the United States Constitution.  (ECF No. 66-1 at PageID 594–96.)  He argues that the narrow exception to sovereign immunity under Ex parte Young, 209 U.S. 123 (1908), does not apply to him because he lacks the required authority to enforce the allegedly unconstitutional statute.  (Id. at PageID 596.)

Eleventh Amendment sovereign immunity can shield a state's agents or officials from suit in certain circumstances.  See Town of Smyrna v. Mun. Gas Auth., 723 F.3d 640, 650 (6th Cir. 2013) (quoting Ernst v. Rising, 427 F.3d 351, 358 (6th Cir. 2005) (en banc)) (noting that Eleventh Amendment immunity protects only "defendants that are the state itself or an 'arm of the state'").  The Supreme Court has consistently held that nonconsenting states are protected by the Eleventh Amendment when sued by citizens of the state in question.  See, e.g., Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 446 (2004) (collecting cases).

18

Here, OUTMemphis brought its claims against Skrmetti in his official capacity as the state attorney general.  (ECF No. 62 at PageID 460.)  Suits related to an individual's official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent."  Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 690 n. 55 (1978)) (citation modified).  Thus, Skrmetti is immune here unless one of three exceptions to Eleventh Amendment immunity apply: (1) the Ex parte Young Doctrine; (2) state consent to the suit; or (3) congressional abrogation of state sovereign immunity.  S&M Brands, Inc. v. Cooper, 527 F.3d 500, 507 (6th Cir. 2008) (citing Kovacevich v. Kent State Univ., 224 F.3d 806, 817 (6th Cir. 2000)).  OUTMemphis argues that Ex parte Young's exception applies to Skrmetti because of his responsibility for enforcing the Aggravated Prostitution statute.  (ECF No. 67 at PageID 653, 657–59.)

The Ex parte Young Doctrine allows private parties to sue state defendants in their official capacities for prospective injunctive relief.  Block v. Canepa, 74 F.4th 400, 406 (6th Cir. 2023) (internal citations omitted).  The question of sovereign immunity is closely related to standing—when "a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy this element of Ex parte Young."  Russell, 784 F.3d at 1047 (citing 209 U.S. at 154–55).  State officials with a specific tie to a statute and an explicit charge to enforce it may thus be subject to suit for prospective injunctive relief.  Id. at 1047 (citing Ex parte Young, 209 U.S. at 157); see also Welty v. Dunaway, No. 24-CV-768, 2025 WL 2015454, at *11 (M.D. Tenn. July 18, 2025) (quoting Ex parte Young, 209 U.S. at 159–60) ("Under this exception, a defendant who 'seeks to enforce' a law that is 'a violation of the Federal Constitution' is 'stripped of his official . . . character" and thus his ability to rely on sovereign immunity.").  However, a statewide official's general

19

enforcement power is insufficient for suit.  Children's Healthcare Is a Legal Duty, Inc. v. Deters,

92 F.3d 1412, 1416 (6th Cir. 1996).

If there is no reason to question that the state will enforce a challenged statute, Ex parte

Young may be applicable to pre-enforcement matters.  Booksellers, 484 U.S. at 393; Welty, 2025

WL 2015454, at *11; Russell, 784 F.3d at 1047.  For instance, in Booksellers, the Supreme Court

held that plaintiffs had standing to bring a pre-enforcement facial challenge based on injury to

booksellers and infringement of the First Amendment rights of book buyers.  Id. at 391–93.  The

Supreme Court was "not troubled by the pre-enforcement nature" of the challenge because "[t]he

State ha[d] not suggested that the . . . law will not be enforced, and [the Supreme Court saw] no

reason to assume otherwise."  Id. at 393.

As discussed earlier, OUTMemphis has standing to sue Skrmetti because of the attorney

general's active role in the Tennessee Code Annotated § 8-7-106 enforcement process, which

creates a reasonable risk of prosecutorial action by the attorney general.  Skrmetti has

enforcement power via the trigger statute, and he has not suggested that he will refrain from

enforcing the Aggravated Prostitution statute.  Like Booksellers, there is no reason to assume the

Aggravated Prostitution statute will not be enforced.  And, to the extent this is a pre-enforcement

challenge, this Court is not troubled by that.  Thus, Skrmetti is subject to suit under Ex parte

Young's exception to state sovereign immunity.  Because he is, the Court need not analyze the

abrogation or consent arguments.

The motion to dismiss Skrmetti for lack of standing is **DENIED**.

## II.    **Rule 12(b)(6) Claim Upon Which Relief Can Be Granted**

Skrmetti's arguments for dismissal based on OUTMemphis's failure to state a claim are

next considered.  "To survive a motion to dismiss, a complaint must contain sufficient factual

20

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Jackson v. Ford

Motor Co., 842 F.3d 902, 906 (6th Cir. 2016) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009)) (internal quotation marks omitted).  Courts "construe the complaint in the light most

favorable to the plaintiff, accept all the factual allegations as true, and determine whether the

plaintiff can prove a set of facts in support of its claims that would entitle it to relief." Bovee v.

Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001) (citing Mayer v. Mylod, 988 F.2d

635, 637–38 (6th Cir. 1993)).  However, courts "are not bound to accept as true a legal

conclusion couched as a factual allegation." Torres v. Vitale, 954 F.3d 866, 871 (6th Cir. 2020)

(quoting Iqbal, 556 U.S. at 678) (internal quotation marks omitted).

Skrmetti asserts that the remaining counts (Counts I–III and IX) must be dismissed

because OUTMemphis fails to state claims for which relief can be granted.  First, as to the ADA

claim in Count I, the Attorney General argues that OUTMemphis is not a proper plaintiff under

the ADA, and the alleged discrimination is not within the statute's scope.  (ECF No. 66-1 at

PageID 605–19.)  Second, as for the Rehabilitation Act claim, Defendant argues that (1) "the

Amended Complaint names no proper defendant," (2) OUTMemphis is "not a qualified

individual with a disability," (3) the State has not consented to Rehabilitation Act claims against

its criminal offense statute, in accordance with the Spending Clause, and (4) "Plaintiff[ has] not

been discriminated against 'solely' based on [its] HIV-status." (Id. at PageID 619–26.)[5]  Third,

Skrmetti argues that the Equal Protection and Substantive Due Process claims fail because the

Aggravated Prostitution statute survives rational basis review and the Amended Complaint

---

[5] Skrmetti's argument that the Rehabilitation Act claim fails because individual plaintiffs were not "otherwise qualified" (ECF No. 66-1 at PageID 622) is **DENIED AS MOOT** following the Settlement Agreement (ECF No. 124), which resulted in dismissal of Counts IV, V, VI, VII, VIII, and X of Plaintiffs' Amended Complaint (ECF No. 125).

identifies no "similarly situated comparator" to demonstrate discrimination. (Id. at PageID 626–31.) The Court reviews each argument in turn.

### A. Title II of the ADA (Count I) and Section 504 of the Rehabilitation Act (Count IX)

"Under the ADA's tripartite structure, Title I covers employment, Title II protects access to public services, and Title III protects access to public accommodations." Marble v. Tennessee, 767 F. App'x 647, 650 (6th Cir. 2019) (citing 42 U.S.C. §§ 12112, 12132, 12182). Here, OUTMemphis brings its ADA claim under Title II, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Section 504 of the Rehabilitation Act—the predecessor to Title II of the ADA—prevents qualified individuals with disabilities from being denied an equal opportunity to receive program benefits and services. Rehabilitation Act, Pub. L. No. 93-113, § 504, 87 Stat. 355, 394 (1973). To bring a claim under Section 504, a plaintiff must have a disability, be "otherwise qualified for participation in a health program or activity," be "excluded from participation in, denied the benefits of, or subjected to discrimination under the program solely by reason of his disability," and the program must receive financial assistance. Doe v. BlueCross BlueShield of Tenn., Inc., 926 F.3d 235, 241 (6th Cir. 2019) (citing Maddox v. Univ. of Tenn., 62 F.3d 843, 846 (6th Cir. 1995)).

The ADA and Rehabilitation Act are considered together as the statutes are interpreted similarly. See MX Grp., 293 F.3d at 332; see also Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 314 (6th Cir. 2012) ("[T]he Rehabilitation Act and the ADA serve the same goals, seeking to eliminate disability-based discrimination and other barriers to employment and public

services for individuals with disabilities."). "[T]he two statutes materially differ in only two ways. First, the Rehabilitation Act applies only to federally funded, rather than 'public,' entities. Second, the Rehabilitation Act requires that discrimination occur 'solely by reason of' the plaintiff's disability, whereas the ADA requires that it occur 'because of' the plaintiff's disability." Bennett v. Hurley Med. Ctr., 86 F.4th 314, 323–24 (6th Cir. 2023) (citation modified).

In arguing for dismissal of Counts I and IX, Skrmetti first asserts that OUTMemphis "is not a 'qualified individual with a disability who meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" (ECF No. 66-1 at PageID 609.) Second, he argues that OUTMemphis has not alleged discrimination that prohibits the organization from participating in "public services, programs, or benefits." (Id. at PageID 609–13.) Third, he contends that Congress lacks authority to prohibit Tennessee from engaging in intentional disability discrimination under Title II and the Rehabilitation Act. (Id. at PageID 613–19.) Lastly, he argues that OUTMemphis cannot demonstrate that it was denied certain forms of treatment "solely" on the basis of HIV status. (Id. at PageID 621.)[6]

OUTMemphis counters that (1) it need not be a "qualified individual" because entities, such as OUTMemphis, can meet the standing threshold for ADA and Rehabilitation Act claims as an organization; (2) the relief sought is not based on the provision of "public services, program, or benefits" but rather is based on the allegedly discriminatory "activities of a Public

---

[6] Skrmetti also argues that the Amended Complaint "names no proper defendant" for the Rehabilitation Act claim and that OUTMemphis lacks a cause of action for that claim. (ECF No. 66-1 at PageID 605–08, 619–20.) These standing arguments were previously addressed. See supra Section I.A.

Entity"; (3) the relief sought is in line with statutory interpretations and would not create constitutional problems; and (4) OUTMemphis alleges discrimination "solely" on the basis of a disability, meeting the Rehabilitation Act's requirements. (ECF No. 67 at PageID 669–74.)

For the reasons that follow as to each of Skrmetti's four arguments, his motion to dismiss is **DENIED** as to Count I but **GRANTED** as to Count IX.

### 1. "Qualified Individual" Under Title II of the ADA and the Rehabilitation Act

Skrmetti argues that OUTMemphis, as an organization, has not suffered "exclusion, [a] denial of benefits, or discrimination," has not shown how its association of "serv[ing] qualified individuals with disabilities" leads to an injury under the ADA, and cannot "reroute" its Title II claim under Section 1983. (ECF Nos. 66-1 at PageID 605–08 (internal citations omitted); 88 at PageID 870–72.) He also contends that OUTMemphis is not a "qualified individual with a disability" under Section 504 of the Rehabilitation Act. (ECF No. 66-1 at PageID 621.) OUTMemphis responds that it has sufficiently alleged an ADA claim because, as an organization, it "alleges discrimination on the basis of disability" and "is aggrieved by such discrimination." (ECF No. 67 at PageID 669–70 (internal citations omitted).) It points to two recent district court decisions finding that organizations can seek relief under Title II of the ADA. (ECF Nos. 157 (citing Mission Working Dogs v. Brookfield Props. Retail, Inc., No. 23-CV-00230, 2025 WL 744048 (D. Me. Mar. 7, 2025)); 167 (citing Gather Church v. Lewis Cnty., No. 25-CV-05850, 2025 WL 3771421 (W.D. Wash. Dec. 31, 2025)).) It also argues that OUTMemphis is a "qualified individual with a disability" under the Rehabilitation Act. (ECF No. 67 at PageID 688–91.)

Whether OUTMemphis can be considered a "qualified individual" under the ADA and the Rehabilitation Act is essentially the same question as whether OUTMemphis has standing,

which has already been answered.  See supra Section I.A.  When an organization alleges

discrimination by a public entity "'because of [its] known association with an individual with a

disability,'" the organization "has standing to bring [an ADA Title II] suit on its own behalf."

MX Grp., Inc., 293 F.3d at 334–35 (quoting Innovative Health Sys., Inc. v. City of White Plains,

117 F.3d 37, 47 (2d Cir. 1997)).  An organization like OUTMemphis may "sue in its own right

for injuries sustained as a result of a defendant's actions . . . where Congress has provided an

entity such a right."  Id. at 333.  And Congress, in Title II, has extended relief to "any person

alleging discrimination on the basis of disability."  Id. at 334 (quoting 42 U.S.C. § 12133).

And, directly on the question of a "qualified individual," Innovative is instructive here.

There, the Second Circuit found that Title II should be read to incorporate Titles I and III of the

ADA, which expressly "define discrimination to include conduct directed at an entity based on

its relationship or association with disabled persons."  Innovative, 117 F.3d at 47.  The Sixth

Circuit agrees.  See MX Grp., Inc., 293 F.3d at 335; see also Dayton Veterans Residences Ltd.

P'ship v. Dayton Metro. Hous. Auth., No. 22-3935, 2023 WL 8081677, at *14 (6th Cir. Nov. 21,

2023) (noting that the MX Group, Inc. court found that "an entity need only generally show that

it serves or is otherwise associated with disabled persons").  OUTMemphis is such an entity, and

therefore meets the criteria for being a "qualified individual" under Title II of the ADA.  Further,

because the Rehabilitation Act and the ADA interpret what is a "qualified individual" similarly,

the same conclusion applies to the Rehabilitation Act claim.  See MX Grp., 293 F.3d at 334.

OUTMemphis has met this element for alleging ADA and Rehabilitation Act claims.

### 2.      Participation in a Public Entity's Services, Programs, or Activities

Next, Skrmetti argues that OUTMemphis's ADA claim is "outside of Title II's scope,"

contending that the statute focuses on a public entity's affirmative provision of equal access to

public services, programs, and activities—not the enforcement of criminal laws.  (ECF No. 66-1 at PageID 609–10.)  Indeed, according to Skrmetti, OUTMemphis's failure to allege that it was "denied any public service or benefit" deprives it of the statute's protection.  (Id.)  And reliance on Title II's residual clause, according to Skrmetti, is misplaced.  (Id. at PageID 611–12.)

To begin, Skrmetti argues that the alleged actions at issue in enforcement of the statute are "arrests," not "'service[s], program[s], or activit[ies]' covered by Title II because they are not 'voluntarily provided by the police' and do not provide a benefit."  (Id. at 611 (quoting Tucker v. Tennessee, 539 F.3d 526, 534 (6th Cir. 2008)).)  OUTMemphis argues that the Sixth Circuit has not decided whether the ADA applies to arrests and that Skrmetti's reference to Tucker is irrelevant.  (ECF No. 67 at PageID 672.)

Skrmetti's comparison to Tucker is not helpful here.  Tucker involved the arrest of a deaf and mute man who committed assault, as well as the arrest of the man's deaf and mute uncle, who attempted to interfere with his nephew's arrest.  539 F.3d at 528–29.  The plaintiffs sued under the ADA, contending that police discriminated against them by "failing to provide a qualified sign language interpreter or other such reasonable accommodation(s) during their arrest[s]" and afterward at the jail and in court.  Id. at 530.  The Sixth Circuit held that the plaintiffs did not state a valid Title II claim related to the criminal proceedings, as they "were arrested because they assaulted police officers, individual citizens, or attempted to interfere with a lawful arrest."  Id. at 536.  The arrests did not arise out of intentional disability discrimination. Id. ("In sum, the Tuckers' generalized claims that they were arrested because of a miscommunication, if any, goes to the merits of the arrest and not the reasonableness of the accommodations made by the officers." (citation modified)).  Thus, the question was not whether enforcement of a criminal statute deprived anyone of a public entity's "service, program, or

26

activity," as Skrmetti contends, but whether, in the process of an arrest, there was intentional

discrimination based on disability—a separate question from the one at issue here.

Here, OUTMemphis alleges that it has been subjected to discrimination not in the process

of being arrested but because the individuals it represents are treated differently simply because

of HIV status.  (See ECF No. 62 ¶¶ 2, 118.)  The alleged mistreatment arises because those

arrested are allegedly "subjected to discrimination," as opposed to an affirmative exclusion or

denial of public services, benefits, or activities.  OUTMemphis contends that the Aggravated

Prostitution statute criminalizes individuals by classifying them based on their HIV status, which

subjects them to discrimination and meets the elements of a Title II ADA claim.  (See ECF No.

67 at PageID 668.)

The Court agrees.  Those arrested for Aggravated Prostitution are specifically subjected

to severe restrictions because of their HIV status.  See Bostock v. Clayton Cnty., 590 U.S. 644,

656 (2020) ("[T]he ordinary meaning of 'because of' is 'by reason of' or 'on account of.'  In the

language of law, this means that Title VII's 'because of' test incorporates the 'simple' and

'traditional' standard of but-for causation." (citation modified)); cf. Tucker, 539 F.3d at 534

(holding that a plaintiff did not have a valid Title II claim because their arrest was not based on

their disability).  OUTMemphis's position is well-taken.[7]

Indeed, this interpretation is also consistent with Title II's residual clause, which prohibits

"discrimination by any [public] entity."  42 U.S.C. § 12132.  Skrmetti, relying on the canon of

---

[7] See also City & Cnty. of S.F. v. Sheehan, 575 U.S. 600, 609 (2015) ("The relevant
provision provides that a public entity may not 'exclud[e]' a qualified individual with a disability
from 'participat[ing] in,' and may not 'den[y]' that individual the 'benefits of[,] the services,
programs, or activities of a public entity.'  This language would apply to an arrest if an arrest is
an 'activity' in which the arrestee 'participat[es]' or from which the arrestee may 'benefi[t].'"
(quoting 42 U.S.C. § 12132)).

construction known as ejusdem generis, argues that Title II's residual clause "prohibits

discrimination only in a public entity's 'outputs'"—that is, a public entity's services or programs.

(ECF No. 66-1 at PageID 611 (quoting Zimmerman v. Or. Dep't of Just., 170 F.3d 1169, 1176

(9th Cir. 1999)).)  OUTMemphis responds that Defendant's interpretation of Title II is narrower

than the Sixth Circuit's definition of "services, programs, and activities."  (ECF No. 67 at

PageID 672–73.)

Even considering the ejusdem generis canon, courts take a broad view of the protections

encompassed within the ADA.  Under ejusdem generis, "[catchall] clauses are to be read as

bringing within a statute categories similar in type to those specifically enumerated."  M.C. v.

Knox Cnty. Bd. of Educ., No. 17-CV-337, 2018 WL 2746014, at *6 (E.D. Tenn. June 7, 2018)

(quoting Paroline v. United States, 572 U.S. 434, 447 (2014)) (internal quotation marks omitted).

Here, the ADA's residual clause comes after specifically listing "services, programs, or activities

of a public entity."  42 U.S.C. § 12132.  Through this statutory language, "Title II imposes

affirmative obligations on public entities."  Wilson v. Gregory, 3 F.4th 844, 859 (6th Cir. 2021)

(quoting Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 910 (6th Cir. 2004))

(internal quotation marks omitted).

And those affirmative obligations apply even to the criminal justice system, to ensure that

it does not violate the ADA.  This conclusion is supported by the Sixth Circuit's broad reading of

the protections of Title II, including what falls under "programs, services, and activities."  See

Johnson v. City of Saline, 151 F.3d 564, 570 (6th Cir. 1998).  As the court concluded, this is

meant to "encompass[ ] virtually everything that a public entity does" within "the bounds of

reasonableness."  See Tri-Cities Holdings LLC v. Tenn. Admin. Procs. Div., 726 F. App'x 298,

307–08 (6th Cir. 2018) (citing Johnson, 151 F.3d at 569, 571) (internal quotation marks omitted);

28

see also Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 FR 35694-01 § 35.102 (noting that Title II applies to "anything a public entity does").  Other circuits have also viewed Title II as a "catch-all phrase that prohibits all discrimination by a public entity, regardless of the context."  Innovative, 117 F.3d at 44–45; Haberle v. Troxell, 885 F.3d 171, 180 (3d Cir. 2018); Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., 673 F.3d 333, 338 (4th Cir. 2012); Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1085 (11th Cir. 2007)).

OUTMemphis cites Johnson to support its argument that the Sixth Circuit broadly interprets Title II's purview.  (ECF No. 67 at PageID 670–71.)  In Johnson, the Sixth Circuit assessed whether the operator of a city's public access cable station could bring a Title II claim against his workplace.  See 151 F.3d at 569–72.  The city provided space and equipment for the station, and it was thus considered to be a "public entity."  Id. at 571–72.  The court concluded that "(1) the discrimination referenced in the statute must relate to services, programs, or activities; and (2) services, programs, and activities include all government activities."  Id. at 569.  The Johnson court reached this conclusion in part by assessing the breadth of the word "activities."  Id. at 570 (noting that "the word 'activities,' on its face, suggests great breadth and offers little basis to exclude any actions of a public entity").[8]  This interpretation of the ADA's protections, according to the Johnson court, must also be "reasonable."  Id. at 571.  And here, as discussed, applying Title II's protections to the Tennessee criminal justice system's enforcement of the Aggravated Prostitution statute is reasonable.

Additionally, Skrmetti cites Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356 (2001), to argue that OUTMemphis's "expansive reading of Title II's residual clause" is incompatible

---

[8] The Johnson court also assessed the Rehabilitation Act and governmental regulations interpreting the ADA to bolster its reasoning.  151 F.3d at 570.

with binding precedent concerning Title I.  (ECF No. 66-1 at PageID 612.)  Because Garrett

determined that "Congress lacked authority to abrogate the States' sovereign immunity for

failing to comply with Title I's provisions," Skrmetti argues that OUTMemphis's interpretation is

too broad.  (Id.)  OUTMemphis counters that Garrett, a case dealing with Title I of the ADA,

provides no insight into what activities are covered under Title II.  (ECF No. 67 at Page ID 674.)

In Garrett, the Supreme Court determined that the ADA's legislative record does not

"authorize private individuals to recover money damages against the States" under Title I.  531

U.S. at 374.  Title II of the ADA is only explicitly mentioned in a footnote, where the Supreme

Court identified a lack of briefing from the parties on Title II's applicability.  Id. at 360 n.1; see

also id. ("We are not disposed to decide the constitutional issue whether Title II, which has

somewhat different remedial provisions from Title I, is appropriate legislation under § 5 of the

Fourteenth Amendment when the parties have not favored us with briefing on the statutory

question.").  Thus, this Court's conclusion as to Title II—a different part of the code—does not

contradict the Supreme Court's ruling in Garrett.  Moreover, OUTMemphis seeks prospective

injunctive relief, while Garrett concerned employment claims for money damages under Title I.

See Garrett, 531 U.S. at 374.  Skrmetti's several arguments as to why Title II should not be read

broadly enough to encompass OUTMemphis are unavailing.

Therefore, viewing facts alleged in the Amended Complaint in the light most favorable to

OUTMemphis, it has sufficiently alleged that Skrmetti's actions subjected the individuals it

represents to discrimination related to a public entity's services, programs, or activities, based on

their HIV status.

30

3.    **Whether Congress Has Authority Under Section 5 of the Fourteenth Amendment, the Commerce Clause, and the Spending Clause to Prohibit Tennessee from Engaging in Intentional Disability Discrimination Under Title II of the ADA and the Rehabilitation Act**

Skrmetti next challenges OUTMemphis's statutory interpretations as overly expansive, asserting that its interpretation of Title II "would create serious constitutional problems," given Congress's enactment of the ADA under § 5 of the Fourteenth Amendment and the Commerce Clause.  (ECF No. 66-1 at PageID 613–19.)

"Congress is free to define the remedies available under any kind of legislation, whether enacted under § 5 of the Fourteenth Amendment, the Spending Clause, the Commerce Clause, or the Taxing Power."  Jones v. City of Detroit, 20 F.4th 1117, 1122 (6th Cir. 2021).  When enacting the ADA, Congress relied on powers granted by both § 5 of the Fourteenth Amendment and the Commerce Clause.  42 U.S.C. § 12101(b)(4).  Congress relied on the Spending Clause when enacting the Rehabilitation Act.  See 29 U.S.C. § 794.  But Skrmetti challenges whether the bounds of the Constitution allow OUTMemphis to use these statutes to make its claims.

First, Skrmetti relies on City of Boerne v. Flores, 521 U.S. 507, 529–36 (1997), to argue that OUTMemphis's interpretation of Title II exceeds Congress's § 5 authority "to enforce, by appropriate legislation[,]" the Fourteenth Amendment's provisions.  (ECF No. 66-1 at PageID 613–19.)  He further asserts that OUTMemphis's stance would "push the Commerce Clause power of Congress beyond the outermost limits."  (Id. at PageID 617–19.)  Lastly, he contends that, under the Spending Clause, Tennessee did not properly waive sovereign immunity or consent to the Rehabilitation Act claim.  (Id. at PageID 623.)  OUTMemphis contends that Congress had the power to enact the ADA under both constitutional provisions, and that Tennessee consented to OUTMemphis's Rehabilitation Act claim by receiving federal funds and thus waiving sovereign immunity.  (See ECF No. 67 at PageID 674–87, 691–95.)  The Parties'

31

arguments regarding (1) Section 5 of the Fourteenth Amendment, (2) the Commerce Clause, and (3) the Spending Clause are addressed below.

**a.**    <u>**Section 5 of the Fourteenth Amendment and the ADA Claim**</u>

First, Skrmetti argues that OUTMemphis's ADA claim is not the type of claim for which sovereign immunity was properly abrogated under § 5 of the Fourteenth Amendment. Sovereign immunity, as discussed earlier, shields the state and its agents from suit under the Eleventh Amendment of the United States Constitution. However, Congress can abrogate this immunity if, in addition to using clear language in the statute itself, it "acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment." <u>Touvell v. Ohio Dep't of Mental Retardation & Developmental Disabilities</u>, 422 F.3d 392, 395 (6th Cir. 2005) (citing <u>Hibbs</u>, 538 U.S. at 726).

In <u>City of Boerne v. Flores</u>, 521 U.S. 507 (1997), the Court set out the test for when state sovereign immunity has been properly abrogated under § 5 of the Fourteen Amendment: when the remedial legislation exhibits "a congruence and proportionality" between an injury and the means to remedy it. 521 U.S. at 520. Under <u>City of Boerne</u>, a court examines three steps to determine whether Congress properly abrogated state sovereign immunity. <u>Tennessee v. Lane</u>, 541 U.S. 509, 522–31 (2004). First, it "identif[ies] the constitutional right . . . that Congress sought to enforce" in enacting a statute. <u>Id.</u> Second, the court looks for a documented history of a violation of this right that would justify Congress's intervention. <u>Id.</u> at 524. Third, the court asks whether the statute is "congruent and proportional" to the violation at issue. <u>Id.</u> at 531.

In <u>Tennessee v. Lane</u>, 541 U.S. 509 (2004), the Court found that at least one Title II provision properly abrogated state sovereign immunity. There, the Court applied the <u>City of Boerne</u> analysis to determine that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority

32

to enforce the guarantees of the Fourteenth Amendment." 541 U.S. at 533–34.[9] However, the

Court "resisted any temptation to conclude that Congress's abrogation of immunity would be

valid for <u>any</u> claim filed under Title II, reminding lower courts that context matters." <u>Saqr v.</u>

<u>Univ. of Cincinnati</u>, No. 18-CV-542, 2019 WL 699347, at *5 (S.D. Ohio Feb. 20, 2019), <u>report</u>

<u>and recommendation adopted</u>, No. 18-CV-542, 2019 WL 1200802 (S.D. Ohio Mar. 14, 2019)

(citing <u>Lane</u>, 541 U.S. at 530).

Skrmetti argues that OUTMemphis cannot state a claim under Title II of the ADA

because its interpretation would exceed Congress's § 5 authority to enact prophylactic

legislation. (ECF No. 66-1 at PageID 613–19.) He asserts that, under <u>City of Boerne</u>, applying

Title II to the intentional disability discrimination alleged in the Aggravated Prostitution statute

would be disproportionate to the problems Congress identified when it enacted the ADA. (<u>Id.</u> at

PageID 614.) Given this lack of proportionality, Skrmetti contends, using Title II of the ADA to

challenge this conduct would be an inappropriate application of the Fourteenth Amendment.

(<u>Id.</u>) OUTMemphis counters that it can "easily satisfy" each step of the <u>City of Boerne</u> analysis

and demonstrate that § 5 of the Fourteenth Amendment permits using Title II of the ADA to

---

[9] This Court previously expressed uncertainty about applying the <u>City of Boerne</u> framework, given that OUTMemphis only seeks prospective injunctive relief. (<u>See</u> ECF Nos. 154, 156.) <u>See also</u> <u>Sims v. Univ. of Cincinnati</u>, 219 F.3d 559, 562 (6th Cir. 2000) ("Congress's enforcement authority under § 5 of the Fourteenth Amendment is remedial and preventative in nature." (citing <u>City of Boerne</u>, 521 U.S. at 524)); <u>Garrett</u>, 531 U.S. at 374 ("[I]n order to authorize private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional [via the <u>City of Boerne</u>] to the targeted violation."). However, at the January 30, 2025 hearing, both Parties remained adamant that this framework applies. (<u>See</u> ECF Nos. 155–56 (sealed).) Thus, the Court evaluates whether OUTMemphis seeks to apply Title II of the ADA in a way that was properly abrogated under § 5 of the Fourteenth Amendment.

33

challenge the alleged intentional disability discrimination facilitated by the Aggravated

Prostitution statute.  (ECF No. 67 at PageID 674–79.)

Only "congruent and proportional" remedies are permissible under § 5 of the Fourteenth

Amendment.  The proportionality inquiry essentially consists of two facets: "[1] the extent of the

threatened constitutional violations, and [2] the scope of the steps provided in the legislation to

remedy or prevent such violations."  Coger v. Bd. of Regents of State of Tenn., 154 F.3d 296,

306 (6th Cir. 1998).  Each City of Boerne factor is addressed below.[10]

### i.     Nature of Constitutional Right That Congress Sought to Enforce Under Title II of the ADA

The City of Boerne analysis first requires identifying "with some precision the scope of

the constitutional right at issue," which then allows courts to assess "the metes and bounds of the

constitutional right in question."  Garrett, 531 U.S. at 365, 368.  In other words, the Court must

identify the constitutional rights that Congress aimed to enforce when enacting Title II.  See

Lane, 541 U.S. at 522.  "The ADA represents Congress' considered efforts to remedy and prevent

what it perceived as serious, widespread discrimination against the disabled."  Thrope v. Ohio,

19 F. Supp. 2d 816, 822 (S.D. Ohio 1998) (citation modified).

---

[10] Some circuits have read Lane to "conclusively resolve" the first two City of Boerne factors as to Title II, such that the nature of the right sought and the congressional record need not be assessed.  See T.W. v. N.Y. State Bd. of L. Exam'rs, 110 F.4th 71, 83 (2d Cir. 2024) (citing Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 487 (4th Cir. 2005); McCarthy ex rel. Travis v. Hawkins, 381 F.3d 407, 423 (5th Cir. 2004) (Garza, J., concurring in part and dissenting in part); Klingler v. Dir., Dep't of Revenue, 455 F.3d 888, 896 (8th Cir. 2006); Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ., 405 F.3d 954, 957–58 (11th Cir. 2005)).  But other circuits have viewed Lane more narrowly regarding Title II and require an individual assessment of each City of Boerne factor.  See Toledo v. Sanchez, 454 F.3d 24, 35 (1st Cir. 2006); Guttman v. Khalsa, 669 F.3d 1101, 1117 (10th Cir. 2012).  Because the Sixth Circuit has not ruled on this issue, and the Parties discuss each component in their filings, the Court will address each City of Boerne factor.

Here, the right at issue is to be free from intentional discrimination based on one's HIV status.  As Lane explains, Title II "seeks to enforce [a] prohibition on irrational disability discrimination . . . [and] seeks to enforce a variety of other basic constitutional guarantees, . . . infringements of which are subject to more searching judicial review."  541 U.S. at 510 (internal citations omitted).   Even though Congress's remedy in Title II is a "a limited one," Lane, 541 U.S. at 531, Congress's broad purpose is to end irrational discrimination based on disability.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985) ("Our refusal to recognize the [disabled] as a quasi-suspect class does not leave them entirely unprotected from invidious discrimination. . . .  The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").[11]

The potential harm caused by the Aggravated Prostitution Statute is significant.  See Nat'l Ass'n of the Deaf v. Florida, 980 F.3d 763, 771–72 (11th Cir. 2020) (considering a statute's impact when evaluating the first City of Boerne factor).  Those convicted under the Aggravated Prostitution statute face criminal penalties, which can stay with them and impact their future ability to succeed in society.  See Saqr, 2019 WL 699347, at *6 (quoting Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ., 405 F.3d 954, 958 (11th Cir. 2005)) (applying the City of Boerne analysis to a Title II claim and determining that, although the right at issue was not fundamental, it was "vital to the future success of our society").

---

[11] OUTMemphis also counters a potential argument, which Skrmetti does not make, about the ADA's "direct threat exception."  (ECF No. 67 at PageID 675 (citing 28 C.F.R. § 35.139(b)).)  Although the "direct threat exception" allows entities to engage in a form of "rational" intentional disability discrimination, only after engaging in "an individualized assessment" of a person's risk level, 28 C.F.R. § 35.139(b), it cannot apply to the Aggravated Prostitution statute because the statute makes no such individualized assessment.  See Disability Rts. N.J., Inc. v. Comm'r, N.J. Dep't of Hum. Servs., 796 F.3d 293, 301 (3d Cir. 2015) (noting that a "direct threat" cannot be established under Title II without an individualized inquiry).  If Skrmetti had raised the argument, it would have failed.

While the nature of the constitutional right that OUTMemphis alleges is at issue here is not a fundamental one, Congress's intent to prohibit intentional discrimination based on disability is clear, and that is the protection sought by OUTMemphis.  This factor is satisfied.

**ii.**      <u>**Extent to Which Congress Passed Title II of the ADA in Response to a Documented History of Discrimination**</u>

Next, <u>City of Boerne</u> requires examination of the ADA's legislative record to determine whether, as relevant here, Congress identified a "history and pattern" of state criminal laws that irrationally discriminated against people with disabilities.  <u>See</u> <u>Garrett</u>, 531 U.S. at 368; <u>see also</u> <u>Touvell</u>, 2004 WL 5566567, at *1 (noting that this part of the analysis requires courts to "examine the statute's legislative history to determine whether the statute was in response to a history or pattern of widespread deprivation of constitutional rights protected by the Fourteenth Amendment").  The record must be sufficient to "justify Congress' exercise of its prophylactic power."  <u>Lane</u>, 541 U.S. at 528.  This assessment examines the context surrounding Title II's passage and what Congress intended to address.

Although Congress considered the ADA's impact on those with HIV, Skrmetti asserts that this review was limited to the Title I employment context, not Title II.  (ECF No. 66-1 at PageID 615 (citing Senate Committee on Labor and Human Resources, Rep. 101–116 (Aug. 30, 1989), p. 37 (citing <u>Sch. Bd. of Nassau Cnty. v. Arline</u>, 480 U.S. 273, 287 n.16 (1987)).)  According to him, "[t]here is not a Congressional record of irrational discrimination in criminal laws and prosecutions by the States that Congress gathered and made findings about in order to justify a sweeping application of Title II, as is contemplated here."  (ECF No. 156 at PageID 1919.)  Skrmetti contends that the analysis here resembles the one conducted in <u>Garrett</u> (<u>see id.</u>), where the Supreme Court determined that the congressional record when enacting Title I of the ADA included "minimal evidence of unconstitutional state discrimination in employment against the

36

disabled," 531 U.S. at 370.  OUTMemphis counters that Congress took a broader view when assessing widespread unequal treatment leading to the passage of Title II, satisfying this City of Boerne factor.  (ECF No. 67 at PageID 675–77.)  It also asserts that Congress considered testimony about HIV-related discrimination when approving Title II.  (See ECF No. 156 at PageID 1921–23.)

To begin, the Garrett court assessed the legislative record in the context of Title I.  See Garrett, 531 U.S. at 370–71.  Here, however, the Court is evaluating a claim brought under Title II.  The analysis of this factor must focus on the passage of Title II.  And, when enacting Title II, Congress investigated the discrimination broadly faced by individuals with disabilities.  42 U.S.C. § 12101(a); see Lane, 541 U.S. at 524 ("Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights."); see also Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 487 (4th Cir. 2005) (noting that, when the Lane court examined examples of disability discrimination, "it was the cumulative effect of this evidence that mattered most").

Congress knew about the discrimination individuals with HIV faced.  See Coolbaugh v. Louisiana, 136 F.3d 430, 436 (5th Cir. 1998) (ruling on a Title II claim and noting that Congress considered "the medical, financial, ethical, policy, and legal issues that affect those afflicted with HIV" when enacting the ADA (citation omitted)).  A Senate Report "favorably" recommending the need for ADA-like legislation cited the former chairperson of the President's Commission on the [HIV] Epidemic, who testified that "the Commission concluded that discrimination against individuals with HIV infection is widespread and has serious repercussions for both the individual who experiences it and for this Nation's efforts to control the epidemic."  S. Rep. No.

37

101-116, pt. IV, at 7 (1989).  The Commission recommended "omnibus civil rights legislation" and saw the ADA as a potential part of that landscape.  Id.  As both Parties note, while Congress was considering the ADA, many states had laws attempting to criminalize the means for spreading HIV.  (See ECF Nos. 66-1 at PageID 615–16 & n.10; 67 at PageID 676.)

Although Skrmetti contends that these references arose only regarding Title I (ECF No. 66-1 at PageID 615), HIV was discussed multiple times and in multiple contexts as Congress considered Title II.  For instance, stories of discriminatory treatment, including in a criminal context, were raised by individuals with HIV at various points during hearings on the ADA.  See Americans with Disabilities Act of 1988: Hearing Before the S. Comm. on Lab. and Hum. Res., Subcomm. on the Handicapped, and H. Comm. on Educ. and Lab., Subcommittee on Select Educ., ADA-LH 16, 1989 WL 1176429 (A.&P.L.H.), at *14, 29–41 (noting "widespread" concerns relating to HIV specifically during a hearing on the ADA when Title II was discussed).[12]  Yes, OUTMemphis has not identified a specific Congressional reference to prostitution or the criminalization of prostitution.  See also 42 U.S.C. § 12101; S. Rep. No. 101–116 (1989); H.R. Rep. No. 101–485 pts. 1, 2, 3 & 4 (1990), reprinted in 1990 U.S.C.C.A.N. 267; H.R. Conf. Rep. 101–558 (1990); H.R. Conf. Rep. No. 101–596 (1990), reprinted in 1990 U.S.C.C.A.N. 565.  Nevertheless, the record demonstrates that Congress intended to address the

---

[12] For one story of how a man with AIDS was treated differently by law enforcement, as told during an ADA hearing on the ADA, see Americans with Disabilities Act of 1988: Hearing Before the S. Comm. on Lab. and Hum. Res., Subcomm. on the Handicapped, and H. Comm. on Educ. and Lab., Subcommittee on Select Educ., ADA-LH 16, 1989 WL 1176429, at *58 (1988) (statement of Mary Linden) ("A man passing through a central Kentucky town was stopped for drunk driving.  After he told the arresting officers that he had AIDS, the man's car was driven to a parking lot of the jail.  Instead of putting the man in jail, the officers locked him inside his car to spend the night.  The car was eventually surrounded by sightseers, staring and pointing at the man.").

38

pervasive history of unequal treatment faced by those with disabilities, including those infected with HIV.[13]

Given this deep legislative record and consideration, Congress intended for the legislation to protect those with HIV from discrimination.  The robust legislative history weighs in favor of OUTMemphis's attempt to invoke Title II to support the rights of those who know they have HIV while engaged in prostitution.

<strong>iii.    Congruence and Proportionality Between the Remedy OUTMemphis Seeks and the Purview of ADA Title II</strong>

Finally, City of Boerne requires a "congruence and proportionality" inquiry.  This factor asks whether Title II is an appropriate response to remedying the injury to the right in question, rather than overly burdensome or disproportionate.  See Lane, 541 U.S. at 531–32.  Title II's "affirmative obligation to accommodate people with disabilities" as they allegedly face intentional discrimination based on their HIV status "cannot be said to be 'so out of proportion to a supposed remedial or preventive [purpose] that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'"  Id. at 533 (citing City of Boerne, 521 U.S. at 532; Kimel, 528 U.S. at 86).

---

[13] Congress outlined the broad "Purpose" of Title II:

(1)    to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
(2)    to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
(3)    to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and
(4)    to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. § 12101(b).

39

Skrmetti asserts that OUTMemphis seeks legal remedies that go beyond the scope of Congress's purpose in enacting Title II of the ADA.  (ECF No. 66-1 at PageID 616.)  He argues that because "no Plaintiff has any right to engage in prostitution," Title II's imposition of liability against Skrmetti for enforcing the Aggravated Prostitution statute would be "out of proportion to a supposed remedial or preventive [purpose]."  (Id. (quoting City of Boerne, 521 U.S. at 532).)  According to Skrmetti, using Title II to invalidate the Aggravated Prostitution statute "infringes on Tennessee's traditional authority over moral and public-health issues" and "imposes significant costs on the State's public health system by removing a tool for limiting the spread of HIV," which is an "out of proportion" response when no fundamental rights are at stake.  (Id. at PageID 617 (citing Barnes v. Glen Theatre, Inc., 501 U.S. 560, 560 (1991); City of Boerne, 521 U.S. at 532).)  He contends that, when assessing "the difference in standards between the underlying nature of the right and the remedy afforded by the ADA in terms of congruence and proportionality, this case looks exactly like Garrett."  (ECF No. 156 at PageID 1920.)

According to OUTMemphis, the Aggravated Prostitution statute is the type of law that the ADA was designed to prohibit.  (See id. at PageID 1914.)  It argues that the legislature enacted the Aggravated Prostitution statute because of stereotypes, which the ADA sought to limit.  (ECF No. 67 at PageID 678.)  It asserts that deference to congressional intentions "is particularly appropriate in the context of disabled individuals."  (Id. at PageID 678–79 (citing Johnson v. State Tech. Ctr., 24 F. Supp. 2d 833, 840–41 (W.D. Tenn. 1998).)  And it argues that Congress used an "appropriately limited" approach when enacting Title II of the ADA, because it only prohibits classifications "unfounded in science."  (Id. at Page ID 679 (citing Lane, 541 US at 531).)  According to OUTMemphis, Title II offers a guide for addressing how laws like the

40

Aggravated Prostitution statute should be measured, which satisfies the final factor of the City of Boerne test. (Id.)

The question here is whether Title II can permissibly address OUTMemphis's alleged injury under the Aggravated Prostitution statute—the criminalization of prostitution based on known HIV status, or intentional disability discrimination. The assessment only involves the specific purpose at issue here, rather than the ADA in its entirety. See id. at 531 n.18 (noting that "courts need not examine 'the full breadth of the statute' all at once"). OUTMemphis's sought-after remedy "under Title II of the ADA [must be] congruent and proportional to the injury and the means adopted to remedy the injury." Saqr, 2019 WL 69934, at *7 (quoting Ass'n for Disabled Americans., 405 F.3d at 959). Thus, OUTMemphis's sought-after application of Title II cannot be "so out of proportion to a supposed remedial or preventive [purpose] that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." Toledo v. Sanchez, 454 F.3d 24, 39 (1st Cir. 2006) (quoting City of Boerne, 521 U.S. at 532) (internal quotation marks omitted). "Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." City of Boerne, 521 U.S. at 530.

Here, Skmretti's arguments are unpersuasive. The Aggravated Prostitution statute results in criminal penalties for knowingly engaging in prostitution while having HIV. Given the breadth of the ADA's scope, and the harshness of intentional disability discrimination manifesting in criminal penalties, the Aggravated Prostitution statute is reasonably in line with the kind of matters that Congress intended to address with the enactment of the ADA. Despite Skrmetti's argument that the Tennessee legislature enacted the Aggravated Prostitution statute

41

because of concerns regarding health and safety,[14] imposing criminal penalties based on disability flies in the face of the ADA's wide-ranging mission. Although legislatures must be able to address public health concerns, the record indicates that Congress still intended Title II of the ADA to evaluate such legislation for intentional discrimination based on a disability, such as one's HIV status.[15]

Weighing the City of Boerne factors—the nature of the right at stake, the legislative history, and the congruence and proportionality between the injury and potential means to prevent it—OUTMemphis's ADA claim is not barred by § 5 of the Fourteenth Amendment. Thus, because Congress properly abrogated Tennessee's sovereign immunity as to this claim, Skrmetti's motion to dismiss Count I is **DENIED**.

### b.       The Commerce Clause and the ADA Claim

Next, Skrmetti argues that OUTMemphis's ADA claim exceeds what is permissible legislation under the Commerce Clause. (ECF No. 66-1 at PageID 617–19.) He argues that a state's enforcement of criminal statutes is not an "economic endeavor" and thus cannot be regulated under the Commerce Clause. (Id. (quoting United States v. Morrison, 529 U.S. 598,

---

[14] Courts have recognized that governments have actual interests in certain areas of regulation relevant here. For a discussion of these interests, see the Equal Protection Clause section. See infra Section II.B.1.

[15] Skrmetti's argument that the Supreme Court's reasoning in Garrett exemplifies how this factor should be applied (see ECF No. 156 at PageID 1919–20) is further unpersuasive. In Garrett, a Title I case, the Supreme Court ruled that "it would be entirely rational (and therefore constitutional) for a state employer to conserve scarce financial resources by hiring employees who are able to use existing facilities," and yet the ADA "requires employers to 'mak[e] existing facilities used by employees readily accessible to and usable by individuals with disabilities.'" 531 U.S. at 372 (quoting 42 U.S.C. §§ 12112(5)(B), 12111(9)). Although cost factored into the Garrett decision, here, there is no cost-related justification for the enforcement of the Aggravated Prostitution statute. If anything, the statute's enforcement would cause a further strain on resources.

609 (2000)).) He cites two Supreme Court cases that struck down statutes for running afoul of the Commerce Clause—United States v. Lopez, 514 U.S. 549 (1995), which invalidated the Gun-Free School Zones Act of 1990, and Morrison, 529 U.S. at 609, which invalidated the Violence Against Women Act. (Id.)

OUTMemphis argues that this Title II claim is proper under Congress's Commerce Clause authority, and thus the claim can go forward regardless of the City of Boerne analysis. (ECF Nos. 67 at PageID 682–87; 156 at PageID 1898.) It asserts that, under the Commerce Clause, "even wholly intrastate activity is subject to congressional regulation when the activity in question substantially affects interstate commerce" and prostitution is economic activity which does so. (Id. (citing Lopez, 514 U.S. at 558–60; United States v. Todd, 627 F.3d 329, 333 (9th Cir. 2010)).) It argues that Congress had a rational basis for Title II's prohibition of disability discrimination across a range of economic activities, and thus Title II's application here is authorized under the Commerce Clause. (Id.)

Congress has "broad" authority to regulate commerce, although this power does have some limits. Maryland v. Wirtz, 392 U.S. 183, 196 (1968), overruled on other grounds, Nat'l League of Cities v. Usery, 426 U.S. 833 (1976). Regulated activity must "substantially affect[]" interstate commerce for the Commerce Clause to apply. Lopez, 514 U.S. at 559–60 ("Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained."). The Supreme Court has defined "economics" as "the production, distribution, and consumption of commodities." Gonzales v. Raich, 545 U.S. 1, 25–26 (2005) (citing Webster's Third New International Dictionary 720 (1966)). Under the power of the Commerce Clause, Congress can (1) regulate "the use of the channels of interstate commerce," (2) "regulate and protect the instrumentalities of interstate commerce, or persons or things in

43

interstate commerce," and (3) regulate "activities having a substantial relation to interstate commerce." United States v. Coleman, 675 F.3d 615, 619 (6th Cir. 2012) (citing Lopez, 514 U.S. at 558–59). There must be a rational basis for concluding that an activity substantially affects interstate commerce, a "modest" threshold. Gonzales, 545 U.S. at 22 .

Both Parties rely on Lopez, 514 U.S. 549, and Morrison, 529 U.S. 598, to support their Commerce Clause arguments. (See ECF Nos. 66-1 at PageID 618; 67 at PageID 679–80.) In Lopez, the Supreme Court held that a law criminalizing the knowing possession of a firearm in a school zone exceeded the Commerce Clause's purview because (1) the statute's terms neither related to "commerce" nor any economic activity and (2) the statute had no jurisdictional element to limit enforcement to the violation's impact on interstate commerce. 514 U.S. at 561–67. Similarly, in Morrison, the Supreme Court determined that a statute addressing gender-motived crimes of violence was "not, in any sense of the phrase, economic activity." Morrison, 529 U.S. at 613. Additionally, the violent crimes addressed in Morrison had a broad scope and did not include a jurisdictional element for the federal cause of action. Id.

Skrmetti asserts that Lopez and Morrison illustrate that criminal statutes may not be proper "economic endeavors," since the regulated activity must be economic in nature. (ECF No. 66-1 at PageID 618.) But OUTMemphis argues that Lopez and Morrison are distinguishable because they involved a "single, non-economic activity," unlike here, which concerns "an essential part of Title II's purpose: removing barriers to engagement in society for people with disabilities." (ECF No. 67 at PageID 681.)

OUTMemphis's position on Lopez and Morrison is persuasive. Unlike Lopez and Morrison, this case relates to multiple laws connected to commerce. First, the Sixth Circuit has determined that "the ADA is a valid exercise of Congress's power under the Commerce Clause to

44

prohibit even rational discrimination on the basis of disability." Reese v. Michigan, No. 99-1173,

2000 WL 1647923, at *8 (6th Cir. Oct. 24, 2000) (citing Erickson v. Bd. of Governors of State

Colls. & Univs. for Ne. Ill. Univ., 207 F.3d 945, 949–50 (7th Cir. 2000)).[16] Skrmetti argues that

the Commerce Clause bars extending Title II to OUTMemphis's claims because of the

prospective injunctive relief that OUTMemphis seeks. (ECF No. 66-1 at PageID 617.)

However, the relevant question is not what form of relief is sought, but whether the relief

substantially relates to interstate commerce. See Perez v. United States, 402 U.S. 146, 151

(1971) (The commerce power "extends to those activities intrastate which so affect interstate

commerce . . . as to make regulation of them appropriate means to the attainment of a legitimate

end . . . ." (citation omitted)).

The Tennessee Aggravated Prostitution statute relates to commerce. Tennessee defines

"prostitution" as "engaging in, or offering to engage in, sexual activity as a business or being an

inmate in a house of prostitution or loitering in a public place for the purpose of being hired to

engage in sexual activity." Tenn. Code Ann. § 39-13-512(6). Multiple terms in the statute

contemplate business-related actions, including "business" and "hired." And prostitution

connects to economic markets. See Todd, 627 F.3d at 333 ("Congress concluded that prostitution

in American cities encouraged and enlarged the market for this traffic from abroad." (internal

citation omitted)). Moreover, Congress has the "power to regulate purely local activities that are

part of an economic 'class of activities' that have a substantial effect on interstate commerce,"

---

[16] It is true that the Sixth Circuit stated that "the ADA's validity under the Commerce Clause cannot serve as the basis for valid abrogation of state sovereign immunity to suits brought under the statute." Reese v. Michigan, No. 99-1173, 2000 WL 1647923, at *8 (6th Cir. Oct. 24, 2000) (unpublished table decision). However, in that case, the Eleventh Amendment precluded the plaintiff from pursuing his claims for money damages under Title I of the ADA. Id. at *6–7. Here, Plaintiff pursues prospective injunctive relief, which the Eleventh Amendment does not bar under Ex parte Young, as discussed earlier. See supra Section I.C.

such as growing medical marijuana at home or consuming child pornography.  United States v.

Powers, 364 F. App'x 979, 982 (6th Cir. 2010) (quoting Gonzales, 545 U.S. at 17).  These

business interactions create a substantial effect on interstate commerce itself.

Thus, the Commerce Clause provides an alternative foundation for OUTMemphis's Title

II claim, in addition to § 5 of the Fourteenth Amendment.

### c.        Spending Clause

Under the Spending Clause, Congress is empowered to "lay and collect Taxes . . . to pay

the Debts and provide for the common [Defense] and general Welfare of the United States."

Tennessee v. Becerra, 117 F.4th 348, 358 (6th Cir. 2024).  Congress has "broad power" under the

Spending Clause to set the terms for its disbursements.  Cummings v. Premier Rehab Keller,

P.L.L.C., 596 U.S. 212, 216 (2022).  And, as states accept federal funds, they "waive their

Eleventh Amendment immunity with regard to Rehabilitation Act claims."  Nihiser v. Ohio

E.P.A., 269 F.3d 626, 628 (6th Cir. 2001).  Specifically, when Congress enacted the

Rehabilitation Act under the Spending Clause, it "enlisted all programs receiving federal funds"

to comply with the Act.  Arline, 480 U.S. at 277.  In determining which programs receive federal

financial assistance, courts take an expansive approach.  See Kaufman v. Carter, 952 F. Supp.

520, 527 (W.D. Mich. 1996) ("To hold otherwise would be tantamount to requiring Congress to

specify each and every one of the governmental units that it contemplates when it enacts any

statute that is generally applicable to the states.").

Section 504 defines "program or activity" to include "all the operations of . . . a

department, agency, special purpose district, or other instrumentality of a State or of a local

government."  Sharer v. Oregon, 581 F.3d 1176, 1178 (9th Cir. 2009) (quoting 29 U.S.C. §

794(b)(1)(A)).  "[I]f a state accepts federal funds for a specific department or agency, it

voluntarily waives sovereign immunity for Rehabilitation Act claims against the department or agency—but only against that department or agency." Babcock v. Michigan, No. 22-CV-12951, 2024 WL 6895830, at *13 n.5 (E.D. Mich. Mar. 30, 2024) (quoting Koslow v. Pennsylvania, 302 F.3d 161, 171 (3rd Cir. 2002)).

The issue here is whether Tennessee's acceptance of federal funds for the Attorney General's office abrogates state sovereign immunity for a Rehabilitation Act claim against the Attorney General's enforcement of a criminal statute. Skrmetti argues that the Rehabilitation Act does not "unambiguously require" Tennessee to "knowingly waive all sovereign immunity from suits alleging discrimination in its criminal code" by accepting federal funding under the Spending Clause. (ECF No. 66-1 at PageID 623–24 (citing Kentucky v. Yellen, 54 F.4th 325, 354 (6th Cir. 2022)).) He also asserts that the Rehabilitation Act only applies to programs that specifically receive federal funds "intended as a subsidy," and the state's enforcement of the Aggravated Prostitution statute does not qualify. (Id. at PageID 625–26 (citing Shotz v. Am. Airlines, Inc., 420 F.3d 1332, 1335 (11th Cir. 2005)).) OUTMemphis counters that, under the statute's text, when states accept federal funding, they "lose their immunity to Rehabilitation Act suits for discriminatory acts." (Id. at PageID 691–92 (quoting Barbour v. Wash. Metro. Area Transit Auth., 374 F.3d 1161, 1167–68 (D.C. Cir. 2004)) (citation modified).) It also argues that Skrmetti's reliance on cases that address the Rehabilitation Act in the context of claims for damages are inapposite because OUTMemphis is seeking only prospective injunctive relief. (Id. at PageID 692.)

OUTMemphis alleges, and Skrmetti does not deny, that both the State of Tennessee and the Attorney General's office accept federal funding. (ECF Nos. 62 ¶¶ 424, 431; 67 at PageID 695.) For a state to validly waive its sovereign immunity by accepting federal funds under the

47

Spending Clause, the federal funding must be reasonably calculated to respond to federal interests.  Cutter v. Wilkinson, 423 F.3d 579, 586 (6th Cir. 2005) (quoting South Dakota v. Dole, 483 U.S. 203, 209 (1987)).  Other circuits have applied this analysis to the Rehabilitation Act. See Koslow, 302 F.3d at 175 ("[O]ne need only identify a discernible relationship imposed by a Rehabilitation Act condition on a 'department or agency' and a federal interest in a program it funds[.]"); Miller v. Tex. Tech Univ. Health Scis. Ctr., 421 F.3d 342, 350 (5th Cir. 2005) ("[As a practical matter, § 504 funds received by specific state departments or agencies are frequently not tracked, making it virtually impossible to determine how the agency spent the federal dollars and whether the federal funds paid for the affected employee's salary or benefits[.]").

One federal interest manifested in the Rehabilitation Act is to "promote and expand employment opportunities in the public and private sectors for handicapped individuals and to place such individuals in employment."  Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat 355 (capitalization modified).  The employment of individuals with HIV and their ability to work are included, and prostitution is a form of work.  See Grizzard v. Nashville Hosp. Cap., LLC, No. 18-CV-00034, 2021 WL 3269955, at *27 (M.D. Tenn. July 30, 2021) ("'Prostitution' is statutorily defined as 'engaging in . . . sexual activity as a business . . . .'" (quoting Tenn. Code Ann. § 39-13-512(6))).  If individuals working in prostitution who know that they have HIV are treated differently from those working in prostitution who do not have HIV, resulting in an enhanced level of criminalization, then there is a meaningful difference relating to their employment.  Treating two different groups of individuals engaging in the same conduct differently because they know they are HIV positive triggers coverage under the Rehabilitation Act.  And a state agency accepting funds under the Act's purview must be prepared to uphold these principles, and waives its sovereign immunity under the Spending Clause.

48

Skrmetti relies on Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1 (1981), and its

progeny, to argue that the State could not sufficiently anticipate suit under the Rehabilitation Act

simply because the State accepts federal funding.  (ECF No. 66-1 at PageID 625.)  For instance,

Skrmetti cites one Sixth Circuit case quoting Pennhurst to argue that "the legitimacy of

Congress' power to enact Spending Clause legislation turns on whether the recipient voluntarily

and knowingly accepts the terms of that contract."  (Id. at PageID 623 (citation modified)

(quoting Yellen, 54 F.4th at 348).)  Therefore, to trigger Rehabilitation Act coverage here,

according to Skrmetti, "Congress must provide 'clear notice' of the obligations a spending law

entails."  (Id. (quoting Yellen, 54 F.4th at 348).)

However, Pennhurst interpreted the Developmentally Disabled Assistance and Bill of

Rights Act, which, unlike the Rehabilitation Act, does not contain a clear and express waiver of

sovereign immunity.  See Pennhurst, 451 U.S. at 5–6.  In contrast, the Rehabilitation Act

includes "the most express language" waiving Eleventh Amendment immunity.  Nihiser, 269

F.3d at 628 (citing Edelman v. Jordan, 415 U.S. 651, 673 (1974))).  Specifically, under the

Rehabilitation Act, "[a] State shall not be immune under the Eleventh Amendment of the

Constitution of the United States from suit in Federal court for a violation of section 504 of the

Rehabilitation Act of 1973."  Id. (citing 42 U.S.C. § 2000d-7 (1986)).

Moreover, concerns regarding notice most specifically apply to issues of money damages.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 287 (1998) ("When Congress attaches

conditions to the award of federal funds under its spending power, . . . we examine closely the

propriety of private actions holding the recipient liable in monetary damages for noncompliance

with the condition.  Our central concern in that regard is with ensuring that 'the receiving entity

of federal funds [has] notice that it will be liable for a monetary award.'" (citation modified)).

49

Here, OUTMemphis does not seek monetary damages—it seeks prospective injunctive relief.

Therefore, the Pennhurst comparison is even less applicable.[17]

Skrmetti also asserts that the Rehabilitation Act cannot apply because OUTMemphis does

not clarify how Skrmetti receives Rehabilitation Act funding to enforce the Aggravated

Prostitution statute, and because he incurs no liability under the Rehabilitation Act unless the

federal funds he receives were intended as a subsidy.  (ECF No. 66-1 at PageID 626.)  These

arguments are also misplaced.  Skrmetti does not seem to dispute that the Attorney General's

office receives federal financial assistance and consents to being subjected to the Rehabilitation

Act.  See Nihiser, 296 F.3d at 628.  And Congress need not say directly that it is subsidizing the

recipient of the funds to make a suit possible.  See Moreno v. Consol. Rail Corp., 99 F.3d 782,

787 (6th Cir. 1996) ("Congress may not have chosen to say in so many words that it was

subsidizing . . . but actions sometimes speak louder than words[.]").  As the Third Circuit

recognized, funds received under the Rehabilitation Act are "fungible," given that it can be

"virtually impossible" to determine what specific federal funds are going to certain purposes.

Koslow, 302 F.3d at 176 ("For our purposes, all funds received by [a state agency] under the

Rehabilitation Act are fungible.  It is virtually impossible to determine whether federal dollars

paid for [a plaintiff's] salary or any benefits he received.").  The important consideration is

whether Skrmetti received federal funds via the Rehabilitation Act, not specifically whether that

---

[17] The Parties also discuss the applicability of Pennhurst's progeny.  For instance,
Skrmetti cites Kentucky v. Yellen, 54 F.4th 325 (6th Cir. 2022), where injunctive relief under
spending clause legislation was at issue.  (ECF No. 66-1 at PageID 623–24.)  In Yellen, because
Tennessee was deprived of "clear notice" of conditions under the American Rescue Plan Act
("ARPA"), it did not know the obligations would be part of the "contract" required under the
ARPA, which was Spending Clause legislation.  54 F.4th at 348 (citing Pennhurst, 451 U.S. at
24).  The Yellen court determined that the statute included "indeterminate" language which failed
to give proper notice.  Id.  Here, however, the Rehabilitation Act includes clear and explicit
language, which directly warns states about the waiver of Eleventh Amendment immunity.

Rehabilitation Act funding went to enforcing the Aggravated Prostitution statute or any other parts of Tennessee's criminal code.  Embracing Skrmetti's argument would make it nearly impossible to bring challenges under the Rehabilitation Act and impermissibly limit its scope.

The Spending Clause does not block OUTMemphis's claim under Section 504 of the Rehabilitation Act.  When it accepted these federal funds, Tennessee consented to suit under the statute.

### 4.    Discrimination "Solely" Based on HIV Status

Skrmetti's other Rehabilitation Act-related argument is that OUTMemphis's claim under the Rehabilitation Act fails because it cannot allege that the discrimination occurred "solely" because of the disability.  (ECF No. 66-1 at PageID 621.)  Rather, Skrmetti argues that "aggravated prostitution involves more than having HIV."  (ECF No. 88 at PageID 874.)  According to Skrmetti, because the Aggravated Prostitution statute requires that a person (1) know their HIV status and (2) choose to engage in prostitution, discrimination does not occur "solely" because of disability.  (ECF No. 66-1 at PageID 621.)  The "knowing conduct," Skrmetti contends, means that the discrimination does not occur solely because of disability.  (See ECF No. 88 at PageID 874.)

OUTMemphis responds that the difference in treatment under the Aggravated Prostitution statute occurs "solely" because of a difference in HIV status, because one cannot know that they have HIV until they in fact do have HIV and the Rehabilitation Act requires an "'evenhanded treatment of handicapped persons' relative to those persons who do not have disabilities."  (ECF No. 67 at PageID 688–89 (quoting Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 618–19 (1999) (Thomas, J., dissenting).)  OUTMemphis asserts that Skrmetti "treat[s] individuals who engage in the exact same conduct (prostitution) who are not living with HIV more leniently than

51

those who are." (ECF No. 67 at PageID 689.) It highlights the fact that those living with other conditions—"such as COVID-19, Hepatitis B, genital herpes, or [HPV], many of which [OUTMemphis alleges] are easier to transmit and/or harder to treat than HIV"—are not covered by the Aggravated Prostitution statute. (Id.) However, because the statute applies to knowing criminal conduct, it does not discriminate "solely" because of disability, and Skrmetti's arguments carry the day.

There are few cases addressing what it means to discriminate "solely by reason of" disability. See Sandison v. Mich. High Sch. Athletic Ass'n, Inc., 64 F.3d 1026, 1031 (6th Cir. 1995). When raising a disparate treatment claim under Section 504 of the Rehabilitation Act, "a plaintiff must allege that the defendant acted intentionally, i.e., that the defendant engaged in discriminatory conduct intentionally, or 'solely by reason of [the plaintiff's] disability.'" Doe v. BlueCross BlueShield of Tenn., Inc., No. 17-cv-02793, 2018 WL 3625012, at *4 (W.D. Tenn. July 30, 2018), aff'd, 926 F.3d 235 (6th Cir. 2019) (citations omitted). Alleging that other individuals who did not have the disability were treated differently supports such a claim. See H.M. v. Bd. of Educ. of the Kings Loc. Sch. Dist., 117 F. Supp. 3d 992, 1012 (S.D. Ohio 2015) (finding it "reasonable to infer from the alleged facts that the treatment was solely due to [the plaintiffs'] multiple handicaps and that non-disabled [counterparts] were not treated in the same manner"); North v. Widener Univ., 869 F. Supp. 2d 630, 635–36 (E.D. Pa. 2012) (finding that a plaintiff showed that he was treated differently "solely" by reason of his disability when he was treated differently from similarly situated peers without his disability). This "solely" language "does not encompass actions taken for nondiscriminatory reasons." Doe, 926 F.3d at 242.

Under this strict standard, alleging that anything other than the disability contributed to the discrimination can be grounds for dismissal. See Saqr, 2019 WL 69934, at *11. There can

52

be no non-discriminatory reason contributing to the adverse action in question.  The Aggravated Prostitution statute distinguishes those who know that they have HIV from those who do not. Even though one cannot know that they have HIV unless they have it, discriminating based on one's knowledge is not a discrimination "solely" on the basis of disability.

To argue that the discrimination occurs "solely" on the basis of disability, OUTMemphis draws parallels to the Supreme Court's treatment of racial discrimination in a Title VII context. (ECF No. 67 at PageID 688–89.)  It compares a Black employee who is performing poorly, and is fired, with non-Black employees who are also performing poorly and are not fired.  (Id. ("[In Olmstead,] under Title VII, a fired Black employee 'had to show that although he was not a good employee, equally bad employees were treated more leniently by [his employer] if they happened not to be black.' . . .  Thus, if a plaintiff is fired because they have a disability and are often late to work, their disability may not be the sole cause of being fired.  But if others were late to work as frequently and not fired, the plaintiff would have a valid claim of discrimination solely by reason of disability."  (internal citations omitted)).)  In the first example, although there were two alleged reasons for the employee's firing (race and a difference in performance), there was, according to OUTMemphis, only one reason for the difference in treatment—race.  (ECF No. 156 at PageID 1924–25.)

But Skrmetti argues that there is a gap between the pool of individuals living with HIV who have engaged in criminal conduct and those who have not.  (Id. at PageID 1928–30.)  And he contends that a further gap exists between those who are aware of their HIV-positive status and those who remain undiagnosed.  (Id. at PageID 1931–32.)  Whichever gap one considers, argues Skrmetti, "[t]here are a number of ways that someone could be infected with HIV and not

53

be violating" the Aggravated Prostitution statute.  (Id. at PageID 1931.)  Thus, Skrmetti contends that the statute does not discriminate "solely because of" disability.

OUTMemphis's comparison to Olmstead is unpersuasive, for the Title VII analysis is different from the analysis for a Rehabilitation Act claim.  See Doe, 2018 WL 3625012, at *4 ("[U]nlike statutes like Title VII and the ADA, the Rehab[ilitation] Act includes the 'solely because of' language, critical to the Court's analysis here." (internal citations omitted)).  Under the Rehabilitation Act, unlike in the Title VII context, "a plaintiff cannot prevail by 'showing mixed motive—that is, a showing that his employer's discriminatory animus was one of the reasons, but not the only reason, for his adverse treatment.'"  Rumburg v. Sec'y of the Army, No. 10-11670, 2011 WL 1595067, at *6 (E.D. Mich. Apr. 27, 2011) (quoting Jones v. Potter, 488 F.3d 397, 409–10 (6th Cir. 2007)).  Because the Rehabilitation Act is triggered only by discrimination "solely because of" disability, the analogy to Olmstead cannot overcome the Act's narrow causation standard.  Moreover, although OUTMemphis compares those impacted by the Aggravated Prostitution statute to those with other disabilities, that argument also fails the strict "solely because of" standard.  To the extent it raises the specter of a "mixed motive" in the statute, it is likewise insufficient to make out a Rehabilitation Act claim.

Because OUTMemphis has not alleged that the discrimination occurs "solely" on the basis of disability, Skrmetti's motion to dismiss OUTMemphis's claim under Section 504 of the Rehabilitation Act is **GRANTED**.

B.    **Equal Protection Claim (Count II) and Substantive Due Process Claim (Count III)**

Under the Fourteenth Amendment to the United States Constitution, states can neither "deny any person within its jurisdiction the equal protection of the laws" (under the Equal Protection Clause) nor "deprive any person of life, liberty, or property, without due process of

54

law" (under the Due Process Clause).  The amendment's application to particular statutes is subject to different levels of scrutiny, depending on the classifications at issue.  See Clark v. Jeter, 486 U.S. 456, 461 (1988) ("In considering whether state legislation violates the Equal Protection Clause of the Fourteenth Amendment[,] we apply different levels of scrutiny to different types of classifications."); City of Cleburne, 473 U.S. at 451 (Stevens, J., concurring) ("[O]ur cases reflect a continuum of judgmental responses to differing classifications which have been explained in opinions by terms ranging from 'strict scrutiny' at one extreme to 'rational basis' at the other.").

According to Skrmetti, OUTMemphis's equal protection and substantive due process claims—Counts II and III—both fail under the applicable level of scrutiny, which he argues is rational basis.  (ECF No. 66-1 at PageID 626–30.)  In response, OUTMemphis contends that a heightened level of rational basis review applies to the Equal Protection Clause claim (ECF No. 67 at PageID 695–700), and that both its Equal Protection claim and its Substantive Due Process claim are able to withstand rational basis review (id. at PageID 695–707).

For the reasons stated below, Skrmetti's motion to dismiss Counts II and III is **GRANTED**.  Each claim is addressed separately below.

### 1.      Equal Protection Claim (Count II)

"To state an equal protection claim, a plaintiff must adequately plead that the government [treats certain people] disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis."  Raymond v. O'Connor, 526 F. App'x 526, 530 (6th Cir. 2013) (quoting Ctr. for Bio–Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 379 (6th Cir. 2011)).

Skrmetti argues that OUTMemphis's Equal Protection Clause claim fails because OUTMemphis does not identify any individuals with "relevant similarity" treated more favorably under the Aggravated Prostitution statute, nor does it identify how such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis. (ECF No. 66-1 at PageID 626–30.) In response, OUTMemphis asserts that its Equal Protection claim survives dismissal because OUTMemphis's clients are similarly situated to others convicted of misdemeanor prostitution or patronizing prostitution, and, applying a heightened level of rational basis review, there is no rational basis for the difference in treatment.[18] (ECF No. 67 at PageID 695–704.) According to OUTMemphis, scientific developments further undermine Skrmetti's position. (ECF No. 67 at PageID 701 n.20.) Thus, the questions at issue are (1) whether OUTMemphis identifies "similarly situated individuals" and (2) whether the Aggravated Prostitution statute survives the applicable standard of rational basis review.

### a.  **"Similarly Situated"**

Skrmetti asserts that OUTMemphis's equal protection claim cannot succeed because the Amended Complaint fails to identify any "similarly situated" individuals treated more favorably under the Aggravated Prostitution statute. (ECF No. 66-1 at PageID 630–31.) He argues that (1) the state is "justified" in treating HIV-positive individuals who knowingly expose others to a deadly, highly infectious disease more harshly than those HIV-positive individuals who do not know of their illness, and thus do not consciously place others at risk (id. at PageID 630–31); (2) OUTMemphis cannot compare HIV-positive individuals who engage in prostitution with others convicted of misdemeanor prostitution who have different infectious diseases with similar risk

---

[18] The Parties seem to agree that no fundamental right or suspect class is at issue. (ECF No. 66-1 at PageID 626.)

and symptoms (id. at PageID 631); and (3) it is inappropriate to compare individuals convicted of patronizing prostitution, in other words, the buyers or clients of prostitution, including those with HIV or other infectious diseases, to those OUTMemphis serves (id. at PageID 631).

In response, OUTMemphis argues that the claim is brought on behalf of individuals who are (1) "identically" situated to those buyers who patronize prostitution and who know they have HIV (ECF No. 67 at PageID 696); (2) "similarly" situated to those engaged in misdemeanor prostitution who know they have comparable diseases (id. at PageID 696–97); and (3) "similarly" situated to individuals convicted of misdemeanor prostitution who may or may not have infectious diseases, such as HIV, because advancements in medicine have so lowered the risk of HIV infection to "a zero to minuscule risk of transmission" (id. at PageID 697–98).

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, 473 U.S. at 439 (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)). States must "treat similarly situated individuals in a similar manner." S.S. v. E. Ky. Univ., 532 F.3d 445, 457 (6th Cir. 2008) (citing Buchanan v. City of Bolivar, 99 F.3d 1352, 1360 (6th Cir. 1996)) (internal quotation marks omitted).

The question of whether other persons are "similarly situated" at the motion to dismiss stage is assessed based on "relevant similarity," rather than "exact correlation."[19] Stimmel v. Sessions, 879 F.3d 198, 212 (6th Cir. 2018) (quoting Bench Billboard Co. v. City of Cincinnati, 675 F.3d 974, 987 (6th Cir. 2012)) (internal quotation marks omitted). For a successful equal protection claim, "the plaintiff must demonstrate that a discrimination of some substance has

_____

[19] Skrmetti relies on Loesel v. City of Frankenmuth, 692 F.3d 452, 462 (6th Cir. 2012), to argue that OUTMemphis has "the burden of demonstrating that they were treated differently than" others who were "similarly situated in all material respects." (ECF No. 66-1 at PageID 630.) However, Loesel was resolved on a motion for judgment as a matter of law. See 692 F.3d at 461. A motion to dismiss involves a different pleading standard.

occurred which has not occurred against other individuals who were similarly situated." Hall v.

Callahan, 727 F.3d 450, 457 (6th Cir. 2013) (citing City of Cleburne, 473 U.S. at 439).

Skrmetti argues that OUTMemphis cannot compare HIV-positive persons to HIV-

negative persons because Tennessee criminalizes "*conduct*," not "being HIV positive." (ECF

No. 66-1 at PageID 630.)  He contends that "[n]on-infected individuals who commit prostitution

are materially different"—not similarly situated—from those covered by the Aggravated

Prostitution statute because non-infected individuals "do not pose the same public health risks."

(Id.)

OUTMemphis, however, argues that one valid set of comparators are those who know

they are HIV positive and those who do not yet know they are positive.  (ECF No. 67 at PageID

697.)  Between these two individuals, those who fall under the Aggravated Prostitution statute

pose no greater risk than those who fall under the original prostitution statute.  (Id.)  It argues

that even "the 'riskiest' sexual encounter only carries a 1.4% risk of transmission" of HIV, and

many encounters carry no risk at all.  (Id. at PageID 698.)  The Aggravated Prostitution statute

does not separate people by the health risk they pose, according to OUTMemphis, but rather by

the knowledge of their medical status.  (Id. at PageID 697.)  Indeed, a major difference between

Tennessee's Misdemeanor Prostitution statute, Tenn. Code Ann. § 39-13-513, and the Aggravated

Prostitution statute, Tenn. Code Ann. § 39-13-516, is that the latter introduces a "knowing"

element.  (See id.)  "In both groups," it argues, "there are individuals who pose a risk of

transmitting HIV or another communicable disease and individuals who do not."  (Id.)

OUTMemphis's argument that two HIV-positive individuals—one who knows their

status, the other ignorant, but both committing prostitution—are valid comparators is persuasive.

Under Tennessee law, only those with the knowledge of their status receive heightened penalties.

OUTMemphis plausibly alleges that the statute violates Equal Protection by treating differently those with knowledge of their HIV status.  (Id.)

OUTMemphis raises another comparator: those who fall under the Aggravated Prostitution statute are "identically situated to people who patronize prostitution while living with HIV."  (ECF No. 67 at PageID 696.)  OUTMemphis contends that "[a]n individual living with HIV who patronizes a sex worker poses the exact same risk of HIV transmission as an individual living with HIV who engages in prostitution."  (Id.)  Assuming that the customer knows that he or she has HIV, this comparison is compelling, for both sets of individuals have the same disease and engage in the same intimate act.  However, the two are held to different standards—one is subjected to the "Aggravated Prostitution" statute, while the one patronizing is subjected to the misdemeanor "Patronizing Prostitution" statute.  See Tenn. Code Ann. § 39-13-514.  While engaging in prostitution is different than patronizing, such that the two individuals are not exactly similar, this comparison also satisfies the "relevant similarity" standard.

OUTMemphis alleges a third comparator, arguing that the individuals it represents are "similarly situated to individuals convicted of misdemeanor prostitution who know that they have communicable diseases" other than HIV.  (ECF No. 67 at PageID 696).  OUTMemphis identifies other infectious diseases that spread through intimate activity, such as chronic Hepatitis B or herpes simplex.  (ECF No. 67 at PageID 696–97.)  It provides allegations to support these comparators in the Amended Complaint.  (ECF No. 62 ¶¶ 318–66.)  According to those allegations, individuals who commit prostitution while they know they are infected with these other diseases have "relative similarities" to those who know they are infected with HIV, too.

Considering the allegations in the light most favorable to the non-moving party, OUTMemphis has alleged similarly situated comparators who are treated differently under the

59

Aggravated Prostitution statute.  But, to survive a Rule 12(b)(6) motion, the equal protection

claim must also overcome the applicable standard of review.

### b.        Rational Basis Review Standard

If an equal protection claim does not involve a fundamental right or a suspect class, as is

the case here, the statute in question will be subject to deferential rational basis review.  Bowman

v. United States, 564 F.3d 765, 772 (6th Cir. 2008) (citing City of Cleburne, 473 U.S. at 440).

Typically, applying this standard in situations where a challenged statute "appear[s] to be based

on an illegitimate purpose," courts apply a heightened rational basis standard—sometimes called

"rational basis with a bite."  Am. Exp. Travel Related Servs. Co. v. Ky., 641 F.3d 685, 691–92

(6th Cir. 2011).

Skrmetti argues that the Aggravated Prostitution statute is "rational," survives rational

basis review, and is not subject to heightened rational basis review.  (ECF Nos. 66-1 at PageID

626–30, 88 at PageID 874–76.)  OUTMemphis responds that heightened rational basis review

applies (ECF No. 67 at PageID 698–700); the Aggravated Prostitution statute has always been

and remains irrational (id. at PageID 702–03); and the statute's rationality must be evaluated

based on current science (id. at PageID 700–02).  The Parties' arguments are addressed below.

### i.        Rational Basis or Heightened Rational Basis

First, the Parties dispute whether deferential rational basis review or the more discerning

heightened rational basis review should apply.  (ECF Nos. 67 at PageID 698–700; 88 at PageID

874–76.)  The application of rational basis review does not mean that a law will automatically be

upheld.  See, e.g., Eisenstadt v. Baird, 405 U.S. 438, 446–55 (1972); U.S. Dep't of Agric. v.

Moreno, 413 U.S. 528, 533–38 (1973); City of Cleburne, 473 U.S. at 448; Romer v. Evans, 517

U.S. 620, 635 (1996).  Nevertheless, plaintiffs challenging a statute under rational basis review face an uphill battle.

OUTMemphis contends that because "individual liberty and human dignity are at stake," rational basis should be applied here with "particular vigor."  (ECF No. 67 at PageID 699.)  It argues that the Aggravated Prostitution statute was passed during a time of great fear and was "reflexively motivated by HIV-related animus."  (Id. at PageID 699–702.)  Skrmetti replies that heightened rational basis review only applies when a statute is motivated by animus, for those laws "lack a legitimate interest and must fail."  (ECF No. 88 at PageID 874–75.)  Here, however, according to Skrmetti, heightened rational basis review is inappropriate because of a lack of animus.  (Id. at PageID 874–76.)  Skrmetti also argues that heightened rational basis review is inappropriate when the legislature can independently justify the contested law.  (See ECF Nos. 66-1 at PageID 629; 88 at PageID 875.)

"Animus" is defined as 'ill will" or "animosity."  Animus, Black's Law Dictionary (12th ed. 2024).  The Amended Complaint includes multiple allegations of animus.  (See, e.g., ECF No. 62 ¶¶ 22 –23, 65, 75.)  Yet "while the court must presume the truth of all allegations in the complaint when evaluating a Rule 12(b)(6) motion to dismiss, allegations of animus do not overcome the presumption of rationality."  JDC Mgmt., LLC v. Reich, 644 F. Supp. 2d 905, 925 (W.D. Mich. 2009) (citation modified).

OUTMemphis cites Romer, 517 U.S. at 635, to argue that heighted rational basis review applies to the Aggravated Prostitution statute because it singles out those with HIV, which can only be explained by impermissible animus.  (ECF No. 67 at PageID 703.)  In Romer, the Supreme Court struck down a Colorado constitutional amendment prohibiting legislative, executive, or judicial actions intended to protect individuals from discrimination based on their

61

sexual orientation. See 517 U.S. at 623–24. The amendment "impos[ed] a broad and undifferentiated disability on a single named group" and had such "breadth" that it was "inexplicable by anything but animus toward the class it affects." Id. at 632. The state's defense for the law—that "it puts gays and lesbians in the same position as all other persons" and "does no more than deny homosexuals special rights"—lacked a rational relation to state interests. See id. at 626, 632.

But Skrmetti justifies the statute here by arguing that individuals who engage in prostitution while having HIV create a public health risk and could further spread the disease. (ECF No. 88 at PageID 875.) He cites Gallagher v. City of Clayton, in which the plaintiff argued that an ordinance prohibiting outdoor smoking on certain public properties violated the Equal Protection Clause. 699 F.3d 1013, 1018 (8th Cir. 2012). According to the plaintiff, smokers were a suspect or quasi-suspect class because of "discrimination, animus, stigma and second-class characterization." Id. However, because the city had sufficient, non-animus-related rationales for the statute, the Gallagher court found no equal protection violation under rational basis review—and there was no showing of exclusive animus that could lead to heightened rational basis. Id. at 1019–21. Rather, the court recognized that heightened rational basis review only applies "where there is no other legitimate state interest for the legislation that survives scrutiny," and the challenged statute is solely the product of animus. Id. at 1021. Even though other possible air contaminants were not banned, the statute's under-inclusivity did not cause it to trigger heightened review. Id. at 1019.

Gallagher, although not binding on this Court, is instructive. Here, too, as in Gallager, the legislature's purported motivation of "safeguard[ing] the public health" (see ECF No. 66 at

PageID 570) demonstrates a lack of animus. While the Aggravated Prostitution statute may be under-inclusive, like the law in Gallagher, this lack of breadth is not a product of animus.

Because the legislative record does not demonstrate animus, heightened rational basis review does not apply. OUTMemphis's challenge to the Aggravated Prostitution Statute based on equal protection will be assessed applying a rational basis review standard.

### ii.    Rationality of Aggravated Prostitution Statute

Skrmetti argues that "the challenged statutes are rational" because "[d]iscouraging HIV-positive individuals from engaging in prostitution rationally advances the legislature's goal to stop the spread of HIV." (ECF No. 66-1 at PageID 626–30.) According to him, "stemming the spread of a dangerous, communicable disease more than pass[es] rational-basis muster." (ECF No. 66-1 at PageID 627.) At the time the statute was enacted in 1991, according to Skrmetti, the spread of HIV was deeply threatening, and the legislature "rationally" took this concern into account when enacting the Aggravated Prostitution statute. (Id. at PageID 627–30.) He argues that the legislature had legitimate interests when enacting the statute at that time. (Id. at PageID 629 (citing Smart v. Ashcroft, 401 F.3d 119, 123 (2d Cir. 2005)).) OUTMemphis argues, however, that the statute is not written rationally to prevent the spread of HIV, either now or back in 1991. (ECF No. 67 at 703.) "[A]ll that is required under the statute beyond misdemeanor prostitution," contends OUTMemphis, "is knowledge that one is living with HIV—not risk of transmission, intent to transmit, or actual transmission." (Id. (citing Tenn. Code Ann. § 39-13-516).) According to OUTMemphis, the statute makes an irrational distinction.

The Constitution gives states "wide latitude" to legislate on social or economic matters and "presumes that even improvident decisions will eventually be rectified by the democratic processes." City of Cleburne, 473 U.S. at 440. When dealing with a classification that is

63

"presumptively rational," the plaintiff "bears the burden of proving that the facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 84 (2000) (citation modified). Because of this deferential standard of review, "the State may discriminate on the basis of disability if such classification is rationally related to a legitimate state interest." Popovich v. Cuyahoga Cnty. Ct. of C.P., 276 F.3d 808, 811 (6th Cir. 2002) (citation modified).

Skrmetti offers justifications here that other courts have upheld as rational. For instance, courts widely accept that the government has a legitimate interest in regulating health and safety. See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 607 (1982); Bah v. Att'y Gen. of Tenn., 610 F. App'x 547, 551 (6th Cir. 2015) (noting "Tennessee's legitimate interest in public health and safety"); cf. Craigmiles v. Giles, 312 F.3d 220, 225 (6th Cir. 2002) (finding that a law prohibiting selling caskets without a license had no "rational relationship" to managing health and safety). Courts have also found that governments have a legitimate interest in regulating prostitution. See Kutrom Corp. v. City of Ctr. Line, 979 F.2d 1171, 1175 (6th Cir. 1992) (finding a rational basis to regulate prostitution); Mini Spas, Inc. v. S. Salt Lake City Corp., 810 F.2d 939, 942 (10th Cir. 1987) (determining that a municipality had "a legitimate interest in prohibiting prostitution").

Applying rational basis review, courts "accept a legislature's generalizations even when there is an imperfect fit between means and ends." League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 537 (6th Cir. 2007) (quoting Heller v. Doe by Doe, 509 U.S. 312, 321 (1993)). Here, the Aggravated Prostitution statute is being used as the legislature intended—to thwart individuals who know they have HIV from risking the spread of an infectious disease by engaging in prostitution. The statute's objective of deterrence is directly tied to public health

64

goals.  And a statute with a rational public health purpose is likely to survive rational basis review.

However, OUTMemphis offers, as a final argument, that the rationality of a statute must be examined with "present-day facts," rather than with the facts available when the statute was first enacted.  (ECF No. 67 at PageID 701 n.20 (citing ECF No. 66-1 at PageID 629).)  Skrmetti responds that a law's rationality is assessed "at the time of passage."  (ECF No. 66-1 at PageID 629.)  Skrmetti cites a Second Circuit case, Smart v. Ashcroft, 401 F.3d 119 (2d Cir. 2005), to argue that even Congress's later determination that a previously enacted statute is "unfair, outdated, and in need of improvement" does not impact the law's rationality when it was enacted.  (Id. (citing 401 F.3d at 123).)

Smart was a challenge to an immigration provision that withheld derivative citizenship from foreign-born children adopted by foreign-born, naturalized parents, unless those children were living with their adopted parents while the parents were being naturalized.  401 F.3d at 120–22.  Alleging that the foreign-born adoptive children were treated differently than foreign-born biological children, the plaintiff argued that the provision violated equal protection.  Id. at 122.  The Smart court found that Congress had a rational basis for the statute and that it met the rational basis review's requirements, even though Congress had repealed these derivative citizenship requirements in the intervening years.  Id. at 123.  According to the Smart court, Congress's subsequent legislative action did not change the outcome.  Id. ("A congressional decision that a statute is unfair, outdated, and in need of improvement does not mean that the statute when enacted was wholly irrational or, for purposes of rational basis review, unconstitutional.").

The Smart ruling is persuasive, especially here, where the Tennessee legislature has not repealed the Aggravated Prostitution statute. The correct timeframe for reviewing a statute's rationality is at the time of its passage. See Wagner v. Haslam, 112 F. Supp. 3d 673, 693 (M.D. Tenn. 2015) ("In sum, where rational basis review applies—as is the case here—the U.S. Constitution allows state legislators and policymakers to make both excellent decisions and terrible decisions, provided that the decisions are based on some conceivable modicum of rationality at the time of their passage or application in practice.").

Although OUTMemphis offers additional support for its argument, these cases are unpersuasive. For example, OUTMemphis cites Nashville, Chattanooga & St. Louis Ry. v. Walters, 294 U.S. 405 (1935), to argue that a law's rationality should be considered on the facts as they are at the time of review. (ECF No. 67 at PageID 700–01.) In Walters, when evaluating the constitutionality of a law related to state highway and railroad crossings, the Supreme Court determined that "[a] statute valid as to one set of facts may be invalid as to another" and "[a] statute valid when enacted may become invalid by change in the conditions to which it is applied." 294 U.S. at 415 (citations omitted). According to the Supreme Court, the lower courts had not considered all of the important and timely facts needed to assess a legislature's justification for enforcement. Id. at 415–16, 428–29.

Here, more research is available about HIV today than when the statute was first passed, as OUTMemphis has alleged. (See, e.g., ECF No. 62 ¶ 23.) However, the conditions themselves have not changed. HIV-positive individuals engaging in prostitution still risk spreading HIV (even if the risk is lower than it had been previously). The Aggravated Prostitution statute is still being applied as intended, to thwart the spread of HIV and deter knowingly HIV-positive individuals from engaging in prostitution. Although OUTMemphis cites case law from other

66

circuits explaining that changing facts can make previously rational laws irrational,[20] that is not the case here, given the health issues that remain.  The Aggravated Prostitution statute remains rational.

Although OUTMemphis has identified "similarly-situated" individuals, OUTMemphis has not overcome rational basis review as a matter of law.  The motion to dismiss OUTMemphis's Equal Protection Clause claim is **GRANTED**.

2. <u>**Substantive Due Process Claim (Count III)**</u>

"The doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed has come to be known as substantive due process."  <u>Pearson v. City of Grand Blanc</u>, 961 F.2d 1211, 1216 (6th Cir. 1992) (citations omitted).  Skrmetti argues that OUTMemphis's substantive due process claim fails rational basis review, the applicable level of scrutiny here.  (ECF No. 66-1 at PageID 626–30.) OUTMemphis responds that it has plausibly alleged a substantive due process claim because of the statute's lack of rationality.  (ECF No. 67 at PageID 704–05.)

Substantive due process is intended to "provide heightened protection against government interference with certain fundamental rights and liberty interests."  <u>Grinter v. Knight</u>, 532 F.3d 567, 573 (6th Cir. 2008) (citation omitted).  If state legislative actions do deprive individuals of "life, liberty, or property," they must be grounded in "some rational basis." <u>Pearson</u>, 961 F.2d at 1223.  However, the result here is the same as under equal protection—

---

[20] <u>See</u> ECF No. 67 at PageID 701–02 (citing <u>Heffner v. Murphy</u>, 745 F.3d 56, 86 (3d Cir. 2014); <u>Long v. Robinson</u>, 316 F. Supp. 22, 27–28 (D. Md. 1970), <u>aff'd</u>, 436 F.2d 1116 (4th Cir. 1971); <u>Seaboard Air Line R.R. Co. v. City of West Palm Beach</u>, 373 F.2d 328, 329 n.3 (5th Cir. 1967); <u>United States v. Moore</u>, 644 F.3d 553, 554–56 (7th Cir. 2011); <u>Burlington N.R.R. Co. v. Dep't of Pub. Serv. Regul.</u>, 763 F.2d 1106, 1111 (9th Cir. 1985); <u>Dias v. City & Cnty. of Denver</u>, 567 F.3d 1169, 1183 (10th Cir. 2009)).

67

Skrmetti provides a rational basis for the Aggravated Prostitution Statute.  Once again, OUTMemphis is unable to overcome the hurdle imposed by rational basis review.

For the foregoing reasons, Skrmetti's motion to dismiss OUTMemphis's substantive due process claim is **GRANTED**, and Count III is **DISMISSED**.

### III.    <u>Scope of Relief</u>

Skrmetti finally asserts that this Court cannot properly enjoin enforcement of the Aggravated Prostitution statute against all persons, but rather the relief must be limited to OUTMemphis.  (ECF Nos. 66-1 at PageID 634–35; 88 at PageID 876.)[21]  OUTMemphis argues that it appropriately requests that Skrmetti be prevented from enforcing the statute against anyone.  (ECF No. 67 at PageID 707–10.)

Skrmetti's argument does not carry the day.  Here, OUTMemphis raises facial challenges (see ECF Nos. 66-1 at PageID 592; 67 at PageID 709) to the Aggravated Prostitution statute itself, rather than the statute's permissibility as to certain applications, see <u>Ray v. McCloud</u>, 507 F. Supp. 3d 925, 931 (S.D. Ohio 2020) (citing <u>Winston v. City of Syracuse</u>, 887 F.3d 553, 559 (2d Cir. 2018)).  Given this breadth, OUTMemphis's challenges would apply to all who are impacted by the statute, not just the party bringing the suit.  "[D]istrict courts are not categorically prohibited from granting injunctive relief benefitting an entire class in an <u>individual</u> suit," although this relief is far from guaranteed.  <u>Sharpe v. Cureton</u>, 319 F.3d 259, 273 (6th Cir. 2003).  Moreover, OUTMemphis need not formally represent a class in order to raise this challenge.  <u>See Caspar v. Snyder</u>, 77 F. Supp. 3d 616, 642 (E.D. Mich. 2015) ("Courts have regularly held that a plaintiff may seek an injunction applicable to all similarly-situated

---

[21] After the Court accepted the Parties' Joint Notice of Partial Settlement and Stipulation of Partial Dismissal (ECF No. 125), Skrmetti's other arguments are **DENIED AS MOOT**.

individuals harmed by the same unconstitutional practice, without the necessity of seeking class-action treatment." (citations omitted)).

Because OUTMemphis's remaining ADA claim challenges the Aggravated Prostitution statute itself, an injunction prohibiting Skrmetti's enforcement of the Aggravated Prostitution statute going forward would be an appropriate remedy.[22]

## **CONCLUSION**

For these reasons, the Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff OUTMemphis's claim against Defendant Attorney General Skrmetti for prospective injunctive relief under Title II of the ADA remains.

**IT IS SO ORDERED,** this 31st day of March, 2026.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE

---

[22] The Supreme Court's recent decision in Trump v. CASA, Inc., 606 U.S. 831 (2025), issued after briefing for the Motion to Dismiss had concluded, does not alter the Court's analysis. In CASA, the Supreme Court limited the use of universal injunctions, not statewide injunctions, the type of relief sought here.  See Welty v. Dunaway, No. 24-CV-768, 2025 WL 2015454, at *15 (M.D. Tenn. July 18, 2025) (quoting CASA, 606 U.S. at 839).  Additionally, the CASA Court "explicitly recognized the validity of equitable relief under Ex parte Young . . . based on 'a long line of cases authorizing suits against state officials in certain circumstances.'"  (Id. (quoting CASA, 606 U.S. at 846 n.9).)